**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

WILLIAM D. PAYNE; NICOLE PAYNE;
LESLIE B. BENSON; KEITH BASTION;
JACQUELIN FERNANDEZ-QUEZADA;
CASON N. HEARD; GREGORY
OLDHAM and SHERRY K. WELCH, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

vs.                                                                                    No. CIV 14-1044 JB/KBM

TRI-STATE CAREFLIGHT, LLC, and
BLAKE A. STAMPER, individually,

        Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on: (i) Defendants Tri-State Careflight, LLC,

and Blake A. Stamper's Motion for Summary Judgment and Memorandum Brief in Support,

filed on March 1, 2016 (Doc. 110)("Motion for Summary Judgment"); and (ii) the Plaintiffs'

Motion to Exclude Consideration of New Law or New Argument Raised in Defendants' Reply to

the Motion for Summary Judgment or, in the Alternative, to Permit Plaintiff to File a Surreply,

filed on May 2, 2016 (Doc. 123)("Motion to Exclude").  The Court held a hearing on August 17,

2016.  The primary issues are: (i) whether Congress, by the Railway Labor Act, 45 U.S.C. §§

151-65, has preempted the claims of the Plaintiffs William D. Payne, Nicole Payne, Leslie

Benson, Keith Bastion, Jacquelin Fernandez-Quezada, Cason N. Heard, Gregory Oldham, and

Sherry K. Welch for unpaid compensation, brought in accordance with the New Mexico

Minimum Wage Act, NMSA §§ 50-4-1 to -33 ("NMMWA"), and New Mexico's common law

of unjust enrichment; and (ii) whether the Defendants Tri-State CareFlight, LLC, and Blake A. Stamper, raised a new issue of law in their reply in support of their Motion for Summary Judgment.  Because congress has not preempted the field of labor regulation for railroad and airline workers, and the present dispute does not involve the interpretation of a collective bargaining agreement, the Court concludes that the Defendants are not entitled to judgment as a matter of law on the basis of Railway Labor Act preemption.  The Court also concludes that the Defendants raised a new issue of law in their reply in support of their Motion for Summary Judgment, to which the Plaintiffs may reply with a surreply should they deem it appropriate.

**FACTUAL BACKGROUND**

Tri-State Careflight operates an air ambulance service in New Mexico, Arizona, Colorado, and Nevada.  See Motion for Summary Judgment ¶ 1, at 2.[1]  Tri-State CareFlight operates a fleet of aircraft that it staffs with "pilots and trained medical personnel, including emergency medical technician paramedics ('Flight Paramedics') and registered nurses ('Flight Nurses')."  Motion for Summary Judgment ¶ 2, at 2.  The Federal Aviation Administration has certified Tri-State CareFlight "to operate as an air carrier in accordance with the Federal Aviation Act."  Motion for Summary Judgment ¶ 3, at 2.

Tri-State CareFlight employed Plaintiff William D. Payne as a flight paramedic, Plaintiff

---

[1]The Plaintiffs, in the Plaintiffs' Response to Defendants' Motion for Summary Judgment, filed March 16, 2016 (Doc. 114)("Summary Judgment Response"), state that "[w]ithout waiving its right to challenge the issue at some other point, for purposes of the instant motion Plaintiffs concede that Tri-State qualifies as a 'common carrier by air engaged in interstate or foreign commerce' under 45 U.S.C. § 181."  Summary Judgment Response at 2 n. 2.  The Plaintiffs do not otherwise dispute the "Undisputed Material Facts" that the Defendants set forth in the Motion for Summary Judgment.  Summary Judgment Response at 2.  Thus, the Defendants' facts are deemed undisputed, see D.N.M.L.R. Civ. 56.1(b), and the Court will use them for its undisputed facts.

Nicole Payne as a flight nurse, and Plaintiff Leslie B. Benson as a pilot.  See First Amended Representative Action Complaint for Damages for Violation of New Mexico Minimum Wage Act at 1-5, filed October 28, 2015 (Doc. 68)("Amended Complaint").  Tri-State CareFlight currently employs, or employed, Plaintiff Keith Bastian as a flight paramedic and Plaintiff Sherry Welch as a flight nurse.  See Motion for Summary Judgment ¶¶ 4, 8, at 2.  Tri-State CareFlight also employs, or employed -- as pilots -- Plaintiffs Cason N. Heard and Gregory Oldham.  See Motion for Summary Judgment ¶¶ 6-7, at 2.  Last, Tri-State CareFlight employs, or employed, Plaintiff Fernandez-Quezada as a flight nurse.  See Motion for Summary Judgment ¶ 5, at 2.  Regarding Tri-State CareFlight and Stamper, each are, or were, the employers of all of the Plaintiffs within the definition of the NMMWA.  See Motion for Summary Judgment ¶ 9, at 2.

## PROCEDURAL BACKGROUND

This case is a wage-and-hour dispute.  See Representative Action Complaint for Damages for Violation of New Mexico Minimum Wage Act and Unjust Enrichment ¶¶ 9-25, at 2-4, filed November 17, 2014 (Doc. 1-1)("First Complaint").  The Plaintiffs seek recovery for themselves -- and all similarly situated Tri-State CareFlight employees employed in New Mexico at any time since June 19, 2009 -- of: (i) unpaid overtime compensation under the NMMWA; and (ii) other unpaid compensation on a theory of unjust enrichment.  See First Complaint ¶¶ 26-38, at 3-5.

The original Plaintiffs, W. Payne and N. Payne, filed their case in state court on September 11, 2014.  See Payne v. Tri-State Careflight, LLC, D-101-CV-2014-02048 (1st Jud. Dist. Ct., Cnty. of Santa Fe, State of N.M.)(Montes, J.).  Tri-State CareFlight and Stamper removed the case to federal court on November 17, 2014.  See Notice of Removal, filed

November 17, 2014 (Doc. 1)("Notice of Removal").  The Defendants invoked diversity jurisdiction, representing that there is complete diversity of citizenship between the Plaintiffs and the Defendants.  See Notice of Removal ¶ 4, at 2.

On August 24, 2015, W. Payne and N. Payne moved to amend their Complaint, filed  to: (i) eliminate a claim asserted for compensation for certain travel time; and (ii) to add an additional Plaintiff -- Benson.  See Plaintiffs' Amended Opposed Motion for Leave to File First Amended Complaint, filed August 24, 2015 (Doc. 44)("First Motion to Amend").  On September 4, 2015, W. Payne and N. Payne filed Plaintiffs' Motion for and Brief in Support of Class Certification, filed September 4, 2015 (Doc. 48)("First Motion for Class Cert.").[2]  The Court held a hearing on the First Motion to Amend on October 28, 2015.  See Clerk's Minutes, filed October 28, 2015 (Doc. 67)("Oct. 28th Clerk's Minutes").  At the October 28, 2015, hearing, the Court granted the First Motion to Amend.  See Oct. 28th Clerk's Minutes at 1.  The same day as the hearing, W. Payne and N. Payne filed their Amended Complaint, in which W. Payne, N. Payne, and Benson asserted one count against the Defendants for their violation of the NMMWA.[3]  See Amended Complaint at 1-5.

