## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WILLIAM D. PAYNE; NICOLE PAYNE;
LESLIE B. BENSON; KEITH BASTIAN;
JACQUELINE FERNANDEZ-QUEZADA;
CASON N. HEARD; GREGORY
OLDHAM AND SHERRY K. WELCH, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

vs.                                     No. CIV 14-1044 JB\KBM

TRI-STATE CAREFLIGHT, LLC and
BLAKE A. STAMPER,

        Defendants.

<u>Consolidated with:</u>

KRISTY BELL; DEBORAH BEREST;
DANIEL BERGMAN; WILLIAM
DALLAS BUNDRANT, JR; ROCKY H.
BURROWS, II; CHASE CARTER;
BRENDA CASAREZ; KARA
CERVANTES; THOMAS CISLO; DAVID
DANIELS; ADAM DOYLE;
DARREN EEN; TOBY EICHER; LON
ENOS; WALTER FABIAN; HAROLD
JOSEPH FISHER; CHRISTINA
FLEEMAN; LUKE FORSLUND;
SALUSTIANO FRAGOSO; REHANNON
GONZALES; KRISTEN GRADO;
COURTNEY GUERRA; DARRIN
HAMILTON; ALEXANDER HOWELL;
DANIELLE IRVIN; ALLEN JACOBS;
ALEX JONES; DONALD LUKE
KEENAN; DANIEL KUHLER; SIMON
LUCERO; RAPHAEL MAHAIM;
NATHAN MAPLESDEN; ORLANDO
MARQUEZ; CINDY D. MAXWELL;
JENNIFER MAZZANTI; BETHANY
MCCANDLESS; WILLIAM J.
MCCONNELL; DAN MEEHAN; KEVIN

NAPP; JAMES O'CONNOR; KATHY
ONSUREZ-WILSON; ERIC PARKER;
JASON PERRY; AMANDA PETERSEN;
BRENT PLACE; JIMMY RONALD
PRIMM, JR; PHILIP QUBAIN; PAUL
RATIGAN; JOSEPH ROOT; DARON
RUCKMAN; FREDERIC RUEBUSH;
JENNIFER SALAVERRY; LAUREN
SALAZAR; PAUL SERINO; CHRISTIAN
SPEAKMAN; DANIEL ST. PETERS; IAN
STEPHENS; USVALDO R. TRUJILLO;
PAUL VACULA; GRACIELA
VILLALOBOS; ERIC VOGT; GREG
WALSH; TYLER WILKINS;
VIRGINIA WILLIAMS; SARA
YURKOVICH; TERRY ZACHARIAS and
MICHAEL ZULASKI,

        Plaintiffs,

vs.                                                                              No. CIV 17-0796 JB\CG

TRI-STATE CAREFLIGHT, LLC and
BLAKE A. STAMPER,

        Defendants.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on the Plaintiffs' Motion for Conditional

Certification of Collective Action Pursuant to New Mexico Minimum Wage Act, filed

September 7, 2017 (Doc. 9)("Motion") and on the Plaintiffs' Request for Rule 16 Scheduling

Conference, filed December 21, 2017 (Doc. 19)("Hearing Motion"). In the Hearing Motion, the

Plaintiffs requested that the Court set a Rule 16 Scheduling Conference to establish case

management deadlines, and to consider the Motion. See Hearing Motion at 1. The Court

granted the Hearing Motion, and the Rule 16 Scheduling Conference was reset for June 26, 2018,

before the Honorable Carmen E. Garza, Chief United States Magistrate Judge for the District of New Mexico. See Order Resetting Rule 16 Scheduling Conference, filed June 4, 2018 (Doc. 35). The Court held a hearing on the Motion on June 21, 2018. The primary issues in the Motion are: (i) whether, under Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393 (2010)("Shady Grove"), the collective action standard in rule 23 of the Federal Rules of Civil Procedure or in the New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-1 to -33 ("NMMWA"), contained in § 50-4-26(D), should be applied to the Plaintiffs' conditional certification of their state law overtime claims as a collective action; and (ii) whether, applying the appropriate standard, the Plaintiffs have met the requirements for conditional certification of their overtime claims. The Court concludes that, applying the test set forth in Justice Stevens' concurring and controlling opinion in Shady Grove, (i) the correct standard is rule 23, because N.M. Stat. Ann. § 50-4-26(D)'s provision is a procedural rule; and (ii) the Plaintiffs have not demonstrated their compliance with the requirements for class certification enumerated in rule 23. Accordingly, the Court will deny the Motion.

## FACTUAL BACKGROUND

Defendant Tri-State CareFlight, LLC is a medical transport service company whose service area includes New Mexico, Colorado, and Arizona. See First Amended Representative and Class Action Complaint ¶¶ 3-12, at 2-4, filed June 5, 2018 (Doc. 37)("Amended Complaint"). Tri-State CareFlight and Defendant Blake Stamper are or were the employers of all of the Plaintiffs within the definition of the NMMWA. See Amended Complaint ¶ 6, at 3. Tri-State CareFlight employs or employed the following people -- the proposed class seeking conditional certification -- as flight paramedics, flight nurses, or pilots: Kristy Bell, Deborah

Prair Berest, Daniel Bergman, William Dallas Bundrant, Jr., Rocky H. Burrows, II, Chase Carter,

Brenda Casarez, Kara Cervantes, Thomas Cislo, David Daniels, Adam Doyle, Darren Een, Toby

Eicher, Lon Enos, Walter Fabian, Harold Joseph Fisher, Rehannon Fisher, Christina Fleeman,

Luke Forslund, Salustiano Fragoso, Kristen Grado, Courtney Guerra, Darrin Hamilton,

Alexander Howell, Danielle Irvin, Allen Jacobs, Alex Jones, Donald Luke Keenan, Daniel

Kuhler, Simon Lucero, Raphael Mahaim, Nathan Maplesden, Orlando Marquez, Cindy Maxwell,

Jennifer Mazzanti, Bethany McCandless, William McConnell, Dan Meehan, Kevin Napp, James

O'Connor, Kathy Onsurez-Wilson, Eric Parker, Jason Perry, Amanda Petersen, Brent Place,

Jimmy Ronald Primm, Jr., Philip Qubain, Paul Ratigan, Joseph Root, Daron Ruckman, Frederick

Ruebush, Jennifer Salaverry, Lauren Salazar, Paul Serino, Christian Speakman, Ian Stephens,

Daniel St. Peters, Usvaldo R. Trujillo, Paul Vacula, Graciella Villalobos, Eric Vogt, Greg Walsh,

Tyler Wilkins, Virginia Williams, Sara Yurkovich, Terry Zacharias, Michael Zulaski, Benjamin

Aguilar, Alison Lopez, Ted McGill, Satoshi Mori, John Munn, Anita Nelson, Laurie Pittman,

Diane Sarno, Gregory Steiner, and Sherryn Terblanche.  See Amended Complaint ¶¶ 13-89, at 4-

10 (listing the names and professional titles of each Plaintiff).

        The Plaintiffs allege that they were routinely asked to work more than forty hours per

work week, and were not compensated at the statutorily required one and one-half times their

regular rate for all hours over forty hours per work week.  See Amended Complaint ¶¶ 91-92, at

10.  Flight Paramedics and Flight Nurses were paid the one and one-half times rate only for

hours worked in excess of ninety-six hours in any two-week pay period.  See Amended

Complaint ¶ 98, at 11.  Pursuant to a uniform company policy, they were denied overtime pay for

hours over forty hours worked per week.  See Amended Complaint ¶ 99, at 12.

Pilots were paid a daily rate for each regularly scheduled twelve hour shift, but, the Plaintiffs allege, they were sometimes required to work longer than twelve hours, and were not additionally compensated for hours past twelve hours in a given work day. <u>See</u> Amended Complaint ¶ 92, at 10.  Most pilots were routinely scheduled to work seven consecutive twelve-hour shifts, followed by seven days off work.  <u>See</u> Amended Complaint ¶ 100, at 12.  Some were scheduled for fourteen consecutive twelve-hour shifts, followed by fourteen days off work.  <u>See</u> Amended Complaint ¶ 100, at 12.  Pursuant to a uniform company policy, Pilots were denied overtime pay for hours over forty hours worked per week.  <u>See</u> Amended Complaint ¶ 101, at 12.

The Plaintiffs allege that Tri-State CareFlight violated N.M. Stat. Ann. § 50-4-22(D), which states in relevant part: "An employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours." N.M. Stat. Ann. § 50-4-22(D).[1]  <u>See</u> Motion at 5.

The Plaintiffs now move to conditionally certify their overtime claims as a collective action pursuant to N.M. Stat. Ann. § 50-4-26(D), which permits one or more employees to bring an action to recover liability for an employer's violation of any provision of N.M. Stat. Ann. § 50-4-22 "on behalf of the employee or employees and for other employees similarly situated."  Motion at 1.  The Plaintiffs define "similarly situated" as flight paramedics, flight nurses and pilots "formerly employed in New Mexico by the Defendants at any time

---

[1]On page 5 of the Motion, the Plaintiffs mistakenly identify the NMMWA provision addressing overtime claims as N.M. Stat. Ann. § 50-4-22(C).  The correct provision is N.M. Stat. Ann. § 50-4-22(D).

during the relevant time period who were subjected to the same unlawful and uniform pay policies to which Plaintiffs were subjected." Amended Complaint ¶ 102, at 12. The relevant time period runs from June 19, 2009, through July 2016, when Tri-State CareFlight ceased applying the pay policies described above. See Amended Complaint ¶ 102, at 12.

## PROCEDURAL BACKGROUND

The Plaintiffs bring a representative action pursuant to N.M. Stat. Ann. § 50-4-26(D), on behalf of themselves and all other similarly situated former Tri-State CareFlight employees. See Amended Complaint ¶ 95, at 10. In the alternative, the "Plaintiffs bring this matter as a class action pursuant to Fed. R. Civ. P. 23." Amended Complaint ¶ 96, at 10. The Amended Complaint contains two counts: (i) violation of N.M. Stat. Ann. §§ 50-4-19 et seq.; and (ii) unjust enrichment.

The Plaintiffs filed their case in federal court on August 3, 2017. See Representative and Class Action, filed August 3, 2017 (Doc. 1)("Complaint"). The Plaintiffs invoked diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), asserting that the present action is a class action lawsuit, with a matter in controversy exceeding $5,000,000.00, and complete diversity of citizenship between the original Plaintiffs and the Defendants. See Complaint ¶ 8, at 3.

Approximately three weeks later, Tri-State CareFlight and Stamper filed an Answer, asserting that a representative action may be pursued in federal court only under rule 23, and denying that the Plaintiffs can meet rule 23's requirements. See Answer to Representative and Class Action Complaint, filed August 30, 2017 (Doc. 7)("Answer"). The Plaintiffs filed the Amended Complaint. See Amended Complaint. Tri-State CareFlight and Stamper filed an

Answer.  See Answer to First Amended Representative and Class Action Complaint, filed June 19, 2018 (Doc. 39).

       **1.**      **The Motion.**

      The Plaintiffs move the Court, pursuant to the NMMWA, to conditionally certify their overtime claims as a collective action.  See Motion at 1.  The Plaintiffs who were employed as pilots plan to seek certification of their unjust enrichment claim but do not do so in the Motion.  See Motion at 4.  The Plaintiffs first argue that the NMMWA standard, articulated in § 50-4-26(D), rather than the rule 23 standard, should apply to their collective action certification.  See Motion at 1.  The Plaintiffs contend that Justice Stevens' concurrence in Shady Grove warrants this outcome.  See Motion at 7.  According to the Plaintiffs, the test from Justice Stevens' concurrence, which the Plaintiffs assert is the controlling test in the United States Court of Appeals for the Tenth Circuit, as opposed to the test that Justice Scalia's plurality opinion in Shady Grove provides, is that, "if a federal rule displaces a state rule that is 'procedural' in the ordinary sense of the term, . . . but sufficiently interwoven with the scope of a substantive right or remedy" as to define the substantive right's scope, the federal rule must give way to the state rule.  Shady Grove, 559 U.S. at 429 (Stevens, J., concurring)(quoting S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist., 60 F.3d 305, 310 (7th Cir. 1995)(Posner, C.J.).

      The Plaintiffs first assert that § 50-4-26(D) is in effect part of the substantive right which the NMMWA grants, because it is so "intertwined with Plaintiffs' right to sue for overtime pursuant to that statute."  Motion at 5.  "An action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and on behalf of the employee  or  employees  and  for  other  employees  similarly  situated  .  .  .  ."

N.M. Stat. Ann. § 50-4-26(D).   The Plaintiffs contend that the analysis of what constitutes "similarly situated" should proceed in two stages, as the Tenth Circuit outlines in Thiessen v. GE Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001), and, at the first stage of analysis, should "require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 48, 168 P.3d 129, 144 (quoting Vaszvalik v. Storage Tech. Corp., 175 F.R.D. 672, 678 (D. Colo. 1997)(Babcock, J.)). See Motion at 5.  The standard, the Plaintiffs assure, is a lenient one, and significantly different from rule 23's rigorous requirements, or those in its analogue in New Mexico, N.M.R.A. 1-023.  See Motion at 5-6.  The Plaintiffs argue that there is a public policy rationale for the more lenient standard applied to the NMMWA, i.e., that the New Mexico Legislature designed the statute to be remedial in nature.  See Motion at 6.

The Plaintiffs then argue that the Tenth Circuit has adopted Justice Stevens' concurring opinion in Shady Grove as controlling.   See Motion at 7 (citing James River Ins. v. Rapid Funding, LLC, 658 F.3d 1207, 1217 (10th Cir. 2011); Garman v. Campbell Cty. Sch. Dist. No. 1, 630 F.3d 977, 983 & n.6 (10th Cir. 2010)).  Applying the test from Justice Stevens' concurrence, the Plaintiffs assert, when there is a direct conflict between a federal procedural rule and a state law standard in a diversity case, "the state law standard is applicable if it is in essence substantive even if nominally procedural."  Motion at 7.  The Plaintiffs suggest that the trend across the nation's district courts has been that a seemingly procedural state law provision is substantive in essence when it "is located in the same statute creating the private right of action sued on and is applicable only to claims under that same statute, rather than to cases generally." Motion at 11.  The New York statute at issue in Shady Grove, the Plaintiffs argue, was

procedural because "it applied not only to claims based in New York law, but also to claims based on federal law or the law of another state." Motion at 7. Section 50-4-26(D), the Plaintiffs assert, "is in the very same section of the statute that creates the right sued on here in the overtime claim, in fact in the very same sentence." Motion at 12 (citing N.M. Stat. Ann. § 50-4-26). The Plaintiffs argue that the New Mexico Legislature included § 50-4-26(D) in the NMMWA to replace the generally applicable New Mexico state rule governing class actions, in N.M.R.A. 1-023. See Motion at 13 ("Had the legislature not intended to make it easier to pursue such claims, it need not have included any language regarding representative actions in the statute at all, in which case the more stringent standards set forth in [N.M.R.A. 1-023] would apply to overtime claims brought in state court."). Section 50-4-26(D) is applicable only to claims under the NMMWA. See Motion at 12. The Plaintiffs argue that the Court "must therefore apply the NMMWA's "similarly situated" standard, rather than Fed. R. Civ. P. 23, to class certification in this case." Motion at 13.