On November 19, 2015, the Paynes resolved their claims via settlement with the

---

[2] W. Payne and N. Payne subsequently withdrew their First Motion for Class Cert on January 26, 2016.  See Plaintiffs' Notice of Withdrawal of Motion for Class Certification, filed January 26, 2016 (Doc. 96).

[3] The Amended Complaint did not reassert a count against the Defendants for unjust enrichment.  See Amended Complaint at 1-5.  Asserting honest mistake, the Plaintiffs sought leave to file, and filed, their Second Amended Representative and Class Action Complaint for Damages for Violation of NMMWA and New Mexico Common Law, filed January 28, 2016 (Doc. 100)("Second Amended Complaint"), which also added as Plaintiffs the intervenors Bastian, Heard, Oldham, Welch, and Fernandez-Quezada.  See Intervenor MOO at 16-18; Order, filed January 28, 2016 (Doc. 99)(granting leave to file the Second Amended Complaint in this fashion).

Defendants, in which the Defendants agreed to provide them with full relief under the NMMWA. See Memorandum Opinion and Order at 47, filed August 17, 2016 (Doc. 142)("Intervenor MOO"). At some point thereafter, on or around November 19, 2015, Benson signed a global release in an administrative proceeding before the Occupational Safety and Health Administration ("OSHA"). See Intervenor MOO at 42. Accordingly, the Court allowed Bastian, Heard, Oldham, Welch, and Fernandez-Quezada to intervene as Plaintiffs in this case pursuant to rule 24(b) of the Federal Rules of Civil Procedure. Intervenor MOO at 1-2. The intervenor Plaintiffs have thus taken the place of W. Payne, N. Payne, and Benson, and make their allegations against the Defendants in the Second Amended Complaint. See Second Amended Complaint at 1.

The Defendants now move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, to enter summary judgment in their favor and dismiss all claims in the Second Amended Complaint in their entirety and with prejudice. See Motion for Summary Judgment at 1. The Defendants state that federal law preempts the Plaintiffs' state law claim for the alleged violation of the NMMWA and the state law claim for unjust enrichment. See Motion for Summary Judgment at 1. The Plaintiffs oppose the Defendants Motion for Summary Judgment and also filed their Motion to Exclude as a result of the Defendants Motion for Summary Judgment.

### 1.    The Motion for Summary Judgment.

The Defendants filed their Motion for Summary Judgment on March 1, 2016. As grounds for their Motion for Summary Judgment, the Defendants state that the "Plaintiff's state law claims for unjust enrichment and alleged violations of the New Mexico Minimum Wage Act are preempted by federal law. In particular, as a company providing air ambulance services, Tri-

State is governed by the federal Railway Labor Act, 45 U.S.C. §§ 151-188," a federal law that, according to the Defendants, has completely occupied the field of the relevant regulations. Motion for Summary Judgment at 1.

The Motion for Summary Judgment then explains that the National Mediation Board, "a United States government agency that coordinates labor relations for United States airlines and railroads," operating pursuant to Title II of the federal Railway Labor Act, has explicitly held "not only that air ambulance services in general are covered by the RLA but that Tri-State in particular -- that is, *the Defendant in this case* -- is a common air carrier covered by the RLA." Motion for Summary Judgment at 3 (citing TriState CareFlight LLC, 41 NMB 55 (2014); Rocky Mountain Holdings, LLC d/b/a Eagle Airmed of Arizona, 26 NMB 132 (1999); Slavens v. Scenic Aviation, Inc., 221 F.3d 1353 (10th Cir. 2000))(emphases in original).  Defendants then argue that, because Tri-State CareFlight is a common carrier covered under the Railway Labor Act, the Railway Labor Act's comprehensive framework for the resolution of labor disputes in the railway and airline industries, including the "prompt and orderly settlement of *all disputes* concerning *rates of pay*, rules, or working conditions," means that "states are barred from attempting to legislate in any aspect of that area of law."  Motion for Summary Judgment at 3 (citations omitted)(emphasis in original).  The Defendants concede, though, that the "United States Court of Appeals for the Tenth Circuit has never addressed the specific question of whether the RLA preempts state wage and hour laws with respect to their applicability to covered airlines and railroads."  Motion for Summary Judgment at 4 (footnote omitted). Accordingly, the Motion for Summary Judgment explains that "[t]wo other circuit courts of appeals, however, have addressed that issue and concluded that Congress' 'expansive regulation' of carriers in the RLA manifested the 'intent that states be precluded from enacting and

enforcing overtime provisions' that purport to apply to such carriers." Motion for Summary Judgment at 4 (quoting Wisconsin Central, Ltd. v. Shannon, 539 F.3d 751, 764 (7th Cir. 2008), and referencing R.J. Corman R.R. Co. v. Palmore, 999 F.2d 149 (6th Cir. 1993)). The Motion for Summary Judgment, in a footnote, provides that, although the Tenth Circuit has not spoken on the relevant issue in this case, it has held that "air ambulance companies are governed by the RLA and therefore exempt from the federal Fair Labor Standards Act[, 29 U.S.C. §§ 201-19] ("FLSA")." Motion for Summary Judgment at 4 n. 1 (referencing Slavens v. Scenic Aviation, Inc., 221 F.3d 1353 (10th Cir. 2000); Osborne v. Enchantment Aviation, Inc., 112 Fed. Appx. 673, 674-75 (10th Cir. 2004)).

The Motion for Summary Judgment thereby requests that the Court apply the field preemption doctrine that both the United States Court of Appeals for the Sixth Circuit and the United States Court of Appeals for the Seventh Circuit have applied in the context of the Railway Labor Act. See Motion for Summary Judgment at 4-6. The Defendants argue: "By expressly applying the RLA to air carriers like Tri-State. Congress has manifested its clear intent to preempt any state laws governing wages of the employees of such businesses." Motion for Summary Judgment at 6. Accordingly, the Motion for Summary Judgment asserts that the NMMWA cannot be held to apply to the Defendants, because "the RLA completely preempts the field of air carrier wage regulation." Motion for Summary Judgment at 7. Additionally, enforcement of the claim for unjust enrichment "intrudes on the field that Congress preempted and is void." Motion for Summary Judgment at 7.