The Plaintiffs next aver that, by applying the two-step procedure adopted by the Court of Appeals of New Mexico in Armijo v. Wal-Mart Stores, Inc., all of the Plaintiffs in this action are similarly situated, so conditional certification of the class is appropriate. See Motion at 13. Under the two-step approach from Armijo v. Wal-Mart Stores, Inc., the initial stage of analysis requires only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 48, 168 P.3d at 144 (quoting Vaszvalik v. Storage Tech Corp., 175 F.R.D. 672, 678 (D. Colo. 1997)(Babcock, J.)). Only after merits discovery and/or a motion to decertify, the court applies a stricter standard and considers "(1) whether the class members have disparate factual and

- 9 -

employment settings, (2) whether the available defenses to the claims are individual to each class member, and (3) whether there are any fairness or procedural considerations relevant to the action." Hasken v. City of Louisville, 213 F.R.D. 280, 282 (W.D. Ky. Feb. 11, 2003)(Simpson, J.). The Plaintiffs argue that class members are "generally found to be similarly situated when they have the same employer and are subject to the same employer practices with regard to overtime practices." Motion at 14 (citing Hasken v. City of Louisville, 213 F.R.D. at 282).[2]

Because merits discovery has not yet occurred in this case, Plaintiffs contend that the Court should apply only the initial stage analysis. See Motion at 14. The Plaintiffs assert that there is "substantial evidence of a single unlawful policy" by the Defendants, of which the Plaintiffs were together the victims. See Motion at 14. The Plaintiffs point to Tri-State CareFlight's pay practices, which, they assert, while different in some details between flight paramedics and nurses on the one hand and pilots on the other, are the same in their "failure to pay overtime compensation for all hours worked over forty (40) in a workweek." Motion at 15. The Plaintiffs list other factors that they argue bolster their position that all of the Plaintiffs in the proposed class are similarly situated. Motion at 19. The Plaintiffs note that all proposed class members worked for the same employer, in close proximity, and in the same locations, providing services as a team. See Motion at 19. Although the Plaintiffs concede that flight paramedics,

---

[2]Hasken v. City of Louisville is a case concerning the Federal Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), and while the Plaintiffs argue that the FLSA and the NMMWA have similar collective action provisions, the Plaintiffs devote a footnote to explaining their salient differences -- mainly that the FLSA provision is opt-in, whereas the NMMWA provision is, by its plain text, opt-out. See Motion at 13 n.4. While the court in Hasken v. City of Louisville, 213 F.R.D. at 282, accepted the proposed class as "similarly situated," it did not undergo an analysis of how that determination was reached, or what factors contributed to its finding. See generally Hasken v. City of Louisville.

flight nurses, and pilots "have different training, different certification and different duties," the Plaintiffs argue that these distinctions are too small to undermine class certification under § 50-4-26(D).  See Motion at 19.

> ### 2.    The Response.

Tri-State CareFlight and Stamper filed a response to the Motion.   See Defendants' Response to Plaintiffs' Motion for Conditional Certification of Collective Action Pursuant to New Mexico Minimum Wage Act, filed September 29, 2017 (Doc. 12)("Response").   Tri-State CareFlight first asserts that rule 23 governs NMMWA claims in federal court, citing decisions by at least two other District of New Mexico Judges who relied on Justice Scalia's plurality opinion in Shady Grove, rather than on Justice Stevens' concurrence.   See Response at 1-2 (citing Medrano v. Flowers Food, Inc., Civ. No. 16-350 JCH/KK, 2017 WL 3052493 (D.N.M. July 21, 2017)(Herrera, J.); Abrams v. City of Albuquerque, Civ. No. 10-0872 MV/RHS, 2014 WL 11497810, at *12 & n.7 (D.N.M. June 26, 2014)(Vázquez, J.); and Casias v. Distrib. Mgmt. Corp., Civ. No. 11-00874 MV/RHS, 2014 WL 12710236, at *2 (D.N.M. March 31, 2014)(Vázquez, J.)).

Tri-State CareFlight next asserts that, in Shady Grove, even in Justice Stevens' concurring opinion, the Supreme Court of the United States acknowledges that applying rule 23 to class claims will not impair "an alleged 'substantive' right" because rule 23 by its very purpose permits class claims.  Response at 3 (quoting Shady Grove, 559 U.S. at 436 (Stevens, J., concurring)).  Tri-State CareFlight argues that the issue "is not whether class actions are allowed but only what process must be followed and what procedural criteria must be met for the plaintiffs to pursue such class claims."  Response at 3.  Tri-State CareFlight therefore concludes

that the matter before the Court is purely procedural.  See Response at 3.  Tri-State CareFlight

argues that the Plaintiffs do not satisfy the necessary rule 23 criteria.  See Response at 5.

Tri-State CareFlight asserts that the cases upon which the Plaintiffs rely in their Motion

do not address whether the two-step process that the Tenth Circuit approved in Thiessen v. GE

Capital Corp. and that the Court of Appeals of New Mexico applied in Armijo v. Wal-Mart

Stores, Inc., or the rule 23 standard, applies.  See Response at 4.  By contrast, Tri-State

CareFlight argues that the Medrano v. Flowers Food, Inc. court addressed that question, stating

that "the Court is bound by Shady Grove, the Rules Enabling Act,[3] and Rule 23 of the Federal

Rules of Civil Procedure.  Thus, if the Plaintiffs wish to pursue their NMMWA claim as a

collective action, they must seek class certification under Rule 23."  Response at 5 (quoting

Medrano v. Flowers Food, Inc., 2017 WL 3052493, at *6).  For instance, Tri-State CareFlight

argues that, because § 50-4-26(D) contains the same "opt out" process as rule 23, the opt-in cases

to which the Plaintiffs cite are not relevant.  Response at 5.

Next, Tri-State CareFlight asks the Court to defer ruling on the Motion until a pending

Motion to Transfer Related Case, filed September 26, 2017 (Doc. 11), is decided because of

pending motions[4] in Payne v. Tri-State CareFlight, LLC, No. CIV 14-1044 JB/KBM (D.N.M.

---

[3]If there is a direct collision between a federal rule and a state rule, a court must follow the federal rule if it is a valid exercise of the Supreme Court's authority pursuant to the Rules Enabling Act, i.e., it must "not abridge, enlarge, or modify a substantive right."  28 U.S.C. § 2072(b).  See Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163-64.

[4]The Defendants reference two motions for class certification.  See Response at 6.  In the Response, the Defendants assert that the motions were filed in a case they refer to as "Bastian v. Tri-State Careflight, LLC and Blake A. Stamper, 1:14-CV-KB-KBM."  Response at 6. However, because Bastian and his co-plaintiffs were intervenor plaintiffs in Payne v. Tri-State

filed November 17, 2014)(Browning, J.).  This request is moot, because the Court decided and

granted the motions in a Memorandum Opinion and Order.  See Payne v. Tri-State Careflight,

LLC, 322 F.R.D. 647 (D.N.M. September 30, 2017)(Browning, J.)(granting the Opposed Fed. R.

Civ. P. 24(B) Motion and Supporting Memorandum to Intervene as Parties Plaintiff and Class

Representatives, filed November 29, 2016 (Doc. 151) in CIV 14-1044 JB/KBM, and the

---

CareFlight, LLC, No. CIV 14-1044 JB/KBM (D.N.M., filed November 17, 2014), the case
caption remains Payne v. Tri-State CareFlight, LLC, No. CIV 14-1044 JB/KBM (D.N.M, filed
November 17, 2014), even following their intervention as plaintiffs.  The Defendants reference
the Plaintiffs' Motion For and Brief in Support of Class Certification, filed September 4, 2015
(Doc. 48)("First Motion to Certify"), and Plaintiffs' Motion For and Brief in Support of Class
Certification, filed May 16, 2016 (Doc. 126)("Second Motion to Certify").  Both motions were
filed in Payne v. Tri-State CareFlight, LLC, No. CIV 14-1044 JB/KBM, filed November
17, 2014).  Both motions were fully briefed.  See Notice of Completion of Briefing, filed October
14, 2015 (Doc. 62); Notice of Completion of Briefing, filed July 8, 2016 (Doc. 137).  The First
Motion to Certify was withdrawn.  See Plaintiffs' Notice of Withdrawal of Motion for Class
Certification, filed January 26, 2016 (Doc. 96).  The Second Motion to Certify was argued before
the Court on August 17, 2016.  See Draft Transcript of Motion Hearing (taken August 17,
2016)(Doc. 146)("August 2016 Tr.").  At the August 17, 2016 Hearing, the Court took the
Second Motion to Certify under advisement.  See Clerk's Minutes at 1 (taken August 17,
2016)(Doc. 145).  Before the Court ruled on the motion for class certification, Payne v. Tri-State
CareFlight, LLC, No. CIV 14-1044 JB/KBM (D.N.M., filed November 17, 2014) concluded with
a Final Judgment, filed November 23, 2016 (Doc. 150).  The Plaintiffs then filed two post-
judgment motions: Opposed Fed. R. Civ. P. 24(B) Motion and Supporting Memorandum to
Intervene as Parties Plaintiff and Class Representatives, filed November 29, 2016 (Doc. 151),
and Opposed Fed. R. Civ. P. 24(B) Supplemental Motion and Supporting Memorandum to
Intervene as Parties Plaintiffs and Class Representatives, filed June 27, 2017 (Doc. 166).  The
Defendants argue that, if the Court grants these motions to intervene, the same certification
questions presented in Payne v. Tri-State Careflight, LLC will arise again.  See Response at 6.
The Defendants argue that the Court should defer ruling on the Motion, to "avoid the potential
for conflicting decisions."  Response at 6.  As noted in the text above, the Court has decided and
granted the motions.  See Payne v. Tri-State Careflight, LLC, 322 F.R.D. 647 (D.N.M.
September 30, 2017)(Browning, J.)(granting the Opposed Fed. R. Civ. P. 24(B) Motion and
Supporting Memorandum to Intervene as Parties Plaintiff and Class Representatives, filed
November 29, 2016 (Doc. 151) in CIV 14-1044 JB/KBM, and the Opposed Fed. R. Civ. P. 24(B)
Supplemental Motion and Supporting Memorandum to Intervene as Parties Plaintiffs and Class
Representatives, filed June 27, 2017 (Doc. 166) in CIV 14-1044 JB/KBM).

Opposed Fed. R. Civ. P. 24(B) Supplemental Motion and Supporting Memorandum to Intervene as Parties Plaintiffs and Class Representatives, filed June 27, 2017 (Doc. 166) in CIV 14-1044 JB/KBM).

      **3.**      **The Reply.**

The Plaintiffs replied.  See Plaintiffs' Reply in Support of Motion for Conditional Certification of Collective Action Pursuant to New Mexico Minimum Wage Act, filed October 13, 2017 (Doc. 17)("Reply").  The Plaintiffs begin by arguing that the cases which other district judges in this district have decided are of no precedential value because they apply the wrong test from Shady Grove.  See Reply at 2.  The Plaintiffs assert that the Tenth Circuit has reiterated in a decision post-dating the Motion that Justice Stevens' concurring opinion, rather than Justice Scalia's plurality opinion, is controlling.  See Reply at 2 (citing Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1164 (10th Cir. 2017).  The Plaintiffs also point to one of the Court's decisions, recognizing Justice Stevens' concurrence as controlling.  See Upky v. Lindsey, No. CIV 13-0552 JB/GBW, 2015 U.S. Dist. LEXIS 55167, at *59-60 (D.N.M. April 7, 2015)(Browning, J.).

The Plaintiffs argue that the other cases relied upon by Tri-State CareFlight also apply the incorrect test from Justice Scalia's plurality opinion rather than the correct test from Justice Stevens' concurrence.  See Reply at 3.  The Plaintiffs assert that these cases cannot be correct, because, otherwise, the many cases where courts have declined to apply rule 23 to state law claims "would be incorrectly decided."  Reply at 4-5.  The Plaintiffs next contend that this result would be inconsistent with Garman v. Campbell County School District Number 1, which rigorously applies Justice Stevens' concurrence to find that a state provision prevailed over a

federal procedural rule.  See Reply at 5.

The Plaintiffs conclude that Justice Stevens' concurrence recognizes that there are situations in which applying a federal rule to a state law claim in federal court would "run afoul of the Rules Enabling Act's prohibition applying [sic] a federal rule to 'abridge, enlarge, or modify any substantive right.'"  Reply at 5 (quoting 28 U.S.C. § 2072(b)).  Accordingly, the Plaintiffs ask that the Court decline to follow the incorrect test followed by the Honorable Judith C. Herrera, United States District Judge for the District of New Mexico, in Medrano v. Flower Foods, Inc. and in Abrams v. City of Albuquerque, and the Honorable Martha Vázquez, United States District Judge for the District of New Mexico, in Casias v. Distribution Management Corp. See Reply at 5.

The Plaintiffs next argue that the cases upon which they relied in the Motion are relevant, because they address conflicts in federal court between rule 23 and various state law claims in federal court.  See Reply at 5-6.  The Plaintiffs assert that the opt-in cases cited in the motion are still relevant, because although the "opt out" detail may not be in conflict between rule 23 and § 50-4-26(D), "numerous other ones are."  Reply at 8.  Specifically, the Plaintiffs point to the fact that § 50-4-26(D) does not contain a numerosity requirement, a restriction on who can serve as a representative, a predominance requirement, or a superiority requirement, whereas rule 23 contains all four.  See Reply at 8.