### 2. **Summary Judgment Response.**

The Plaintiffs oppose the Motion for Summary Judgment with their Summary Judgment Response. Essentially, the Plaintiffs argue that the Defendants' citation to case law from "sister

circuits," regarding field preemption and the Railway Labor Act, is not persuasive. Summary Judgment Response at 1-2. The Summary Judgment Response does not otherwise "dispute Defendants' presentation of their Undisputed Material Facts," conceding, for the purposes of the Motion for Summary Judgment, that Tri-State CareFlight constitutes a "common carrier" under the Railway Labor Act. Summary Judgment Response at 2 (footnote omitted).

The Summary Judgment Response begins by explaining that "[w]hether federal law preempts a state law establishing a cause of action is a question of congressional intent." Summary Judgment Response at 3. The Summary Judgment Response thus argues that the "Congressional purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." Summary Judgment Response at 3. Accordingly, the Defendants argue that under the Railway Labor Act, there is a mandatory arbitration mechanism for "the prompt and orderly settlement of two classes of disputes" -- those classes being major disputes, which relate to the formation of collective bargaining agreements, and minor disputes, which relate to grievances arising out of the interpretation or application of collective bargaining agreements in particular factual situations. Summary Judgment Response at 3. The Defendants argue that "[m]ajor disputes seek to create contractual rights, minor disputes to enforce them," which leads the Summary Judgment Response to provide that "a determination that a party's complaints constitute a minor dispute would preempt her state law actions under the RLA." Summary Judgment Response at 4.

The Summary Judgment Response then argues that "[t]he relevant inquiry into RLA preemption is whether the state law claim is dependent upon the interpretation of a collective bargaining agreement." Summary Judgment Response at 4. Accordingly, the Summary Judgment Response asserts that the "Plaintiffs' state law wage claims in this lawsuit are not

preempted by the RLA because they do not depend upon the application and/or interpretation of a CBA, there being no CBA upon which to depend." Summary Judgment Response at 5.

Next, the Summary Judgment Response explains that the Defendants' argument is, essentially, that "the RLA covers both railroads and air carriers; Congress has regulated both over the years; two Circuit Courts have found preemption of state wage and hour laws involving railroads, *ergo* the RLA preempts state wage and hours laws involving air carriers." Summary Judgment Response at 7. The Summary Judgment Response then refutes the applicability of the case that the Sixth Circuit decided, because that case involved "nine (9) predicate statutes Congress enacted over a one hundred year period that were specifically directed to the regulation of the railroad industry and that, in the aggregate, demonstrated field preemption." Summary Judgment Response at 8. The statute that was primarily at issue in the Sixth Circuit opinion, the Summary Judgment Response argues, was "the Adamson Act of 1916," which governed the specific wage issue in that case involving an "eight (8) hour work day." Summary Judgment Response at 8. And, regarding the opinion from the Seventh Circuit, the Summary Judgment Response asserts that, while the Seventh Circuit addressed Railway Labor Act preemption, the opinion merely "reaffirmed the principle that RLA preemption depends upon interpretation of the Parties' CBA," and instead rested its holding on the "Adamson Act," and on "additional Congressional legislation" that supports "field preemption of Illinois's overtime laws as to railroads." Summary Judgment Response at 9. The Summary Judgment Response thus argues that, in this case involving air carriers, the opinions from the Sixth and Seventh Circuits -- which based their conclusions of field preemption on the application of a number of Congress' laws regulating railroads -- are unpersuasive. See Summary Judgment Response at 10.

3.      **The Summary Judgment Reply.**

The Defendants replied to the Summary Judgment Response with Defendants Tri-State CareFlight, LLC, and Blake A. Stamper's Reply Brief in Support of Motion for Summary Judgment, filed April 4, 2016 (Doc. 117)("Summary Judgment Reply").   In the Summary Judgment Reply, the Defendants frame the Plaintiffs' argument in their Summary Judgment Response as being that

> the field preemption that the [Sixth and Seventh Circuits] applied in those cases does not apply in this case because (1) the Railway Labor Act . . . has no preemptive effect on state overtime laws in cases where the plaintiffs do not have collective bargaining agreements . . . and (2) field preemption of state wage and hour laws applies only to railways and not air carriers.

Summary Judgment Reply at 1.  According to the Summary Judgment Reply, though, "[t]he first argument misses the point, and the second is simply incorrect."  Summary Judgment Reply at 1.

In support, the Summary Judgment Reply argues that: "Even in the absence of a CBA requiring interpretation, the RLA is relevant to field preemption of overtime laws because, notwithstanding the fact that the statute itself does not contain substantive wage or hour provisions, it provides the exclusive mechanism for determining overtime pay: collective bargaining."  Summary Judgment Reply at 2 (emphasis omitted).  The Summary Judgment Reply thereby argues that although the Sixth and Seventh Circuits may have "determined that . . . direct, conflict preemption under the RLA is not a concern in a particular case . . . the RLA is crucial to the preemption analysis because the statute provides the sole avenue left available by Congress for overtime wage protection."  Summary Judgment Reply at 2 (internal quotation marks and citation omitted).

Regarding the Summary Judgment Response's argument that the preemption which the Sixth Circuit and Seventh Circuit applied in this context was restricted to railroad regulation, the

Summary Judgment Reply argues that "the RLA unquestionably applies to both air carriers and railroads." Summary Judgment Reply at 3. Further, the Summary Judgment Reply notes that air carriers, as compared to railroads, are similarly regulated in nearly every aspect of their operations. See Summary Judgment Reply at 4. In support, the Summary Judgment Reply references the regulations under the Federal Aviation Act which "constitute pervasive and comprehensive federal regulation over the airline industry." Summary Judgment Reply at 4. The Defendants argue that, to the extent that those Sixth and Seventh Circuit cases "are grounded upon substantive regulatory laws rather than, or in addition to, the RLA, the fact that railroad laws apply to railroads and air carrier laws apply to air carriers is immaterial. Both industries are subject to comprehensive federal regulation." Summary Judgment Reply at 5. The Summary Judgment Reply thus reasserts its contention that federal law preempts the Plaintiffs' state law claims. Summary Judgment Reply at 5.