Next, the Plaintiffs aver that applying rule 23 to the overtime claim here would abridge or modify a substantive right in violation of the Rules Enabling Act, and the Plaintiffs present various hypotheticals to illustrate the argument.  See Reply at 9-10.  The Plaintiffs note that § 50-4-26(D) is in the same section of the NMMWA that creates the substantive right to sue for

unpaid overtime compensation and applies only to NMMWA claims.  See Reply at 10.  Finally, the Plaintiffs assert that the Defendants' request that the Court defer the ruling is moot, because the present case, Bell v. Tri-State CareFlight, LLC, CIV 17-0796 JB/CG (D.N.M., filed August 3, 2017)(Browning, J.), has already been consolidated with Payne v. Tri-State CareFlight, LLC, No. CIV 14-1044 JB/KBM (D.N.M., filed November 17, 2014)(Browning, J.).  See Reply at 11.

**4.      The Hearing.**

On May 29, 2018 the Court issued a Notice of Hearing on the Hearing Motion and granted the Hearing Motion, setting a hearing for June 21, 2018.  See Notice of Hearing, entered May 29, 2018.  The Court held the hearing on June 21, 2018.  See Draft Transcript of Motion Hearing (taken June 21, 2018)("Tr.").[5]  The Court began by confirming that both parties agree that, if the collective action question is addressed according to § 50-4-26(D), neither side opposes conditional certification.  See Tr. at 2:10-17 (Court).  The Court identified the main issue as whether, under Shady Grove, the conditional certification question should be analyzed according to rule 23 or according to § 50-4-26(D).  See Tr. at 2:17-21 (Court).  The Court stated that it seems the Tenth Circuit has indicated that Justice Stevens' concurring opinion in Shady Grove controls for purposes of these issues.  See Tr. at 2:17-3:5 (Court).

The Court then asked the Plaintiffs whether Judge Herrera was the only district judge in this district to issue an opinion based on Justice Scalia's plurality opinion in Shady Grove.  See Tr. at 3:24-25 (Court).  The Plaintiffs replied that Judge Herrera and Judge Vázquez both issued opinions based on Justice Scalia's plurality opinion.  See Tr. at 4:2-3; 4:15-22 (Moody).  The

---

[5]The Court's citations to the hearing transcripts refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Court asked the Plaintiffs how Judge Herrera and Judge Vázquez decided to use the plurality opinion. See Tr. at 6:12-16 (Court). The Plaintiffs replied:

> I have to confess I don't one hundred percent remember. I don't think they relied on each other. I think that it was more or less, as you, say grabbing Justice Scalia's plurality opinion. So what they're doing is they're saying: Okay, we have to first look if there is a conflict between the state law and the federal rules. If there is, we apply the federal rule, so long as it is validly enacted under the Rules Enabling Act. And of course, there are court decisions upholding all of the Federal Rules of Civil Procedure in the Rules Enabling Act. So if you apply that test, then it becomes a very simple problem, because in every case you're going to apply the federal rule.

Tr. at 6:17-7:6 (Moody).

The Plaintiffs then acknowledged that Judge Herrera recently issued an opinion addressing Justice Stevens' concurrence and arrived at the conclusion that rule 23 should apply rather than the state rule. See Tr. at 7:19-24 (Moody). According to the Plaintiffs, however, Judge Herrera looked to the FLSA for guidance in interpreting the NMMWA and concluded that the NMMWA has an opt-in provision. See Tr. at 8:12-15 (Court, Moody). The Plaintiffs argued that this comparison is a mistake, because the NMMWA provision is opt-out, exactly like rule 23. See Tr. at 7:25-8:25 (Moody). The NMMWA provision contains no opt-in language. See Tr. at 7:25-8:25 (Moody). The Plaintiffs argued that, "if you can designate an agent to bring the case, there is really no basis for concluding that it could be an opt-in, in that situation, because you're allowing right in the statute for a representative action." Tr. at 9:3-7 (Moody). In other words, a designated agent could bring an action on behalf of a class, without requiring the class members to actively consent to their inclusion in the class.

The Court asked the Plaintiffs whether Judge Herrera's and Judge Vázquez' opinions were the only opinions from this district on this issue. See Tr. at 9:21-23 (Court). The Plaintiffs

replied that they were aware of no other opinions.  See Tr. at 9:24-25 (Moody).  The Plaintiffs next averred that the trend across federal district courts is to follow Justice Stevens' concurrence and determine whether a state procedural rule is so intertwined with the substantive law that a federal court sitting in diversity must apply it instead of rule 23.  See Tr. at 10:5-20 (Moody). The Plaintiffs argued that the judicial approach has been to view statutes of general applicability regarding class actions as procedural, as in Shady Grove, whereas statutory provisions regarding class actions that are situated in the statute creating the right on which the suit is built are generally regarded as substantive.  See Tr. at 11:9-13:19 (Moody).

The Plaintiffs argued that the "clear intent of the legislature was to affect the behavior of employers and employees in New Mexico with regard to vindicating rights to minimum wages and overtime," and in those circumstances the provision is "substantive within the meaning of Justice Stevens' concurrence."  Tr. at 14:20-15:5 (Moody).  Applying the federal rule instead, the Plaintiffs argued, would "allow, in some cases at least, employers to avoid obligations under the state overtime provisions of the act, and it would significantly burden employees."  Tr. at 15:13-15 (Moody).

The Plaintiffs next asserted that there is a direct conflict between rule 23 and § 50-4-26(D).  See Tr. at 15:19-21 (Moody).  The Plaintiffs highlighted numerosity, adequacy, predominance, superiority, and eligibility as a representative, all as rule 23 characteristics that § 50-4-26(D) does not share.  See Tr. at 15:19-17:6 (Moody).

The Court asked whether it was at all a concern that there would be an action in federal court very similar to rule 23 as an opt-out class action, but run "through the filter of a state provision rather than rule 23, given all the case law that we have in federal court, particularly as

of recent years on class actions." Tr. at 17:24-18:7 (Court).  The Plaintiffs replied that this outcome would not be of concern, because the Plaintiffs would "still have to show people are similarly situated," so there would still be a standard to meet before class certification, albeit a more lax standard than rule 23.  See Tr. at 18:8-18 (Moody).  The Plaintiffs asserted that there are checks on the state standard, and the Plaintiffs would still need to show there was a common policy and "enough to [sic] cohesion."  Tr. at 19:10-13 (Moody).  The Plaintiffs summarized that the Court would have the tools to address any concerns which arise as a result of the case proceeding under § 50-4-26(D).  See Tr. at 20:10-12 (Moody).

The Court next asked whether the Plaintiffs read Tri-State CareFlight's response as saying they do not have any opposition to the Motion if the Court determines that § 50-4-26(D) can be used.  See Tr. at 20:13-18 (Court).  The Plaintiffs agreed with that reading.  See Tr. at 20:23-24 (Moody).  The Court asked whether, if the Court were to conclude that rule 23 is the appropriate standard, the Plaintiffs would then proceed through the rule 23 lens.  See Tr. at 21:16-21 (Court).  The Plaintiffs confirmed that they would then brief the issue under rule 23. See Tr. at 21:22-23 (Moody).

The Defendants then responded and presented the Court with a copy of the Court's opinion in Bustillos v. Board of County Commissioners of Hidalgo County, 310 F.R.D. 631 (D.N.M. 2015)(Browning, J.), referencing a footnote in the Court's opinion applying rule 23 to a wage-and-hour state claim under the NMMWA.  See Tr. at 24:6-10 (Lowry). That footnote states:

> The Plaintiffs may pursue both a rule 23 class action for their state law claims and a § 216(b) action for their FLSA claims.  See Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245-50 (2d Cir. 2011)(Miner, J.)(allowing the

> plaintiffs to pursue damages under the state minimum wage law through rule 23,
> as well as damages under the FLSA through FLSA § 2169(b)).  See also Advisory
> Committee's Notes to Federal Rule 23(b)(3)("The present provisions of 29 U.S.C.
> § 216(b) are not intended to be affected by Rule 23, as amended.").

Bustillos v. Bd. of Cty. Com'rs of Hidalgo Cty., 310 F.R.D. at 673 n.10.  The Defendants also

handed the Court a copy of Jones v. United Parcel Service, Inc., a published opinion applying

Shady Grove in a manner in accordance with the opinions of Judge Vázquez and Judge Herrera.

See Tr. at 24:1-25:18 (Lowry).  See Jones v. United Parcel Service, Inc., 674 F.3d 1187, 1203

(10th Cir. 2012).  The Defendants argued that, because Jones v. United Parcel Service, Inc. post-

dates James River Insurance v. Rapid Funding, LLC, the proper way to read the law around

Shady Grove "until the Tenth Circuit resolves it" is to apply either the plurality opinion or the

concurrence from Shady Grove.  Tr. at 25:19-25 (Lowry).  The Defendants disagreed that Judge

Vázquez and Judge Herrera had applied the wrong test, arguing instead that the district court

rulings were consistent with the Tenth Circuit precedent in Jones v. United Parcel Service, Inc.,

applying the test from Justice Scalia's plurality opinion and looking only to the federal rule to

determine whether it is procedural.  See Tr. at 26:8-27:8 (Lowry).

The Defendants next argued that, even under Justice Stevens' concurring opinion, the

result would be the same, and rule 23 should still apply to the Motion, because "nothing about

Rule 23 . . . will abridge the rights or remedies under the New Mexico Minimum Wage Act."

Tr. at 27:9-27:17 (Lowry).  The Defendants asserted that Justice Stevens' concurrence states that

"the bar for finding an enabling act problem is a high one, and that there must be little doubt that

the rule alters a state-created substantive right."  Tr. at 27:20-24 (Lowry).

The Court asked the Defendants whether they disagreed that Justice Stevens' concurrence

- 20 -

controlled in the Tenth Circuit, and the Defendants replied that they did agree that Justice

Stevens' concurrence controlled.  <u>See</u> Tr. at 28:8-15 (Lowry).  The conflict that the alternate

approach followed in the <u>Jones v. United Postal Service, Inc.</u> case causes, Defendants argue, can

be resolved by allowing both Justice Scalia's and Justice Stevens' analyses to apply, and then

ensuring that there is no Rules Enabling Act violation under either analysis.  <u>See</u> Tr. at 28:18-25

(Lowry).

 The Court asked whether that approach still resulted in Justice Stevens' concurrence

operating as the controlling opinion or if it rendered Justice Stevens' concurrence approach

simply an additional test.  <u>See</u> Tr. at 29:4-7 (Court).  By way of answer, the Defendants noted

that <u>Jones v. United Postal Service, Inc.</u> is a later case than <u>James River Insurance v. Rapid</u>

<u>Funding, LLC</u>, and should control if there is a conflict in the Tenth Circuit regarding which

<u>Shady Grove</u> analysis should apply.  <u>See</u> Tr. at 29:8-11 (Lowry).

 The Defendants argued that the difference between Justice Scalia's approach and Justice

Stevens' approach is that Justice Scalia's approach focuses the analysis on the federal rule and

whether it is procedural, whereas Justice Stevens' approach focuses the analysis on whether the

purpose of the state law is substantive.  <u>See</u> Tr. at 29:14-30:1 (Lowry).  The Court noted that, if

the Defendants' proposed cumulative test approach were applied, Justice Scalia's opinion would

become the controlling opinion, because, under its analysis, the federal rule would always

prevail. <u>See</u> Tr. at 35:13-17 (Court).

 The Plaintiffs argued that, based on principles of construction, the Court should apply the

narrowest basis for the result to which the Supreme Court arrived in its plurality opinion, and

accordingly should apply Justice Stevens' concurrence, as the Tenth Circuit and this Court have

said.  See Tr. at 35:18-36:9 (Moody).

The Plaintiffs argued that the central point of Justice Stevens' concurrence is that "you shouldn't get a radically different result in federal court than you would in the state court just because of a procedural rule."  Tr. at 39:7-13 (Moody).  The Plaintiffs asserted that the difference would be that, if certification is granted, several times as many people as are currently in the lawsuit would be in the plaintiffs' class.  See Tr. at 39:24-40:3 (Moody).

The Court established that the end date for the Plaintiffs' action would be when Air Methods Corporation acquired Tri-State CareFlight and stopped operating under its own name. See Tr. at 42:1-2 (Court).

Finally, the Plaintiffs corrected a mistake that they made in their Motion and asked that, if there is a conditional certification, it be for "all people employed by Tri-State New Mexico from June 19th of 2009" as pilots, flight nurses, and paramedics.  Tr. at 42:13-43:1 (Moody). The Court did not make an oral ruling at the hearing whether the Plaintiffs' Motion should be evaluated under rule 23 or under § 50-4-26(D).  See Tr. at 47:22-23 (Court).  The Court noted, however, that "the Tenth Circuit was rather clear that Justice Stevens' opinion was controlling." Tr. at 28:8-12 (Court).  The Plaintiffs informed the Court that they had a Rule 16 Scheduling Conference before Judge Garza the week following the Motion Hearing.  See Tr. at 43:11-12 (Moody).  The Court offered to provide the parties with an oral ruling in advance of the Rule 16 conference, to help guide the parties' discussion with Judge Garza.  See Tr. at 44:15-20 (Court). At 1:00 P.M. on June 26, 2018, before the parties' 2:00 PM conference with Judge Garza, the Court held a hearing and delivered an oral ruling on the Motion.  See Draft Transcript (taken June 26, 2018)("Ruling Tr.")(Court).  On June 26, 2018, the Court provided an oral ruling.  The

Court stated that, "in the Tenth Circuit, Justice Stevens' concurring opinion in <u>Shady Grove</u> controls."  Ruling Tr. at 6:4-6.  The Court concluded that § 50-4-26(D) is "a procedural rule, and therefore . . . rule 23 is going to govern this, and so the Court is going to not conditionally certify the proposed class."  Ruling Tr. at 18:20-23 (Court).  The Court promised to deliver a written opinion to the parties as soon as possible.  <u>See</u> Ruling Tr. at 19:1-2 (Court).[6]

### LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938)("<u>Erie</u>"), a federal district court sitting in diversity jurisdiction applies "state law with the objective of obtaining the result that would be reached in state court."  <u>Butt v. Bank of Am., N.A.</u>, 477 F.3d 1171, 1179 (10th Cir. 2007).  <u>Accord</u> <u>Mem. Hosp. v. Healthcare Realty Tr. Inc.</u>, 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]."  <u>Guidance Endodontics, LLC v. Dentsply Int'l., Inc.</u>, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).[7]  "Just as a court engaging in statutory interpretation must always begin

---

[6]This Memorandum Opinion and Order is the opinion that the Court promised the parties at the June 26, 2018 Ruling Hearing.