### 4. The Motion to Exclude.

The Plaintiffs filed their Motion to Exclude upon receiving the Defendants' Summary Judgment Reply. See Motion to Exclude at 1. In the Motion to Exclude, the Plaintiffs argue that the Summary Judgment Reply raises a new issue of law in the form of a preemption argument under the Federal Aviation Act. See Motion to Exclude at 1. Accordingly, the Motion to Exclude repeats the arguments that both the Motion for Summary Judgment and the Summary Judgment Response present, noting that the Defendants referred to the Federal Aviation Act only in their Motion for Summary Judgment, and only on one occasion, that coming in an unrelated context with respect to preemption. See Motion to Exclude at 1-6. Because the Summary Judgment Reply states, "for the first time, that those Congressional enactments purportedly preempt Plaintiffs' wage claims here, just like the Adamson Act preempt[s] . . . wage claims for

rail carriers," the Motion to Exclude argues that the Defendants have included new law -- specifically, the Federal Aviation Act -- in their argument in favor of field preemption.  Motion to Exclude at 6.  Accordingly, the Motion to Exclude requests that the Court either not consider the new law that the Summary Judgment Reply raises, or else permit the Plaintiffs to file a Surreply.  See Motion to Exclude at 8.

> 5.      **Response to the Motion to Exclude.**

The Defendants responded to the Motion to Exclude with the Defendants' Response in Opposition to Plaintiffs' Motion to Exclude Consideration of New Law or New Argument Raised in Defendants' Reply to the Motion for Summary Judgment or, in the Alternative, to Permit Plaintiffs to File a Surreply, filed May 18, 2016 (Doc. 128)("Response to Motion to Exclude").  The Response to Motion to Exclude provides that "the issue before the Court is whether the field preemption doctrine set forth in those cases bars the Plaintiffs' claims in this case" and that the Summary Judgment Reply was arguing:

> Even if Plaintiffs were correct that the field preemption applied [by the Sixth Circuit and Seventh Circuit] is grounded on the general comprehensive federal regulation of railway companies rather than on the RLA, field preemption still would apply in the instant case because federal law also comprehensively regulates airline companies, a point made in the original motion for summary judgment.

Response to Motion to Exclude at 3.  Thus, the Response to Motion to Exclude argues that the Summary Judgment Reply's extrapolation on the comparable nature of the regulations governing both the railway and airline industries does not introduce new law.  See Response to Motion to Exclude at 4-5.

> 6.      **The Motion to Exclude Reply.**

The Plaintiffs replied with the Plaintiffs' Reply to Motion to Exclude Consideration of New Law or New Argument Raised in Defendants' Reply to the Motion for Summary Judgment

or, in the Alternative, Permit Plaintiffs to File a Surreply, filed May 18, 2016 (Doc. 128)("Motion to Exclude Reply").   The Motion to Exclude Reply maintains the Motion to Exclude's argument that the Summary Judgment Reply raises new issues of law and expresses surprise at the Response to Motion to Exclude's argument that the Defendants had not raised new law.   <u>See</u> Motion to Exclude Reply at 1-2.

       7.    <u>**The August 17, 2016, Hearing**</u>.

       The Court held a hearing on August 17, 2016.   <u>See</u> Transcript of Hearing (taken August 17, 2016)("Tr.").   The Court first took up the Motion to Exclude and told the Plaintiffs that, "if after today, you feel like you still need to file a surreply, probably I'd be inclined to grant it.   But maybe after you say everything today, you may not feel it's necessary."   Tr. at 4:1-4 (Court). The parties agreed that this arrangement was fair, and the Court ruled that "I'll deny the request to not consider any arguments.   I'm going to consider everything. . . .   But I will give the Plaintiffs leave to file surreply.   So after today, if you think one is appropriate, you can file one." Tr. at 4:9-5:8 (Stanford, Vigil, Court).

       The Court then turned to the Motion for Summary Judgment.   <u>See</u> Tr. at 5:11 (Court). The Court inquired why the Defendants had waited two years to file the Motion for Summary Judgment.   <u>See</u> Tr. at 5:14-19 (Court).   The Defendants responded that the reason was the initial goal was to settle with the original Plaintiffs, which they did, but now the intervening Plaintiffs present a different scenario.   <u>See</u> Tr. at 5:19-6:14 (Vigil).   The Court then posited to the Defendants that the "cases you have cited from the two circuits, particularly the one from the Sixth Circuit, [are] pretty old," and "the development of field preemption has not been going in your direction."   Tr. at 6:15-24 (Court).   Additionally, the Court inquired whether the Defendants were relying solely on field preemption, as opposed to direct preemption, to which the

Defendants answered that the Court was correct.  See Tr. at 6:1-10 (Court, Vigil).  The Defendants explained that their argument is that "what the Courts in both Corman and the Shannon case were talking about was the idea that the federal government has occupied the field with respect to regulation of airlines.  Regulation of airlines is heavy."  Tr. at 8:18-24 (Vigil).

The Court asked the Defendants to tell the Court: "Okay, Judge, here's the preemption, and by the way, here's where you're going to have to go.  Here is going to be the law you're going to have to apply."  Tr. at 11:2-8 (Court).  In response, the Defendants posited that the Railway Labor Act would be that law.  See Tr. at 11:9-14 (Vigil).  The Court then pressed the Defendants to point to the federal law that says: "Here's what governs -- I mean, the claims in this case are failing to pay employees one-and-a-half times their regular rate of pay for all hours over 40 hours.  Is there anything . . . I'm not an expert in the RLA.  But is there a provision in there that governs that?"  Tr. at 11:15-21 (Court).  The Defendants replied that there was no such provision "on rates of pay."  Tr. at 11:22-23 (Vigil).  The Defendants, nonetheless, then argued that

> the basis for which the Second [sic] and Sixth Circuit said, we're going to apply field preemption . . . was [the] RLA . . . and the Adamson Act regulated hours of work.  It did not regulate rates of pay.  But what these two circuit courts said was, it's close enough you impliedly regulate rates of pay.

Tr. at 12:16-22 (Vigil).  The Court then provided that "the Supreme Court over the last few years has incredibly narrowed field preemption."  Tr. 13:5-10 (Court).

The Plaintiffs next took up argument, asserting first that, in the absence of a collective bargaining agreement, the Railway Labor Act cannot apply in the manner which the Defendants propose.  See Tr. at 15:8-11 (Stanford).  Next, by reference to the "FLSA . . . savings provision," the Plaintiffs further argued that "states are entitled to provide greater protections in situations where they choose to provide greater benefits for the safety, health, and welfare of their

citizens." Tr. at 16:12-19 (Stanford).  Yet, the Plaintiffs argued, with respect to the "FLSA . . . I don't know if it's a red herring -- it's just not an avenue that's necessarily at issue in this particular case, for the fact that neither of those courts dealt with it in finding preemption . . . ." Tr. at 17:6-10 (Stanford).  Accordingly, the Plaintiffs reasserted their argument that the Railway Labor Act does not preempt state wage-and-labor law, and "there hasn't been a single case in which a court has found that the Federal Aviation Act and the various laws, the Air Commerce Act of 1926, and the like, have preempted state wage and hour law claims."  Tr. at 17:22-18:1 (Stanford).  The Plaintiffs then conceded that Congress has, generally, "entered into the field of aviation," but that the field at issue here "is the field of wages, the field of overtime issues."  Tr. at 18:8-18 (Stanford).  And, the Plaintiffs provided, "in juxtaposing how much congress has spoken on . . . noise, price, and the like, the fact that it said nothing about wages, suggests that, in fact, congress hasn't gotten into the field of wages for airline carriers at all."  Tr. at 20:5-10 (Stanford).  Essentially, then, the Plaintiffs argue that Congress' entry into the field of aviation regulation is, with respect to the notion of preemption, generally related to the concept of aviation safety.  See Tr. at 24:22-25:19 (Stanford).