[7]In performing its <u>Erie</u>-mandated duty to predict what a state supreme court would do if faced with a case, <u>see</u> <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456, 466 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, <u>see</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an <u>Erie</u> prediction that conflicts with state court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old

with the statute's text, a court formulating an <u>Erie</u> prediction should look first to the words of the state supreme court." <u>Peña v. Greffet</u>, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[8]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." <u>Mosley v. Titus</u>, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from

---

state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an <u>Erie</u> prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  <u>See</u> <u>Peña v. Greffet</u>, 110 F. Supp. 3d 1103, 1132 n.17 (D.N.M. 2015)(Browning, J.).  In short, a state supreme court case that a federal court predicts under <u>Erie</u> that the state court would overrule is likely to be very old, neglected in subsequent state court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[8]In <u>Peña v. Greffet</u>, the Court engaged this approach to predict what the Supreme Court of New Mexico would say about imposing vicarious liability under the aided-in-agency theory in the prison-guard inmate context, and predicted that the Supreme Court of New Mexico would say: "If an inmate can establish that a prison official with corporal authority over the inmate committed a tort against the inmate, and that the official's position of authority aided the official in the commission of that tort, then the official's employer is vicariously liable for all injuries that the tort inflicts." <u>Peña v. Greffet</u>, 110 F. Supp. 3d at 1131.  Then, in <u>Spurlock v. Townes</u>, 2016-NMSC-014, 368 P.3d 1213, the Supreme Court of New Mexico agreed with the Court's prediction, quoting extensively from the <u>Peña v. Greffet</u> opinion.  <u>See</u> <u>Spurlock v. Townes</u>, 2016-NMSC-014, ¶¶ 11, 17-20, 368 P.3d at 1216-19.

the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[9]   The Court may also rely on Tenth Circuit

---

[9]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . .

We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper

decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy Production, LLC, No. CIV 12-0040 JB/KBM, 27 F. Supp. 3d, 1188, 1243 & n.30 (D.N.M. May 16, 2014)(Browning, J.).[10]  Ultimately, "the Court's task is to predict what the state supreme court

---

administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts,] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[10]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes a state's law has undergone in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to be at least uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court toward a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least

_____

provides consistency at the federal level, so long as federal district judges must follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end, and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th

Cir. 1987)(McKay, J., dissenting)(collecting cases); Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986).  Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent.  See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908.  See also [Rawson v. Sears, Roebuck, & Co., 822 F.2d at 923](McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or the "so-called local-judge rule" in its analysis).  The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law --  in a case brought in diversity.

Erie's purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive

data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted)).  This formulation may not be the most precise if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that state circuit court interprets it, see Abbott Laboratories v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the state circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the Restatements of Law, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would not necessarily inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when a United States Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the state jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of

the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolved the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  Indeed, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has noted it and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refuses to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest court.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be

would do."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.   Accord Mosley v. Titus, 762

F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-

89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins., 483 F.3d at 665-66).  See In

re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., 288 F. Supp. 3d

1087, 1161-67 (D.N.M. 2017)(Browning, J.).

### LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie doctrine instructs the federal courts must apply state

substantive law and federal procedural law."  Racher v. Westlake Nursing Home Ltd. P'ship, 871

F.3d at 1162.  "If a federal rule of civil procedure answers the question in dispute, that rule

governs our decision so long as it does not 'exceed[] statutory authorization or Congress's

rulemaking power.'"  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (quoting

Shady Grove, 559 U.S. at 398).  "When faced with a choice between a state law and an allegedly

conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme

Court in [Shady Grove], as laid out by Justice Stevens in his concurring opinion."  Racher v.

Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162.  "First, the court must decide whether the

scope of the federal rule is sufficiently broad to control the issue before the court, thereby

leaving no room for the operation of seemingly conflicting state law."  Racher v. Westlake

Nursing Home Ltd. P'ship, 871 F.3d at 1162 (citations and quotations omitted).  There is a

---

at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing
State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).
Nevertheless, the Court must abide by the Tenth Circuit's interpretation of Erie.

conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163 (citations omitted).  If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163.

If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's rulemaking authority under the Rules Enabling Act, i.e., it must "not abridge, enlarge or modify a substantive right."  28 U.S.C. § 2072(b).  See Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163-64.

> Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right.  [Shady Grove, 559 U.S. at 418-21 (Stevens, J., concurring)]; see Gasperini 518 U.S. at 427.  Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural."  Shady Grove, 559 U.S. at 419 (Stevens, J., concurring).  Rather, a more nuanced approach is required.  [Shady Grove, 559 U.S. at 419-20].  Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy."  [Shady Grove, 559 U.S. at 419-20](citation and internal quotation marks omitted).  One example of such a law is a procedural rule that "may . . . define the amount of recovery."  [Shady Grove, 559 U.S. at 420].  Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." [Shady Grove, 559 U.S. at 418].  If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (citations omitted)(alteration in the original)(quoting Shady Grove, 559 U.S. at 418-20 (Stevens, J., concurring)).  "[W]hen state

law creates a cause of action, it also defines the scope of that cause of action," which includes "the applicable burdens, defenses, and limitations."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164-65.  Consequently, even though burdens of proof, affirmative defenses, and liability limitations are all legal concepts that savor of procedure, "[f]ailing to enforce such attendant attributes of a state law would lead to different measures of the substantive rights enforced in state and federal courts," i.e., would modify substantive rights.  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1165.

## LAW REGARDING CLASS CERTIFICATION UNDER RULE 23

Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all the requirements of rule 23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-(b).  The plaintiff[11] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive

---

[11]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification.  See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.).  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

interpretation, and that [denying certification] is justified only by a clear showing to that [end]. . . .").   In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[12]   See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").   "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."   Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).   See Vallario v. Vandehey, 554 F.3d 1259,

---

[12]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."   In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).   Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues.   Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013).   This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.   See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).   Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in [General Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-352 (2011) "Wal-Mart.")  In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013)(Ginsburg, J.).  To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case.  This approach is analogous to preliminary injunction

practice, and many circuits have endorsed it.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620-22 (1997).  In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson Living Trust v. WPX Energy Production LLC, No. CIV 12-0040 JB/LFG, 306 F.R.D. 312, 378 n.39 (D.N.M. March 19. 2015)(Browning, J.).

## 1.    Rule 23(a).

All classes must satisfy the prerequisites of rule 23(a):

**(a)    Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

   **(1)**    the class is so numerous that joinder of all members is impracticable;

   **(2)**    there are questions of law or fact common to the class;

   **(3)**    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

   **(4)**    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of

whether 'the prerequisites of Rule 23(a) have been satisfied.'"   Shook v. El Paso Cty., 386 F.3d

963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161

(1982))(citing Reed v. Bowen, 849 F.2d at 1309).   These four requirements are often referenced

as numerosity, commonality, typicality, and adequacy, respectively. See Fed. R. Civ. P. 23(a).

The commonality requirement is particularly relevant to this case, because the plaintiffs'

proposed class includes flight paramedics, flight nurses, and pilots.   See Motion at 2.   The

Plaintiffs concede that "the details of Tri-State's policy vary between Flight Paramedics and

Flight nurses [sic] on the one hand and Pilots on the other," but allege that the end result is the

same, because both groups receive no overtime compensation.   Motion at 15.   The Plaintiffs

request that if the Court determines that pilots are not "sufficiently similarly situated" (the

standard in § 50-4-26(D)), the Court conditionally certify the groups as two separate classes. See

Motion at 20.   Throughout the Motion, the Plaintiffs describe flight paramedics/flight nurses and

pilots separately.   See Motion at 2, 15-17.   The Plaintiffs concede that flight paramedics/flight

nurses and pilots have different job duties, and different work schedules.   See Motion at 20. The

Pilot Plaintiffs do not currently seek certification for their unjust enrichment claim.   See Motion

at 4.   Under the rule 23 standard, therefore, there may be some question whether there are

"questions of law or fact common to the class" of flight paramedics, flight nurses and pilots.

Fed. R. Civ. P. 23(a)(2).

   Rule 23(a)(2) requires that "there are questions of law or fact common to the class."   Fed.

R. Civ. P. 23(a)(2) (emphasis added).   Even "factual differences in the claims of the individual

putative class members should not result in a denial of class certification where common

questions of law exist."   In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo.

1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'"  (citations omitted)).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart, 564 U.S. at 349.

"Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met."  In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000)(Brieant, J.).  Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart, 564 U.S. at 348-52.  In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 564 U.S. at 342.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.

See 564 U.S. at 343-45.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  564 U.S. at 345.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, supra, at 132).  In EQT

- 39 -

Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011), the United States Court of Appeals for the

Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.
>
> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.
>
> The district court identified numerous common royalty payment practices.  For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In Wal-Mart, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations

of each employee's eligibility for backpay."  564 U.S. at 366.  From this observation, he then

concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

- 40 -

Wal-Mart, 131 U.S. at 367.  Thus, the common question or questions cannot be "incidental," nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

      **2.**      **<u>Rule 23(b)</u>.**

Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." <u>Adamson v. Bowen</u>, 855 F.2d at 675.  See <u>DG ex rel. Stricken v. Devaughn</u>, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)** **Types of Class Actions.**  A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)** prosecuting separate actions by or against individual putative class members would create a risk of:
> >
> > > **(A)** inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > **(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

> **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> **(3)** the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.   The matters pertinent to these findings include:
>
> > **(A)** the putative class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > **(B)** the extent and nature of any litigation concerning the controversy already begun by or against putative class members;
> >
> > **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J.)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under

(b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments").  The Court will focus on the most important form of class action, the (b)(3) damages class action.[13]

_____

[13]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is

injunctive or declaratory "whipsawing," in which, u.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments.  See Fed. R. Civ. P. 23(b)(1)(B).  Rule 23(b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim.  As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances.  See Fed. R. Civ. P. 23(c)(2)(A).

Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  Nagareda, supra, at 132.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

- 44 -

_____

Wal-Mart, 564 U.S. at 360-61 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  See William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed. 2017)("Newberg").  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . . Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.
>
> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added). Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized. <u>See</u> Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)(citing <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," <u>In re Nassau Cty. Strip Search Cases</u>, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," <u>Blades v. Monsanto Co.</u>, 400 F.3d at 566. Although a case need not present only common questions to merit certification, and the presence of some

-- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class. <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages.  In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires.  The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates.  The district court

found, among other things, that the damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis.  To establish such damages, the plaintiffs relied solely on the testimony of Dr. James McClave.  Dr. McClave designed a regression model which compared actual cable prices in the Philadelphia "Designated Market Area" with hypothetical prices that would have prevailed but for Comcast Corp.'s allegedly anticompetitive activities.  The model calculated damages of $875,576,662.00 for the entire class.  As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

The Court of Appeals for the Third Circuit affirmed the district court decision.  The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation."  569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question of "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."  569 U.S. at 39.  Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination." 569 U.S. at 34.  Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.  Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34.   Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.   Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity."   569 U.S. at 35 (emphasis in original).

It is clear that Comcast Corp. v. Behrend applies to classwide damages.   It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages. There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.   First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.   Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages.   Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to classwide damages.   As to the first option, while much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards.   Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual.   While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards.   On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to

the individual determination of damages as it does to classwide damages.  The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  569 U.S. at 42 (Ginsburg, J., dissenting).  Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law.  Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage.  Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class

members that they do not create for other class members or groups.  The predominance analysis

must identify precisely the common issues and uncommon issues that application of the class

methodology or methodologies raise, and then determine whether, in the total issue mix, the

common issues predominate over the individual ones.

A defendant's desire to assert individual counterclaims[14] does not typically defeat

predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v.

Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003).  A defendant's desire to assert individual

affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile

Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class

action status under Rule 23(b)(3) simply because affirmative defenses may be available against

individual members."), but this statement is less true after Wal-Mart.[15]   Other recurring

---

[14]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all.

[15]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.

Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic

individual issues present more serious challenges to predominance, such as: (i) the prima facie

element of reliance or due diligence in common-law fraud and other cases;[16] (ii) differences in

_____

> disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., supra ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[16]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v.

the applicable law in a multi-state, state-law-based class actions,[17] see Castano v. Am. Tobacco

Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual personal injury

_____

Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).  The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

>We have found a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[17]In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in an opinion that predates Wal-Mart and Comcast, stated:

>No class action is proper unless all litigants are governed by the same legal rules.  Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3).  Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.  Judge Easterbrook then discussed how variations in tires defeat class treatment:

>Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone

tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.  Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court.  See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport

damages, which presents such a challenge to predominance that class certification of mass tort

claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.  There is

little uniform guidance on how to assess when common issues predominate over individual ones,

and the Court's statements to this point have, obviously, done more to disavow various tempting

but fallacious rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Courts of Appeals over

the proper way to analyze predominance -- with the United States Courts of Appeals for the

Seventh and Sixth Circuits on one side and the United States Courts of Appeals for the Third,

Tenth, and Eleventh Circuits on the other.  The Honorable Richard A. Posner,[18] United States

Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a

question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012),

vacated, 569 U.S. 1015 (2013).  Judge Posner poses the predominance question as: "Is it more

efficient, in terms both of economy of judicial resources and of the expense of litigation to the

_____

Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, G.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

[18]Judge Posner is the most-cited legal scholar of all time.  See Fred R. Shapiro, The Most-Cited Legal Scholars, 29 J. Legal Stud. 409, 424 (2000).  Judge Posner retired from the Seventh Circuit, effective September 2, 2017.

parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears,

Roebuck & Co., 702 F.3d at 362.   In Butler v. Sears, Roebuck & Co., the Seventh Circuit

reversed a district court's denial of certification of a class of washing-machine owners who

alleged that Sears' washing machines were prone to cultivate mold and affirmed the district

court's certification of the same class to pursue a claim that the machines' control units were

defective.  See 702 F.3d at 360-61.  The Seventh Circuit certified the class -- which spanned six

states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit.  If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty).  But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.
>
> . . . .
>
> [T]he district court will want to consider whether to create different subclasses of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions

pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck

& Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v.