After a short reply, in which the Defendants maintained their argument that the Railway Labor Act preempts state wage-and-labor laws, the Court provided that "you can tell I'm a narrower construction person of field preemption."  Tr. at 28:17-18 (Court).  The Court then told the parties it was inclined not to grant the Motion for Summary Judgment.  See Tr. at 29:3-6 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the **moving** party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting) (emphasis in original).[4]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

---

[4]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the

fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable
> to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed.
> Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has
> carried its burden under Rule 56(c), its opponent must do more than simply show
> that there is some metaphysical doubt as to the material facts . . . .  Where the
> record taken as a whole could not lead a rational trier of fact to find for the
> nonmoving party, there is no 'genuine issue for trial.'"   Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote
> omitted).  "[T]he mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material fact."
> Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing
> parties tell two different stories, one of which is blatantly contradicted by the
> record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was
> driving in such fashion as to endanger human life.  Respondent's version of
> events is so utterly discredited by the record that no reasonable jury could have
> believed him.  The Court of Appeals should not have relied on such visible
> fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the
> litigation, a plaintiff's version of the facts must find support in the record: more
> specifically, "[a]s with any motion for summary judgment, when opposing parties
> tell two different stories, one of which is blatantly contradicted by the record, so
> that no reasonable jury could believe it, a court should not adopt that version of
> the facts."   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir.
> 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel.
> Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[5]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd by 499 Fed. Appx. 771.

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

---

[5]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, and Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Amended Order.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.
Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).
In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,
United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal
question of qualified immunity and "determine whether plaintiff's factual allegations are
sufficiently grounded in the record such that they may permissibly comprise the universe of facts
that will serve as the foundation for answering the legal question before the court," before
inquiring into whether there are genuine issues of material fact for resolution by the jury.  584
F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.
1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are
irrelevant to the qualified immunity analysis because that analysis assumes the validity of the
plaintiffs' facts").

## LAW REGARDING PREEMPTION

Article VI, clause 2, of the Constitution provides that the laws of the United States "shall
be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the
Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Consistent with the Supremacy Clause,
the Supreme Court has "long recognized that state laws that conflict with federal law are
'without effect.'"  Altria Grp., Inc. v. Good, 555 U.S. 70, 75 (2008)(quoting Maryland v.
Louisiana, 451 U.S. 725, 746 (1981)).  The Supreme Court has summarized the situations in
which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether
> Congress' command is explicitly stated in the statute's language or implicitly
> contained in its structure and purpose.  Absent explicit pre-emptive language, we
> have recognized at least two types of implied pre-emption:  field pre-emption,
> where the scheme of federal regulation is so pervasive as to make reasonable the
> inference that Congress left no room for the States to supplement it, and conflict

pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992)(citations omitted).

Preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose."  Altria Grp., Inc. v. Good, 555 U.S. at 77.  When the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."   Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under rule 12(b)(1).  See Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007)(applying rule 12(b)(1) when reviewing motion to dismiss asserting preemption defense).

Addressing express preemption requires a court to determine the scope of the preemption. That task entails scrutinizing the preempting words in light of two presumptions.  First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted).

Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case."

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted).

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486 (citations omitted)(internal quotation marks omitted).

In Bruesewitz v. Wyeth, LLC, 562 U.S. 223 (2011), the Supreme Court concluded that the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa-11(c)(1), 300aa-13(a)(1)(A), preempted all design-defect claims that the plaintiffs seeking compensation brought against vaccine manufacturers for injury or death that certain vaccine side effects caused.   See Bruesewitz v. Wyeth, LLC, 562 U.S. at 230.  The Supreme Court noted that Congress passed this act to "stabilize the vaccine market and facilitate compensation."   Bruesewitz v. Wyeth, LLC, 562 U.S. at 228.  The Supreme Court pointed out that this federal statutory scheme provided for "[f]ast, informal adjudication," allowing "[c]laimants who show that a listed injury first manifested itself at the appropriate time are prima facie entitled to compensation."   Bruesewitz v. Wyeth, LLC, 562 U.S. at 228.  Additionally,

> [a] claimant may also recover for unlisted side effects, and for listed side effects that occur at times other than those specified in the Table, but for those the claimant must prove causation.  Unlike in tort suits, claimants under the Act are not required to show that the administered vaccine was defectively manufactured, labeled, or designed.

562 U.S. at 228-229 (footnote omitted).  The Supreme Court also noted that the statutory scheme had relatively favorable remedy provisions.  See 562 U.S. at 229.  "The quid pro quo for this, designed to stabilize the vaccine market, was the provision of significant tort-liability protections for vaccine manufacturers," such as limiting the availability of punitive damages and expressly eliminating liability for a vaccine's unavoidable, adverse side effects. 562 U.S. at 229.  The statutory text at issue in Bruesewitz v. Wyeth, LLC was as follows:

- 23 -

> No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the injury or death resulted from side effects that were unavoidable even though the vaccine was properly prepared and was accompanied by proper directions and warnings.

562 U.S. at 230 (quoting 42 U.S.C. § 300aa-22(b)(1)). The Supreme Court emphasized the use of the word "unavoidable" in reaching its conclusion that the statute preempted design defect claims resulting from unavoidable side effects. Bruesewitz v. Wyeth, LLC, 562 U.S. at 231-232. The Supreme Court also found it persuasive that the statutory text directly mentioned other aspects of product liability law. See Bruesewitz v. Wyeth, LLC, 562 U.S. at 232-233.