Behrend."   Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013).   On

reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by

Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.   That's incorrect.   An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.   [Wal-Mart, 564 U.S. at 338].   That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case).   But predominance requires a qualitative assessment too; it is not bean counting.   In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997), it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."   And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .
>
> As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.   It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).   The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.   But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.
>
> There is a single, central, common issue of liability: whether the Sears washing machine was defective.   Two separate defects are alleged, but remember that this class action is really two class actions.   In one the defect alleged involves mold, in the other the control unit.   Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses.   See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d at 365 (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[19]

---

[19]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. [569 U.S. at 37](emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed.2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." But in support of its argument Sears

- 58 -

The Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[20]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently.  This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule

> cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

> Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

> Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis.  As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed

Bulter v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[20]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim."  Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'").  Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted).  That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making.  Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action."  That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class."  Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones.  Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013)(citations omitted).  The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied.  See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.  This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual

determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. <u>If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.</u>

The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. <u>When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust,</u> as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

<u>McLaughlin on Class Actions</u> § 5:23 (11th ed. 2016)(emphases added)(omission in original)(footnotes omitted).

Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third, Tenth, and Eleventh Circuits stake out a different test.

"Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."  Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member."  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

<u>Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.</u>, 601 F.3d 1159, 1170 (11th Cir. 2010)(emphasis in original)(citations omitted).[21]   The Eleventh Circuit, however,

---

[21]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in

imposes a different, more rigorous, second step: the district court's trial plan must spend more

_____

2004 in <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241 (11th Cir. 2004), and gave renewed articulations of the test in 2009 in <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d 1256 (11th Cir. 2009), and in 2010, in <u>Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.</u>   In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d 309 (5th Cir. 1978).   In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").   If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

<u>Klay v. Humana, Inc.</u>, 382 F.3d at 1255.  <u>See</u> <u>Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.</u>, 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d at 1270 (quoting the above portion of <u>Klay v. Humana, Inc.</u>).

> The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.   The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.   If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, <u>then the necessary common question might not be present</u>.

<u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d at 322 (emphasis added)(footnote omitted).

<u>time</u> adjudicating the common questions than it does adjudicating the individual questions.  The

Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value

cases that can be fairly and efficiently adjudicated via class action should not be certified[22] -- but

---

[22]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases.  Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's.  "Predominate," the word that rule 23 uses, means "[t]o be of greater power, importance, <u>or quantity</u>; be most important or outstanding."  <u>The American Heritage Dictionary of the English Language</u>, <u>supra</u>, at 1032 (emphasis added).  Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis.  There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, <u>see</u> Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, <u>see</u> Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").  These provisions are indeed unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction.  Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim.  Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication.  Judge Posner's test explicitly admits of subclasses and issue classes.  Even if it had not allowed for these classes, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear.  The Eleventh Circuit's best discussion of subclasses comes from <u>Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.</u>:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses.  We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety.  The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance.  When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.
>
> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

601 F.3d at 1176 (citations omitted). These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category. 601 F.3d at 1176. That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Co. case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining

---

> common issue predominates over the remaining individual issues would
> eviscerate the predominance requirement of rule 23(b)(3); the result would be
> automatic certification in every case where there is a common issue, a result that
> could not have been intended.

84 F.3d at 745 n.21 (citations omitted).  This logic is hardly unassailable.  Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be "automatic certification in every case where there is a common issue," because superiority must still be satisfied.  <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21.  If a proposed class action is superior -- <u>e.g.</u>, if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule.  <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21.  Moreover, it is a poor reading of the rule's text.  Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D).  Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended."  <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21.

The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues
> and claims over the common issue that the majority now certifies for class
> treatment, the majority has adopted an inventive approach to Rule 23 that allows
> certification of a class where the predominance requirement of Rule 23(b)(3) is
> admittedly unmet in the context of the case as a whole.  According to the
> majority, to require the certified issue in this case to predominate over the
> individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it
> appears to view as a fourth avenue for class certification, on equal footing with
> Rules 23(b)(1), 23(b)(2), and 23(b)(3).  In doing so, the majority glorifies Rule
> 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class
> treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and
> 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s
> requirements no longer need be applied to "[a]n action," <u>see</u> Fed. R. Civ. P. 23(b),
> but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part).  Despite Judge Niemeyer's concern with creating a circuit split, the Second Circuit, the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc.  See Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001).  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case.  See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996)("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").  We did not directly address the propriety of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l

- 66 -

it is commendable in that it <u>is</u> a test that district courts can use, rather than yet another meaningless recitation, <u>see</u> <u>CGC Holding Co. v. Broad & Cassel</u>, 773 F.3d 1076, 1087 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." (quoting <u>Newberg</u> § 4:49)), circular axiom, <u>see, e.g.</u>, <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, <u>see</u> <u>Reed v. Bowen</u>, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations."), self-evident comparison, <u>see</u> <u>Monreal v. Potter</u>, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]" (quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. at 623-24)), or worthless slogan, <u>see</u> <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

The Tenth Circuit followed the Eleventh Circuit's approach in <u>CGC Holding Co., LLC v. Broad and Cassel</u>.

---

<u>Union of Operating Engr's, Local No. 139, AFL-CIO</u>, 216 F.3d 577, 581 (7th Cir. 2000), <u>and</u> <u>Jefferson v. Ingersoll Int'l Inc.</u>, 195 F.3d 894, 898 (7th Cir. 1999), <u>with</u> <u>Allison v. Citgo Petroleum Corp.</u>, 151 F.3d 402, 420-22 (5th Cir. 1998). We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

<u>Monreal v. Potter</u>, 367 F.3d at 1237 n.12.

Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d at 1087.

## ANALYSIS

The Court concludes that Justice Stevens' concurring opinion in Shady Grove controls in the Tenth Circuit, and the one Tenth Circuit opinion and the few district court cases that have applied a different analysis have done so incorrectly. Applying Justice Stevens' analysis to the determination of whether rule 23 or § 50-4-26(D) governs the Plaintiffs' Motion, the Court concludes that rule 23 governs, because the state conditional certification provision, § 50-4-26(D), is procedural in nature, and directly conflicts with the federal rule. Further, the Plaintiffs have not demonstrated their eligibility for conditional certification pursuant to the rule 23

requirements.  Accordingly, the Court will deny the Motion.

## I.    IN THE TENTH CIRCUIT, JUSTICE STEVENS' CONCURRING OPINION IN <u>SHADY GROVE CONTROLS.</u>

The Tenth Circuit applies Justice Stevens' concurrence in <u>Shady Grove</u> and not Justice

Scalia's plurality opinion, when determining whether applying a federal rule of civil procedure

would exceed Congress' rulemaking power.[23]  <u>See James River Ins. v. Rapid Funding, LLC</u>, 658

---

[23]While Justice Stevens' concurrence is the controlling opinion in the Tenth Circuit and therefore the Court will apply Justice Stevens' concurrence in this case, the Court notes its preference for the test that Justice Scalia's plurality opinion describes.  Justice Stevens acknowledges that almost any rule of procedure could have a significant effect on the outcome of a case, but that the bar for finding a Rules Enabling Act problem is a high one.  "The mere possibility that a federal rule would alter a state-created right is not sufficient.  There must be little doubt."  <u>Shady Grove</u>, 559 U.S. at 432 (Stevens, J., concurring).  Justice Stevens also acknowledges that determining whether a seemingly procedural state law is so "interwoven with the scope of a substantive right or remedy" as to create a Rules Enabling Act problem is a difficult inquiry to make.  <u>Shady Grove</u>, 559 U.S. at 429 (Stevens, J., concurring).  The line between procedure and substance, admits Justice Stevens, is hazy, but Justice Stevens propounds that "Courts cannot ignore text and context in the service of simplicity," however difficult the inquiry is.  <u>Shady Grove</u>, 559 U.S. at 426 (Stevens, J., concurring).

Justice Stevens asks courts to interpret federal rules in light of considerations like sensitivity to important state interests and regulatory policies.  <u>See Shady Grove</u>, 559 U.S. at 426 (Stevens, J., concurring).  As <u>Sibbach v. Wilson & Co.</u>, 312 U.S. 1 (1941), and Justice Scalia's plurality opinion in <u>Shady Grove</u> both assert, however, the Federal Rules of Civil Procedure should not be valid in some jurisdictions and not in others depending on the different state purposes that federal courts divine to explain conflicting state procedural rules.  <u>See Shady Grove</u>, 559 U.S. at 404 (Scalia, J.); <u>Sibbach v. Wilson & Co.</u>, 312 U.S. at 14.  Such an approach would "invite endless litigation and confusion."  <u>Sibbach v. Wilson & Co.</u>, 312 U.S. at 13-14.  <u>See Shady Grove</u>, 559 U.S. at 409-10 (Scalia, J.).

Justice Scalia's plurality opinion advocates for looking to the federal rule and determining whether it regulates substance or procedure.  <u>See Shady Grove</u>, 559 U.S. at 410 (Scalia, J.).  The rule must regulate procedure, pursuant to the Rules Enabling Act limitation that it not "abridge, enlarge, or modify any substantive right."  28 U.S.C. § 2072(b).  <u>See Shady Grove</u>, 559 U.S. at 406 (Scalia, J.)("In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule.  We have held since <u>Sibbach</u>, and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure.").  The Rules Enabling Act limitation provides for protection of state substantive rights and remedies, while also not

F.3d at 1217 ("[T]he Tenth Circuit has understood [Stevens'] concurrence to be the controlling

opinion in <u>Shady Grove</u>."); <u>Garman v. Campbell Cty. Sch. Dist. No. 1</u>, 630 F.3d at 983 n.6

(stating that the Tenth Circuit "look[s] to Justice Stevens' concurrence for guidance" in applying

<u>Shady Grove</u>, because Justice Stevens' reasoning was narrower than Justice Scalia's reasoning in

the plurality opinion).[24]   Because Justice Stevens joined the plurality opinion as to sections I and

II-A, those sections also control.   See <u>Lisk v. Lumber One Wood Preserving, LLC</u>, 792 F.3d

1331, 1335 (11th Cir. 2015) [25]   (the controlling rule from the plurality joined by Justice Stevens

is that "a federal rule applies in any federal lawsuit, and thus displaces any conflicting state

provision, so long as the federal rule does not 'abridge, enlarge, or modify any state right.'")

(citing <u>Hanna v. Plumer</u>, 380 U.S. 460 (1965))).

Nonetheless, in one case, the Tenth Circuit applies Justice Scalia's plurality opinion and

---

submerging courts in endless and difficult inquiries into the legislative purpose of a particular state rule.

[24]In <u>Marks v. United States</u>, 430 U.S. 188 (1977), the Supreme Court addressed the problem with interpreting plurality opinions.  The Supreme Court outlined a narrowest-grounds doctrine, explaining that, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  <u>Marks v. United States</u>, 430 U.S. at 193.  Because Justice Stevens' concurrence still provides some room for deference to state courts, and does not propose applying rule 23 in all instances of conflict with a comparable state provision, his opinion is the narrowest grounds for the decision.

[25]In a recent opinion, Judge Herrera adopted the rule from <u>Lisk v. Lumber One Wood Preserving, LLC</u> in determining which portions of <u>Shady Grove</u> control, and arrived at the same conclusion that Justice Stevens' concurrence, as well as Sections I and II-A of the plurality opinion, are controlling.  See <u>Gandy v. RWLS, LLC</u>, 308 F. Supp. 3d 1220, 1226 (D.N.M. 2018)(Herrera, J.).

not Justice Stevens' concurrence.  See Jones v. United Parcel Serv., Inc., 674 F.3d at 1203.[26]

That Jones v. United Parcel Serv., Inc. reflects only a momentary deviation from the Tenth

Circuit precedent is clear in light of the fact that the Tenth Circuit has repeatedly noted its

adoption of Justice Stevens' concurrence both before and after Jones v. United Parcel Serv., Inc.

See Los Lobos Renewable Power, LLC v. Americulture, Inc, 885 F.3d 659, 676 n.3 (10th Cir.

2018)("Justice Stevens' concurrence in *Shady Grove* provides the controlling analysis in the

Tenth Circuit."); Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162; Macon v.

United Parcel Serv., Inc., 743 F.3d 708, 714 (10th Cir. 2014)("A federal rule, therefore, cannot

govern a particular case in which the rule would displace a state law that is procedural in the

ordinary use of the term but is so intertwined with a state right or remedy that it functions to

define the scope of the state-created right."  (quoting Shady Grove, 559 U.S. at 423 (Stevens, J.,

concurring));  Kechi Twp. v. Freightliner, LLC, 592 F. App'x 657, 673 (10th Cir.

---

[26]The Jones v. United Parcel Serv., Inc. Court states that Shady Grove's first step is to
"determine whether [the rule] answers the question in dispute."  674 F.3d at 1203 (alteration in
original)(quoting Shady Grove, 559 U.S. at 398 (Scalia, J.)).  Stevens' concurrence, by contrast,
states that the "court must first determine whether the scope of the federal rule is 'sufficiently
broad' to 'control the issue' before the court, 'thereby leaving no room for the operation' of
seemingly conflicting state law."  Shady Grove, 559 U.S. at 421 (quoting Burlington N. R.R. v.
Woods, 480 U.S. 1, 4-5(1987))(Stevens, J., concurring).  The Jones v. United Parcel Serv., Inc.
court states that the second step is to determine whether the rule regulates procedure, an inquiry
for which "[w]e do not look to the purpose of the conflicting state law, but rather we look to [the
federal rule] itself; the purpose of the state law, even if substantive, is immaterial to our
analysis."  Jones v. United Parcel Serv., Inc., 674 F.3d at 1206 (citing Shady Grove, 559 U.S. at
405-06 (Scalia, J.)).  Justice Stevens contends that the second step must consider whether an
ostensibly procedural rule is not "so intertwined with a state right or remedy that it functions to
define the scope of the state-created right."  Shady Grove, 559 U.S. at 423 (Stevens, J.,
concurring).

2014)(unpublished)[27]("Application of a federal rule is not such a valid exercise where it 'abridge[s], enlarge[s] or modif[ies] *any* substantive right.'"  (quoting Shady Grove, 559 U.S. at 422 (Stevens, J., concurring))).

A few District of New Mexico cases have either expressly applied Justice Scalia's plurality opinion or followed Shady Grove's holding without considering whether a seemingly procedural law is substantive.  In 2014, Judge Vázquez determined that rule 23, and not § 50-4-26(D), "sets forth the standard for determining whether Plaintiffs' [NMMWA] action may proceed as a class action."  Casias v. Distrib. Mgmt. Corp., 2014 WL 12710236, at *8.  Judge Vázquez applied Justice Scalia's plurality opinion in Shady Grove, first determining that rule 23 and § 50-4-26(D) "attempt to answer the same question."  Casias v. Distrib. Mgmt. Corp., 2014 WL 12710236, at *8.  Judge Vázquez then determined that rule 23 applies, because -- she reasoned -- Shady Grove already concludes that rule 23 "is valid under the Rules Enabling Act because it is procedural."  Casias v. Distrib. Mgmt. Corp., 2014 WL 12710236, at *9 (citing Shady Grove, 559 U.S. at 401, 408).  In so holding, Judge Vázquez relied on Justice Scalia's summary that "it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule."  Casias v. Distrib.