Implied conflict preemption is found when it is impossible for a private party to comply with both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941). "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

The Supreme Court, in the past, found that implied preemption may take the form of "obstacle" preemption. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). The Supreme Court instructed that, in obstacle preemption

cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it."  P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988).  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute."  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).  In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, by a five-to-four vote, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag.  See 529 U.S. at 874.  The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective.  And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict.  Hence, the tort action is pre-empted."  529 U.S. at 886.  Justice Stevens, in his dissenting opinion, expressed a desire to eliminate obstacle preemption.  He argued that the presumption against preemption

> serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Geier v. Am. Honda Motor Co., 529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has now begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations.  In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2003), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard.  In 2008, in Altria Group. Inc. v. Good, the Supreme Court rejected the plaintiffs' obstacle-preemption claim that the Federal Cigarette Labeling and

Advertising Act, 15 U.S.C. §§ 1331-41, preempted a similar state act, see Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008), because it presented an obstacle to the Federal Trade Commission's longstanding policy of encouraging consumers to rely on representations of tar and nicotine content based on an approved methodology.  See Altria Group. Inc. v. Good, 555 U.S. 70, 90 (2008).  In 2009, in Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co., rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption.  See Wyeth v. Levine, 555 U.S. at 581.  The Supreme Court held that

> it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)].

Wyeth v. Levine, 555 U.S. at 581.  In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, finding that the decision in that case was based on the "complex and extensive" history of the substantive regulation at issue.  555 U.S. at 566.  The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."  Wyeth v. Levine, 555 U.S. at 609.  Justice Stevens quoted Justice O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them."  Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v.

Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption is Justice

Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

555 U.S. at 583 (Thomas, J., concurring in the judgment).  Justice Thomas stressed his concern:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

Wyeth v. Levine, 555 U.S. at 587.   Justice Thomas emphasized that, when analyzing the

preemptive effect of federal statutes or regulations, "[e]vidence of pre-emptive purpose must be

sought in the text and structure of the provision at issue" to comply with the Constitution.  Wyeth

v. Levine, 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).

Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604

(2011), recently concluded, however, that conflict preemption required the preemption of

inconsistent state laws on generic drug labeling that conflicted with the respective federal law,

because it was impossible to comply with both federal and state law.  See 564 U.S. at 617-618.

The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the

respective statutory schemes in each case was distinguishable.  See PLIVA, Inc. v. Mensing, 564

- 27 -

U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption.  See Wyeth v. Levine, 555 U.S. at 565 n.3.  "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005)(internal quotation marks omitted).  If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.  See Wyeth v. Levine, 555 U.S. at 565; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion).

In Arizona v. United States, 132 S. Ct. 2492 (2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption. The Supreme Court struck down provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens."  132 S. Ct. at 2505.  With Justice Kagan taking no part in the consideration or decision of the case, writing for a five-to-three majority, which included Chief Justice Roberts and Justices Ginsburg, Breyer, and Sotomayor, Justice Kennedy wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment."  132 S. Ct. at 2505.  The Supreme Court ruled that congressional intent is clear; Congress considered and rejected penalizing aliens who sought

- 28 -

unauthorized employment.  See 132 S. Ct. at 2504.  Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress had clearly and intentionally omitted.  See 132 S. Ct. at 2505.

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption").  Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012).  As the defendant in Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the United States invoked only conflict preemption to dismiss Colorado's claims against it; the Tenth Circuit therefore did not address field preemption in this area.  See 693 F.3d at 1222.  "To avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same.  A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal."  Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations, citation omitted)).

In Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the state of Colorado created a schedule for the United States to follow in the destruction of hazardous waste stored in the state in an attempt to prohibit the storage of hazardous waste within the state.  See 693 F.3d at 1223.  The Tenth Circuit held that the state statute creating this schedule was in conflict with a statute which Congress had passed, mandating a deadline for the destruction of the materials.  See 693 F.3d at 1224.  The Tenth

Circuit reasoned that allowing Colorado to set a deadline for the destruction of the materials would impede the flexibility Congress had intended in its deadline.  See 693 F.3d at 1224.  The Tenth Circuit found that, because the Colorado deadline would interfere with the method that Congress intended for the disposal of the waste, the state law was in conflict with the federal law and, therefore, that the federal law preempted Colorado's schedule.  See 693 F.3d at 1224.  The Tenth Circuit recently reiterated its stance on preemption in United States v. Supreme Court of New Mexico, 2016 WL 5946021, at *22 n.16, 17 (10th Cir. 2016), while the Supreme Court recently maintained its approach in Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288, 1297 (2016).

## LAW REGARDING FIELD PREEMPTION AND THE RAILWAY LABOR ACT

The source for grievance arbitration in the railroad and airline industries is statutory.  See 45 U.S.C. §§ 151-88.  "The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent . . . wasteful strikes and interruptions of interstate commerce."  Detroit & T.S.L.R. Co. v. United Transp. Union, 396 U.S. 142, 148 (1969).  The Railway Labor Act applies to rail and air carriers alike.  Section 151 of Title 45 of the United States Code applies the Railway Labor Act's terms to all rail carriers, which

> includes any railroad subject to the jurisdiction of the Surface Transportation Board, any express company that would have been subject to subtitle IV of Title 49, as of December 31, 1995, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such 'carrier.'

45 U.S.C. § 151 (footnote omitted).

- 30 -

> All of the provisions of subchapter I of this chapter except section 153 of this title are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce, and every carrier by air transporting mail for or under contract with the United States Government, and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service.

45 U.S.C. § 181.

> The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a.

The Railway Labor Act created local boards of adjustment to settle grievances that arise in the ordinary course of carrying out major agreements, as well as those minor grievances that occur incidentally in the course of a worker's employment. See Ollman v. Special Bd. Of Adjustment No. 1063, 527 F.3d 239, 245 (2d Cir. 2008). The local boards soon became inefficient, causing the number of unadjusted disputes to grow. See Ollman v. Special Bd. Of Adjustment No. 1063, 527 F.3d at 245. Congress thus amended the Railway Labor Act in 1934 to reinvent the grievance and adjustment procedures relating to minor disputes among employees, unions, and carriers. See Elgin, Joliet & Eastern Ry. v. Burley, 325 U.S. 711, 725 (1945). Disputes involving the interpretation or application of existing collective bargaining agreements are classified as "minor disputes," whereas disputes concerning the formation of those collective bargaining agreements are classified as "major disputes." Elgin, Joliet & Eastern Ry. v. Burley, 325 U.S. at 723-24. Major disputes, then, seek to create contractual

rights, while minor disputes seek to enforce the contractual rights a grievant has already secured.

See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 253 (1994).

By the 1934 amendment, Congress considered it essential to keep "minor" disputes within the boards of adjustment and out of the courts.  Trainmen v. Chicago, R. & I. R. Co., 353 U.S. 30, 40 (1957).  Accordingly, minor disputes, "growing 'out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions,'" are subject to compulsory arbitration.  Consol Rail Corp. v. Ry. Labor Executives' Assn., 491 U.S. 299, 303 (2000)(quoting 45 U.S.C. § 152 Sixth).  To further those goals, the amended Railway Labor Act creates the National Railroad Adjustment Board, "which consists of seventeen members selected by the carriers and seventeen by the employee representatives." Ollman v. Special Board of Adjustment No. 1063, 527 F.3d at 245.  "[D]isputes may be referred by petition of the parties or by either party to the appropriate division of the National Railroad Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."  Ollman v. Special Board of Adjustment No. 1063, 527 F.3d at 245 (internal quotation marks and citation omitted).  Despite these procedures, inefficiency still plagued the system, causing Congress to once again amend the Railway Labor Act in 1966.  See Ollman v. Special Board of Adjustment No. 1063, 527 F.3d at 245-46.