_____

[27]Kechi Twp. v. Freightliner, LLC is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Kechi Twp. v. Freightliner, LLC has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Motion.

Mgmt. Corp., 2014 WL 12710236, at *8 (quoting Shady Grove, 559 U.S. at 410).   Judge

Vázquez reaffirmed this approach a few months later, in Abrams v. City of Albuquerque:

> Federal Rule of Civil Procedure 23 -- and not the state Wage Act's collective
> action provision contained in Section 50-4-26(D) -- determines whether Plaintiffs'
> claims are subject to class treatment, because Plaintiffs are litigating their Wage
> Act claims in federal district court.   See Shady Grove Orthopedic Assocs., P.A. v.
> Allstate Ins. Co., 559 U.S. 393 (2010)(holding that Federal Rule of Civil
> Procedure 23, and not a state law in conflict with Rule 23, governs whether claims
> can proceed as a class action in federal court); Casias et al. v. Distribution Mgmt.
> Corp., No. 11-CV-00874-MV-RHS, slip op. at 12-18 (D.N.M. filed Mar. 31,
> 2014)(holding that the class action procedure set forth in Federal Rule of Civil
> Procedure 23, and not the collective action procedure established in Section 50-4-
> 26(D), applies to claims under the New Mexico Wage Act brought in federal
> court)(citing Shady Grove, 559 U.S. 393).

Abrams v. City of Albuquerque, 2014 WL 11497810, at *12 n.7.

In 2017, Judge Herrera summarized Shady Grove with reference to Justice Scalia's

plurality opinion and not with reference to Justice Stevens' concurrence.   See Medrano v.

Flowers Foods, Inc., 2017 WL 3052493, at *5.   Accordingly, Judge Herrera concluded that rule

23 controlled the Plaintiffs' NMMWA claims.   See Medrano v. Flowers Foods, Inc., 2017 WL

3052493, at *5 (citing Abrams v. City of Albuquerque, 2014 WL 11497810, at *12 & n.7; Casias

v. Distrib. Mgmt. Corp., 2014 WL 12710236, at *8).

It is not clear why these three district court cases rely on Justice Scalia's Shady Grove

plurality opinion and not on Justice Stevens' concurrence.   Arguably, the Tenth Circuit did not

clearly reaffirm its adoption of Justice Stevens' concurrence before those cases were decided:

between Jones v. United Parcel Serv., Inc. and Judge Herrera's 2014 cases, the Tenth Circuit

mentioned its adoption of Justice Stevens' concurrence, but only once in passing.   See Macon v.

United Parcel Serv., Inc., 743 F.3d at 714 n.2.   In Macon v. United Parcel Serv., Inc., the Tenth

Circuit observed, in a footnote, that Justice Stevens' concurrence provides Shady Grove's controlling analysis, but the Tenth Circuit did so only to note Shady Grove's possible impact on a relevant case:

> Shady Grove was not cited by either party here or in the district court with respect to its possible impact on [Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002)], and we are reluctant to address such an important issue which was not briefed (or even raised). Fortunately, we need not do so. If [Foster v. Alliedsignal, Inc.] still controls, the district judge erred in applying the more lenient "preponderance of the evidence" standard. . . . But since the possible error resulted in a more favorable treatment of Macon's claims, it was harmless as to him. See Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."). Under our analysis, Macon's claims fail under either the clear-and-convincing or the preponderance-of-the-evidence standard.

Macon v. United Parcel Serv., Inc., 743 F.3d at 714 n.2. The Tenth Circuit's only mention of Justice Stevens' concurrence after Macon v. United Parcel Serv., Inc. but before Medrano v. Flowers Foods, Inc. came in an unpublished opinion. See Kechi Twp. v. Freightliner, LLC, 592 F. App'x at 673 ("Application of a federal rule is not such a valid exercise where it 'abridge[s], enlarge[s] or modif[ies] any substantive right.'" (quoting James River Ins. v. Rapid Funding, LLC, 658 F.3d at 1218)(emphasis in James River Ins. Co. v. Rapid Funding, LLC)).

    In the short time since Medrano v. Flowers Foods, Inc., however, the Tenth Circuit has, in two published opinions, affirmed its adoption of Justice Stevens' Shady Grove concurrence. See Los Lobos Renewable Power, LLC v. Americulture, Inc, 885 F.3d at 676 n.3 ("Justice Stevens' concurrence in Shady Grove provides the controlling analysis in the Tenth Circuit."); Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162. In fact, Judge Herrera issued an opinion earlier this year acknowledging Justice Stevens' concurrence as controlling in the

Tenth Circuit and applying its test to a claim for class certification under § 50-4-26(D).   See

Gandy v. RWLS, LLC, 308 F. Supp. 3d 1220, 1226 (D.N.M. 2018)(Herrera, J.).

The overwhelmingly consistent approach in the Tenth Circuit has been to apply Justice

Stevens' concurring opinion in Shady Grove, rather than Justice Scalia's plurality opinion.   The

few district court opinions that have applied Justice Scalia's analysis constitute minor deviations

from a trend that both federal district judges -- including this Court -- and courts in the Tenth

Circuit have consistently reaffirmed.   This Court does not propose to deviate from the controlling

rule, which Justice Stevens articulated.

## II.   APPLYING THE TEST FROM JUSTICE STEVENS' CONCURRENCE IN SHADY GROVE, RULE 23 GOVERNS THE PRESENT MOTION.

The first step in applying Justice Stevens' Shady Grove concurrence is to determine

whether there is a "direct collision" between the federal and state rules that is unavoidable, such

that the state and federal rules cannot "exist side by side . . . each controlling its own sphere of

coverage."   Racher v. Westlake Nursing Home Ltd. P'rship, 871 F.3d at 1163 (citations omitted).

In Section II-A of the opinion in Shady Grove, Justice Scalia writes for the Supreme Court that

"[r]ule 23 provides a one-size-fits-all formula for deciding the class-action question."   Shady

Grove, 559 U.S. at 398-99.   The Supreme Court in Shady Grove determined that the scope of

rule 23 is "sufficiently broad to control the issue before the court, thereby leaving no room for

the operation of seemingly conflicting state law."   559 U.S. at 421.   There is therefore a direct

collision between rule 23 and the NMMWA provision, because § 50-4-26(D) also purports to

create a formula for deciding the class-action question.   Rule 23 requires that a class meet four

prerequisites -- numerosity, common questions of law or fact, typicality, and fair and adequate

representation, see Fed. R. Civ. P. 23(a); the NMMWA allows a plaintiff or plaintiffs to sue on

- 75 -

behalf of those "similarly situated," <u>see</u> N.M. Stat. Ann. § 50-4-26(D).

After determining there is a direct collision between rule 23 and § 50-4-26(D), the next step is to determine whether rule 23 is a valid exercise of the Supreme Court's authority pursuant to the Rules Enabling Act, <u>i.e.</u>, that it does "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b).  <u>See</u> <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1163-64. Here, Justice Stevens' analysis departs from the plurality in <u>Shady Grove</u>.  Justice Scalia advocates for a focus on whether the federal rule regulates procedure.  In <u>Shady Grove</u>, the Supreme Court agreed that rule 23 regulates procedure.  <u>See</u> 559 U.S. at 408.  Because Justice Stevens' concurrence controls in the Tenth Circuit, however, the Court's analysis must continue. According to Justice Stevens, the analysis should focus on whether the state law in question, while seemingly procedural, actually defines the scope of state substantive rights or remedies. <u>See</u> <u>Shady Grove</u>, 559 U.S. at 420 (Stevens, J., concurring).  The test articulated in Justice Stevens' concurrence is, "if a federal rule displaces a state rule that is 'procedural' in the ordinary sense of the term, . . . but sufficiently interwoven with the scope of a substantive right or remedy" as to define the substantive right's scope, the federal rule must give way to the state rule.  <u>Shady Grove</u>, 559 U.S. at 429 (Stevens, J., concurring)(quoting <u>S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.</u>, 60 F.3d 305, 310 (7th Cir. 1995)(Posner, C.J.)).

Section 50-4-26(D) does not define the scope of substantive rights or remedies, and is therefore procedural.  The Plaintiffs argue that § 50-4-26 (D) is so interwoven with employees' right to recover for unpaid overtime in violation of the NMMWA, that it is in essence substantive.  The Plaintiffs also assert that the New Mexico Legislature declined to refer to its general rule for class certification, in N.M.R.A. 1-023, but rather created § 50-4-26(D) as a

standard specific for NMMWA claims.  According to Plaintiffs, this significantly distinguishes the New Mexico state provision from the New York provision at issue in <u>Shady Grove</u>, which was of more general applicability, suggesting that it was procedural.  <u>See</u> Motion at 7.  The Plaintiffs miss, however, that Justice Stevens does not suggest that every state procedural provision located within, or specifically applied to a particular statute, should be deemed substantive.  In fact, Justice Stevens expressly declines to arrive at that conclusion by continuing his analysis of the substantive versus procedural question beyond his determination that the New York provision was generally applicable.  <u>See</u> <u>Shady Grove</u>, 559 U.S. at 433-35 (Stevens, J., concurring).

The Plaintiffs cite to a number of federal district and state supreme court cases to support their assertion that, when a seemingly procedural state provision is located in the same statute that creates the substantive right on which the plaintiff is suing and is applicable only to claims under that statute, the provision is in essence substantive, and allowing rule 23 to override it would violate the Rules Enabling Act.  <u>See</u> Motion at 8-11.  While some of the cases to which the Plaintiffs cite are factually similar to this one, however, distinguishing factors compel the Court to arrive at a different conclusion.  First, the wage-and-hour cases which the Plaintiffs cite conclude that opt-in state provisions are substantive, but their analysis is specific to the provisions' opt-in characteristics, and therefore does not apply to § 50-4-26(D), which is an opt-out provision.  Second, a District of New Mexico case concludes that even opt-in provisions are procedural and not substantive.  Third, the Plaintiffs significantly overweight the part of Justice Stevens' analysis in which he notes that the New York provision at issue in <u>Shady Grove</u> is procedural because it is in a generally applicable rule, and is not specific to claims under one

statute.

First, the Defendants correctly assert that, in the two wage-and-hour cases which the Plaintiffs highlight, Driscoll v. George Washington University, 42 F. Supp. 3d 52 (D.D.C. 2012)(Huvelle, J.), and Harris v. Reliable Reports, Inc., Civil Action No. 1:13-CV-210 JVB, 2014 U.S. Dist. LEXIS 31223 (N.D. Ind. 2014)(Van Bokkelen, J.), the state laws at issue allow for "opt-in" procedures, whereas in this case, an "opt-out" standard would apply under either § 50-4-26(D) or the federal rule.  Response at 4-5.  The Plaintiffs contend in a footnote that although "[t]he NMMWA does not contain an opt in standard, . . . the issue in Driscoll is comparable because here the NMMWA applies to establish a procedural framework for collective actions that is different than the requirements of Fed. R. Civ. P. 23."  Motion at 9 n.2.[28]  The Court's determination in Driscoll v. George Washington University that the state

_____

[28]It is true that the NMMWA establishes a procedural framework for collective actions that differs from that which rule 23 establishes.  That fact does not render Driscoll v. George Washington University comparable to this case for the purpose of the substantive versus procedural analysis of § 50-4-26(D).  That rule 23 and a state provision establish different procedural frameworks is no more than the prerequisite for a Shady Grove analysis.  "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (citations and quotations omitted).  There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163 (citations omitted).  If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163.  After determining that there is a direct collision between a state and federal rule -- i.e., the state and federal rules establish different procedural frameworks for collective actions -- the Court progresses to the second step of the analysis, and at that stage, determines whether the state provision is procedural or substantive.  See Shady Grove, 559 U.S. at 420 (Stevens, J., concurring).

- 78 -

provision at issue was substantive hinged on its determination that the characteristics specific to an opt-in mechanism conferred substantive rights which would be abridged, enlarged, or modified by requiring rule 23's opt-out mechanism.[29]  An opt-out mechanism does not share the same characteristics, suggesting that the substantive versus procedural analysis of an opt-out state provision would necessarily differ.  See Driscoll v. George Washington Univ., 42 F. Supp. 3d at 62 ("Namely, [the opt-in mechanism] provides that employees' claims can only be litigated where the employees have affirmed their intent to be bound, and it establishes that employers have a right not to be sued in representative actions absent each plaintiff employee's consent.").  See also id. at 61-62 (citing Dillworth v. Case Farms Processing, Inc., No. 5:08CV1694, 2009 WL 2766991, at *6 (N.D. Ohio 2009)(Lioi, J.)("The opt-in requirement is substantive because it 'is the device by which . . . rights are secured,' as it prevents employees from 'hav[ing] their rights litigated without their knowledge and express consent' and generally reduces the number of plaintiffs in a representative suit against a business.'" (quoting Ellis v. Edward D. Jones & Co., L.P., 527 F. Supp. 2d 439, 456 & n.18 (W.D. Pa. 2007)(Gibson, J.); id. at 455-60; Zelinsky

---

[29]The Harris v. Reliable Reports, Inc. Court relied heavily on Driscoll's conclusion that the substantive nature of a state provision regarding collective actions was bound up with its characteristics as an opt-in mechanism.

The Court is aware of only one case that decided the question of whether Rule 23 prevails over an opt-in provision enacted as part of a wage and hour law.  In Driscoll v. George Washington University, No. 12-0690, 2012 U.S. Dist. LEXIS 127870, 2012 WL 3900716 (D.D.C. Sept. 10, 2012), the court concluded that the District of Columbia's opt-in provision 'confers substantive rights such that application of Rule 23 . . . would violate the Rules Enabling Act.' 2012 U.S. Dist. LEXIS 127870, [WL] at *7.  This Court reaches the same conclusion.

Harris v. Reliable Reports, Inc., 2014 U.S. Dist. LEXIS 31223, at *21-22.

v. Staples, Inc., Civil Action No. 08-684, 2008 WL 4425814, at *4 (W.D. Pa. 2008)("The decision to authorize an opt-in versus opt-out class represents substantive policy.")(Ambrose, C.J.))).