Now, a carrier and a representative of the employees of that carrier may agree to the formation of a "special adjustment board," which may resolve all disputes otherwise referable to the National Railroad Adjustment Board.  Ollman v. Special Board of Adjustment No. 1063, 527 F.3d at 246.  Such "special adjustment boards" sit in panels consisting of one person designated by the carrier, one by the employees' representative, and a neutral panelist.  See Ollman v. Special Board of Adjustment No. 1063, 527 F.3d at 246.  See also Brotherhood of Maintenance

of Way Employees Division/IBT v. Norfolk S. Ry. Co., 2012 WL 4461690, at *8 n.12 (N.D. Ill.,

Sept. 25, 2012)(Kendall, J.)("[Railway Labor Act] arbitration Boards are sometimes referred to

as 'Public Law Boards.'   Public Law Boards are equivalent in all respects to the [National

Railroad Arbitration Board] and the term is interchangeable with Special Boards of

Adjustment.").   "[P]arties may be heard either in person, by counsel, or by other representatives,

as they may respectively elect, and the [] divisions of the Adjustment Board shall give due notice

of all hearings to the employee or employees and the carrier or carriers involved in any disputes

submitted to them."  Ollman v. Special Board of Adjustment No. 1063, 527 F.3d at 246 (internal

quotation marks and citation omitted).  A National Board of Mediation may fund the process and

help designate persons to sit on the boards.  See 45 U.S.C. § 143, Second.

> The effectiveness of the Adjustment Board in fulfilling its task depends on
> the finality of its determinations.  Normally finality will work to the benefit of the
> worker: He will receive a final administrative answer to his dispute; and if he
> wins, he will be spared the expense and effort of time-consuming appeals which
> he may be less able to bear than the railroad.

Union Pacific R. Co. v. Sheehan, 439 U.S. 89, 94 (1978).  Congress thus limited judicial review

of Adjustment Board orders to three specific grounds: (i) the Adjustment Board's failure to

comply with the Railway Labor Act's requirements; (ii) the Adjustment Board's failure to

conform, or confine, itself to matters within the scope of its jurisdiction; and (iii) fraud or

corruption.  See 45 U.S.C. § 153(q).  "Only upon one or more of these bases may a court set

aside an order of the Adjustment Board."  Union Pacific R. Co. v. Sheehan, 439 U.S. at 94.  The

Supreme Court has described the judicial review under the Railway Labor Act as "among the

narrowest known to the law."  Union Pacific R. Co. v. Sheehan, 439 U.S. at 91.

Meanwhile, should a major dispute arise, those parties are required to "maintain the

status quo" until they complete a "lengthy process of bargaining and mediation."  Consol. Rail

- 33 -

Corp. v. Ry. Labor Executives' Assn., 491 U.S. at 302.  A district court therefore has jurisdiction -- without a showing of irreparable harm -- to enter an injunction to maintain the status quo during resolution of a major dispute.  See Consol. Rail Corp. v. Ry. Labor Executives' Assn., 491 U.S. at 303.  Should the bargaining and mediation process fail to settle a major dispute, the parties may resort to economic force.  See Consol. Rail Corp. v. Ry. Labor Executives' Assn., 491 U.S. at 303.

Accordingly, the Railway Labor Act provides, with specificity, the framework for dispute resolution amongst covered employees and their employers.  There is, though, more leeway for a reviewing court's exercise of discretion and equity in the case of a major dispute -- meaning, essentially, that "a determination that [a] respondent's complaint[] constitute[s] a minor dispute would pre-empt his state-law actions."  Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253.  Preemption is the result, because a minor dispute exists only where a collective bargaining agreement exists, meaning that the collective bargaining's terms govern the parties' dispute, with those terms, under the Railway Labor Act, operating to preempt any actions brought to enforce rights that a source independent of the collective bargaining agreement provides.  See Broth. of Maintenance of Way Employ. v. Union Pac. R.R. Co., 19 Fed. Appx. 731 (10th Cir. 2000).  The Supreme Court, though, has not held that anything other than a minor dispute will trigger preemption principles under the Railway Labor Act.  See Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253, 260 ("[A] state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA.").  See also Wolfe v. BNSF Ry. Co., 749 F.2d 859, 863 (9th Cir. 2014)("The parties agree that the only way Wolfe's claim is preempted is if the conflict over the collision constitutes a minor dispute.  BNSF bears the burden of proof on its preemption defense.")(internal quotation marks omitted).  Two Circuit

Courts of Appeals, though, have considered the Railway Labor Act as a factor in opinions where the courts declared preempted by federal law certain labor disputes which had given rise to actions at state law.   See Wisconsin Central Ltd. v. Shannon, 539 F. 3d 751 (7th Cir. 2008)("Shannon"); R.J. Corman R.R. Co. v. Palmore, 999 F.2d 149 (6th Cir. 1993)("Corman").

In Corman the Sixth Circuit considered claims that the State of Kentucky brought on behalf of railroad workers against their employers, arguing that the workers were entitled to overtime pay under Kentucky law.  See Corman, 999 F.2d at 151-52.  The Sixth Circuit pointed to the Adamson Act, 45 U.S.C. § 65, which establishes a uniform eight-hour workday for railroad workers, while leaving employees and their employers free to bargain with respect to wages.  See Corman, 999 F.2d at 153.  Accordingly, the Sixth Circuit concluded that the Adamson Act preempted Kentucky's enforcement of the overtime laws at issue.  See Corman, 999 F.2d at 153 ("Congress's aim in enacting the Adamson Act, which was to provide a uniform workday for railroad employees, yet leave the amount of compensation to labor agreements."). Additionally, to support the conclusion that the Adamson Act explicitly preempts all other regulation of overtime and workers' hours, the Sixth Circuit identified numerous other federal statutes -- including the Railway Labor Act -- which suggest that "congressional regulation in the area of worker hours has broad preemptive effect."  Corman, 999 F.2d at 153.