Second, in Gandy v. RWLS, LLC., a District of New Mexico case, Judge Herrera noted that district courts are split on the issue of whether an opt-in collective action rule is procedural or substantive.  See 308 F. Supp. 3d, at 1227 (comparing Driscoll v. George Washington Univ. with Roberts v. C.R. Eng., Inc., No. 2:12–cv–00302–RJS–BCW, 2018 WL 1449200, at *4-5 (D. Utah 2018)(Shelby, J.)(holding that a state opt-in provision was procedural).  Finding a district court split, Judge Herrera in Gandy v. RWLS, LLC performed her own analysis and disagreed with Driscoll v. George Washington University, concluding that even opt-in collective action provisions are procedural.

> Whether a similarly situated person must affirmatively act to join a suit or is automatically in the suit unless he opts out does not determine the substantive rights and remedies potentially available to that person. . . . Accordingly, the Court concludes that the opt-in collective action requirement is not substantive in nature to the rights and remedies created by the NMMWA.

Gandy v. RWLS, LLC, 308 F. Supp. 3d at 1229.  If replacing an opt-in provision with rule 23, which is an opt-out mechanism, does not violate the Rules Enabling Act, then replacing an opt-out provision -- § 50-4-26(D) -- with rule 23 also does not violate the Rules Enabling Act.

Third, the Plaintiffs significantly overweight the importance of where a particular state provision is located within a statutory scheme and the breadth of that provision's applicability. The Plaintiffs contend that "when an ostensibly procedural provision of state law is located in the same statute creating the private right of action sued on and is applicable only to claims under that same statute, rather than to cases generally, it will be found to define the scope of the state

- 80 -

law right.  Such a provision is substantive and must be applied by a federal court sitting in

diversity under <u>Shady Grove</u>."  Motion at 11.  The Court disagrees.  The location of a particular

provision within a state's statutory scheme does not determine the procedural or substantive

nature of that provision.  <u>See</u> <u>Roberts v. C.R. Eng., Inc.</u>, 2018 WL 1449200, at *5 ("The location

of a law within state statutory codes can be useful in discerning the legislature's intent, but

cannot in itself prove the law's procedural or substantive nature.  Instead, whether a law is

'intimately bound up in the scope of a substantive right or remedy' is a legal question.").  The

Plaintiffs cite to a number of cases, including <u>Lisk v. Lumber One Wood Preserving, LLC</u>, 993

F. Supp. 2d 1376 (N.D. Ala. 2014), to support their assertion that the location of a state provision

within the statutory scheme is significant to the <u>Shady Grove</u> analysis.[30]  The Eleventh Circuit

---

[30]The Plaintiffs cite to the following cases considering state provisions with different
collective action requirements than rule 23 to support this assertion: <u>Driscoll v. George
Washington Univ.</u>, 42 F. Supp. 3d at 60-62; <u>Harris v. Reliable Reports, Inc.</u>, No. 1:13-CV-210
JVB, 2014 U.S. Dist. LEXIS 31223, at *19-22 (N.D. Ind. March 10, 2014)(Van Bokkelen, J.);
<u>Ipock v. Manor Care of Tulsa, OK, LLC</u>, No. 17-CV-0106-CVE-TLW, 2017 U.S. Dist. LEXIS
51134, *4-12 (N.D. Okla. April 4, 2017)(Eagan, J.); <u>In re Nexium (Esomeprazole) Antitrust
Litig.</u>, 968 F. Supp. 2d 367, 407-08 (D. Mass. 2013)(Young, J.); <u>In re Digital Music Antitrust
Litig.</u>, 812 F. Supp. 2d 390, 414 (S.D.N.Y. 2011)(Preska, C.J.).  <u>See</u> Motion at 8-11.  Several of
the cases cited, the Defendants note, enforce state provisions restricting class actions, and are not
relevant because, although permitting class actions when a state legislature has restricted them
may enlarge substantive rights, both rule 23 and § 50-4-26(D) permit class actions subject to
certain requirements.  <u>See</u> Response at 5.  The cases that the Plaintiffs cite to enforcing state
provisions restricting class actions are <u>Williams v. King Bee Delivery, LLC</u>, 199 F. Supp. 3d
1175, 1185-86 (E.D. Ky. 2016)(Hood, J.); <u>Green v. Platinum Rests. Mid-Am. LLC</u>, No. 1:13-
CV-210 JVB, 2015 U.S. Dist. LEXIS 171647, at *17-23 (W.D. Ky. 2015)(Heyburn II, J.);
<u>Davenport v. Charter Communs., LLC</u>, 35 F. Supp. 3d 1040, 1049-51 (E.D. Mo. 2014)(Fleissig,
J.); <u>In re MyFord Touch Consumer Litig.</u>, No. 13-cv-03072-EMC, 2016 U.S. Dist. LEXIS
179487, at *76-79 (N.D. Cal. 2016)(Chen, J.); <u>Fejzulai v. Sam's West, Inc.</u>, 205 F. Supp. 3d 723,
725-29 (D.S.C. 2016)(Hendricks, J.); <u>Lisk v. Lumber One Wood Preserving, LLC</u>, 993 F. Supp.
2d at 1382-86; <u>In re Target Corp. Customer Data Sec. Breach Litig.</u>, 66 F. Supp. 3d 1154, 1163-
65 (D. Minn. 2014)(Magnuson, J.); <u>In re Trilegiant Corp.</u>, 11 F. Supp. 3d 82, 118-19 (D. Conn.

Court of Appeals concluded in Lisk v. Lumber One Wood Preserving, LLC, however, that the district court had assigned undue importance to the location of the state provision within the statutory scheme:

> To be sure, the New York prohibition [in Shady Grove] on statutory-penalty class actions was included in a procedural statute addressing class actions generally; the prohibition was not part of the statute that created the statutory penalty.  The Alabama class-action prohibition, in contrast, is part of the [Alabama Deceptive Trade Practice Act] itself.  Some district courts have said this is controlling.  But how a state chooses to organize its statutes affects the analysis not at all.  Surely the New York legislature could not change the Shady Grove holding simply by reenacting the same provision as part of the statutory-interest statute.  Surely an identical ban on statutory-interest class actions adopted by another state would not override Rule 23 just because it was placed in a different part of the state's code.  The goal of national uniformity that underlies the federal rules ought not be sacrificed on so insubstantial a ground.  And more importantly, the question whether a federal rule abridges, enlarges, or modifies a substantive right turns on matters of substance -- not on the placement of a statute within a state code.

Lisk v. Lumber One Wood Preserving, LLC, 792 F.3d at 1336.

Nor does the fact that the provision is applicable only to a certain statute or set of cases determine its substantive or procedural nature.  See Gandy v. RWLS, LLC, 308 F. Supp. 3d at 1229 ("The Court finds the nature of the opt-in collective action rule more significant to the analysis than the fact that it is a process applied only in NMMWA cases.").  The Plaintiffs assert

---

2014)(Bryant, J.); Phillips v. Phillip Morris Cos., Inc., 290 F.R.D. 476, 479-82 (Lioi, J.); Williams v. Chesapeake La., Inc., CIVIL ACTION NO. 10-1906, 2013 U.S. Dist. LEXIS 34778, at *6-16 (W.D. La. 2013)(Foote, J.); and Tait v. BSH Home Appliances Corp., No. SACV 10-711 DOC (ANx), 2011 U.S. Dist. LEXIS 54456, at *21-25 (C.D. Cal. 2011)(Carter, J.).  The Plaintiffs also cite to McCann v. Sullivan University System, No. 2015-SC-000144-DG (Ky. 2017)(Wright, J.), a state court case regarding whether Kentucky courts should read a Kentucky statutory provision to prohibit class actions.  McCann v. Sullivan University System does not address Shady Grove or a conflict of any kind between the Kentucky provision and rule 23, and so is irrelevant.

that the "key point [from the cases cited] is that when the respective state legislatures created the statutory rights to sue for overtime compensation, in the very same statutes they expressed their legislative judgment as to how those rights could be exercised."  Motion at 12.  While Justice Stevens did remark in his concurring opinion in <u>Shady Grove</u> that the location and breadth of application of the state provision weighed in favor of finding it to be substantive, the Court did not find those factors to be dispositive.   <u>See Shady Grove</u>, 559 U.S. at 433 (Stevens, J., concurring); <u>Gandy v. RWLS, LLC</u>, 308 F. Supp. 3d at 1228.  Justice Stevens also considered the nature of the provision, legislative history, and legislative intent.  <u>See Shady Grove</u>, 559 U.S. at 433-35 (Stevens, J., concurring).  While the New Mexico Legislature no doubt expressed legislative judgment by situating § 50-4-26(D) within the NMMWA, that fact alone does not resolve whether § 50-4-26(D) is a procedural or substantive provision.

The Supreme Court of New Mexico has not yet directly addressed whether § 50-4-26(D) is procedural or substantive in essence, so this Court must endeavor to predict how the Supreme Court of New Mexico would decide the issue.  <u>See TMJ Implants Inc. v. Aetna, Inc.</u>, 498 F.3d 1175, 1180 (10th Cir. 2007).  The Supreme Court of New Mexico's goal is "to facilitate and promote the Legislature's accomplishment of its purpose."  <u>State v. Smith</u>, 2004-NMSC-032, ¶ 8, 98 P.3d 1022, 1025 (quoting <u>State ex rel Helman v. Gallegos</u>, 1994-NMSC-023, ¶ 23, 871 P.2d 1352, 1359).  The Supreme Court of New Mexico considers a statute's history and background of a particular statute to try to divine what the drafters intend.  <u>See State v. Smith</u>, 2004-NMSC-032, ¶ 9, 98 P.3d at 1025-26.

The Plaintiffs suggested at the hearing on the Motion that the New Mexico Legislature intended to "affect the behavior of employers and employees in New Mexico with regard to

vindicating rights to minimum wages and overtime."  Tr. at 14:20-15:5 (Moody).  In the Motion,

the Plaintiffs cite to New Mexico Department of Labor v. A.C. Electric, Inc., 1998-NMCA-141,

¶ 10, 965 P.2d 363, 365-66, for the proposition that "state policy is to establish and safeguard

'minimum wage and overtime compensation standards.'"   Motion at 6 (quoting New Mexico

Dep't of Labor v. A.C. Elec., Inc., 1998-NMCA-141, ¶ 10, 965 P.2d at 365-66).  The Plaintiffs

then infer that the "broad remedial purpose of the NMMWA" motivated the New Mexico

Legislature to create "an enforcement mechanism more easily satisfied by employees than the

demanding standards applicable to traditional class actions."  Motion at 6.[31]

   While the Court agrees that the New Mexico Legislature exercised its sound judgment in

drafting the procedural mechanism for class actions in § 50-4-26(D), intending to make it easier

---

[31]This interpretation of New Mexico Department of Labor v. A.C. Electric, Inc.'s findings is an extrapolation from the Court of Appeals of New Mexico's statements.  The Court of Appeals of New Mexico specifically discussed § 50-4-22(C) alone, which states: "No employee covered by the provisions of Subsection A of this section shall be required to work more than forty hours in any week of seven days, unless he is paid one and one-half times his regular hourly rate of pay for all hours worked in excess of forty hours."  New Mexico Dep't of Labor v. A.C. Elec., Inc., 1998-NMCA-141, ¶ 9, 965 P.2d at 365 (quoting § 50-4-26 (C)).  The Court of Appeals of New Mexico interpreted that statutory section, and concluded that the New Mexico Legislature designed the wage-and-hour restrictions in the NMMWA with a remedial purpose in mind.  See New Mexico Dep't of Labor v. A.C. Elec., Inc., 1998-NMCA-141, ¶ 13, 965 P.2d at 366.

The Court notes that the Supreme Court of New Mexico, absent clear directives from the Legislature, does not read language into statutes that is not already there.  In State v. Chadwick-McNally, 2018-NMSC-018, ¶ 21, 414 P.3d 326, 330 , the Supreme Court of New Mexico stated:

   Unlike when the death penalty was in force, the Act is now otherwise silent about the procedures that must be followed in a case like Defendant's, including whether bifurcated guilt and sentencing proceedings are permitted or required.  See §§ 31-20A-2, -5.  "We do not read language into the Act that is not there."

State v. Chadwick-McNally, 2018-NMSC-018, ¶ 21, 414 P.3d at 330 (quoting State v. Wyrostek, 1994-NMSC-042, ¶17, 873 P.2d 260, 266).

for employees to sue as a class for violations of the NMMWA, that fact alone does not make § 50-4-26(D) substantive.  The Tenth Circuit recently clarified that a state law is substantive if, after examining "the language and policy of the rule in question[,] . . . the primary objective is directed to influencing conduct through legal incentives," and a state law is procedural if the law's purpose is to "achiev[e] fair, accurate, and efficient resolutions of disputes."  Sims v. Great American Life Ins., 469 F.3d 870, 883 (10th Cir. 2006).  Section 50-4-26(D) creates no additional incentive for a prospective plaintiff to bring a claim -- it offers no additional or different right or remedy.  Justice Stevens stated:

> it is necessary to distinguish between procedural rules adopted for *some* policy reason and seemingly procedural rules bound up in the scope of a substantive right or remedy.  Although almost every rule is adopted for some reason and has some effect on the outcome of litigation, not every state rule "defines the dimensions of [a] claim itself."

Shady Grove, 559 U.S., at 433-34 (Stevens, J., concurring)(emphasis in original)(citations omitted).  "If a state law 'concerns merely the manner and means' by which substantive rights are enforced, it is procedural, but if its application would 'significantly affect the result of litigation, it is substantive.'"  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (quoting Guaranty Tr. Co. v. York, 326 U.S. 99, 109 (1945)).  The substantive right under which the Plaintiffs sue and the remedies available to each plaintiff would not change under rule 23 or § 50-4-26(D) -- the only difference is the procedural mechanism plaintiffs must follow to access the rights and remedies.  Justice Ginsburg, in her dissenting opinion in Shady Grove, suggests that the New York Legislature adopted the state provision at issue in Shady Grove "[a]iming to avoid 'annihilating punishment of the defendant.'"   559 U.S. at 444 (Ginsburg, J., dissenting)(internal quotation marks omitted)(quoting V. Alexander, Practice Commentaries,

C901:11, reprinted in 7B <u>McKinney's Consolidated Laws of New York Ann.</u>, p. 104 (2006)).