In Shannon the Seventh Circuit considered overtime laws in Illinois as they applied to a claim that railroad workers brought against their employers.  See Shannon, 539 F.3d at 755.  The Seventh Circuit first concluded that the Railway Labor Act explicitly preempts only minor disputes and that, in that case, the record was insufficient to conclude that resolution of the dispute involved interpretation of a preexisting collective bargaining agreement; thus, the Railway Labor Act alone did not preempt the action.  See Shannon, 539 F.3d at 760.  The

Seventh Circuit then concluded, however, that the Adamson Act, and other acts of Congress seeking to regulate railroad workers' hours and wages, suggest field preemption of Illinois' overtime laws as they apply to railroad workers.  See Shannon, 539 F.3d at 764-65.  Thus, in the context of railroad workers' hours and wages law, two Circuit Courts of Appeals have looked at the aggregate regulation of railroad labor and considered Congress to have impliedly preempted the field.

## LAW REGARDING SURREPLIES

Local rule 7.4(b) provides: "The filing of a surreply requires leave of the Court." D.N.M.LR-Civ. 7.4(b).  "A surreply is appropriate and should be allowed where new arguments are raised in a reply brief."  Walker v. THI of N.M. at Hobbs Center, 2011 WL 2728344, at *1 (D.N.M. July 6, 2011)(Browning, J.).  See Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. 201, 204 (D.N.M. 2005)(Browning, J.).  The Court has granted leave to file surreply where a party has made arguments and presented new evidence that did not appear in the party's moving papers.  See Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. at 204.

## ANALYSIS

The Court concludes that federal law does not preempt the Plaintiffs' claims and thus denies the Defendants' Motion for Summary Judgment.  In the Railway Labor Act context, the Supreme Court and the Tenth Circuit have not gone any further than to say that the Railway Labor Act's grievance resolution mechanism, and collective bargaining agreements that give rise to minor disputes, preempt state laws and state law claims.  Further, the Court will deny the Plaintiffs' Motion to Exclude, in part.  First, the Court will not strike the discussion of the Federal Aviation Act in the Defendants' Summary Judgment Reply; but second, the Court will allow the Plaintiffs to file a surreply related to the Federal Aviation Act should they deem it

necessary and appropriate in light of the Court's denial of the Motion for Summary Judgment.

I.     **CONGRESS HAS NOT PREEMPTED THE FIELD OF WAGE AND LABOR REGULATION FOR AIRLINE AND RAILROAD WORKERS, AND THUS THE DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

The Defendants concede, and the Court agrees, that the Railway Labor Act does not expressly preempt the present dispute, because there is no collective bargaining agreement, and, therefore, this case does not involve a minor dispute.  See Tr. at 8:18-24 (Vigil).  The Court's inquiry, then, more closely parallels that of the Sixth and Seventh Circuit in Corman and Shannon, and involves field preemption.  See Shannon, 539 F.3d at 764-65; Corman, 999 F.2d at 153.  In those cases, the Sixth and Seventh Circuits concluded that the intensive regulation of the railroad industry -- in particular, the Adamson Act's work-hour regulation -- suggests implied preemption of nonfederal wage and hour regulations for railroad workers.  See Shannon, 539 F.3d at 764-65; Corman, 999 F.2d at 153.  The Defendants ask the Court to adopt that analysis.  See Tr. at 8:18-24 (Vigil).  The Court, though, concludes that the Sixth and Seventh Circuit's opinions by are incompatible with the law from the Supreme Court and from the Tenth Circuit.

The Supreme Court provided in Hawaiian Airlines, Inc. v. Norris that "a determination that [a] respondent's complaint[] constitute[s] a minor dispute would pre-empt his state-law actions."  Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253.  Additionally, the Supreme Court held that a "state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA."  Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253, 260.  It follows that the Supreme Court does not consider the aggregate federal labor regulation for railroad and airline workers to rise to a level that suggests congressional intent to occupy the field.  See Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253, 260.

Instead, Congress has legislated, by the Railway Labor Act, to inspire the use of

collective bargaining agreements -- and, to give those collective bargaining agreements a serious governance stature, preempted the application of state law to minor disputes flowing from their interpretation.  States are otherwise free to regulate the labor or wages of railroad and airline workers with respect to causes of action that exist independent from a collective bargaining agreement.  See Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253, 260.  Particularly where the Supreme Court has, as it did in Hawaiian Airlines, Inc. v. Norris, not found preemption in the context of the Railway Labor Act, the Court is hard-pressed to conclude that "field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," exists in the field of railroad and airline workers' labor regulation.  Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98 (1992). And, the Defendants concede there is no express or obstacle preemption.  Federal law directs that states should remain free to regulate labor and wages for railroad and aviation workers until Congress expresses a clear intent to block that ability.  Accordingly, the Defendants are not entitled to judgment as a matter of law under rule 56 because their proffer of preemption is inapplicable to the present dispute.

## II.    THE COURT WILL GRANT LEAVE FOR THE PLAINTIFFS TO FILE A SURREPLY, BECAUSE, IN AN ATTEMPT TO DEMONSTRATE FIELD PREEMPTION, THE DEFENDANTS MORE SPECIFICALLY HIGHLIGHTED THE POTENTIAL IMPACT OF THE FEDERAL AVIATION ACT IN THEIR SUMMARY JUDGMENT REPLY.

The Court concludes that the Defendants' Summary Judgment Reply raises new issues of law, to which Plaintiffs did not have the opportunity to brief and respond.  See Tr. at 4:9-5:8 (Court).  Accordingly, a surreply is appropriate in this situation.  The Court allowed, however, the Plaintiffs an opportunity to respond at the hearing and has ruled in favor of the Plaintiffs with respect to the Motion for Summary Judgment.  See Tr. at 4:9-5:8 (Court).  The Court thus grants

leave to file surreply should the Plaintiffs deem it appropriate in light of the Court's guidance at the hearing and in this opinion.

**IT IS ORDERED** that: (i) Defendants Tri-State Careflight, LLC, and Blake A. Stamper's Motion for Summary Judgment and Memorandum Brief in Support, filed on March 1, 2016 (Doc. 110), is denied; and (ii) Plaintiffs' Motion to Exclude Consideration of New Law or New Argument Raised in Defendants' Reply to the Motion for Summary Judgment or, in the Alternative, to Permit Plaintiff to File a Surreply, filed on May 2, 2016 (Doc. 123), is denied in part and granted in part.  The Plaintiffs are free to file the requested surreply, but the Court will consider the Defendants' arguments in the Summary Judgment Reply in full.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Christopher M. Moody
Repps D. Stanford
Alice Kilborn
Moody & Warner, P.C.
Albuquerque, New Mexico

 *Attorneys for the Plaintiffs*

Charles J. Vigil
Melanie B. Stambaugh
Jeffrey L. Lowry
Rodey, Dickason, Sloan,
 Akin & Robb, P.A.
Albuquerque, New Mexico

 *Attorneys for the Defendants*

- 39 -