Justice Stevens responds to Justice Ginsburg that "statements such as these are not particularly strong evidence that [the New York state provision] serves to define who can obtain a statutory penalty or that certifying such a class would enlarge New York's remedy.   Any device that makes litigation easier makes it easier for plaintiffs to recover damages."   559 U.S. at 434 (Stevens, J., concurring).   Here, the Plaintiffs' assertion -- which is most likely true -- that the New Mexico Legislature crafted § 50-4-26(D) as a device intended to make litigation easier in the state courts is not strong evidence of a substantive purpose.

The Plaintiffs misconstrue the analysis that Justice Stevens undertakes in his concurrence in <u>Shady Grove</u>.   Justice Stevens wrote in relevant part:

> In my view, however, the bar for finding an Enabling Act problem is a high one. The mere fact that a state law is designed as a procedural rule suggests it reflects a judgment about how state courts ought to operate and not a judgment about the scope of state-created rights and remedies.   And for the purposes of operating a federal court system, there are costs involved in attempting to discover the true nature of a state procedural rule and allowing such a rule to operate alongside a federal rule that appears to govern the same question.   The mere possibility that a federal rule would alter a state-created right is not sufficient.   There must be little doubt.

<u>Shady Grove</u>, 559 U.S. at 432 (Stevens, J., concurring).   Section 50-4-26(D)'s plain language relates to procedure --

> An action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and on behalf of the employee or employees and for other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action on behalf of all employees similarly situated . . .

N.M. Stat. Ann. § 50-4--6(D) -- and is more probably meant to "achiev[e] fair, accurate, and

efficient resolutions of disputes."  Sims v. Great Am. Life Ins., 469 F.3d at 883.[32]  See Leon v.

FedEx Ground Package Sys., Inc., 313 F.R.D. 615, 641 (D.N.M. 2016)(Browning, J.)("The

Court concludes that New Mexico law on substantial similarity is procedural in nature. . . . [T]his

distinction is unlikely to modify any behavior outside of the courtroom.  The rule is instead

aimed at 'achieving fair, accurate, and efficient resolutions of disputes.'" (quoting Sims v. Great

Am. Life Ins., 469 F.3d at 882-83)).  In Upky v. Lindsey, No. CIV 13-0552 JB/GBW, 2015 U.S.

Dist. LEXIS 55167, at *19 (D.N.M. April 7, 2015)(Browning, J.), the Court applied Justice

Stevens' concurring opinion to resolve a conflict between the Federal Rules of Evidence and a

state rule.[33]  The Court discussed the substantive/procedural distinction and concluded:

---

[32]New Mexico renders other state avenues of relief available to employees seeking to
bring wage loss claims.  The New Mexico Workforce Solutions Department adjudicates
administrative hearings that also permit workers to bring wage loss claims.  See N.M. Stat. Ann.
§ 50-4-26(A);  Wage and Hour, New Mexico Department of Workforce Solutions,
https://www.dws.state.nm.us/Labor-Relations/Labor-Information/Wage-and-Hour.  The statute
allows prevailing plaintiffs to recover costs and reasonable attorneys' fees, and exempts
employees from having to pay filing fees or other court costs.  See N.M. Stat. Ann. § 50-4-26(E).
The statute also directs courts to prioritize such claims when managing their dockets.  See N.M.
Stat. Ann. § 50-4-26(E) ("Civil actions and appeals of civil actions brought . . . under this section
shall be heard by the court at the earliest possible date and shall be entitled to a preference over
all other civil actions . . . on the calendar of the court.").

[33]See Upky v. Lindsey, 2015 U.S. Dist. LEXIS 55167, at *19:

The Court must analyze the admissibility of the panel's decision under . . . the
concurring opinion of the Honorable John Paul Stevens, Associate Justice of the
Supreme Court, under Shady Grove Orthopedic Assoc. v. Allstate Ins. Co., 559
U.S. 393 (2010)("Shady Grove") -- "the most recent Supreme Court case
interpreting how to apply rules adopted under the Rules Enabling Act in a
diversity case . . . ." James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at
1218.  See James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at 1217
(explaining that, in Shady Grove, "Justice Scalia wrote for a four-justice plurality
holding that" rule 23 of the Federal Rules of Civil Procedure applied, rather than a

[A] procedural rule is . . . one designed to make the process of litigation a fair and efficient mechanism for the resolution of disputes. Thus, one way of doing things may be chosen over another because it is thought to be more likely to get at the truth, or better calculated to give the parties a fair opportunity to present their sides of the story, or because, and this may point quite the other way, it is a means of promoting the efficiency of the process.

Upky v. Lindsey, 2015 U.S. Dist. LEXIS 55167, at *19 (quoting John Hart Ely, The Irrepressible Myth of Erie, 87 Harv. L. Rev. 693, 724-25 (1974)).

Judge Herrera misidentified § 50-4-26(D) as opt-in, see Gandy v. RWLS, 308 F. Supp. 3d at 1227, [34] but her conclusion was the same as if she had correctly identified § 50-4-26(D) as

---

New York statute that would have barred the suit, while "Justice Ginsburg wrote for the four dissenters," and "Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion.") Justice Stevens described a two-step framework to resolve an alleged conflict between a federal rule under the Rules Enabling Act and state law . . . .

[34]As the Plaintiffs clarified at the hearing on this motion, Judge Herrera analogized the NMMWA to the FLSA, leading to the mistaken determination that the NMMWA collective action provision is opt-in. See Tr. at 7:25-8:25 (Moody). The NMMWA provision contains no opt-in language, and allows for the appointment of an "agent or representative to maintain such action on behalf of all employees similarly situated." N.M. Stat. Ann. § 50-4-26(D). This language suggests opt-out rather than opt-in. Even assuming § 50-4-26 (D) to be opt-in, Judge Herrera still concluded that "the opt-in collective action rule is procedural in nature." Gandy v. RWLS, 308 F. Supp. 3d at 1228. Judge Herrera concluded that "[w]hether a similarly situated person must affirmatively act to join a suit or is automatically in the suit unless he opts out does not determine the substantive rights and remedies potentially available to that person." Gandy v. RWLS, 308 F. Supp. 3d at 1229.

Federal courts almost always apply rule 23 to state representative actions. See, e.g., Medlock v. Taco Bell Corp., No. CIV 07-01314, 2014 WL 4319510, at *7 (E.D. Cal. Aug. 29, 2014)(Boone, M.J.)("The Legislature's use of the phrase 'only if' in Rule 23 clearly evinces an intent that prerequisites are to apply in all representative actions brought in federal court, leaving no room for states to fashion alternative procedural avenues for the prosecution of representative actions in diversity cases.")(quoting Fed. R. Civ. P. 23(a)); U.S. Fid. & Guar. Co. v. Madison Fin. Corp., No. CIV 01-3998, 2002 WL 31731020, at *4 (S.D.N.Y. Dec. 4, 2002)(McMahon, J.)(rejecting the plaintiff's argument that rule 23 should not apply to a representative action brought under state law).

opt-out.  Applying Justice Stevens' concurrence, Judge Herrera concluded in Gandy v. RWLS that, even assuming that the NMMWA contains an implicit opt-in provision, such a provision would still be procedural and not substantive.  See 308 F. Supp. 3d, at 1228 ("According to Justice Stevens' reasoning, the fact that the collective action opt-in requirement applies to NMMWA claims and is not a generally applicable procedural rule to other laws weighs . . . in favor of finding the right to be substantive.  The Court, however, does not find this factor dispositive of the issue.").  Judge Herrera concluded that § 50-4-26(D), despite being applied only to the NMMWA, is not "substantive in nature to the rights and remedies created by the NMMWA."  Gandy v. RWLS, 308 F. Supp. 3d at 1229.

The Plaintiffs argued at the hearing that "you shouldn't get a radically different result in federal court than you would in the state court just because of a procedural rule."  Tr. at 39:7-13

---

The only exception that the Court can find is in California, where some California courts -- but not all -- have determined that rule 23 does not cover the same ground as California's Private Attorney General Act, Cal. Labor Code § 2699 ("PAGA"), does, because the PAGA allows employees to "act as private attorneys general by bringing claims for civil penalties," where seventy-five percent of recovered penalties goes to California's Labor and Workforce Development Agency.  Cardenas v. McLane Foodservice, Inc., No. SACV 10-473, 2011 WL 379413, at *3 (C.D. Cal. Jan. 31, 2011)(Carter, J.).  But see Medlock v. Taco Bell Corp., 2014 WL 4319510, at *7 ("The Court finds that Rule 23 causes a 'direct collision' with PAGA because Rule 23 would prohibit the maintenance of a class action in circumstances where PAGA would permit one." (quoting Burlington N. R.R. v. Woods, 480 U.S. at 4-5)).

The NMMWA -- with no opt-in provision -- is closer to a rule 23 class action than PAGA is to a rule 23 class action.  Additionally, NMMWA's relation to the FLSA is less meaningful given that many courts apply rule 23 to FLSA actions.  See Charles Alan Wright Arthur R. Miller, § 1807 Collective Actions Under the Fair Labor Standards Act, 7B Fed. Prac. & Proc. Civ. § 1807 (3d ed.)(citing Shushan v. Univ. of Colo. at Boulder, 132 F.R.D. 263, 264 (D. Colo. 1990)(Nottingham, J.))(stating that "[t]he peculiar nature of a [FLSA] action has led courts to different conclusions on the question of the extent to which Rule 23 applies in such an action" and concluding that rule 23 should apply "insofar as those requirements are consistent with 29 U.S.C.A. § 216(b)" (emphasis omitted)).

(Moody).   The Plaintiffs do not demonstrate, however, how the result they would obtain in federal court would be radically different than in state court under these circumstances. Plaintiffs' counsel asserted that the difference would be that if certification were granted, several times as many people as are currently in the lawsuit would be in the plaintiffs' class.   See Tr. at 39:24-40:3 (Moody).   Each of the individual plaintiffs could bring a suit asserting his or her own individual claims.   The Supreme Court recognized in Shady Grove:

> It is undoubtedly true that some plaintiffs who would not bring individual suits for the relatively small sums involved will choose to join a class action.   That has no bearing, however, on . . . the plaintiffs' legal rights.   The likelihood that some (even many) plaintiffs will be induced to sue by the availability of a class action is just the sort of "incidental effect[t]" we have long held does not violate § 2072(b).

559 U.S. at 408 (quoting Mississippi Pub. Corp. v. Murphee, 326 U.S. 438, 445 (1946)).

Rule 23 by its very purpose permits class actions.   It states in plain language that "[a] class action may be maintained if Rule 23(a) is satisfied."   Fed. R. Civ. P. 23(b).   Rule 23 then enumerates the requirements that must be met before a class action may be brought.   Fed. R. Civ. P. 23(b).   Applying the federal rule to the Plaintiffs' overtime claims does not abridge, enlarge, or modify the substantive rights or remedies available to them.   They may still bring a class action, pursuant to rule 23's requirements, and they may still recover as a class.   The Plaintiffs' argument that not as many plaintiffs will join the action if it is not certified as a class is not persuasive justification for construing § 50-4-26(D) as substantive.

At the hearing, the Court asked, if the Court were to conclude that rule 23 was the appropriate standard, whether the Plaintiffs would then proceed through the rule 23 lens.   See Tr. at 21:16-21 (Court).   The Plaintiffs confirmed that they would then brief the issue under rule 23. See Tr. at 21:22-23 (Moody).   Concluding that rule 23 answers the question in dispute -- whether

the Plaintiffs may certify as a class -- and concluding, as the Supreme Court did in Shady Grove, that the rule's scope is "sufficiently broad" to "control the issue," "thereby leaving no room for the operation" of seemingly conflicting state law, the Court has passed the first step of Justice Stevens' analysis.  See Shady Grove, 559 U.S. at 421 (quoting Burlington N. R.R. v. Woods, 480 U.S. at 4-5)(Stevens, J., concurring).  At the second step, the Court must consider whether an ostensibly procedural rule is not "so intertwined with a state right or remedy that it functions to define the scope of the state-created right."   Shady Grove, 559 U.S. at 423 (Stevens, J., concurring).  Based on the above analysis, the Court concludes that the state rule is procedural and does not define the scope of the state-created right.  Accordingly, the Court concludes that, under Justice Stevens' test, rule 23 should govern the present Motion.

## III.   UNDER RULE 23, THE PLAINTIFFS HAVE NOT DEMONSTRATED THEIR COMPLIANCE WITH THE REQUIREMENTS FOR MAINTAINING A CLASS ACTION.

The Plaintiffs have not yet demonstrated their compliance with the requirements that rule 23 establishes for bringing a class action.  At the hearing, the Court confirmed that they had not briefed that issue and would need to do so if the Court ruled that they needed to do so.  See Tr. at 21:22-23 (Moody).[35]  Accordingly, the Court will deny the Motion.

_____

[35]If the Court had determined that the state provision, § 50-4-26(D), is in essence substantive and should apply instead of rule 23, the Plaintiffs would satisfy § 50-4-26(D)'s requirements for bringing a conditional certification.  At the hearing, the Defendants conceded that conditional certification would be appropriate if the Court applied the § 50-4-26(D) "similarly situated" standard instead of rule 23:

THE COURT: Would you agree with me that your argument is basically [that] the Shady Grove issue is motion-determinant here, in the sense that if . . . I've got to run this through rule 23, then I have to deny the plaintiff's motion, [but] on the

**IT IS ORDERED** that (i) the Plaintiffs' Motion for Conditional Certification of Collective Action Pursuant to New Mexico Minimum Wage Act, filed September 7, 2017 (Doc. 9), is denied; (ii) the Plaintiffs' Request for Rule 16 Scheduling Conference, filed December 21, 2017 (Doc. 19), is granted.[36]

_____
UNITED STATES DISTRICT JUDGE

_____

other hand, if I agree with the plaintiff, that I don't have to run it through 23, I've touched all the bases to probably grant the conditional certification?

JEFFREY L. LOWRY: That's correct, Your Honor.  We would reserve any attack on the certification for the second stage.

Tr. at 32:15-33:2 (Court, Lowry).

[36]The Court granted the Hearing Motion, and the Rule 16 Scheduling Conference was reset for June 26, 2018, before the Honorable Carmen E. Garza, Chief United States Magistrate Judge for the District of New Mexico.  See Order Resetting Rule 16 Scheduling Conference, filed June 4, 2018 (Doc. 35).  The Court held a hearing on the Hearing Motion on June 21, 2018.

*Counsel:*

Christopher M. Moody
Repps D. Stanford
Alice Kilborn
Moody & Warner, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Charles J. Vigil
Jeffrey L. Lowry
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendants*