# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WILLIAM D. PAYNE; NICOLE PAYNE;
LESLIE B. BENSON; KEITH BASTIAN;
JACQUELINE FERNANDEZ-QUEZADA;
CASON N. HEARD; GREGORY OLDHAM
AND SHERRY K. WELCH, on behalf of
themselves and all others similarly situated,

     Plaintiffs,

vs.                                                      No. CIV 14-1044 JB/KBM

TRI-STATE CAREFLIGHT, LLC and BLAKE
A. STAMPER,

     Defendants.

<u>Consolidated with:</u>

KRISTY BELL; DEBORAH BEREST;
DANIEL BERGMAN; WILLIAM DALLAS
BUNDRANT, JR; ROCKY H. BURROWS, II;
CHASE CARTER; BRENDA CASAREZ;
KARA CERVANTES; THOMAS CISLO;
DAVID DANIELS; ADAM DOYLE;
DARREN EEN; TOBY EICHER; LON ENOS;
WALTER FABIAN; HAROLD JOSEPH
FISHER; CHRISTINA FLEEMAN; LUKE
FORSLUND; SALUSTIANO FRAGOSO;
REHANNON GONZALES; KRISTEN
GRADO; COURTNEY GUERRA; DARRIN
HAMILTON; ALEXANDER HOWELL;
DANIELLE IRVIN; ALLEN JACOBS; ALEX
JONES; DONALD LUKE KEENAN; DANIEL
KUHLER; SIMON LUCERO; RAPHAEL
MAHAIM; NATHAN MAPLESDEN;
ORLANDO MARQUEZ; CINDY D.
MAXWELL; JENNIFER MAZZANTI;
BETHANY MCCANDLESS; WILLIAM J.
MCCONNELL; DAN MEEHAN; KEVIN
NAPP; JAMES O'CONNOR; KATHY
ONSUREZ-WILSON; ERIC PARKER; JASON

PERRY; AMANDA PETERSEN; BRENT
PLACE; JIMMY RONALD PRIMM, JR;
PHILIP QUBAIN; PAUL RATIGAN; JOSEPH
ROOT; DARON RUCKMAN; FREDERIC
RUEBUSH; JENNIFER SALAVERRY;
LAUREN SALAZAR; PAUL SERINO;
CHRISTIAN SPEAKMAN; DANIEL ST.
PETERS; IAN STEPHENS; USVALDO R.
TRUJILLO; PAUL VACULA; GRACIELA
VILLALOBOS; ERIC VOGT; GREG WALSH;
TYLER WILKINS; VIRGINIA WILLIAMS;
SARA YURKOVICH; TERRY ZACHARIAS
and MICHAEL ZULASKI,

        Plaintiffs,

vs.                                    No. CIV 17-0796 JB/CG

TRI-STATE CAREFLIGHT, LLC and BLAKE
A. STAMPER,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Class Certification

& Supporting Memorandum, filed November 6, 2018 (Doc. 220[1])("Motion").  The Court held a

hearing on January 24, 2019.  <u>See</u> Clerk's Minutes at 1, filed January 24, 2019 (Doc. 226).  The

primary issue is whether the Court should grant class certification pursuant to rule 23(b)(3) of the

Federal Rules of Civil Procedure for the Plaintiffs'[2] two classes: (i) a class of flight nurses, flight

---

[1]Unless otherwise noted, the documents that the Court references in this case are filed in
the docket for <u>Payne v. TriState CareFlight, LLC</u>, No. CIV 14-1044 JB/KBM, with which <u>Bell v.</u>
<u>TriState CareFlight, LLC</u>, No. CIV 17-0796 JB/CG, is consolidated.

[2]The Court proceeds here in regards to the Plaintiffs in <u>Bell v. TriState CareFlight, LLC</u>.
In the Plaintiffs' Motion, the Plaintiffs describe this Motion as regarding proposed classes for the
<u>Bell</u> lawsuit.  Moreover, the Court notes that, in the Memorandum Opinion and Order, 2019 WL
1242672, filed March 16, 2019 (Doc. 227)("Third Amended Complaint MOO"), the Court
declined to set aside the Final Judgment and refused to permit the prosecution of <u>Payne v. TriState</u>

paramedics, and pilots that brings a New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-19 to 50-4-30 ("NMMWA"), claim; and (ii) a class of pilots that brings a New Mexico common-law unjust enrichment claim.  The Court grants in part and denies in part the Motion.

The Court will deny the request that it certify the proposed NMMWA class, because the Court concludes that the class does not satisfy rule 23(a)'s commonality, typicality, or adequacy requirements, or rule 23(b)(3)'s predominance and superiority requirements.  To determine the Defendants' liability to a NMMWA class, the Court would have to classify each individual class member as exempt or non-exempt from the statute, which defeats commonality.  Furthermore, class representatives' differing statuses as exempt or non-exempt result in conflicting interests, which defeats typicality.  Even if the Court finds all class members non-exempt, only certain class representatives will have any interest in litigating the exemption issue, defeating adequacy.

The Court will certify the proposed unjust enrichment class to the extent that the Plaintiffs argue that the Defendants could not set the pilots' daily rate to account for hours worked over twelve hours a day given the pilots' twelve-hour shifts, because the Court concludes that this class satisfies all of rule 23's requirements.  The Court will use the Plaintiffs' four designated class representatives for the certified unjust enrichment class.  The other Plaintiffs in the unjust enrichment class will remain named Plaintiffs in this case for the NMMWA claim's purposes.  Because the Defendants do not dispute Moody & Stanford, P.C.'s adequacy as class counsel, see Defendants' Response to Plaintiffs' Motion for Class Certification at 36, filed on December 6,

_____

CareFlight, LLC, without relief from the Final Judgment, filed November 23, 2016 (Doc. 150).  See Third Amended Complaint MOO at 70-72.  No relief from the Final Judgment has been obtained yet.  The Court does not, therefore, proceed with Payne.

2018 (Doc. 223)("Response"), the Court appoints the firm class counsel.  The Court will not order

that a notice in the form of the Notice of Class Action Lawsuit, filed November 6, 2018 (Doc. 220-

18), which provides notice of both proposed classes, be sent to all class members, but will order

that the Plaintiffs prepare a notice of the certified unjust enrichment class to be sent to all class

members.

## <u>FINDINGS OF FACT</u>

Both the Plaintiffs and the Defendants have submitted briefings on the Plaintiffs' Motion.

<u>See</u> Motion; Response; and Plaintiffs' Reply To Motion for Class Certification, filed on January

11, 2019 (Doc. 224)("Reply").  The Court has carefully considered all factual assertions, accepts

some of them, rejects others, and finds some facts that no party brought to its attention.[3]  The Court

also liberally judicially notices background facts.  <u>See</u> Fed. R. Evid. 201.  All of these findings of

fact are authoritative only on the question of class certification, and the parties may relitigate any

of them at the merits stage.  <u>See</u> <u>Abbott v. Lockheed Martin Corp.</u>, 725 F.3d 803, 810 (7th Cir.

2013); <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 313 (3d Cir. 2008); <u>Gariety v. Grant</u>

<u>Thornton, LLP</u>, 368 F.3d 356, 366 (4th Cir. 2004); <u>Anderson Living Tr. v. WPX Energy Prod.</u>,

---

[3]The Court is not required to make formal findings of fact in ruling on a class certification
motion.  <u>See</u> Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or conclusions
when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other
motion."); Fed. R. Civ. P. 52 advisory committee's note to 2007 amendment ("Amended Rule
52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.'  This change
reflects provisions in other rules that require Rule 52 findings on deciding motions. Rules 23(e),
23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples.").  The Court has elected to
do so for the parties' benefit.  The Court made these findings by a preponderance of the evidence
solely to assist in ruling on the class certification matter.  It is difficult to rule intelligently on the
class certification matter without firm factual bases.  The findings of fact are not, of course, binding
on the parties when the Court and the parties get to the case's subsequent merits stage.  <u>See</u>
<u>Menocal v. GEO Group, Inc.</u>, 882 F.3d 905, 926 n.17 (10th Cir. 2018)("<u>Menocal</u>")(considering
facts relevant to the merits only to the extent necessary for class certification).

LLC, 306 F.R.D. 312, 320 (D.N.M. 2015), adhered to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.).  The Court applied the Federal Rules of Evidence at the class certification hearing, ruled on several evidentiary objections, and considered only admissible evidence in finding these facts.

   **1.** **The Defendants.**

   1. Defendants Tri-State CareFlight, LLC, and Blake A. Stamper "owned and operated a medical transport service providing services in New Mexico, Colorado, and Arizona."  Seconded Amended Class Action Complaint ¶ 12, at 4, filed August 15, 2018 (Doc. 202)("Complaint").

   2. Tri-State CareFlight operates helicopters and fixed-wing aircraft at bases in Santa Fe, Taos, Truth or Consequences, Gallup, Tucumcari, Portales, Roswell, Artesia, Carlsbad, and Sandoval, in New Mexico.  See Deposition of Tri-State CareFlight, LLC through Dayna Lokelani Mobley Blake at 9:6-10:3 (taken June 18, 2015), filed October 14, 2015 (Doc. 61-1)("Tri-State Depo.").

   3. Tri-State CareFlight defines its workweek as spanning from "12:00 a.m. on Saturday morning to 11:59 p.m. the following Friday evening."  Motion at 2 (citing Defendants' Objections and Answers to Plaintiff Kristy Bell's First Interrogatories, Interrogatory No. 4, at 2, filed November 6, 2018 (Doc. 220-3)("Defs.' Answers to Bell's First Interrs.")); see Tri-State Depo at 11:6-11.

   4. Before January 19, 2016, the Defendants sometimes required employees to work overtime.  See Response at 29.

   **2.** **Tri-State CareFlight's Policy and Practices Regarding Flight Crew.**

   5. Tri-State CareFlight established an hourly rate for its flight paramedics and flight

nurses, and paid its flight paramedics and flight nurses one and one-half times the hourly rate for

hours worked in excess of ninety-six hours per two-week pay period.  See Tri-State Depo. at 37:20-

38:6.

6.     Tri-State CareFlight's flight nurses and flight paramedics uniformly worked

twenty-four or forty-eight hour shifts; Tri-State CareFlight expected these employees to work

ninety-six hours in a two-week, fourteen-day, pay period, and it paid the flight nurses and flight

paramedics overtime only for work over ninety-six hours in a two-week pay period.  See Tri-State

Depo. at 11:6-11 (stating that flight nurses and flight paramedics work twenty-four or forty-eight

hour shifts); id. at 15:14-21 (stating that Tri-State CareFlight expected flight nurses and

paramedics to work ninety-six hours in a two-week, fourteen-day, period); id. at 37:20-38:6

(stating that since 2009, at least, Tri-State CareFlight pays flight nurses and flight paramedics for

overtime only if they exceed ninety-six hours per pay period); Defendants' Answers to Plaintiffs'

First Interrogatories, Interrogatory No. 3, at 2 (executed March 30, 2015), filed September 4, 2015

("Doc. 48-2")("Defs. Answers to First Interrs.")(describing that flight nurses and flight paramedics

who work more than ninety-six hours in a two-week pay period are paid overtime); Defs.' Answers

to Bell's First Interrs., Interrogatory No. 4, at 2 (stating that the pay period was for two weeks and

that the workweek spanned from 12:00 a.m. on Saturday to 11:59 p.m. on Friday).

7.     Tri-State CareFlight's scheduling of flight nurses and flight paramedics sometimes

resulted in flight nurses and flight paramedics working more than forty hours in a single workweek

but not receiving overtime compensation for hours in excess of forty hours per workweek.  See

Motion at 4 (describing a situation in which a flight paramedic or flight nurse who worked three

twenty-four hour shifts in one workweek would have "one workweek of seventy-two (72) hours

with no overtime compensation for the additional thirty-two (32) hours worked over forty (40) in that first week").

      **3.**      **<u>Tri-State CareFlight's Policy and Practices Regarding Pilots.</u>**

      8.      For every base except the base near Roswell, Tri-State CareFlight scheduled the pilots for seven-days-on-and-seven-days-off shifts, and, for the Roswell bases, Tri-State CareFlight scheduled pilots for fourteen-days-on-and-fourteen-days-off shifts.  <u>See</u>, <u>e.g.</u>, Tri-State Depo. at 24:2-21 (stating that pilots work twelve-hour shifts with seven days on and seven days off); <u>id.</u> at 45:1-23 (stating that pilots are paid overtime only for additional twelve-hour shifts and not for time worked over forty hours); Defendant's Answers to Plaintiffs' Second Interrogatories to Defendants, Interrogatory Nos. 13, at 1-2, filed November 6, 2018 (Doc. 220-4)("Defs.' Answers to Second Interrs.")(describing that, except for pilots based at the Roswell base, pilots worked seven-days-on-and-seven-days-off, and that, at the Roswell base, pilots worked fourteen-days-on-and-fourteen-days-off shifts, and that pilots who worked more than seven days during their shifts received overtime pay).

      9.      A minimum of 138 pilots worked or would have been scheduled to work this seven on/seven off schedule from June 19, 2009, through January 19, 2016. <u>See</u> Motion at 3 (citing Tri-State Depo. at 11:25-12:8).

      10.     Tri-State CareFlight scheduled fixed wing pilots to work fourteen days on followed by fourteen days off.  <u>See</u> Defs.' Answers to Second Interrs, Interrogatory Nos. 13, 17, 18, at 1-3.

      11.     A minimum of fourteen fixed wing pilots would have been scheduled to work this fourteen on/fourteen off schedule from June 19, 2009, through January 19, 2016. <u>See</u> Defs.' Answers to Second Interrs., Interrogatory Nos. 13, 17, 18, at 1-3.

12.     Tri-State CareFlight scheduled pilots for twelve-hour shifts.  See, e.g., Tri-State Depo. at 11:25-12:8 (stating that pilots are scheduled for twelve-hour shifts but that they might work 14 hours under the FAA); Declaration of William Dallas Bundrant. ¶¶ 3, 5-6, 8-9, at 1-3 (executed October 31, 2018), filed November 6, 2018 (Doc. 220-12)("Bundrant Decl.")(stating that he is a designated class representative and was a pilot paid on a daily rate and that he worked fourteen days on for twelve-hour shifts and fourteen days off; and that he did not receive overtime for time worked over forty hours a week or receive compensation for time worked over twelve hours a day); Deposition of David Daniels at 28:3-13 (taken August 8, 2018), filed November 6, 2018, (Doc. 220-9)("Daniels Depo. 220-9")(explaining that twelve hours was a scheduled shift and that he deserved compensation for time worked over that time); Deposition of Michael Zulaski at 20:1-22:3(taken August 15, 2018), filed November 6, 2018 (Doc. 220-11)("Zulaski Depo. 220-11") (describing the shift length as twelve hours); Declaration of Raphael Mahaim ¶¶ 3, 5-6, 8-9, at 2-3 (executed October 30, 2018), filed November 6, 2018 (Doc. 220-10)("Mahaim Decl.")(stating that he is a designated class member and was a pilot, that he worked twelve-hour shifts for seven days on and then had seven days off, and that he received compensation for a daily rate of twelve hours regardless whether he worked over twelve hours).

13.     Tri-State CareFlight paid pilots only for additional shifts that they worked in addition to their scheduled "on" shifts.  See, e.g., Tri-State Depo. at 33:25-34:18 (stating that pilots are paid a daily rate for twelve to fourteen hours and scheduled to work seven days on and seven days off).

14.     Tri-State CareFlight contemplated and contracted with the pilots for a daily rate that accounted for fourteen-hour duty days, although the pilots generally worked twelve-hour

shifts.  See Tri-State Depo. at 24:7-10; EMS Helicopter Pilot Position Description at 1, filed December 6, 2018 (Doc. 223-1)("Helicopter Pilot Position Description")(stating that the daily rate is for fourteen-hour duty days); Daniels Depo. 220-9 at 28:15-16 (describing that twelve hours was a scheduled shift); id. at 25:22-25 (stating that he has not seen a document from Tri-State CareFlight identifying the duty time as anything other than fourteen-hour days).

15.      Tri-State CareFlight's scheduling of pilots could result in pilots working more than forty hours per week without overtime compensation.  See Motion at 4 (describing how a pilot who started work on a "Wednesday and worked for fourteen (14) consecutive days [could work] thirty-six (36) hours in the first workweek (Wednesday through Friday); eighty-four (84) hours in the following workweek (Saturday through Friday); and forty-eight (48) hours in the workweek following that (Saturday through Tuesday)").

16.      The clinical base managers and the lead pilots had a role in overseeing payroll,  see Deposition of Kristy Bell at 45:21-46:3 (taken August 22, 2018), filed December 6, 2018 (Doc. 223-2)("Bell Depo. Doc. 223-2"); Deposition of Benjamin Aguilar at 14:8-10 (taken August 28, 2018), filed November 6, 2018 (Doc. 220-13)("Aguilar Depo. Doc. 220-13"); Deposition of Jason Perry at 14:2-8 (taken September 7, 2018), filed November 6, 2018 (Doc. 220-7)("Perry Depo. 220-7"); Bell Depo. 223-2, at 46:17-19, and scheduling, see Deposition of Kristy Bell at 47:19-48:6 (taken August 22, 2018), filed November 6, 2018 (Doc. 220-14)("Bell Depo. Doc. 220-14"); id. at 64:17-65:23; Deposition of Satoshi Mori at 17:11-20 (taken August 16, 2018), filed December 6, 2018 (Doc. 223-2)("Mori Depo. 223-2")); Perry Depo. 220-7 at 15:7-14; Tri-State Tr. at 14:11-16:13; Deposition of Nathan Maplesden at 22:19-20 (taken August 15, 2018), filed November 6, 2018 (Doc. 220-15)("Maplesden Depo. Doc. 220-15"); id. at 59:9-13.

4.     **Clinical Base Managers and Lead Pilots.**

17.     For payroll, the clinical base managers and the lead pilots verified that employees reported their time, and approved the time that they reported, and then the clinical base managers and the lead pilots transmitted the reports to Tri-State CareFlight's corporate office.  See Bell Depo. 223-2, at 45:21-46:3; Aguilar Depo. 220-13, at 14:8-10; Perry Depo. 220-7 at 14:2-8; Bell Depo. 223-2 at 46:17-19.

18.     For scheduling, the clinical base managers and the lead pilots followed Tri-State CareFlight's existing scheduling requirements, which Tri-State CareFlight created.  See Tri-State Depo. at 15:14-21 (describing the flight nurses' and flight paramedics' schedules); Defs.' Answers to First Interrs., Interrogatory No. 3, at 2 (same); Tri-State Depo. at 24:3-21 (describing the pilots' schedule); Defs.' Answers to Second Interrs., Interrogatory No. 13, at 1-2 (same).

19.     The clinical base managers and the lead pilots applied these policies when they created the schedules.  See Bell Depo. 220-14, at 47:19-48:6 (describing the flight nurses' and flight paramedics' schedules, and noting that everyone followed that rotation and that, as a clinical base manager, she filled holes in the schedule); id. at 64:17-65:23 (stating that, as a clinical base manager, she would input employees' regular shifts into a spreadsheet, and that she would find someone to fill a shift if no one was available or fill the shift herself if needed); Maplesden Depo. 220-15, at 59:9-13 (stating that the employees had a regular schedule, and that he mainly completed holes left by vacations and sick employees); Aguilar Depo. 220-13, at 18:3-7 (describing that flight nurses and flight paramedics signed up for their two days of shifts a week).

20.     The clinical base managers did not have the final say in the schedules' creation; the clinical services manager reviewed the clinical base managers' proposed schedules, and then the

medical program director approved all the schedules.  <u>See</u> Tri-State Depo. at 4:16-17; <u>id.</u> at 13:24-14:21.

21.     The clinical base managers and the lead pilots had no authority to hire or fire employees.  <u>See</u> Perry Depo. 220-7, at 50:1-2.

**5.     <u>The Plaintiffs.</u>**

22.     The Plaintiffs bring this case on behalf of themselves and similarly situated individuals whom the Defendants employed as "Flight Paramedics, Flight Nurses, and Pilots (rotary and fixed wing) at various times between June 19, 2009 and, upon information and belief, July 2016."  Complaint ¶ 10, at 4.

23.     The Plaintiffs have designated the following former Tri-State CareFlight employees as class representatives: Erin Johnson, Jason Perry, Alexander Howell, Ian Stephens, David Daniels, Raphael Mahaim, Michael Zulaski, and William Dallas Bundrant.

24.     Tri-State CareFlight employed Johnson as a flight nurse on an hourly basis from July 6, 2008, to January 19, 2016.  <u>See</u> Deposition of Erin Johnson at 12:9-12 (taken August 13, 2018), filed November 6, 2018 (Doc. 220-6)("Johnson Depo. 220-6")(stating that she was a flight nurse).

25.     Tri-State CareFlight employed Perry as a flight nurse on an hourly basis from April 8, 2013, to January 19, 2016.  <u>See</u> Perry Depo. 220-7, at  9:3-6; <u>id</u>. at 9:18-20; <u>id</u>. at 30:11-25.

26.     Tri-State CareFlight also employed Perry as a clinical base manager, but she received hourly pay "at all times material hereto."  Perry Depo. 220-7, at 13:2-8, <u>id</u>. at 16:17-17:13.

27.     Tri-State CareFlight employed Howell as a flight paramedic on an hourly basis

from approximately July, 2012, to January 19, 2016.  See Deposition of Alexander Howell at 4:15-24 (taken August 21, 2018), filed November 6, 2018 (Doc. 220-5)("Howell Depo. 220-5"); id. at 9:13-16; id. at 11:11-13

28.     Tri-State CareFlight employed Stephens as a flight paramedic on an hourly basis from May, 2012, to August, 2014.  See Declaration of Ian Stephens ¶¶ 5, 6, 7, at 2 (executed October 30, 2018), filed November 6, 2018 (Doc. 220-8)("Stephens Decl.")

29.     Tri-State CareFlight employed Daniels as an EMS rotary wing (helicopter) pilot on a daily rate basis from approximately December, 2010, to January 19, 2016.  See Daniels Depo. 220-9 at 9:19-10:3; id. at 10:10-12; id. at 35:5-7.

30.     Tri-State CareFlight employed Mahaim as a rotary wing pilot on a daily rate basis from November 25, 2014, to January 19, 2016.  See Mahaim Decl. 220-10 ¶¶ 7-9, at 2-3.

31.     Tri-State CareFlight employed Zulaski as a fixed wing pilot on a daily rate basis from April, 2015, to January 19, 2016.  See Zulaski Depo. 220-11, at 10:8-10; id. at 13:8-13; id. at 13:21-14:1; id. at 19:14-20.

32.     Tri-State CareFlight employed Bundrant as a fixed wing pilot on a daily rate basis from July, 2014, to January 19, 2016.  See Bundrant Decl. ¶ 5, at 2.

33.     Several deposed class members live in New Mexico.  See, e.g., Howell Depo. 220-5 at 4:8-10 (giving a current address in Santa Fe); Johnson Depo. 220-6, at 10:1-2 (stating that she currently resides in Santa Fe); Perry Depo. 220-7, at 4:7-9 (giving a current address in Rio Rancho, New Mexico); Daniels Depo. 220-9, at 4:8-10 (giving a current address in Santa Fe); Aguilar Depo. 220-13, at 4:10-12 (giving an address in Alto, New Mexico).

34.     Johnson, Howell, and Stephens worked twenty-four and forty-eight hour shifts, and

ninety-six hours a pay period, with overtime compensation only for time worked over ninety-six hours in a two-week pay period.  See Howell Depo. 220-5, at 4:15-16 (stating he was a flight paramedic); id. at 22:9-23:10 (describing that flight paramedics worked forty-eight-hour shifts during a two-week pay period and worked ninety-six hours in that pay period); id. at 24:9-5:8 (stating that flight paramedics received overtime pay for shifts that they "picked up" over ninety-six hours); id. at 30:4-11 (explaining that the pay period went from Saturday until the Friday two weeks later); Johnson Depo. 220-6, at 12:9-12 (describing that she was a flight nurse); id. at 24:1-7 (describing that flight nurses worked twenty-four and forty-eight hour shifts, and that they built their own schedule); id. at 26:25-27:6 (describing that Tri-State CareFlight paid overtime for time worked in excess of ninety-six hours in two weeks); Stephens Decl. ¶¶ 5-9, at 2 (stating that he is a designated class representative and was a flight paramedic who worked one forty-eight hour shift a week and received overtime when he worked over ninety-six hours in a two-week pay period).

35.     Daniels, Mahaim, and Zulaski worked twelve-hour shifts with either seven or fourteen days on, and seven or fourteen days off, and received overtime compensation only for working additional shifts.  See Daniels at 22:14-19 (stating that he did not receive overtime and that he received the same pay for all fourteen days which he worked); id. at 29:25-30:7 (stating that pilots received overtime for working extra shifts); Zulaski Depo. 220-11 at 15:15-19, 22:14-19 (stating that he worked twelve-hour shifts for two weeks on and two weeks off, and did not receive overtime); Mahaim Decl. ¶¶ 3, 5-7, at 2-3 (stating that he is a proposed class representative and was a pilot, that he worked twelve-hour shifts for seven days on and then had seven days off, and that he did not receive compensation for hours worked over forty hours a week).

36.     Daniels, Bundrant, and Mahaim worked twelve-hour shifts, and received no

additional compensation for time worked over twelve hours.  See Bundrant Decl. ¶¶ 3, 5-6, 8-9, at 1-3 (stating that he is a proposed class representative and was a pilot paid on a daily rate, that he worked fourteen days on for twelve-hour shifts and had fourteen days off, and that he did not receive overtime for time worked over forty hours a week or receive compensation for time worked over twelve hours a day); Daniels Depo. 220-9 at 28:3-13 (explaining that twelve hours was a scheduled shift and that he deserved compensation for time worked over that time); id. at 29:25-30:7 (stating that pilots received overtime for working extra shifts); Zulaski Depo. 220-11 at 20:1-22:3 (describing the shift length as twelve hours long); id. at 22:14-19 (stating that he did not receive overtime and that he received the same pay for all fourteen days that he worked); Mahaim Decl. ¶¶ 3, 5-6, 8-9, at 2-3 (stating that he is a proposed class representative and was a pilot, that he worked twelve-hour shifts for seven days on and  then  had seven days off, and that he received compensation for a daily rate of twelve hours regardless whether he worked over twelve hours).

37.    Flight Nurses, Flight Paramedics, and Pilots were "sometimes scheduled and expected to work overtime" before Tri-State CareFlight's acquisition.  Response at 29.

**6.    Post-Acquisition Changes.**

38.    Air Methods Corporation purchased Tri-State CareFlight and the acquisition transaction closed on January 19, 2016.  See Response at 4 (citing Declaration of Alexxandria Goeglein ¶ 3, at 1 (executed December 3, 2018), filed December 6, 2018 (Doc. 223-1)).

39.    On January, 19, 2016 -- the date of the acquisition -- Stamper ceased his relationship with Tri-State CareFlight because of Air Methods Corporation's acquisition of Tri-State CareFlight.  See Response at 4.

40.    After January 19, 2016, pay practices changed.  See Response at 4.

- 14 -

41.     After January 19, 2016, pilots immediately became "subject to a collective bargaining agreement."  Response at 5 (citing Declaration of Raj Helweg ¶¶ 4-5, at 2 (executed December 3, 2018), filed December 6, 2018 (Doc. 223-1)).

42.     Some of the designated class representatives continued to work for Air Methods after the acquisition.  See Response at 5.

## PROCEDURAL BACKGROUND

1.     The Plaintiffs seek to recover on behalf of themselves and similarly situated individuals unpaid overtime compensation under the NMMWA.  See Second Amended Representative and Class Action Complaint for Damages for Violation of New Mexico Minimum Wage Act and New Mexico Common Law ¶¶ 116-28, at 14-16, filed January 28, 2016 (Doc. 100)("Second Amended Complaint").  Former Tri-State CareFlight employee Plaintiffs Bundrant, Jr., Chase Carter, Thomas Cislo, Adam Doyle, Darren Een, Toby Eicher, Lon Enos, Harold Joseph Fisher, Salustiano Fragoso, Allen Jacobs, Mahaim, Nathan Maplesden, Dan Meehan, Jimmy Ronald Primm, Jr., Daniel St. Peters, Usvaldo R. Trujillo, Paul Vacula, Tyler Wilkins, Virginia Williams, Terry Zacharias, Zulaski, Satoshi Mori, Shailendra Basnet, Shane Engelauf, Shane Herron, Matthew Jansson, William Mallonee, and Josh Martinez seek to recover on behalf of themselves and similarly situated  individuals unpaid compensation for time worked beyond twelve hours in their shifts under a New Mexico common law theory of unjust enrichment. See Second Amended Complaint ¶¶ 129-42, at 16-20.

2.     Bell v. Tri-State CareFlight, LLC, No. CIV 17-0796 JB\CG ("Bell"), has a long and complicated procedural history, and this history intersects with that history of Payne v. Tri-State CareFlight, LLC, No. CIV 14-1044 JB\KBM ("Payne").  The Court recited this procedural

history in its Memorandum Opinion and Order, 327 F.R.D. 433, filed June 21, 2018 (Doc. 198)("Consolidation MOO").  The Court incorporates that recitation below.  The Court also includes footnotes from the Consolidation MOO.

In September, 2014, William D. Payne and Nicole Payne, "on behalf of themselves and all others similarly situated," filed their original complaint against Tri-State CareFlight and Stamper.  Representative Action Complaint for Damages for Violation of New Mexico Minimum Wage Act and Unjust Enrichment at 1, Payne, D-101-CV-2014-02048 (First Judicial District, County of Santa Fe, State of New Mexico)(Montes, J.), filed November 17, 2014 in federal court (Doc. 1-1)("Original Complaint").  Tri-State CareFlight and Stamper removed the case to federal court on November 17, 2014.  See Notice of Removal, filed November 17, 2014 (Doc. 1)("Notice of Removal").  They based removal on the Court's diversity jurisdiction.  See Notice of Removal ¶ 4, at 2.

On August 24, 2015, W. Payne and N. Payne moved to amend the Original Complaint to: (i) eliminate a claim for certain uncompensated travel time from the Original Complaint; and (ii) add an additional named Plaintiff -- Leslie B. Benson. See Plaintiffs' Amended Opposed Motion for Leave to File First Amended Complaint, filed August 24, 2015 (Doc. 44)("First Motion to Amend").  On September 4, 2015, W. Payne and N. Payne filed Plaintiffs' Motion for and Brief in Support of Class Certification, filed September 4, 2015 (Doc. 48)("First Motion for Class Cert.").[4]  The Court held a hearing on the First Motion to Amend on October 28, 2015.  See Clerk's Minutes, filed October 28, 2015 (Doc. 67)("Oct. 28th Clerk's Minutes").  At the October 28, 2015, hearing, the Court granted the First Motion to Amend.  See Oct. 28th Clerk's Minutes at 1; Order at 1, filed March 14, 2016 (Doc. 112).  Later that day, W. Payne and N. Payne filed their First Amended Representative Action Complaint for Damages for Violation of New Mexico Minimum Wage Act, filed October 28, 2015 (Doc. 68)("Amended Complaint").[5]

---

[4]W. Payne and N. Payne subsequently withdrew their First Motion for Class Cert. on January 26, 2016.  See Plaintiffs' Notice of Withdrawal of Motion for Class Certification, filed January 26, 2016 (Doc. 96).

[5]The Amended Complaint did not include the Original Complaint's unjust enrichment claim, see Amended Complaint ¶¶ 25-30, at 4 (asserting an NMMWA claim only), but the Plaintiffs remedied that oversight when they filed the Second Amended Representative and Class Action Complaint for Damages for Violation of New Mexico Minimum Wage Act and New Mexico Common Law . . .¶¶ 33-45, at 5-7, filed January 28, 2016 (Doc. 100).

- 16 -

By November, 2015, W. Payne, N. Payne, and Benson resolved their individual claims against the Defendants.  On November 19, 2015, the Paynes reached a settlement with the Defendants in which the Defendants agreed to provide them with full relief under the NMMWA, i.e., all the relief they requested in the Amended Complaint.  See Memorandum Opinion and Order at 47, 2016 WL 9738302, at *25, filed August 12, 2016 (Doc. 138)("Intervenor MOO").  Benson, meanwhile, signed a global release of his claims against Tri-State CareFlight and Stamper on October 22, 2015.  See Settlement Agreement and General Release at 1-3 (dated October 22, 2015), filed December 9, 2015 (Doc. 71-1).

With W. Payne, N. Payne, and Benson's claims resolved, a new set of named Plaintiffs -- Keith Bastian, Cason N. Heard, Gregory Oldham, Sherry K. Welch, and Jacqueline Fernandez-Quezada -- sought to keep [Payne] alive by intervening pursuant to rule 24 of the Federal Rules of Civil Procedure.  See Opposed Motion to Intervene as Parties Plaintiff and Class Representatives at 1, filed December 15, 2015 (Doc. 73)("First Intervention Motion").  In the First Intervention Motion, the intervenors asserted:

> [N]one of the currently named Plaintiffs will be able to pursue this matter either individually or on behalf of the putative class members who were deprived of overtime pay pursuant to Defendants' uniform and unlawful overtime policies applicable to flight nurses, flight paramedics and pilots.  Intervenors seek to pick up the prosecution of this lawsuit where the current Plaintiffs are soon to depart.

First Intervention Motion at 2.

As the First Intervention Motion was pending, the Defendants moved the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, to enter summary judgment in their favor, and to dismiss all claims in the Second Amended Complaint in their entirety and with prejudice.  See Defendants Tri-State CareFlight, LLC, and Blake A. Samper's Motion for Summary Judgment and Memorandum Brief in Support at 1, filed March 1, 2016 (Doc. 110)("MSJ").  The Defendants argued that federal law preempts the Named Plaintiffs' state-law claim for the alleged NMMWA violation and the state-law claim for unjust enrichment.  See MSJ at 1.  The Named Plaintiffs opposed the Defendants' MSJ, and also filed their Motion to Exclude Consideration of New Law or New Argument Raised in Defendants' Reply to the Motion for Summary Judgment or, in the Alternative, to Permit Plaintiff to File a Surreply, filed on May 2, 2016 (Doc. 123)("Motion to Exclude"), as a result of the Defendants' MSJ.

On August 12, 2016, the Court, pursuant to rule 24(b) . . . , granted the First Intervention Motion, permitting Bastian, Heard, Oldham, Welch, and Fernandez-Quezada [(hereinafter, the Bastian Plaintiffs)] to intervene as Plaintiffs.  See

Intervenor MOO at 1-2.  The Court determined, among other things, that the apparent resolution of W. Payne, N. Payne, and Benson's claims "did not render this case moot under Article III because the personal stake of the indivisible class may inhere prior to a definitive ruling on class certification."  Intervenor MOO at 41 (citing <u>Lucero v. Bureau of Collection Recovery, Inc.</u>, 639 F.3d 1239, 1244-47 (10th Cir. 2011)).

In October, 2016, the Court denied the Defendants' MSJ, concluding that Congress "has not preempted the field of labor regulation for railroad and airline workers, and the present dispute does not involve the interpretation of a collective bargaining agreement."  Memorandum Opinion and Order at 2 . . . 2016 WL 6396214, at *1 . . . , filed October 25, 2016 (Doc. 147)("MSJ MOO").  In the same ruling, the Court also determines that "the Defendants raised a new issue of law in their reply in support of their Motion for Summary Judgment, to which the Named Plaintiffs may reply with a surreply should they deem it appropriate."  MSJ MOO at 2.

On November 2, 2016, the Defendants offered, under rule 68 of the Federal Rules of Civil Procedure, to pay the [Bastian Plaintiffs] a specific amount of money plus their pre-offer "[a]ttorneys' fees and costs actually and reasonably incurred." Offer of Judgement at 1 (dated November 2, 2016), filed November 17, 2016 (Doc. 149-1)("Offer of Judgment").  The Offer of Judgment states: "By accepting this Offer of Judgment, Plaintiffs agree to the entry of the attached form of final judgment."  Offer of Judgment at 2.  The Defendants informed the Court, on November 17, 2016, that [the Bastian Plaintiffs] accepted the Defendants' rule 68 offer.  <u>See</u> Notice of Acceptance of Rule 68 Offer of Judgment at 1, filed November 17, 2016 (Doc. 149)("Acceptance Notice").  <u>See also</u> Email from Chris Moody, to Charles Vigil at 1 (dated November 16, 2016), filed November 17, 2016 (Doc. 149-1)("Plaintiffs accept your offer of judgment.").  The Acceptance Notice states:

> Defendants hereby notify the Court that Plaintiffs have accepted Defendants' Rule 68 Offer of Judgment.  A copy of the accepted Offer of Judgment is attached as Exhibit A, a copy of the Form of Judgment incorporated by reference into the Offer is attached as Exhibit B, and Plaintiff's [sic] acceptance of the offer is attached as Exhibit C.

Acceptance Notice at 1.  Six days later, the Court took the Defendants' proposed final judgment and entered it with no changes.  <u>See</u> Final Judgment at 1, filed November 23, 2016 (Doc. 150).

On November 29, 2016, seventeen people sought to intervene in [Payne] as named Plaintiffs.[6]  See Opposed Fed. R. Civ. P. 24(b) Motion and Supporting Memorandum to Intervene as Parties Plaintiff and Class Representatives, filed November 29, 2016 (Doc. 151)("Motion to Intervene").  On June 27, 2017, fifty-two more people sought to intervene as named Plaintiffs into [Payne (all intervenors are, hereinafter, the "Basnet Intervenors")].[7]  See Opposed Fed. R. Civ. P. 24(B) Supplemental Motion and Supporting Memorandum to Intervene as Parties Plaintiffs and Class Representatives, filed June 27, 2017 (Doc. 166)("Supp. Motion to Intervene").

On August 3, 2017, while the Court considered the Motion to Intervene and the Supp. Motion to Intervene, "a number of the proposed Plaintiffs/Intervenors filed a separate, but essentially duplicative" complaint in [Bell in] the United States District Court for the District of New Mexico, apparently to cover their bases vis-à-vis tolling concerns.  [Plaintiffs' Opposed Fed. R. Civ. P. 42(a)(1) & (a)(2) Motion to Consolidate at 1, filed October 19, 2017 (Doc. 178)("Motion to Consolidate")].  See [Bell].  Tri-State CareFlight and Stamper moved to transfer . . . Bell . . . from the Honorable Kenneth J. Gonzales, United States District Judge for the District of New Mexico, to the Court.  See Bell Defendants' Motion to Transfer Related Case to Honorable James O. Browning, filed September 26, 2017 (Doc. 11)("Motion to Transfer").  In the Motion to Transfer, the Defendants state: "Pursuant to Rule 42(a)(3) of the Federal Rules of Civil Procedure, Defendants Tri-State CareFlight, LLC and Blake A. Stamper

_____

[6]These seventeen people are Kristy Bell, William Dallas Bundrant, Jr., Rocky H. Burrows, II, Brenda Casarez, Adam Doyle, Julie Etchegaray, Walter Fabian, Kristen Grado, Courtney Guerra, Donald Luke Keenan, Brent Place, Jimmy Ronald Primm, Jr., Cindy D. Maxwell, Frederic Ruebush, Daniel St. Peters, Graciela Villalobos and Michael Zulaski.

[7]These additional people are Shailendra Basnet, Deborah Berest, Daniel Bergman, Chase Carter, Michael Castro, Kara Cervantes, Thomas Cislo, David Daniels, Darren Een, Toby Eicher, Harold Joseph Fisher, Christina Fleeman, Luke Forslund, Salustiano Fragoso, Rehannon Gonzales, Darrin Hamilton, Shane Herron, Alexander Howell, Danielle Irvin, Allen Jacobs, Erin Johnson, Alex Jones, Daniel Kuhler, Simon Lucero, Raphael Mahaim, Nathan Maplesden, Jennifer Mazzanti, Bethany McCandless, Ron McDearmid, Dan Meehan, Kevin Napp, James O'Connor, Kathy Onsurez-Wilson, Eric Parker, Jason Perry, Amanda Petersen, Philip Qubain, Paul Ratigan, Joseph Root, Daron Ruckman, Jennifer Salaverry, Paul Serino, Christian Speakman, Ian Stephens, Usvaldo R. Trujillo, Paul Vacula, Jennifer Valdez, Eric Vogt, Greg Walsh, Tyler Wilkins, Virginia Williams, and Terry Zacharias.  Julie Etchegaray is not included in the Opposed Fed. R. Civ. P. 24(B) Supplemental Motion and Supporting Memorandum to Intervene as Parties Plaintiffs and Class Representatives, filed June 27, 2017 (Doc. 166).

respectfully move the Court to transfer the above-captioned case to the Honorable James O. Browning." Motion to Transfer at 1.

On September 30, 2017, the Court granted the Motion to Intervene and the Supp. Motion to Intervene, which added sixty-[eight] current and former Tri-State CareFlight employees as named Plaintiffs [in Payne]. See Memorandum Opinion and Order at 60, 322 F.R.D. 647, 683, filed September 30, 2017 (Doc. 175)("Intervention MOO"). In the Intervention MOO, the Court states:

> . . . Second, the Named Plaintiffs' settlement agreement did not render the Proposed Intervenors claims moot, because their personal stake in the class -- and, therefore, an Article III case or controversy -- inhered at the action's beginning. . . .

Intervention MOO at 2, 322 F.R.D. at 654.

> . . . .

The Court did not make a determination regarding whether the intervening Plaintiffs could proceed, notwithstanding the Court's Final Judgment, without obtaining relief from that Final Judgment via a motion under rule 60(b) of the Federal Rules of Civil Procedure.

> . . . .

Following the Intervention MOO, the parties' counsel began discussing a stipulated order to be filed in Bell vis-à-vis the Transfer Motion. On October 3, 2017, the Defendants' counsel wrote to the Plaintiffs' counsel:

> What are your thoughts, in light of your agreement to not oppose consolidation, on the parties filing a joint motion with [the Honorable Carmen E. Garza, United States District Judge for the District of New Mexico] asking to vacate the JSR deadline and the scheduling conference?

Email from Charles J. Vigil, to Christopher M. Moody and Repps D. Stanford at 3 (dated October 3, 2017), filed October 19, 2017 (Doc. 178-1). The Plaintiffs' counsel responded:

> On our call we said that we would not oppose consolidation so long as there is no appeal of the intervention order. Thinking about it, I don't think you would have an appeal anyway so assuming that you agree not to try an interlocutory appeal, we are not opposing consolidation. If we are not opposing consolidation I think it makes sense to ask Judge Garza to vacate the JSR/scheduling conference

and we submit an order of consolidation and then proceed with case
scheduling before Judge Browning.  In our experience Judge Garza
is pretty available by phone so we might want to approach it that
way.

Email from Christopher M. Moody, to Charles J. Vigil and Repps D. Stanford at 3
(dated October 3, 2017), filed October 19, 2017 (Doc. 178-1).  The Defendants
responded: "Ok. Makes sense.  We are not appealing the intervention order."  Email
from Charles J. Vigil, to Christopher M. Moody and Repps D. Stanford at 3 (dated
October 3, 2017), filed October 19, 2017 (Doc. 178-1).

Payne v. TriState CareFlight, LLC, Consolidation  MOO at 2-10, 327 F.R.D. 433 at 436-40 ([sic]

added in Consolidation MOO).

　　　　3.　　　On October 4, 2017, the Basnet Intervenors filed the Third Amended

Representative and Class Action Complaint for Damages for Violations of New Mexico Minimum

Wage Act and New Mexico Common Law, filed October 14, 2017 (Doc. 177)("Third Amended

Complaint").  See Third Amended Complaint at 18.  The same day,

the Defendants' counsel emailed the Plaintiffs' counsel a draft of the Stipulated
Order, asking for the Plaintiffs' counsel's thoughts.  See Email from Jeffrey L.
Lowry, to Christopher M. Moody and Repps D. Stanford at 6 (dated October 4,
2017), filed October 19, 2017 (Doc. 178-1).  The Plaintiffs' counsel responded:
"The order looks fine except that we think it should refer to Rule 42(a)(2) rather
than (a)(3).  That's the part of the rule implicated in all the class cases involving
consolidation that we have seen."  Email from Christopher M. Moody, to Jeffrey
L. Lowry and Repps D. Stanford at 6 (dated October 4, 2017), filed October 19,
2017 (Doc. 178-1).  The Defendants' counsel explained:

　　　　　The motion cited Rule 42(a)(3) because it allows the most flexibility
　　　　　given the unusual circumstances and status of the two cases.
　　　　　Nevertheless, I don't know that we need to get hung up on the
　　　　　subparagraph.  If we revise the order to cite Rule 42 without
　　　　　reference to any particular part of that rule, would that be
　　　　　acceptable?

Email from Jeffrey L. Lowry, to Christopher M. Moody at 6 (dated October 4,
2017), filed October 19, 2017 (Doc. 178-1).  Later that day, Defendants' counsel
emailed Plaintiffs' counsel: "Here are the motion and order to vacate the Bell
deadlines and scheduling conference as well as the final version of the stipulated
order on the motion to transfer case.  With your approval, I'll file/submit these

today." Email from Jeffrey L. Lowry, to Christopher M. Moody at 9 (dated October 4, 2017), filed October 19, 2017 (Doc. 178-1).  The Plaintiffs' counsel replied: "Looks good."  Email from Repps D. Stanford, to Jeffrey L. Lowry and Christopher M. Moody at 9-10 (dated October 4, 2017), filed October 19, 2017 (Doc. 178-1).

On October 6, 2017, [Judge Gonzales], approved <u>Bell</u>, Stipulated Order Granting Defendants' Motion to Transfer Related Case to Honorable James O. Browning, filed October 6, 2017 (Doc. 15)("Transfer Order").  The Transfer Order states that the "Plaintiffs do not oppose" Tri-State FlightCare's Motion to Transfer and that Judge Gonzalez grants the Motion to Transfer.  Transfer Order at 1.  The Transfer Order concludes with the following: "Accordingly, pursuant to Rule 42 of the Federal Rules of Civil Procedure, IT IS HEREBY ORDERED that the above captioned case be transferred to the Honorable James O. Browning, who shall preside over all future proceedings."  Transfer Order at 1-2.

On October 16, 2017, the Plaintiffs' counsel's paralegal, Anne Chavez, spoke with the Court's Courtroom Deputy, Michelle Behning, to determine whether <u>Bell</u> and [<u>Payne</u>] had been consolidated.  <u>See</u> Declaration of Anne Chavez ¶¶ 4-6, at 1 (dated November 15, 2017), filed November 15, 2017 (Doc. 181-2)("Chavez Decl.").  Behning "confirmed that the cases had not formally been consolidated, and suggested that a motion to consolidate be filed if that was the direction Counsel wished to take."  Chavez Decl. ¶ 6, at 1.  That same day, the Plaintiffs' counsel emailed the Defendants' counsel:

> My paralegal spoke with Michelle at Judge Browning's chambers this morning regarding consolidation.  We filed our reply brief on Friday only in the Bell case because we have not received any order consolidating the two cases from Judge Browning (just the notice from the clerk reassigning the Bell case to Judge Browning).  Michelle told us that the two cases (Bell and Bastian or whatever we are calling it now) are not consolidated and that if we want them consolidated we need to file a motion.  What do you think?

Email from Christopher M. Moody, to Charles J. Vigil and Jeffrey L. Lowry at 10 (dated October 16, 2017), filed October 19, 2017 (Doc. 178-1).  The Defendants' counsel responded:

> Many thanks.   Not being party to your paralegal's ex parte communications with Judge Browning's chambers, it is difficult for me to comment.  We filed a motion to **transfer** the Bell case to Judge Browning and that is what was approved by Judge Gonzalez. And, that is what has happened -- the Bell case is no[w] assigned to Judge Browning.   It was most certainly never a motion to consolidate . . . In any event, we believe consolidation is improper. To the extent Plaintiffs are entertaining making of such a motion,

please be advised that the Defendants oppose and will oppose any
motion to consolidate the two cases.

Email from Charles J. Vigil, to Christopher M. Moody and Jeffrey L. Lowry at 10
(dated October 16, 2017), filed October 19, 2017 (Doc. 178-1)(emphasis in
original).

Payne v. TriState CareFlight, LLC, Consolidation MOO at 10-12, 327 F.R.D. at 440-41.

4.     The Basnet Intervenors then filed the Basnet, asking to consolidate Payne and Bell.
See Motion to Consolidate at 1.  Thirteen days later, the Defendants filed the Defendants' Motion
to Strike or Dismiss Third Amended Complaint, filed November 1, 2017 (Doc. 180)("Motion to
Strike"), arguing that, because Payne is closed, the Basnet Intervenors could not prosecute the
Third Amended Complaint.  See Motion to Strike at 1.  In the Consolidation MOO, the Court
granted the Basnet Intervenors' request to consolidate.  See Consolidation MOO at 2, 29-30, 33-
36, 327 F.R.D. at 436, 450, 452-54.  The Court left the Third Amended Complaint on file until the
Basnet Intervenors demonstrated that they did not need to satisfy rules 59 or 60 of the Federal
Rules of Civil Procedure before they prosecuted the Third Amended Complaint, or that rule 59 or
rule 60 permitted Payne to proceed.  See Consolidation MOO at 37-38, 327 F.R.D. at 453.  Under
the Court's Consolidation MOO, the Defendants did not need to file an answer to the Third
Amended Complaint until the Court and the parties determined whether the Basnet Intervenors
could prosecute Payne.  See Consolidation MOO at 37-38, 327 F.R.D. at 453.

        **1.     The Motion.**

5.     The Plaintiffs filed the Motion on November 6, 2018.  See Motion at 41.  The
Plaintiffs begin by outlining the two pay practices on which their disputes rest: (1) Tri-State
CareFlight not paying flight crew members overtime compensation for hours worked in excess of

forty hours per week and (2) Tri-State CareFlight only paying pilots for twelve hours of work per day regardless of hours worked in excess of twelve hours per day.  See Motion at 2.

6.      Before addressing the classes for which they seek certification, the Plaintiffs note that the NMMWA claim has a three-year statute of limitations period and that the unjust enrichment claim has a four-year statute of limitations period.  See Motion at 6.  According to the Plaintiffs, the NMMWA claim may include claims dating to June 19, 2009, and the unjust enrichment claims may date back to September 11, 2010, four years before Payne's filing on September 11, 2014.  See Motion at 6. The Plaintiffs also assert that the Court should grant "equitable tolling on both claims asserted under the [Second Amended Complaint]under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974)[("American Pipe")], as expanded by Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345 (1983)."  Motion at 6.

7.      The Plaintiffs seek to certify two classes: (i) a class of "all persons employed as flight crew members (Flight Paramedics, Flight Nurses and Pilots) by Tri-State CareFlight in New Mexico at any time from June 19, 2009, through January 19, 2016"; and (ii) a class of "all persons employed as Pilots in New Mexico at any time from September 11, 2010, through January 19, 2016."  Motion at 7.  The Plaintiffs propose in the alternative splitting the first class into two classes: "one consisting of Flight Paramedics and Flight Nurses and the other consisting only of Pilots."  Motion at 7.

8.      The Plaintiffs then apply the class certification requirements to their proposed classes.  See Motion at 10.  According to the Plaintiffs, to grant the request for class certification, the Court must determine "whether a claim satisfies the Rule 23(a) [of the Federal Rules of Civil

Procedure] requirements of numerosity, commonality, typicality, and adequacy of representation." Motion at 10.

9.      The Plaintiffs assert that they satisfy the numerosity requirement.  See Motion at 12-13.  The Plaintiffs state in a footnote that, although many former Tri-State CareFlight employees have joined the lawsuit, several hundred others have not, that the Plaintiffs have joined ninety former Tri-State CareFlight employees in this lawsuit, because "they had to find a strategic way to stave off Defendants' efforts to pick off the named class representatives during the pendency of the class certification motion," and that the "Defendants, however, should not be permitted to pervert Plaintiffs' strategy to argue for the practicability of joinder."  Motion at 12 n.50.  The Plaintiffs explain that the overtime class contains around 300 people whom Tri-State CareFlight employed as "Flight Paramedics, Flight Nurses and Pilots."  Motion at 12.

10.      In a footnote, the Plaintiffs explain that they take the position that the class includes around 300 people based on the Defendants' discovery responses, which include employee lists that identify 139 flight nurses and flight paramedics, and 103 pilots, and the Defs.' Answers to Second Interrs., which identifies 138 pilots.  Motion at 12 n.51.  The Plaintiffs aver that, even if the Court divides the proposed NMMWA class into flight nurses and flight paramedics, and pilots, the class of flight nurses and flight paramedics would have 139 employees, and the class of pilots would have 138 pilots.  See Motion at 12-13. According to the Plaintiffs, the unjust enrichment class of Pilots includes at least 135 Pilots.  See Motion at 13.

11.       The Plaintiffs turn to the issue of whether there are common questions of fact or law.  See Motion at 13.  They list a series of common questions in this case:

1.      Whether Defendant Tri-State is an "employer" within the meaning of the NMMWA.  [Second Amended Complaint]¶ 117[, at 14]; Answer [to Second

Amended Class Action Complaint] ¶ 117, [at 13, filed August 29, 2018 (Doc. 208)("Answer")](denying allegation);

2.      Whether Defendant Stamper is an "employer" within the meaning of the NMMWA.  [Second Amended Complaint] ¶ 117[, at 14]; Answer ¶ 117[, at 13] (denying allegation);

3.      Whether the class members were employees of Defendants during the relevant time period.  [Second Amended Complaint] ¶ 118[, at 14]; Answer ¶ 118[, at 13] (denying allegation);

4.      Whether class members were exempt or non-exempt from the overtime provisions of the NMMWA.  [Second Amended Complaint] ¶ 119[, at 14]; Answer ¶ 119[, at 13] (denying non-exempt status of class members either specifically or because of lack of sufficient knowledge/information);

5.      Whether Defendants' policy and practice of only paying flight nurses and flight paramedics premium overtime compensation for hours over ninety-six (96) in a two-week pay period violated the NMMWA's requirement in Section 50-4-22(D) that employees be paid overtime compensation for all hours worked over forty (40) in a seven (7) day work week.  [Second Amended Complaint] ¶¶ 120, 128[, at 14, 16]; Answer ¶¶ 120, 128[, at 13, 14] (directly denying any and all claims of any NMMWA violations);

6.      Whether Defendants' policy and practice of paying Pilots premium overtime pay only for working shifts other than their regularly scheduled shifts (either seven on/seven off or fourteen on/fourteen off) violated the NMMWA's requirement that employees be paid overtime compensation for all hours over forty in a work week.  [Second Amended Complaint] ¶¶ 120, 128[, at 14, 16]; Answer ¶¶ 120, 128[, at 13, 14] (directly denying any and all claims of any NMMWA violations);

7.      Whether Defendants knew or should have known that Flight Nurses, Flight Paramedics and Pilots were working in excess of forty hours per week such that overtime compensation was due to them.  [Second Amended Complaint] ¶ 123[, at 15]; Answer ¶ 123[, at 14] (directly denying allegation);

8.      Whether Defendants exerted any pressure on Flight Nurses, Flight Paramedics and Pilots to work in excess of forty hours per week such that they were "required" to work overtime under Section 50-4-22; [Second Amended Complaint] ¶¶ 120, 128[, at 14, 16]; Answer ¶¶ 120, 128[, at 13, 14]  (denying any and all liability);

9.      Whether Defendant Tri-State is exempt from application of the NMMWA under pre-emption principles;  Answer ¶13[8] (claiming exemption); and

10.     Whether, and to what extent, the aggrieved employees are entitled to *American Pipe* tolling based on the filing of the underlying *Payne* and current *Bell* lawsuits.

Motion at 14-15.

12.      The Plaintiffs summarize that their proposed common issues 1 through 4 relate to the proposed class members' relationship to the Defendants and whether the NMMWA covers the proposed class members' claims.  See Motion at 15.

13.      The Plaintiffs indicate that issues 1 and 2 especially relate to whether the NMMWA applies to the proposed class.  See Motion at 15.  The Plaintiffs aver that these issues will require classwide analyses whether the NMMWA applies and indicate that particularly the issue of Stamper's individual liability is a "central, material issue" that applies to the class; according to the Plaintiffs, "the material issue of statutory coverage will necessitate discovery, full briefing and a detailed memorandum Opinion and Order from this Court on just this lone, common class issue. . . . [T]his issue alone suffices to support commonality under Rule 23(a)(2)."  Motion at 17. See Motion at 15-17.

14.      The Plaintiffs add that issues 3 and 4 relate to whether the proposed class members meet the NMMWA's statutory definition of employee and "can be resolved by classwide reference to job descriptions, testimony of Plaintiffs and putative class members and payroll records." Motion at 17.

---

[8]The Court assumes that the Plaintiffs intended to cite Answer ¶ 14, at 17 (asserting preemption as a defense).

15.     The Plaintiffs then argue that issues 5 and 6 are "the core, material issues in the overtime claim, namely whether the pay practices of Defendants violated the NMMWA." Motion at 17.  According to the Plaintiffs, the Defendants contest this issue, and the issue "will necessitate a motion for summary judgment and a Memorandum Opinion and Order from this Court to resolve. That resolution will apply equally and uniformly across the entire class." Motion at 17.

16.     The Plaintiffs explain that issue 7 implicates the statutory issue whether Tri-State CareFlight required the Plaintiffs and the proposed class members to work over forty hours a week without compensation. See Motion at 17.  The Plaintiffs contend: "This issue too, can be resolved on a classwide basis by examining policies regarding employee scheduling, the payroll reports, the employees' actual weekly clock in/clock out documents and by testimony of Defendant Stamper, Plaintiffs and class members." Motion at 17.

17.     The Plaintiffs explain that issue 8 relates to Tri-State CareFlight's and Stamper's knowledge that the Plaintiffs and the proposed class members were working over forty hours in a workweek, and the Plaintiffs identify this inquiry as a central element of the NMMWA claim. See Motion at 18.  According to the Plaintiffs, "[t]he same evidence used to support Issue 7 will likewise inform this issue on a common, classwide basis and advance the lawsuit." Motion at 18. The Plaintiffs then aver, regarding issue 9,

> whether Defendants Tri-State and Dr. Stamper are altogether free from NMMWA coverage is an issue of law, the resolution of which will apply equally across the overtime class or classes.  It is obviously an issue central to the overtime claim because its resolution will determine the viability of the overtime claim in its entirety.  While the issue of pre-emption under the Railway Labor Act has already been raised and resolved, Defendants continue to assert the affirmative defense of pre-emption.

Motion at 18.

18.     The Plaintiffs contend, regarding issue 10: "Issue 10 tests the application of *American Pipe* tolling across the entire class and the answer to its applicability in this lawsuit will apply to the class in a common, uniform manner." Motion at 18.

19.     The Plaintiffs argue that <u>Menocal v. GEO Group, Inc.</u>, 882 F.3d 905, counsels a finding of commonality here, because, in that case, where "a group of plaintiffs sued the defendant, a contract detention facility for Immigration and Customs Enforcement, for unjust enrichment and violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589 ('TVPA')," the Tenth Circuit concluded that commonality existed,

> in at least three (3) common areas: "(1) whether the Sanitation Policy "constitutes improper means of coercion" under § 1589, (2) whether GEO "knowingly obtain[s] detainees' labor using [the Sanitation Policy]", and (3) whether a civic duty exception exempts the Sanitation Policy from § 1589. Because the class based the claim on single policies applicable to the class, the Tenth Circuit (and the District Court) correctly determined that the answers to those three (3) questions would materially advance the litigation.

Motion at 19 (quoting <u>Menocal</u>, 882 F.3d at 917-18).

20.     The Plaintiffs add that, in <u>Daye v. Community Financial Service Centers, LLC</u>, 313 F.R.D. 147 (D.N.M. Feb. 9, 2016)(Browning, J.)("<u>Daye</u>"), the Court certified a class where the plaintiff alleged a violation of New Mexico laws which govern payday loans, and the Court identified five common questions:

> 1.     Whether [the] loans are payday loans under the Small Loan Act[, N.M. Stat. Ann. §§ 58-15-1 to -39 ("Small Loan Act")];
>
> 2.     Whether [the] loans complied with the Small Loan Act's requirements for payday loans;
>
> 3.     Whether [the] loans violated the [New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("UPA")] with regard to their violation of the Small Loan Act;

4.      Whether [the] loans are void or it would otherwise be inequitable for [the lender] to retain or collect unlawful interest;

5.      Whether [the lender] conditioned loans on ACH[9] withdrawals in violation of the [Electronic Funds Transfer Act, 15 U.S.C. §§ 1693i-693r ("EFTA")].

Motion at 19-20 (quoting Daye, 313 F.R.D. at 176-77).

21.      The Plaintiffs state that, like the Plaintiffs in these other cases, they have identified ten common questions that will "materially advance the litigation" and that the question whether the Defendants violated the NMMWA alone provides grounds for commonality, especially because, as in Menocal and Daye, a single policy is at issue.  Motion at 20.  The Plaintiffs add that, as in Menocal, the material elements of knowledge and of a statutory exception are at issue.  See Motion at 25.

22.      The Plaintiffs contend that the question whether the Defendants required the proposed class members to work overtime "butresse[s]" commonality.  Motion at 20.  According to the Plaintiffs, "[p]ayroll records, scheduling reports, pay stubs and testimony will all provide common evidence to show that Defendants knew of the overtime work of the class members, consented and then exerted pressure on employees to work overtime without adequate compensation.  In sum, commonality is present on the NMMWA claim."  Motion at 20.

23.      The Plaintiffs next argue that common questions exist on their unjust enrichment claims.  See Motion at 21.  The Plaintiffs list as common issues:

---

[9]"In banking, ACH stands for *Automated Clearing House*, which is a network that coordinates electronic payments and automated money transfers.  ACH is a way to move money between banks without using paper checks, wire transfers, credit card networks, or cash."  Justin Pritchard, Definition: Electronic Payments Made Easy, The Balance, https://www.thebalance.com/what-does-ach-stand-for-315226 (last visited September 12, 2019)(emphasis in original).

1.      Whether Defendants' "daily rate" for Pilots can legally cover more than the twelve hours Pilots were regularly scheduled to work each work day.  [Second Amended Complaint] ¶¶ 130, 131[, at 16-17]; Answer ¶¶ 130, 131[, at 14] (denying claim);

2.      Whether Pilots were regularly expected to work more than twelve hours per shift.  [Second Amended Complaint] ¶¶ 135[, at 17-18]; Answer ¶¶ 135[, at 15] (denying claim);

3.      Whether Defendants knew or should have known that Pilots would on occasion be required to work more than twelve hours per shift.  [Second Amended Complaint] ¶¶ 135, 139[, at 17-19]; Answer ¶¶ 135, 139[, at 15](denying claim);

4.      Whether Defendants' policy and practice of expecting Pilots to work more than twelve hours per shift for no additional compensation caused Defendants to unjustly reap the benefits of failing to pay Pilots for hours worked over twelve per shift.  [Second Amended Complaint] ¶ 135[, at 17-18]; Answer ¶ 135[, at 15](denying claim);

5.      Whether Defendants' failure to pay Pilots additional compensation for hours worked over twelve per shift was malicious, willful, reckless, wanton, fraudulent or in bad faith.  [Second Amended Complaint] ¶¶ 135, 142[, at 17, 18, 20]; Answer ¶¶ 135, 142[, at 15] (denying claim); and

6.      Whether, and to what extent, the aggrieved employees are entitled to *American Pipe* tolling based on the filing of the underlying *Payne* and current *Bell* lawsuit.

Motion at 21.

24.      The Plaintiffs explain that issues 1 through 4 "relate to the material elements of an unjust enrichment claim."  Motion at 21 (quoting New Mexico Department of Labor v. Echostar Communications Corporation, 2006-NMCA-047, ¶¶ 7-9, 12, 16, 134 P.3d 780, 782-84) ("Echostar").[10]  According to the Plaintiffs, "[i]ssue 1 speaks to whether the 'daily rate' paid to

---

[10] Here, the Court must look to how the Supreme Court of New Mexico, rather than the Court of Appeals of New Mexico, would resolve the case.  Federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue. See Erie v. R.R. Tompkins, 304 U.S. 64, 78 (1938)("Erie").  In the absence of an authoritative pronouncement from the highest court, a federal court's task under the Erie doctrine is to predict

Pilots can legally cover just the twelve hours Pilots were scheduled to work or instead can cover up to fourteen hours."  Motion at 21.  To support their argument that this issue is a question, the Plaintiffs cite Echostar, for the holding that a "'regular rate of pay' for calculating overtime compensation [is] not permitted to fluctuate depending on length of work week, but must instead be based on standard forty-hour work week."  Motion at 22 (citing Echostar at ¶¶ 7-9, 12, 16).

25.     The Plaintiffs then argue that, "[b]ecause unjust enrichment requires proof that one party has knowingly benefitted at the other's expense in such a manner that to allow the other to retain the benefit would be unjust, Issues 2 & 3 delve into the heart of the material elements of an unjust enrichment claim."  Motion at 22.  In the Plaintiffs' view, the Defendants' knowledge regarding their benefit is essential to the claim and can be established on a classwide basis.  See Motion at 22.  The Plaintiffs add that issues 2 and 4 can also be shown through classwide proof, and relate to key elements of the unjust enrichment claim, because they relate to whether the Plaintiffs were required to work over twelve hours and whether the Defendants knew of that situation.  See Motion at 22.

---

how the state's highest court would rule if presented with the same case.  See Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007).  When making an Erie prediction, a federal court should follow intermediate state-court decisions "unless other authority convinces us that the state supreme court would decide otherwise."  Koch v. Koch Indus., Inc., 203 F.3d 1202, 1230 (10th Cir. 2000)(quoting Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir. 1984)).  The Supreme Court of New Mexico has construed the NMMWA to "convey rights in the form of minimum standards that the legislature intended all state workers to enjoy."  Self v. United Parcel Serv., Inc., 1998-NMSC-046, ¶ 14, 126 N.M. 396, 402, 970 P.2d 582, 588.  Therefore this Court predicts that the Supreme Court of New Mexico would agree that with Echostar that the NMMWA is intended to "adequately compensate for overtime and discourage overtime," Echostar at ¶ ¶ 11-12, 17,  but that Echostar is narrowly applicable to a fluctuating workweek method of calculating overtime that financially benefits the employer the more hours the employees are mandated to work,  Echostar, at ¶ 7.

26.     The Plaintiffs note too:

> Issue 5 relates to punitive damages on the unjust enrichment claim. Whether Defendants' failure to pay Pilots additional compensation for hours worked over twelve per shift was malicious, will[ful], reckless, wanton, fraudulent or in bad faith can be proved with testimony from Defendants -- primarily Defendant Stamper.  Proof that Defendants acted maliciously applies across the class.

Motion at 22.

27.     The Plaintiffs explain that issue 6 relates to whether "the class members are able to obtain *American Pipe* tolling in light of the underlying *Payne* case."  Motion at 22.

28.     The Plaintiffs aver that Menocal also supports the commonality arguments for the unjust enrichment claim, because, in Menocal,

> the plaintiff asserted a claim for unjust enrichment predicated on the benefit of cheaper labor that the contracting entity obtained. . . . [T]he Tenth Circuit hesitated little in finding commonality.  The question of whether the defendant obtained a benefit from the workers' labor alone was sufficient to create a common question capable of being answered across the class because it would resolve an essential element of the claim in one broad stroke.

Motion at 23 (citing Menocal, 882 F.3d at 924).

29.     The Plaintiffs next argue the issue of typicality.  See Motion at 23.  The Plaintiffs argue, regarding the NMMWA claim, that they and the putative class members have the same overtime claim -- that they worked over forty hours in a seven-day workweek and did not receive the compensation that the NMMWA requires.  See Motion at 24.

30.     The Plaintiffs indicate that the designated class representations whom Tri-State CareFlight employed as flight nurses or flight paramedics worked over ninety-six hours per two-week pay period, and did not receive overtime compensation, and that all other flight nurses and flight paramedics have the same claims.  See Motion at 24.

31.     The Plaintiffs aver that the designated class representatives whom Tri-State CareFlight employed as pilots "were subjected to a policy that paid them overtime compensation only for shifts they worked in addition to their regularly scheduled shifts" and "were not paid overtime for regular shifts even when those regular shifts resulted in them working more than forty (40) hours in a week."  Motion at 24.  According to the Plaintiffs, "[t]he putative class members who were pilots have exactly those claims."  Motion at 24.

32.     The Plaintiffs also argue that the unjust enrichment claim satisfies the typicality requirement.  See Motion at 24.  The Plaintiffs explain that all the pilots share the same claim of not being paid for hours worked over twelve hours in a twelve-hour shift.  See Motion at 24. According to the Plaintiffs, the "Defendants have confirmed in discovery that approximately one hundred and thirty-five (135) pilots worked in that manner at some point.  Each and every one of them suffered the same type of injury from application of Defendants' policy of not paying compensation for hours worked over twelve (12) in a shift."  Motion at 24.  The Plaintiffs add that the designated class representatives share the same claim and injury.  See Motion at 24.

33.     The Plaintiffs next argue that they satisfy the adequacy requirement.  See Motion at 25.  They note that the adequacy inquiry involves two questions: "(i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class." Motion at 25.

34.     Beginning with the first question, the Plaintiffs state that they do not know of "any actual or substantially inherent conflicts that would render them inadequate representatives."

Motion at 25.  According to the Plaintiffs, their interests are aligned with the proposed class members' interests and they have no conflicts, see Motion at 25-26.

> "They served as Flight Nurses, Flight Paramedics or Pilots and they share a common bond with the other similarly situated persons who were employed by Defendants as Flight Nurses, Flight Paramedics or Pilots who were not paid overtime for all hours worked in excess of forty (40) in a work week and, in the case of Pilots, who were not paid compensation for hours worked in excess of twelve (12) in a shift."

Motion at 25.

35.    The Plaintiffs address the Defendants' argument that any designated class representative who served as a base clinical manager or a lead pilot would be in conflict with the rest of the class because base clinical managers and lead pilots scheduled other class members to work over forty hours per week.  See Motion at 25-26.  The Plaintiffs describe this argument as meritless because the lawsuit focuses on the Defendants' pay policies, not scheduling, and because Stamper, not the base clinical managers or lead pilots, created the policies dictating pay.  See Motion at 26 (citing Howell Depo. 220-5 at 31:5-32:13; Perry Depo. 220-7, at 27:14-30:10; id. at 51:8-13).

36.    The Plaintiffs explain further that the clinical base managers and lead pilots mainly scheduled employees to ensure that each crew had the requisite members and had no role in determining pay policies, see Motion at 26 (citing Perry Depo. 220-7, at 14:2-8; id. at 23:2-24:2; id. at 49:7-10; id. at 51:1-7; id. at 53:20-54:18; Daniels Depo. 220-9 at 15:1-13; id. at 17:25-18:6; Aguilar Depo. 220-13, at 16:2-17:3; id. at 17:10-19:8; id. at 38:17-19; Bell Depo. 220-14, at 45:3-7; id. at 45:14-46:19; id. at 47:15-48:16; id. at 63:21-65:23; id. at 63:14-20; id. at 65:24-66:9; Maplesden Depo. 220-15, at 22:16-23:22; id. at 57:12-58:1; id. at 58:10-59:13), and that the clinical base managers and lead pilots also received hourly or daily rate pay, "exercised no

supervisory authority, and . . . failed to receive overtime pay . . . just like every other employee and putative class member," Motion at 26-27 (citing Perry Depo. 220-7, at 13:2-8); id. at 25:4-10; id. at 40:17-25; id. at 49:11-50:25; id. at 57:15-58:14; id. at 60:4-12; Aguilar Depo. 220-13, at 29:23-24; Bell Depo. 220-14, at 54:1-9; id. at 63:21-64:16; id. at 66:10-67:9; Maplesden Depo. 220-15, at 43:5-44:16; id. at 56:5-9; id. at 56:21-57:11.  The Plaintiffs support their argument regarding the clinical base managers and lead pilots with a string cite:

> *See Williams v. Mann*, 2017-NMCA-012, ¶ 30[, 388 P.3d 295,] (accepting that "the Department of Labor's regulations defining the MWA's exemption for administrative, executive, and professional employees control over evaluation of Plaintiff's MWA claims"); NMSA 1978, § 50-4-21(C)(2) (exempts from coverage "an individual employed in a bona fide executive, administrative or professional capacity and forepersons, superintendents and supervisors"); 29 C.F.R. 541.100 (executive must, *inter alia*, be paid on salary basis); 11.1.4.7 NMAC ("[f]orepersons, superintendents and supervisors", as used in Section 50-4-1(C)(2) of the Minimum Wage Act means an employee who meets all of the following requirements: (1) their primary duty is to perform non-manual work related to management of the business; (2) they are to exercise discretion; (3) they regularly assist executives or perform specialized work or special assignments; and (4) they perform less than twenty percent manual work"); 29 CFR 541.102 (defining "management" under executive prong, i.e. supervisory duties); 1978, § 50-4-21(C)(2) (exempts from coverage "an individual employed in a bona fide executive, administrative or professional capacity and forepersons, superintendents and supervisors").

Motion at 27.

37.   In a footnote, the Plaintiffs note that, although the New Mexico Department of Workforce Solutions created the N.M. Admin. Code definition in 2017, the Code follows case law defining supervisory status, which, according to the Plaintiffs provides: "a 'supervisor' is one that the 'employer has empowered . . . to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits." Motion at 27 n.58 (quoting Vance v. Ball State Univ., 570 U.S. 421, 431 (2013)).

38.     According to the Plaintiffs, the clinical base managers and the lead pilots had no authority to affect employment status.  See Motion at 27 n.58.  The Plaintiffs also emphasize that "the class representatives who served as clinical base managers and lead pilots suffered the exact same injury as everyone else by being deprived of overtime pay and/or not receiving additional pay for working over twelve (12) hours a day (i.e. pilots)."  Motion at 27.  According to the Plaintiffs, these designated class representatives seek the same redress as the proposed class members and gained no benefits from the wage and hour practices, so they and the proposed class members share interests and injuries.  See Motion at 27-28.

39.     Turning to the second question, the Plaintiffs aver that their counsels' experience litigating wage-and-hour suits, and class action suits, satisfies the adequacy question.  See Motion at 33.  The Plaintiffs aver that their counsel have the "necessary skills, background and experience" to represent the class.  Motion at 28 (citing generally Declaration of Christopher M. Moody (executed November 6, 2018), filed November 6, 2018 (Doc. 220-16); Declaration of Repps D. Stanford (executed November 6, 2018), filed November 6, 2018 (Doc. 220-17)).  The Plaintiffs explain that their counsel have litigated the case "vigorously" since its beginning and that they will continue to do so.  Motion at 28.

40.     The Plaintiffs also indicate that each designated class representative has stated his or her willingness "to represent the interests of the class appropriately," so each individual "is ready, willing and able to serve as an adequate class representative for the proposed classes."  Motion at 28.  The Plaintiffs also indicate that the designated class representative's depositions

and declarations reveal their basic familiarity with the claims at issue, and note that class representatives do not need a "sophisticated understanding of the law."  Motion at 28-29 (citing Howell Depo. 220-5, at 43:11-21; id. at 44:14-45:24; id. at 48:14-49:15; id. at 51:12-15; id. at 52:15-53:9; id. at 56:5-14; id. at 56:23-57:24; id. at 70:19-71:23; Johnson Depo. 220-6, at 37:20-38:3; id. at 38:7-9; id. at 39:22-40:16; id. at 41:6-9; id. at 44:8-45:15; id. at 45:22-46:17; id. at 46:15-17; id. at 47:21-48:24; id. at 49:19-51:17; Perry Depo. 220-7, at 39:17-40:25; id. at 41:6-42:17; id. at 43:18-44:3; Stevens Decl., ¶¶ 2-4, 9, at 1-3; Daniels Depo. 220-9, at 27:20-28:18; id. at 29:25-30:7; id. at 30:22-24; id. at 34:10-35:7; id. at 35:10-12; id. at 35:16-36:6; id. at 36:22-37:16; id. at 38:1-5; id. at 47:17-49:24; Mahaim Decl. ¶¶ 2-4, 10, at 1-3; Zulaski Depo. 220-11, at 24:21-24; id. at 25:2-7; id. at 25:14-26:1; id. at 26:21-27:9; id. at 29:13-19; id. at 30:13-18; id. at 44:18-46:3; id. at 46:19-48:15; id. at 48:23-25; id. at 49:4-14; id. at 50:21-51:4; Bundrant Decl. ¶¶ 2-4, 10, at 1-3).  The Plaintiffs summarize that the eight designated class representatives satisfy the requirements for adequate representation.  See Motion at 29-30.

41.     The Plaintiffs move to the rule 23(b)(3) requirements.  See Motion at 30.  The Plaintiffs first address the requirement that common questions of fact or law predominate.  See Motion at 35.  For the NMMWA claims, the Plaintiffs argue that the overtime claim "can be proved entirely by common evidence."  Motion at 30.  The Plaintiffs summarize: "This will consist of evidence showing that Defendants were not exempt from the coverage of the NMMWA, that the Plaintiffs and putative class members were employees of Defendants, evidence of Defendants' policies regarding when it paid Flight Nurses, Flight Paramedics and Pilots overtime and when it did not, including the Rule 30(b)(6) deposition testimony of Defendant Tri-State, and evidence that Defendants knew that employees, including Plaintiffs and putative class members, worked

more than forty (40) hours per week, indeed authorized such work, but were not paid overtime compensation." Motion at 30-31.  The Plaintiffs indicate that all the issues that they list in their argument on commonality are "susceptible to classwide proof and will predominate the time, energy, and effort of the Court."  Motion at 31.  The Plaintiffs repeat that the Court will face dispositive motions on Stamper's individual liability, on the Defendants' liability, on the American Pipe tolling, and on the preemption issues.  See Motion at 31.  The Plaintiffs argue that the Defendants' boilerplate affirmative defenses do not mean that common issues do not predominate, that several of the defenses can be resolved on a classwide basis, and that some of the defenses do not apply to this case at all.  See Motion at 31-32.

42.    The Plaintiffs aver that only issues of the amount of "individual overtime compensation, double damages and interest" are individual, but that the Tenth Circuit has held that "the need to calculate individual damages" does not defeat predominance.  Motion at 37 (citing Menocal, 882 F.3d at 922-23).  The Plaintiffs note:

> In another context this Court concluded that the effect of the holding of Comcast Corp. v. Behrend, 569 U.S. 27 . . . (2013), is threefold: (1) at the class certification stage the Court cannot ignore the issue of how individual damages are to be decided; (2) the method by which individual damages are calculated needs to be common for all class members or, if not, the differences need to be taken into account in the predominance analysis; and (3) even if the methodology is common for the class, it needs to operate in a consistent way for each class member. Anderson [Living Tr. v. WPX Energy Prod., LLC], 306 F.R.D. at 388.  Even if this is correct, despite the apparent language to the contrary in Menocal, all of these factors are satisfied here.

Motion at 34.  The Plaintiffs explain regarding the Court's first element that "a uniform formula and some basic arithmetic" will yield the unpaid overtime compensation.  Motion at 34.  The Plaintiffs explain that the "Defendants have recently produced payroll data for the named Plaintiffs in Excel and PDF format that covers most, if not all, of the entire class period and have represented

- 39 -

that similar data for putative class members exist."  Motion at 34.  According to the Plaintiffs, calculating the unpaid overtime compensation will involve basic calculations.  See Motion at 34-35.  The Plaintiffs explain that they will "incur the substantial time, effort and expense" of calculating the unpaid overtime compensation, that they will need to provide the Defendants such information in discovery, that calculating the unpaid overtime compensation will be a mechanical process, and that they cannot see how a dispute will arise over the calculations, because the "regular hourly rate and the .5 multiplier are all known and the mechanical overtime formula is only capable of generating a fixed, undisputed number."  Motion at 35.

43.    The Plaintiffs indicate that the same method for calculating the unpaid overtime compensation will apply to all class members: "calculations of hours worked per work week, the hours worked over forty (40) for which overtime was paid or not paid and the amount due for the overtime hours for which premium compensation was not paid."  Motion at 35.  The Plaintiffs note in a footnote: "The fact that the calculation for Pilots will have one additional step -- a determination of hours worked for which no compensation was paid -- is immaterial.  This step likewise will be automated and does not fundamentally change the methodology."  Motion at 40 n.64.

44.    Third, the Plaintiffs explain that the "damages methodology will be consistent for all class members."  Motion at 40.  They elaborate that they will not need to develop different models to calculate each putative class members' damages.  See Motion at 40.  They repeat that the damages calculations will involve "straightforward arithmetic calculations."  Motion at 36.

45.    The Plaintiffs explain for the unjust enrichment claim: "the elements of an unjust enrichment claim are that (1) one party has knowingly benefitted at the other's expense (2) in a

manner that to allow the other to retain the benefit would be unjust."  Motion at 36 (citing

Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698-99).  The Plaintiffs

explain their contention regarding the unjust enrichment claim:

> Defendant Tri-State's payment scheme for Pilots, which consisted of paying them
> a "daily rate", was, in reality, payment of an hourly wage rate which must have
> been for a fixed shift, and that because Pilots were scheduled to work twelve (12)
> hour shifts, the "daily rate" must be read as payment for twelve (12) hours of work
> even though Pilots occasionally worked additional hours.

Motion at 36.  The Plaintiffs summarize that all of the evidence to support their contention can be

shown on a classwide basis, that this argument predominates the lawsuit, and that this evidence

shows that:

> (1) Defendant Tri-State's own policies and procedures set out a standard twelve
> (12) hour shift for Pilots; (2) testimony from Tri-State officials and Defendant
> Stamper confirm twelve (12) hours as the basic shift for Pilots; (3) Pilots were
> sometimes required to work more than twelve (12) hours in a shift without
> additional compensation; and (4) Defendants knew Pilots were sometimes required
> to work more than twelve (12) hours in a shift without being paid any additional
> compensation.

Motion at 36.  The Plaintiffs explain that this evidence will show whether the Defendants

knowingly benefitted from the pilots' work without overtime compensation, and that the final

question for the unjust enrichment claim -- whether the Defendants benefited unjustly -- is a legal

question that the Court will decide as applied to the class.  See Motion at 37.

46.     The Plaintiffs explain that the Defendants' pay policies resembled a fluctuating

workweek schedule, which the Court of Appeals of New Mexico has "condemned":

> Plaintiffs contend that the terms of the NMMWA do not permit Defendants to
> utilize a variation on the fluctuating work week method of payment, where
> employees are paid a "salary" that covers however many hours they work each
> week, which results in a lower hourly rate (and, thus, lower overtime compensation)
> the more hours the employees work.  Defendants' conception of the "daily rate"
> paid to Pilots is the same: Pilots are scheduled to work twelve (12) hours and the

"daily rate" is for that work, but if Pilots have to work more hours in a shift, the "daily rate" covers that too.  Just like the fluctuating work week method of calculating overtime which has been condemned by the New Mexico Court of Appeals, this method would result in a declining hourly rate the more hours the employees work.

Motion at 37.

47.    The Plaintiffs then explain that the methods for calculating the unpaid overtime compensation will not vary across the class.  See Motion at 37.  The Plaintiffs explained that they will take the number of hours a pilot worked over twelve hours a shift and then multiply that amount by the pilot's hourly rate.  See Motion at 37-38.  The Plaintiffs contend that the multipliers are fixed and that they can obtain the necessary information from the Defendants' payroll records.  See Motion at 38.  The Plaintiffs add that they, and not the Court, will do the mathematics.  See Motion at 38.  The Plaintiffs argue that the calculations here will be even simpler than the arithmetic in Menocal, in which "[t]he Tenth Circuit [commented] that 'the district court reasonably found that individual damages in this case should be easily calculable using a simple formula based on number of hours worked, type of work performed, and fair market value of such work.'"  Motion at 38 (quoting Menocal, 882 F.3d at 927).

48.    The Plaintiffs add that the last issue on the unjust enrichment claim -- punitive damages -- likewise depends on conduct common across the class.  See Motion at 38.

49.    The Plaintiffs then turn to the second 23(b)(3) element to argue that a class action here is a superior method to resolve this case.  See Motion at 38.  According to the Plaintiffs,

[t]he Rule directs the Court to consider the following non-exclusive factors:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)   the likely difficulties in managing a class action.

Motion at 38 (quoting Fed. R. Civ. P. 23(b)(3)).  The Plaintiffs aver that all four factors counsel a class action here.  See Motion at 39.

50.   The Plaintiffs contend that the first element is met, because common interests in liability are present, the class members have the ability to opt-out of the monetary relief and pursue claims in a remedial phase, and the individual claims in this case are small.  See Motion at 39.  The Plaintiffs note that wage-and-hour cases typically have a modest recovery, so class members frequently do not want to pursue separate proceedings.  See Motion at 39.  Second, the Plaintiffs note that no competing cases are pending.  See Motion at 39.  Third, the Plaintiffs indicate that this lawsuit involves only New Mexico employees so proceeding in this forum is logical.  See Motion at 39.  Last, the Plaintiffs explain that the Court has handled larger class actions than this case and that proceeding with a class action in this case is superior to handling smaller cases, because it provides uniformity of decisions and prevents inconsistent determinations.  See Motion at 40.

51.   The Plaintiffs aver that, because the proposed classes are small, minimal proof issues will arise and that a class action will be more efficient than individual cases.  See Motion at 40.  The Plaintiffs also ask that the Court "order that a Notice in the form attached as [Notice of Class Action Lawsuit] be sent to all class members and that Moody & Stanford, P.C., be designated as class counsel, along with any other relief warranted under Rule 23."  Motion at 41.

2.     **The Response**.

52.     The Defendants respond.  See Defendants' Response to Plaintiffs' Motion for Class Certification at 1-49, filed December 6, 2018 (Doc. 223)("Response").  The Defendants begin by pointing the Court to several elements of this case's procedural history.  See Response at 2.

53.     First, the Defendants indicate that, in the Original Complaint, which William D. Payne and Nicole Payne filed in September, 2014, W. Payne and N. Payne did not include an unjust enrichment claim for pilots.  See Response at 2.  The Defendants explain that W. Payne and N. Payne were not pilots and that  W. Payne and  N. Payne included an unjust enrichment claim that they based on a theory related to compensation for travel time, and discarded that theory following the New Mexico's Court of Appeals rejection of such a theory in Segura v. J.W. Drilling, Inc., 2015-NMCA-085, 355 P.3d 845.  See Response at 2-3.

54.     Second, the Defendants point the Court to the number of Plaintiffs that the Second Amended Complaint names -- ninety Plaintiffs -- as evidence that a large number of Plaintiffs are willing to prosecute their own cases here.  See Response at 3.

55.     Third, the Defendants argue that, contrary to the Plaintiffs' assertions, the Complaint raises issues that apply to some, but not to all, of the Plaintiffs.  See Response at 3-4.

56.     The Defendants note that, although, in their Motion, the Plaintiffs state that they seek recovery for the period ending with the January 19, 2016, acquisition, they have not amended the Complaint to reflect this change in timeframe.  See Response at 4.  The Defendants conclude that some of the designated class representatives were not employed by Tri-State CareFlight throughout the period the Plaintiffs identify in the Complaint.  See Response at 5.  The Defendants further note that, because the Plaintiffs include in the class individuals who continued working

post-acquisition, they "properly denied" the Plaintiffs' allegations of commonality.  Response at

6.  The Defendants add that the pilots who were still employed after the acquisition are barred by

the doctrine of federal preemption from bringing "all wage and hour claims based on hours worked

and pay received" because they were part of a Collective Bargaining Agreement.  Response at 5.

57.     Last, the Defendants explain that the Plaintiffs do not distinguish between the

majority of the Tri-State employees, and the clinical base managers and clinical base supervisors,

and aviation base managers and lead pilots,[11] but that the Defendants aver that the NMMWA

exempts these individuals from the definition of employee pursuant to the "forepersons,

superintendents and supervisors" exemption in N.M. Stat. Ann. § 50-4-21(C)(2).  Response at 6.

The Defendants take the stance that none of the NMMWA claims involving these exempted

individuals should be admitted.  See Response at 7.  The Defendants add:

> Given that Plaintiffs admit that the managers exercised significant
> responsibility in "scheduling" flight crew members, and in approving payroll, it is
> evident that a potential conflict exists between those who scheduled crew members
> to work more than 40 hours in a week, knowing Tri-State's policy on paying
> overtime, and those who were scheduled to work those hours, regardless of whether
> the managers had any role in "determining the overtime pay policies" of Tri-State.

Response at 7 (citing Motion at 26; Deposition of Erin Johnson at 21:3-4 (taken August 13, 2018),

filed December 6, 2018 (Doc. 223-2)(Johnson Depo. 223-2)).  The Defendants explain that the

exemption issue differs from the conflicts issue, because, pursuant to the NMMWA exemption,

exempted individuals are not employees, and Tri-State CareFlight and Stamper are not those

---

[11]According to the Defendants, "[t]he terms 'Clinical Base Manager' and 'Clinical Base Supervisor' refer to the same supervisory position, as do 'Aviation Base Manager' and 'Lead Pilot.'"  Response at 6 n.2 (citing Deposition of Alexander Howell at 16:8-16 (taken August 21, 2018), filed December 6, 2018 (Doc. 223-1)("Howell Depo. 223-1); Maplesden 220-15, at 12:17-13:1.  The Court will use the phrases clinical base manager and lead pilot.

individuals' employers.  See Response at 8.  The Defendants explain that they properly deny the Plaintiffs' allegations that all Plaintiffs are employees and that they properly deny the Plaintiffs' other NMMWA allegations, "because a substantial number of 'Plaintiffs' are expressly excluded from the Act's coverage."  Response at 9.  See Response at 8-9. In a footnote, the Defendants state that the Plaintiffs try to argue that the Court should conclude now that the clinical base managers and lead pilots are not supervisors for the NMMWA exception, but that the Court should not make that determination before merits discovery, and that evidence suggests that the analysis of the individuals' supervisory roles is a highly fact-specific and individualized analysis, which counsels not granting a class certification motion.  See Response at 8 n.3.

58.    The Defendants contend: the "Plaintiffs' description of the Tri-State's overtime policies and practices, is generally accurate to the extent, but only to the extent, that it applies to the pre-acquisition time period. Plaintiffs' description stating how Tri-State compensated Pilots during that time period, however, is grossly misleading."  Response at 9 (citing Motion at 2-3). The Defendants argue that Tri-State CareFlight's policy identified a fourteen-hour duty day for the pilots, that the pilots were generally scheduled for twelve-hour shifts, and that the Defendants paid the pilots for a day's work no matter how many hours they worked.  See Response at 9 (citing Deposition of Tri-State CareFlight, LLC through Dayna Lokelani Mobley Blake at 33:16-34:11 (taken June 18, 2015), filed December 6, 2018 ("Tri-State Depo. Doc. 223-1")).  The Defendants argue: "Plaintiffs' repeated assertions to the contrary should be disregarded because they are unsupported -- indeed, contradicted by -- the evidence."  Response at 12.  The Defendants aver that no evidence supports that Tri-State CareFlight withdrew the fourteen-hour duty day, that the

pay records support their interpretation of the pay policy, and that every pilot at times worked under twelve-hour shifts but still received the daily basis.  See Response at 12-13.

59.     The Defendants turn to the NMMWA, and explain that the NMMWA excludes from the definition of employee "an individual employed in a bona fide executive, administrative or professional capacity ***and forepersons, superintendents and supervisors***."  Response at 13 (emphasis in Response)(citing N.M. Stat. Ann. § 50-4-21(C)(2)).  The Defendants emphasize that the Fair Labor Standards Act,  29 U.S.C. §§ 201-04, 206-07, 209-19 ("FLSA"), does not contain an identical exemption, so the Plaintiffs' misplace their reliance on FLSA caselaw.  Response at 14.  According to the Defendants, the Plaintiffs also misplace their reliance on the N.M. Admin Code § 11.1.47, because the regulation was not in effect during the period at issue in this case, and, because, as the regulation provides one definition for foreperson, supervisor, and superintendent, it does not appropriately interpret the terms according to their plain meanings, which differ between the words.  See Response at 14-15.

60.     Additionally, the Defendants argue that, through the NMMWA exemption, the New Mexico Legislature rejected the FLSA distinction between foremen and executives, so the N.M. Admin. Code § 11.1.47's interpretation of the foreperson, superintendent, and supervisor exemption as "essentially equivalent" to the "'executive' exemption of the FLSA" defeats the New Mexico Legislature's purpose.  Response at 15.  The Defendants aver that at least a jury question exists whether the clinical base managers and lead pilots qualify for the NMMWA exemption.  See Response at 15.

61.     The Defendants then turn to New Mexico law on unjust enrichment and aver that the Supreme Court of New Mexico "has made clear that a party to a contract cannot rewrite the

terms of the contract by asserting an unjust enrichment claim to avoid what the parties contractually agreed to."  Response at 16 (citing Rio Grande Jewelers Supply, Inc. v. Data General Corp., 1984-NMSC-094, 689 P.2d 1269 (N.M. 1984).  The Defendants argue that, to succeed on their unjust enrichment theory, the Plaintiffs must "prove that Tri-State communicated different terms regarding the daily rate to one or more Pilots such that those Pilots could reasonably believe that company-wide policy and practice did not apply to them."  Response at 16.  The Defendants describe that, if the evidence shows that the parties understood or should reasonably have understood that the pilots would receive a daily rate for work up to fourteen hours, the Plaintiffs' claim cannot succeed.  See Response at 16.

62.     The Defendants next address concerns regarding the statutes of limitations.  See Response at 17.  The Defendants first note that the NMMWA statute of limitations "implicat[e]s the claims of only a few Plaintiffs" and "is irrelevant to most of the claims in this lawsuit." Response at 17.  The Defendants admit that they do not argue that the NMMWA statute of limitations defeats rule 23's commonality or predominance requirements, but they note that the statute-of-limitations issue is not a common issue across the class.  See Response at 17-18.  The Defendants agree with the Plaintiffs that the New Mexico unjust enrichment claim has a four-year statute of limitations, but dispute the Plaintiffs' assertion that the Payne lawsuit's date provides the date for calculating the four-year period.  See Response at 18.  In the Defendants' view, the Plaintiffs first asserted the current unjust enrichment theory in the First Amended Complaint that they filed in October, 2015.  See Response at 18.  The Defendants add that any relation back argument, pursuant to rule 15(c) of the Federal Rules of Civil Procedure, about the unjust

enrichment claim should fail and that any such argument is irrelevant to the Motion, "because the claims of only a few Pilots are implicated in that potential dispute."  Response at 18 n.5.

63.     The Defendants next turn to the Plaintiffs' proposed classes.  See Response at 18. The Defendants argue that "the proposed employment dates are inapplicable no matter how or whether *American Pipe* tolling is applied," because any putative class member who did not work for Tri-State CareFlight after September 11, 2011, does not have a NMMWA claim if the tolling period is considered to start with the Original Complaint's filing, and because the statute of limitations is later if filing the Original Complaint does not toll the statute of limitations.  Response at 18-19.  The Defendants add that, for the unjust enrichment claim, "the earliest applicable employment date would be four years from October 28, 2011 -- four years from when Plaintiffs first asserted that claim in their First Amended Complaint.  If the statute of limitations began running after the Final Judgment was entered, that date would be even later."  Response at 19.

64.     The Defendants then address the Plaintiffs' proposal to use designated class representatives.  See Response at 19.  The Defendants object that they do not agree to this approach, as the Plaintiffs allege, and that, in the Joint Status Report, they assert, rather: "'There is no legal basis to designate a subset of plaintiffs to represent other named plaintiffs already parties to the lawsuit, who can and must represent their own interests in litigation.'"  Response at 19 (quoting Joint Status Report at 4, filed May 29, 2018 (Doc. No. 33).  The Defendants argue that no caselaw supports the Plaintiffs' approach and that rule 23 exists to protect unnamed class members.  See Response at 19-20.  The Defendants contend:

> Having 90 named plaintiffs makes satisfying the superiority element essentially impossible, but it also raises another problem: the Plaintiffs' structurally unequal "approach," where some named plaintiffs relinquish their responsibilities to other

named plaintiffs, is inconsistent with the responsibilities undertaken and imposed on a party by law when he or she signs up as a named plaintiff in a lawsuit.

Response at 20.

65.     The Defendants also argue that only Perry was a clinical base manager and that his responsibilities differed from what the evidence suggests were other clinical base managers' responsibilities.  See Response at 20-21 (citing Perry Depo. 220-7, at 15:15-16; id. at 49:1-51:25; Bell Depo. 223-2, at 45:8-13; Johnson Depo. 223-2, at 19:8-16; Maplesden Depo. 220-15, at 20:18-21; Deposition of David Daniels at 16:11-20 (taken August 8, 2018), filed December 6, 2018 (Doc. 223-2)("Daniels Depo. Doc. 223-2"); Mori Depo. 223-2, at 20:10-12.  The Defendants describe that

> [b]ase managers, including numerous named Plaintiffs, were responsible for scheduling, approving payroll, coordinating with Tri-State administration to disseminate information to flight crews, taking calls from sick crew members so that replacements could be scheduled, and "anything that a field staff member might feel like needed to be addressed by a supervisor," including issues with other staff members or concerns about equipment.

Response at 21 (quoting Johnson Depo. at 21:1-14; Maplesden Depo. 220-15, at 20:11-21; Bell Depo. 220-14, at 45:3-18).  The Defendants aver that employees considered clinical base managers to be supervisors, see Response at 21 (citing Mori Depo. 223-2 at 15:5-8), that Cislo, at least, worked as a lead pilot and a "'Check Airman/Instructor Pilot' at Tri-State, meaning he performed evaluations of the Pilots' aviation skills in addition to their general performance as employees," Response at 21 (quoting Second Amended Complaint ¶ 21, at 5); Moshi Depo. at 15:5-8; Maplesden Depo. Doc. 220-15 at 20:11-17, and that Tri State paid clinical base managers an additional stipend, see Response at 21 (citing Plaintiff Kristy Bell's Objections, Answers and Responses to Defendant Tri-State CareFlight, LLC's, First Sets of Interrogatories and Requests

for Production, Interrogatory No. 6, at 3, filed December 6, 2018 (Doc. 223-3); Plaintiff Benjamin

Aguilar's Objections, Answers and Responses to Defendant Tri-State CareFlight, LLC's, First Sets

of Interrogatories and Requests for Production, Interrogatory No. 6, at 3, filed December 6, 2018

(Doc. 223-3), and Plaintiff Nathan Maplesden's Objections, Answers and Responses to Defendant

Tri-State CareFlight, LLC's, First Sets of Interrogatories and Requests for Production,

Interrogatory No. 6, at 3, filed December 6, 2018 (Doc. 223-3)).  The Defendants argue that this

evidence at least rebuts the Plaintiffs' contention that the clinical base managers and the lead pilots

had no supervisory authority, shows that the parties must at least engage in "a detailed,

individualized analysis of each manager's particular supervisory functions and responsibilities,"

and reflects problems for a rule 23 analysis using these designated class representatives.  Response

at 21.

      66.    The Defendants next address rule 23(a)'s requirements: numerosity, commonality,

typicality, and adequacy.  <u>See</u> Response at 22.  First, the Defendants concede that they do not

dispute numerosity here.  <u>See</u> Response at 22.  Second, the Defendants argue that the Plaintiffs'

proposed classes do not satisfy the <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338 (2011)("<u>Wal-

Mart</u>"), standard.  Response at 24.  The Defendants indicate initially that the Plaintiffs' approach

of listing common issues based on the Defendants' Answer to the Complaint cannot satisfy alone

the <u>Wal-Mart</u> standard, which requires that a class action be capable of generating common

answers, because, under the Plaintiffs' approach, "unless a defendant conceded all liability at the

outset of the case, a court would find common issues of fact or law."  Response at 23-24.

      67.    The Defendants begin by addressing specifically the NMMWA claims.  <u>See</u>

Response at 24.  The Defendants argue regarding the Plaintiffs' issues 1, 2, and 3 that, in the

Answer, the Defendants denied allegations regarding NMMWA employers and employees, because, regarding issue 1 -- whether Tri-State CareFlight was an NMMWA employer -- some Plaintiffs and proposed class members are not employees for NMMWA purposes, because the NMMA exemption applies.  See Response at 24-25.  The Defendants also indicate that some Plaintiffs worked post-acquisition, so the Defendants properly denied the Defendants' employer status.  See Response at 25.  The Defendants argue regarding the Plaintiffs' issues 2 and 3 that their Answer does not reflect their allegations about all Plaintiffs, because whether Plaintiffs were exempt from the NMMWA is not a classwide issue.  See Response at 25.  According to the Defendants, many Plaintiffs did not fill those positions, and many Plaintiffs did not work with the Defendants post-acquisition.  See Response at 25-26.  Regarding the Plaintiffs' issue 4, the Defendants argue that the NMMWA exemption issue does not apply to all Plaintiffs, but "there will have to be an intensive, factual investigation and presentation of evidence regarding *some* (not all) of the class members to determine whether they are exempt under the NMMWA."  Response at 26 (emphasis in original).  The Defendants state in a footnote that the answer to the inquiry might even vary by clinical base manager.  See Response at 26 n.6.

68.     Regarding the Plaintiffs' issues 5 and 6, the Defendants argue that the Plaintiffs mischaracterize their Complaint, which reads:

> "Defendants' actions of failing to pay Plaintiffs properly for all hours worked over forty (40) in a week at one and one-half (1½) times their regular rate of pay constitute violations of the NMMWA."  (SAC ¶ 120).  [Second Amended Complaint] ¶ 128 alleged as follows: "As a result of Defendants actions, Plaintiffs and all other similarly situated individuals are entitled to compensation for the unpaid overtime hours that they worked, plus interest, plus an amount equal to twice the compensation for unpaid overtime hours in accordance with the NMMWA, plus costs and attorney's fees and any other relief afforded by the NMMWA.  (*Id.* ¶ 128.)"

Response at 27.  According to the Defendants, the Plaintiffs cite these Complaint paragraphs, which, based on the Complaints' language, apply to all Plaintiffs, as evidence that the parties dispute separate issues about the flight nurses and flight paramedics, and about the pilots.  See Response at 26-27.  The Defendants argue that their denials do not address issues 5 and 6, and ask that the Court reject these issues, because the record does not reflect them.  See Response at 27. The Defendants repeat that they denied the Complaint's allegations, because they believe that some Plaintiffs are exempt from the NMMWA, that some Plaintiffs worked post-acquisition, and that some pilots worked subject to a collective bargaining agreement post-acquisition.  See Response at 27.

69.     Regarding the Plaintiffs' issue 7, the Defendants argue that the Plaintiffs cite as evidence of the dispute a Complaint paragraph that discusses rule 23's commonality element and that the Defendants accurately dispute that allegation in their Answer.  See Response at 28.  The Defendants argue that the knowledge requirement is not common across the post-acquisition timeframe, because, before that point, the Defendants knew or should have known the hours that the Plaintiffs and proposed class members worked, but that the Plaintiffs have no evidence that the Defendants had such knowledge post-acquisition.  See Response at 28.  Regarding issue 8, the Defendants argue: "Plaintiffs cite once more to [Second Amended Complaint]¶¶ 120 and 128 as the basis for this issue.  Those paragraphs do not say anything about 'pressure,' so the alleged issue as framed by the Plaintiffs can be disregarded for that reason alone."  Response at 28 (quoting Motion at 15).  The Defendants aver that they properly denied the Complaint's allegations and that issue 8 reflects no issues that will result in classwide answers.  See Response at 29.  The Defendants

argue that any overtime they required the employees to work prior to the acquisition is irrelevant to the employees exempt from the NMMWA provisions.  See Response at 29.

70.    Regarding issue 9, the Defendants argue: "There is no mention of 'pre-emption principles' in Additional Defense ¶ 13.  As explained in detail and many times above, the exemption question regarding 'forepersons,' 'superintendents,' and 'supervisors' under the NMMWA -- which is specifically mentioned in Additional Defense ¶ 13 -- does *not* raise questions common to the class."  Response at 29-30 (emphasis in original).  Regarding issue 10, the Defendants aver that the American Pipe tolling issue applies to some, but not to all the Plaintiffs, so the issue is not a common issue.  See Response at 30.  The Defendants contend:

> [g]iven that Plaintiffs bear the burden of proving how *American Pipe* tolling applies classwide, to all of the class members' claims, *Reed v. Bowen*, 849 F.2d 1307 (10th Cir. 1988), the Court should reject the notion that Issue 10 raises "common" questions because Plaintiffs have failed to prove that it affects *any* named Plaintiff, much less all of them.

Response at 30 (emphasis in original).

71.    The Defendants aver that, although they need not disprove commonality, the record suggests that several Plaintiffs do not have American Pipe tolling issues.  See Response at 30-31.

72.    The Defendants next address the unjust enrichment claim.  See Response at 31. Regarding the Plaintiffs' issue 1, the Defendants argue that the Plaintiffs misinterpret Echostar, and that a correct interpretation reveals that Echostar relates only to calculating overtime and does not provide a basis in law for issue 1.  See Response at 31-32.  The Defendants argue that issue 2 resembles issue 7 related to the NMMWA claim, and that, given the Defendants' policies involved a fourteen-hour duty day, "[i]f individual Pilots have evidence, and not just an unsupported belief, that Tri-State's daily rate was meant to cover exactly 12 hours of work, the Court and parties will

need to conduct an individualized examination and evaluation of the communications from Tri-State to those Pilots." Response at 32.  The Defendants argue that the Plaintiffs base issue 3 on the same paragraph regarding commonality that the Plaintiffs cite for issue 7 related to the NMMWA claim and that, although the Defendants do not dispute that they expected pilots to work more than  twelve hours at a time pre-acquisition, the Defendants dispute that they had such requirements post-acquisition. See Response at 33.  In the Defendants' view, this post-acquisition change means that issue 3 does not raise a common issue. See Response at 33.  Regarding issue 4, the Defendants argue that the Plaintiffs mischaracterize the Defendants' pay policies and that the issue involves the uncommon issue whether the pilots can assert a New Mexico common-law unjust enrichment claim for activities post-acquisition, when the collective bargaining agreement existed.  See Response at 33.  According to the Defendants, "Issue 5, which is '[w]hether Defendants' failure to pay Pilots additional compensation for hours worked over twelve per shift was malicious, willful, reckless, wanton, fraudulent or in bad faith,' suffers the same flaws as Issue 4, above."  Response at 34 (quoting Motion at 21).  The Defendants aver that issue 6 resembles issue 10 related to the NMMWA claims and that, although the statute of limitations issue likely raises more issues for the unjust enrichment claim, those issues are not classwide, given that the issues do not affect some pilots. See Response at 34.

73.      The Defendants then address typicality. See Response at 35.  The Defendants argue that the typicality and the commonality requirements "tend to merge," and reassert their arguments regarding commonality.  Response at 35.  The Defendants argue specifically regarding typicality that the Supreme Court's "formulation" of typicality relates to the named Plaintiffs, of which this case has ninety, and that the Defendants oppose the Plaintiffs' proposed approach of using

designated class representatives.  Response at 35.  The Defendants also argue that some named Plaintiffs must prove that they are not exempt from the NMMWA if those Plaintiffs want to recover.  See Response at 35.  According to the Defendants, "'[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'"  Response at 36 (quoting Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d 52, 59 (2d Cir. 2000)).  The Defendants argue that a trial will likely focus on whether the clinical base managers and the lead pilots were employees for NMMWA purposes and that regular employees' claims are not typical of these clinical base managers' and lead pilots' claims.  See Response at 36.

74.    Regarding adequacy, the Defendants concede the second inquiry for adequacy -- whether counsel and the Plaintiffs will vigorously prosecute the case -- but contend that the Plaintiffs do not satisfy the first inquiry -- the conflict element.  See Response at 36.  The Defendants argue that courts deny class certifications where a potential conflict between class members exists.  See Response at 37.  They cite Donaldson v. Microsoft Corp., 205 F.R.D. 558 (W.D. Wash. 2001)(Pechman, J.), to support their argument, and describe,

> for example, the plaintiffs in a Title VII discrimination case moved for certification of a class that included both supervisory and non-supervisory employees.  The court denied the motion for certification, noting the "serious concerns about potential conflicts of interest between the class representatives and members of the putative class."  [Donaldson v. Microsoft Corp., 205 F.R.D.] at 568.  In language that is pertinent here, the court explained, "Two of the three named plaintiffs . . . are former Microsoft supervisors.  As such, they were obligated to implement the very supervisory system which this litigation challenges.  A conflict of interest may arise where a class contains both supervisory and nonsupervisory employees."  Id.

Response at 37.  The Defendants argue that, here, some of the Plaintiffs served as clinical base managers or lead pilots, and had scheduling and payroll responsibilities.  See Response at 37 (citing Johnson Depo. 220-6 at 21:3-4).  The Defendants aver that the Plaintiffs' argument that the clinical base managers and the lead pilots were involved in scheduling, but not in pay policies, does not overcome the conflict.  See Response at 37-38.  The Defendants argue that scheduling is relevant to the NMMWA claim, as the Plaintiffs argue that the Defendants scheduled employees for more than forty hours a week.  See Response at 38.  According to the Defendants, "the base managers necessarily 'implemented' the allegedly unlawful system they challenge in this lawsuit." Response at 38 (quoting Donaldson v. Microsoft Corp., 205 F.R.D. at 568).  The Defendants argue that these base clinical managers "acted directly or indirectly in the interest of Tri-State," and could have been Defendants in this lawsuit under N.M. Stat. Ann. § 50-4-21(B), regardless of their overtime pay.  See Response at 38.

75.      The Defendants then turn to rule 23(b)(3)'s requirements.  See Response at 38. The Defendants aver that, even if the Plaintiffs abandon their post-acquisition claims, the litigation will focus on whether class members are exempt from the NMMWA and, for the unjust enrichment claim, "whether any Pilots can prove that they had communications with Tri-State or Dr. Stamper sufficient to override the general policy of paying Pilots a daily rate for any hours worked up to a" duty day of fourteen hours.  Response at 40.  See id. at 39-40.  The Defendants aver that litigating the individualized issues will require more "time and effort" than litigating the classwide issues. Response at 40.  The Defendants explain, for instance, that the parties do not genuinely dispute Tri-State CareFlight's overtime pay policies or whether Tri-State CareFlight scheduled employees to work more than forty hours a week, and expected that or knew that they worked this time.  See

Response at 40.  The Defendants also argue that they do not dispute that Stamper qualifies as an employer for non-exempt employees under the NMMWA, so the issue of Stamper's individual liability will focus on whether some Plaintiffs are exempt from NMMWA employee status.  See Response at 40-41.  The Defendants also incorporate their prior arguments on the American Pipe tolling issue and argue that the issue applies only to "a small minority of claims in this case." Response at 41.  The Defendants indicate as well that any preemption issues related to the post-acquisition collective bargaining agreement are not classwide even for the pilots and that the issue is moot if the Plaintiffs have abandoned their post-acquisition claims.  See Response at 41.

76.     The Defendants argue, regarding their affirmative defenses, that they asserted the defenses "to preserve them" and that such defenses should not defeat predominance, but contend that the Plaintiffs will have to prove that the clinical base managers and lead pilots are employees for NMMWA purposes.  Response at 42.  The Defendants argue that the NMMWA exemption issue will "be vigorously litigated," and that they "will call numerous witnesses and introduce documentary evidence showing that many base managers evaluated other employees and performed a wide variety of other supervisory duties." Response at 42.  The Defendants argue that some Plaintiffs have "down-played their supervisory responsibilities" and that the Defendants should have an opportunity to conduct merits discovery before the Court decides this issue. Response at 42-43.  The Defendants object to the Court resolving the issue in this Memorandum Opinion and Order on the Motion.  See Response at 43.  The Defendants repeat that evidence shows that clinical base managers and lead pilots had supervisory duties, and that some Plaintiffs may have had more supervisory responsibility than others.  See Response at 43-44.  In the

Defendants' view, "[l]itigating the base manager responsibilities and the application of the NMMWA exemptions to those facts will overwhelm other aspects of this case."  Response at 44.

77.     Last, the Defendants address rule 23(b)(3)'s superiority requirement.  See Response at 44.  The Defendants argue that this issue "may be the most obviously problematic in this case given the number of individuals who have signed on as named Plaintiffs."  Response at 44.  The Defendants argue that class actions are used where small recoveries mean that few people are interested in pursuing litigation, and that the number of Plaintiffs in this case makes managing analyses like the typicality and the adequacy inquiries difficult.  See Response at 44-45.

78.     The Defendants argue that the first factor for the superiority analysis -- class members' interest in pursuing the litigation -- weighs against superiority, because so many former Tri-State CareFlight employees are Plaintiffs.  See Response at 46.  Second, the Defendants aver that this same fact weighs against the second factor in the analysis -- the extent and the nature of the litigation.  See Response at 45-46.  The Defendants argue that the Plaintiffs know that tens of thousands of dollars are at stake and that the Plaintiffs request attorneys' fees and costs, a fact which undermines the argument that the individual costs of litigation outweigh the benefits.  See Response at 46.  According to the Defendants,

> [a]lthough Plaintiffs suggest that bringing this lawsuit *en masse* by signing up dozens of plaintiffs was "a strategic way to stave off Defendants' efforts to pick of the named representatives," (Pls.' Mot. at 12 n. 50), the Plaintiffs' very success in doing so demonstrates that the special class action procedure is not even necessary, and certainly not superior to, ordinary, multi-plaintiff litigation.

Response at 46.

79.     Regarding the third factor -- the desirability of concentrating the litigation in this forum -- the Defendants concede that the Court is "well-suited to adjudicating the claims at issue,"

but argue that the number of Plaintiffs who have joined the case indicates that the class action procedure is unnecessary to concentrate the claims.  Response at 47.  The Defendants indicate that the Court has allowed the Plaintiffs to intervene in this action and that the parties have transferred claims to the Court from another judge.  See Response at 47.  The Defendants aver that the fourth factor -- manageability -- depends on predominance and that the NMMWA exemption issue will make addressing this case through a class action an "impossible" task.  Response at 47-48.  The Defendants add that "[t]he same is true for any individual Pilots who claim to have communications from Tri-State that revoked or negated the 14-hour duty day time period that the Pilots daily rate was meant to cover."  Response at 48.  The Defendants conclude that the Plaintiffs' arguments that class actions are more manageable than individual lawsuits are unpersuasive, because the alternative here is not ninety individual lawsuits, but a multi-plaintiff litigation.  See Response at 48.  The Defendants add that, "[w]hen non-class 'aggregation' alternatives exist, the Court should use them instead of Rule 23," and note that the parties and the Court have managed the ninety-person litigation so far.  Response at 48.

### 3.      The Reply.

80.      The Plaintiffs reply.  See Plaintiffs' Reply to Motion for Class Certification at 4-18, filed January 11, 2019 (Doc. 224).  Regarding commonality for the NMMWA claim, the Plaintiffs argue that the Defendants' commonality analysis is incorrect, because, although "[u]nder [Wal-Mart], a party can no longer develop a laundry list of non-material questions to establish commonality," Reply at 1 (citing Wal-Mart, 564 U.S. at 349-50), they identified eight central, material issues common to the class, see Reply at 1.  According to the Plaintiffs, the Defendants do not contest the existence of common evidence for these issues.  See Reply at 1.  The Plaintiffs

also argue that the Defendants do not avoid <u>Menocal</u> and <u>Daye</u>.  <u>See</u> Reply at 1-2.  The Plaintiffs

add that the Defendants' arguments that they do not deny fully the Plaintiffs' allegations in the

Complaint fail, because, pursuant to rule 8(b)(2) of the Federal Rules of Civil Procedure, the

Defendants could qualify denials, but they categorically denied the Plaintiffs' allegations.  <u>See</u>

Reply at 2.  The Plaintiffs explain that the Defendants have vehemently denied liability throughout

the litigation and that they cannot now "seek to defuse the common issues by engaging in wishy-

washy litigation tactics."  Reply at 3.  <u>See id.</u> at 2-3.  The Plaintiffs propose that, if the Defendants

are genuine, they can:

> (a) concede liability for those employees who worked during the relevant, designated timeframe and who are not alleged to be exempt under the NMMWA; and (b) have no issue with the Court certifying a damages class for them under Fed. R. Civ. P. 23.  The Court can then certify a class/subclass of the purportedly "substantial number" of clinical base managers/lead pilots, as every single issue, including their "exempt" status, would be common to that entire class/subclass on the NMMWA claim.

Reply at 3.

81.   Regarding the commonality for the unjust enrichment claim, the Plaintiffs argue

that the Defendants attempt to litigate the claim.  <u>See</u> Reply at 3.  The Plaintiffs contend that

<u>Echostar</u>

> raises relevant issues about the nature and structure of the wage and hour relationship between employer and employee, which is at the heart of the unjust enrichment claim and which, if truly disputed by Defendants, is a common question for resolution by the Court.  Furthermore, the NMMWA and unjust enrichment claims overlap because the pilots contend some of the hours that they worked, and for which they claim they were not paid, occurred during the overtime period.

Reply at 3-4.  The Plaintiffs argue, regarding issues 2 and 3, that, although the Defendants try to

state that the parties do not dispute that the pilots "routinely worked more than 12 hours a day,"

the Defendants' Answer denies any wrongdoing, so a dispute remains.  Reply at 4 (citing Answer

¶¶ 133-42, at 15).  The Plaintiffs add that the Defendants' assertion that issue 3 applies only to some pilots is wrong, and argue that "[c]lass certification for the unjust enrichment claim involves all pilots who worked for Tri-State during the relevant timeframe, 135 of whom have been identified as working more than 12 hours/day.  Knowledge of Pilots having to work the additional time is common to the class."  Reply at 4.  Regarding issue 4, the Plaintiffs allege that, in Menocal, the Tenth Circuit held that this same issue alone established rule 23 commonality.  See Reply at 4.  According to the Plaintiffs, moreover, they plead claims relating to a timeframe that includes the post-acquisition period, because they engaged in notice pleading, and they now narrow the class period as they indicate in the Motion.  See Reply at 4.  The Plaintiffs argue that the Defendants attempt to litigate the unjust enrichment claim, but that this merits argument and is not the proper test for a rule 23 motion.  See Reply at 4-5.  The Plaintiffs aver:

> At its core the unjust enrichment issues are this: when Tri-State paid pilots a daily rate, did it properly cover only 12 hours/day or 14 hours/day, and if the former, was Tri-State unjustly enriched?  See Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11[, 3 P.3d at 698-99] (discussing elements of unjust enrichment claim).  While Defendants claim the 14 hours/day is uncontested, several pilots testified that they believed the "daily rate" was meant to cover only 12hours/day of work because that corresponded with their assigned work schedules.

Reply at 4-5 (citing Zulaski Depo. 220-11 at 20:1-17; Maplesden Depo. 220-15, at 43:13-14; id. at 43:24-44:16).

82.     The Plaintiffs then turn to the typicality issue.  See Reply at 5.  The Plaintiffs argue that the Defendants have cited no authority to show that using designated class representatives precludes typicality or a "favorable Rule 23 ruling in general."  Reply at 6.  The Plaintiffs repeat that they adopted the ninety-Plaintiff strategy to prevent the Defendants from "picking off named plaintiffs."  Reply at 6.  The Plaintiffs summarize that the Defendants agreed to the plan, because,

had they "not, they would have disavowed the proposed Rule 23 plan, filed exceptions to the JSR/PDP, voiced their disapproval at the Rule 16 conference and/or filed a motion objecting to the plan." Reply at 6. The Plaintiffs indicate that the Defendants have also not deposed all the designated class representatives, but have deposed Plaintiffs who are not designated class representatives. See Reply at 6. The Plaintiffs argue, in response to the Defendants' contentions about the clinical base managers and the lead pilots: "[i]t is well-settled that 'differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.'" Reply at 6 (quoting Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).

83.     The Plaintiffs next address the adequacy issue. See Reply at 6. The Plaintiffs summarize that the Defendants do not dispute their counsels' competence, the designated class representatives' satisfaction of their class obligations, the lack of conflict related to the designated class representatives for the proposed unjust enrichment class, and the lack of actual conflict related to the designated class representatives for the proposed NMMWA class. See Reply at 6. The Plaintiffs describe that the Defendants allege a potential conflict based on the clinical base managers and lead pilots' scheduling of other Plaintiffs. See Reply at 6-7. The Plaintiffs assert: "This conflict does not exist, and certainly not to the core of this litigation." Reply at 7 (citing 7A Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure § 1768 at 389-93 (3d ed. 2005)). The Plaintiffs aver that the Defendants have not identified potential conflicts for five of the designated class representatives. See Reply at 7. The Plaintiffs aver that Tri-State CareFlight testifies that Stamper and Tom Hoover were the only people responsible for Tri-State CareFlight's overtime policies for nurses and paramedics. See Reply at 7 (citing Defendants'

Answers to Plaintiffs' First Interrogatories, Interrogatory No. 9, at 5, filed January 11, 2019

(Doc. 224-2)("Defs.' Answers to First Interrs. 224-2").   The Plaintiffs describe that the pay

practices and the scheduling should not be conflated:

> Ms. Blake testified that while base managers initially filled out schedules, they were
> forwarded to the clinical services manager and then to her.   She oversaw
> scheduling, ensured that nurses/paramedics worked at least ninety-six hours in the
> pay period, and ultimately approved each schedule before posting.   On the medical
> side, the scheduling buck stopped with her, not the clinical base managers.

Reply at 10 (citing Tri-State Depo. at 13:19-15:19).   The Plaintiffs add that Donaldson v. Microsoft

Corp. is inapposite, because the NMMWA does not make unlawful scheduling employees to work

over forty hours a week, but it makes unlawful failing to pay employees for one and a half time

during the overtime hours worked, and the clinical base managers and lead pilots had no control

over pay practices.   See Reply at 7-8.

84.      The Plaintiffs also dispute the Defendants' argument that the clinical base managers

and the lead pilots could be employers, because a NMWWA exemption does not mean that an

employee becomes an employer, and because, under similar FLSA caselaw, individual liability is

limited to those individuals with control over an entity's operations.   See Reply at 8 (citing

Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 48 (1st Cir. 2013); Irizarry v. Catsimatidis, 722

F.3d 99, 105, 107 (2d Cir. 2013)).

85.      The Plaintiffs then argue that they satisfy predominance.   See Reply at 9.   The

Plaintiffs note that the Defendants could forward a stipulation to the proposed class period or that,

if necessary, the Plaintiffs can amend the Complaint to clarify a new class period.   See Reply at 9.

The Plaintiffs argue that the Defendants mischaracterize the caselaw and that the application of an

exemption does not defeat predominance.   See Reply at 9 (citing CGC Holding Co. v. Broad &

Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014)).  The Plaintiffs argue that the Defendants previously

did not raise the NMMWA exemption issue when the parties discussed the Bastian Plaintiffs rule

23 class certification proposal and that the Defendants agreed to pay W. Payne, who was a clinical

base manager, the full relief that he requested.  See Reply at 9-10.  The Plaintiffs add that

commonality does not need to be universal and quote "'[c]ourts traditionally have been reluctant

to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be

available against individual members.'"  Reply at 10 (alteration in Reply)(quoting Smilow v. Sw.

Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)).  The Plaintiffs add:

> What the Eleventh Circuit actually stated in [Sacred Heart Health Systm. Inc. v.
> Humana Military Healthcare Servs. Inc., 601 F.3d 1159, 1170 (11th Cir. 2010),]
> was that if "after adjudication of the classwide issues, plaintiffs must still introduce
> evidence of individualized proof . . . [t]heir claims are not suitable for class
> certification under Rule 23(b)(3)."

Reply at 10 (quoting Sacred Heart Health Systm. Inc. v. Humana Military Healthcare Servs. Inc.,

601 F.3d at 1170).  According to the Plaintiffs, they will not bear the burden of proof on the

NMMWA exemption issue, but the Defendants will bear that burden.  See Reply at 10-11.  The

Plaintiffs aver that the Defendants have not provided evidence showing why the NMMWA

exemption inquiry will predominate or why the small differences between job duties will require

individualized analyses.  See Reply at 11.  According to the Plaintiffs, a significant dispute does

not exist about the clinical base managers' and the lead pilots' duties, and the clinical base

managers' and the lead pilots' roles in setting schedules and performing evaluations does not

answer the question what the individuals' primary duties were.  See Reply at 11.  The Plaintiffs

argue that:

> it will hardly tax the Court's resources or dominate this lawsuit: (a) to develop
> evidence on what individuals actually did and how much time they expended on

- 65 -

activities; (b) to request documents from Tri-State evidencing each instance in which employees managed, hired, fired, disciplined, set policies, deviated from policies independently of others etc.; and (c) to combine those together.

Reply at 12.

86.     The Plaintiffs aver that the remaining dispute will involve the legal definition of "supervisor" or "foreperson," and argue that such an issue will not predominate the lawsuit.  Reply at 12.  The Plaintiffs add that the Court will litigate the NMMWA exemption regardless of whether the case proceeds as a joint litigation or as a class action, and opine that resolving the question will be easier in a class action setting.  See Reply at 12.

87.     The Plaintiffs then turn to the unjust enrichment claim.  See Reply at 12.  The Plaintiffs argue that, contrary to the Defendants' assertions, each pilot will not need to prove reliance on communications with Tri-State CareFlight to establish the unjust enrichment claim. See Reply at 12-13 (citing Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99).  The Plaintiffs argue that they do not see why an individualized assessment of the claim is necessary, because the Plaintiffs must prove that: "(1) Defendants knowingly benefitted at their expense; and (2) in a manner such that allowance of the other to retain the benefit would be unjust." Reply at 13 (citing Menocal, 882 F.3d at 923).  The Plaintiffs describe:

> Proof may consist of communications exchanged between various Plaintiffs and representatives.  Alternatively, it may consist of proof of Tri-State's corporate documents and testimony regarding the same, as well as the applicability of [Federal Aviation Administration] regulations to the matter and testimony as to whether Tri-State did or did not reap benefits at the pilots' expense.

Reply at 13.  According to the Plaintiffs, regardless whether the case proceeds on an individualized basis or on a class basis, they will need to prove "the same common evidence."  Reply at 13.

88.     Last, the Plaintiffs argue that they have satisfied the superiority requirement.  <u>See</u> Reply at 13.  The Plaintiffs contend that the Defendants' arguments about the ninety Plaintiffs fail, because the Plaintiffs adopted the ninety-Plaintiff strategy to reach a class certification ruling and not to defeat superiority.  <u>See</u> Reply at 13.  The Plaintiffs add: "[t]he fact that Plaintiffs' counsel designated eight (8) representatives out of the Plaintiff pool was done for purposes of efficiency and expediency, but it does not undermine the fact that a class case remains superior to multiple jury cases."  Reply at 13.  The Plaintiffs also argue that no dollar limitation adheres to rule 23 such that those people who earn high compensation or will acquire a certain dollar amount through litigation cannot proceed under rule 23.  <u>See</u> Reply at 13-14.  The Plaintiffs add that the Defendants' reference to the rule 68 offer to the Bastian Plaintiffs reflects a high damages number, because of the treble damages for the violation, but that the Defendants should not be able to avoid class liability because they might face such damages.  <u>See</u> Reply at 14.  The Plaintiffs argue that the Defendants want to avoid a class action, because they will face several hundred similarly situated former employees to whom the Defendants will owe money.  <u>See</u> Reply at 14.  The Plaintiffs summarize: "Finally, despite Defendants' doubts, Plaintiffs are more than confident that this Court can successfully manage a wage and hour lawsuit with two (2) legal claims and one primary affirmative defense implicating only two (2) job positions."  Reply at 15.

**4.      <u>The Hearing.</u>**

89.     The Court began the hearing by indicating that it owed the parties a Memorandum Opinion and Order, but that, unless the parties objected, the Court had concluded that the parties could proceed to litigate the Motion before the Court issued the Memorandum Opinion and Order

that it owed.[12]   See Draft Transcript of Hearing at 3:23-4:5 (taken July January 24, 2019)(Court)("Tr.").[13]   The Plaintiffs then began their arguments by summarizing Payne's and Bell's procedural history, and particularly the Defendants' picking off of W. Payne, N. Payne, and the Bastian Plaintiffs.   See Tr. at 4:20-5:14 (Moody).   The Plaintiffs indicated that they believe that the Motion is ripe.   See Tr. at 5:20-23 (Moody).   The Court asked the Plaintiffs to remind it how many more individuals that the class action would add to the case.   See Tr. at 5:24-6:2 (Court). The Plaintiffs replied that they estimated 300 total class action members and, after the Court's request for clarification, explained that the 300 includes the ninety named Plaintiffs plus around 210 additional class members.   See Tr. at 6:3-10 (Moody, Court).   The Court asked the Plaintiffs whether, at this stage, they had considered using joinder instead of the class action procedure. See Tr. at 6:11 (Court)  The Plaintiffs replied that they had sent notices to all of the Tri-State CareFlight employees, and that, while ninety is a large number, few people have joined the lawsuit lately so that ninety seems to be the limit on the Plaintiffs who would join the litigation.   See Tr. at 6:11-24 (Court, Moody).   The Plaintiffs emphasize that ninety is less than a third of the people wronged. See Tr. at 6:24 (Court, Moody).   See Tr. at 6:11-24 (Court, Moody).   The Court followed with the inquiry whether it should assume that the ninety were all the people interested in the litigation. See Tr. at 6:25-7:2 (Court).   The Plaintiffs replied that they believe that there is a difference between being a named representative and being a class member, and that they cannot surmise the

---

[12]The Court has since issued this Memorandum Opinion and Order.   See generally Third Amended Complaint MOO.

[13]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

motivations for those individuals who are not interested in being class members.  See Tr. at 7:3-5 (Moody); id. at 7:9-13 (Moody).   The Plaintiffs opined that people would likely want their overtime pay, and also noted that people might have moved out of state and concluded that joining the lawsuit was too much hassle.  See Tr. at 7:5:9 (Moody); id. at 7:16-21 (Moody). The Plaintiffs indicated that the presence of ninety named Plaintiffs reflects a high level of interest in the litigation, but that the ninety also shows that the Court and the parties should not "get null justice," and that a class action procedure is superior here.  Tr. at 7:21-8:6 (Moody).

90.    The Plaintiffs then addressed commonality.   See Tr. at 8:7-9 (Moody).   The Plaintiffs indicated that, although the practicing of listing all common, insignificant issues for commonality has ended since Wal-Mart, the Plaintiffs listed several significant common issues to their proposed classes.  See Tr. at 8:9-15 (Moody).  The Plaintiffs then repeated their proposed classes and their common issues.  See Tr. at 8:15-11:3 (Moody).  The Plaintiffs explained that they based these issues on the Defendants' denials in the Answer, so the issues are live.  See Tr. at 11:4-7 (Moody).

91.    The Court stated that it cannot remember seeing plaintiffs present so many issues in a class action and expressed concern that some issues are "phantom issues," i.e., issues that are not actually at issue.  Tr. at 11:13 (Court).  See Tr. at 11:8-18 (Court).  The Plaintiffs responded that they do not believe that the issues are phantom issues, because the Defendants had an obligation to respond truthfully in their Answer and indicated that they -- the Plaintiffs -- took the Defendants at their word and have had no stipulation from the Defendants.  See Tr. at 11:19-12:1 (Moody).  The Plaintiffs stated that Stamper's status as an employee, for instance, raises an issue of the appropriate standard for individual liability under the NMMWA.  See Tr. at 12:2-7 (Moody).

The Court asked how important such an issue is, and indicated that it understood <u>Wal-Mart</u> to require courts to consider issues qualitatively and "say that's the big issue.  That's the one that if you answer yes, win; if you answer no, they win."  Tr. at 12:13-15 (Court).  The Court asked whether Stamper was not a "sideshow."  Tr. at 12:17 (Court).  <u>See id.</u> at 12:16-17 (Court).  The Plaintiffs responded to the question in the negative, because Tri-State CareFlight no longer operates, and the Plaintiffs could not say how collection against Tri-State CareFlight would proceed and whether they could collect against Stamper on a judgment against Tri-State CareFlight.  <u>See</u> Tr. at 12:18-13:5 (Moody).

92.     The Court indicated that sometimes, in class actions, the parties brief such issues before proceeding to the class certification stage.  <u>See</u> Tr. at 13:6-14 (Court).  The Court asked whether deciding such an issue before class certification was better, and the Plaintiffs replied that deciding it post-class certification was preferable to avoid, for instance, a "one way intervention problem."  Tr. at 14:6 (Moody).  <u>See id.</u> at 14:2-6 (Court, Moody).  To the Court's request for elaboration on their reference to intervention problems, the Plaintiffs explained that they refer to a situation wherein plaintiffs obtain a judgment of liability before a class certification, and stated that some courts have described this situation as unfair, because then all potential class members want to join the class.  <u>See</u> Tr. at 14:8-13 (Moody).  The Plaintiffs indicated that these courts' views have influenced some of their decisions about class certification.  <u>See</u> Tr. at 14:14-19 (Moody).  The Court noted that defendants usually file dispositive motions, and the Plaintiffs admitted that the parties might have resolved some of the issues here through a motion that the Plaintiffs could file.  <u>See</u> Tr. at 14:25-15:6 (Court, Moody).  The Court asked whether such motions were not in the Plaintiffs' interests before class certification, and the Plaintiffs responded that such

motions were not in their interests, that they might file such motions after class certification, and that the potential for such filings indicate that the case would not be too complex for the Court to manage.  See Tr. at 15:9-15 (Moody).

93.    The Court responded that it was sympathetic to the focus on manageability, but indicated that it does not understand class action law to focus on manageability.  See Tr. at 15:16-21 (Court).  The Plaintiffs replied that the law does not focus on that issue, but that they consider manageability a factor for a court's consideration, and, to the Court's pressing regarding under what rule 23 factor they consider the issue, stated that the factor is a consideration in rule 23(b)(3)'s superiority requirement.  See Tr. at 15:22-16:9 (Moody, Court).  The Plaintiffs noted that the Court has certified bigger, more complex class actions than this case.  See Tr. at 16:9-13 (Moody).  The Plaintiffs explained that they believe this case well suited to a class action, because it involves employees all paid using the same pay practices, and they began to reiterate some common issues for the unjust enrichment claim.  See Tr. at 16:14-17:2 (Moody).

94.    The Court asked the Plaintiffs what they obtain through the unjust enrichment claim.  See Tr. at 17:3-8 (Court).  The Plaintiffs explained that their unjust enrichment claim covers hours for which employees worked, but did not receive pay, and that they do not understand the NMMWA to cover this situation.  See Tr. at 17:9-25 (Moody).  The Plaintiffs explained that, in Menocal, the Tenth Circuit addresses precisely such an issue of a proposed class on an unjust enrichment claim.  See Tr. at 19:15-18 (Moody).  The Plaintiffs explained their belief that Menocal is "pretty squarely on point" here.  Tr. at 19:24.  See id. at 19:21-20:17 (Moody).  The Plaintiffs then repeated the common issues that they had identified regarding the unjust enrichment claim.  See Tr. at 21:13-21; id. at 22:2-23:8 (Moody).  The Plaintiffs explained that they have seen no

efforts from the Defendants to concede liability and opined that the Defendants' denials suggest that the issues are live.  See Tr. at 23:9-18 (Moody).

95.     The Plaintiffs then addressed typicality.  See Tr. at 23:24 (Moody).  They explained that the Defendants argue that some individuals may be exempt from the NMMWA, but the Plaintiffs opine that this possibility does not create individualized issues as every base had a clinical base manager or a lead pilot.  See Tr. at 23:24-24:10 (Moody).  The Court asked the Plaintiffs how many bases there were, and the Plaintiffs guessed around fifteen bases.  See Tr. at 24:11-15 (Court, Moody).  The Court explained that it was seeking an idea how the Plaintiffs' clients operate.  See Tr. at 25:16-17 (Court).  The Court asked: "Do the pilots go out for 12 hours . . . and if they're called, then they get in a plane and move patients around, but otherwise, they're just kind of on call?  Is that the way it works?"  Tr. at 24:19-23 (Court).  The Plaintiffs replied that the Court correctly described how the system operates.  See Tr. at 24:24-25:3 (Moody).  The Court asked whether, while on call, the pilots sat at the base, and the Plaintiffs responded that the pilots remained at the base, because they might need to enter the air immediately.  See Tr. at 25:4-16 (Court, Moody).  According to the Plaintiffs, the pilots are at the base for twelve hours while the flight nurses and the flight paramedics are at the base twenty-four hours.  See Tr. at 25:16-18 (Moody).

While addressing typicality, the Plaintiffs said regarding the clinical base managers:

So a clinical base manager they have if a job description for that.  What they do is they just designate one of the nurses or paramedics to be the clinical base manager, and that person is responsible for making sure there is coverage 24 hours a day, 7 days a week.  And I think there are some incidental duties, like ordering supplies when they run out of medical supplies.  But it's not a replacement for their regular job.  They're still working as a nurse or a paramedic and they get a small stipend in addition.  They don't supervise employees.  They don't determine pay practices.

> All they do is the scheduling, basically.  And the scheduling has to be reviewed by
> a higher authority, it did have to be reviewed by a higher authority within Tri-State.

Tr. at 27:10-25 (Moody).  Regarding the lead pilots, the Plaintiffs explained:

> Lead pilot is the same thing to basically, as for pilots, as opposed to the
> clinical staff, nurses and paramedics, the main job duty is to determine coverage,
> make sure there is coverage.  Somebody can't work, then it's up to the lead pilot to
> find another pilot who will agree to come in and cover a 12 hour shift.  So that's
> basically what they are.  And the pilots also got a small stipend in addition to their
> regular daily rate.

Tr. at 28:2-10 (Moody).  The Plaintiffs explained that, whereas the stipend for clinical base

managers was around five to six percent of their total pay, the stipend for lead pilots was around

three to four percent of the total pay.  See Tr. at 28:12-15 (Moody).  The Plaintiffs argue that, in

these circumstances, the issue of the clinical base managers and the lead pilots does not destroy

typicality; the Court can address the issue in a dispositive motion, and the Plaintiffs have Tri-State

CareFlight's deposition on the issue.  See Tr. at 28:11-17 (Moody).  The Plaintiffs explained that

all of the Plaintiffs have the same claims, theories, and requests for remedies.  See Tr. at 28:22-23

(Moody).

96.     The Plaintiffs addressed adequacy and explained that the Defendants have

concerns about the clinical base managers and the lead pilots.  See Tr. at 29:1-7 (Moody).  The

Plaintiffs opined that most of the prospective class members and most designated class

representatives were not clinical base managers or lead pilots.  See Tr. at 28:8-12 (Moody).  The

Plaintiffs explained that no conflict exists and that the Court can resolve the concerns "fairly

expeditiously in the course of the litigation, whether [in] motion practice or in trial.  We can present

testimony and I think that will resolve the issue pretty swiftly."  Tr. at 29:15-18 (Moody).

97.     Turning to the rule 23(b)(3) requirements, the Plaintiffs expressed that they believe that the Court's concern about phantom issues relates to predominance and that, in their opinion, these issues are real issues that are central to this case.  See Tr. at 29:22-30:7 (Moody).  The Plaintiffs noted the clinical base manager and lead pilot issue, if it is an individual issue, could be resolved in one day at trial.  See Tr. at 30:12-16 (Moody).  The Plaintiffs also repeated that the individual damages will involve automatic calculations and that the case does not involve different theories for calculating damages.  See Tr. at 30:17-32:16 (Moody).  The Plaintiffs noted that the Defendants have not even indicated that the individual damages affect predominance, so the Plaintiffs do not think that the Defendants will raise the individual damages as an issue for the Motion.  See Tr. at 33:9-14 (Moody).

98.     The Plaintiffs then addressed superiority.  See Tr. at 33:15 (Moody).  The Plaintiffs addressed the two issues that they understood the Defendants to raise about the superiority requirement.  See Tr. at 33:19-21 (Moody).  The Plaintiffs argued, first, that they believe that the involvement of ninety Plaintiffs reflects that joinder is inferior, and they addressed, second, the issue of the claims' value and argued that they do not yet know the value of this case's claims.  See Tr. at 33:24-34:6 (Moody).  The Plaintiffs noted that the offers of judgment to the Bastian Plaintiffs ranged from $4,500.00 to $22,000.00, but argued that the potential for such recovery is not sufficient to establish that every prospective class member would be willing to obtain their own lawyer for litigation and should not defeat superiority.  See Tr. at 34:6-24 (Moody).  The Plaintiffs added that ninety individuals chose to pursue this litigation through one firm and that no other cases on this issue have been filed indicates that not many people view the case as worth pursuing individually.  See Tr. at 34:25-35:7 (Moody).

99.     The Court asked how the Plaintiffs envisioned litigating the case.  <u>See</u> Tr. at 35:18-20 (Court).  The Plaintiffs explained that their trial plan involves the two classes that they earlier described and noted, in response to questions from the Court about the number of prospective class members in each class, that the 300 proposed class members were in the NMMWA claim and that around 135 pilots, who were part of the 300 proposed class members in the NMMWA claim, form the class for the unjust enrichment claim.  <u>See</u> Tr. at 36:1-17 (Moody, Court).  The Plaintiffs explained that, because they had ninety named Plaintiffs, they propose to select eight people to represent the class, and that they chose "two nurses, two paramedics, two rotary wing pilots[,] and two fixed wing pilots."  Tr. at 37:12-13 (Moody).  <u>See id.</u> at 37:6-13 (Moody).  The Plaintiffs explained that they adopt this approach for administrative efficiency, although they do not know whether other cases have used such an approach.  <u>See</u> Tr. at 37:13-19 (Moody).  The Plaintiffs identified alternatives to the eight designated class representatives, such as considering all ninety Plaintiffs class representatives, or dismissing all the Plaintiffs but the eight designated class representatives and having the dismissed Plaintiffs be absent class members.  <u>See</u> Tr. at 37:19-38:7 (Moody).  The Plaintiffs explained that, as a condition of certification, the Court could dismiss without prejudice the extra Plaintiffs.  <u>See</u> Tr. at 38:9-17 (Moody).  The Plaintiffs explained that, even if all ninety people were class representatives, the Plaintiffs' counsel would choose representative Plaintiffs to testify at trial, as has occurred in FLSA cases.  <u>See</u> Tr. at 39:2-14 (Moody).  The Plaintiffs described that having more than two or three plaintiffs testify on a subject becomes cumulative, and that, even where defendants threaten to call all plaintiffs on damages issues, such an approach usually does not prevail, because it is "not a good way to try a case."  Tr. at 40:1 (Moody).  <u>See id.</u> at 39:16-40:1 (Moody).  The Plaintiffs described that they expect a week

to a-week-and-a-half trial, and would use a consultant to present damages if the parties do not

agree to damages before the trial, so the trial will be manageable.  See Tr. at 40:3-15 (Moody).

100.    The Court turned to the Defendants.  See Tr. at 41:4-6 (Court).  The Court asked

the Defendants whether the case seemed manageable.  See Tr. at 41:15-19 (Court).   The

Defendants agreed that the case is manageable, but noted that the Plaintiffs must show that a class

action is a better way to litigate the case than alternative procedures are.  See Tr. at 41:20-42:5

(Lowry).  The Court asked the Defendants why, with this third wave of Plaintiffs, a class action is

not a better approach.  See Tr. at 42:6-12 (Court).  The Defendants responded that the presence of

ninety Plaintiffs indicates that people are willing to litigate their own claims here.  See Tr. at 42:13-

24 (Lowry).  The Court told the Defendants that it does not want to say that only people with a

negative value case can proceed with a class action and that the law did not support such a

conclusion.  See Tr. at 42:25-43:7 (Court).  The Defendants responded that they are arguing that,

here, sufficient incentives for litigating the case -- the damages and the statutory attorneys' fees --

exist that these people have decided to pursue their own claims.  See Tr. at 43:8-21 (Lowry).  The

Court asked where the law says that a case where individuals who have incentives to bring claims

and have the ability to obtain attorneys' fees should not be certified as a class.  See Tr. at 43:22-

44:3 (Court).  The Defendants responded that the law analyzes the issue in aggregation, and, to the

Court's question whether it should not analyze the issue across the 300 claims, explained that the

superiority requirement embraces the issue.  See Tr. at 44:4-10 (Lowry, Court).  The Court pressed

the Defendants whether they have a case that supports their argument, and the Defendants replied

that they have no case, but the issue should arise with the question whether ordinary joinder offers

an effective procedure.  See Tr. at 44:11-45:5 (Court, Lowry).  The Defendants explained that, if

there are not incentives to litigate a case individually, the situation counsels certification, so, by negative implication, having incentives counsels against certification.  See Tr. at 45:5-9 (Lowry). The Court indicated that this reasoning suggests favoring class actions with negative values, which are the class actions that most concern judges, and disfavoring class actions with high values, with which judges generally have more comfort.  See Tr. at 46:7-14 (Court).  The Defendants responded that the ninety Plaintiffs here "is extremely unusual."  Tr. at 46:17 (Lowry).  See id. at 46:15-17 (Lowry).  The Court asked whether that number simply suggests that the Court should proceed as a class action.  See Tr. at 46:23-47:4 (Court).  The Defendants responded that the Court could handle such a case through joinder, but the Court replied that the techniques in such a joinder case would resemble a class action.  See Tr. at 47:9-15 (Lowry, Court).  The Defendants stated that the procedures would be similar to a class action, "but there will not be this attempt to bring in and maximize."  Tr. at 47:17-18 (Lowry).  The Court asked whether that issue is what the parties are disputing -- the Plaintiffs want a bigger class with more fees and damages, and the Defendants' want a smaller class with lower damages -- and the Court has to decide whether it can check the boxes that caselaw requires for a class certification.  See Tr. at 47:22-48:5 (Court).  The Defendants agreed.  See Tr. at 48:6-7 (Lowry).

101.    The Court directed the Defendants to address the Plaintiffs' contentions.  See Tr. at 48:8-11 (Court).  The Defendants argued that the Plaintiffs attempt to take the Answer and to state that, where the Defendants denied a claim, a common issue exists.  See Tr. at 48:12-20 (Lowry). The Court responded that it has seen no motions that rid this case of issues and asked the Defendants how else the Plaintiffs would identify the issues other than looking at the Answer.  See Tr. at 48:21-49:9 (Court).  The Defendants responded by repeating their explanation from the

Response that the Plaintiffs' claims in the Complaint involve issues in the post-acquisition period, but that the Plaintiffs have not stated that they will not pursue claims in that timeframe. See Tr. at 49:10-50:16 (Lowry). The Defendants explained that they cannot dispute the overtime practices and that the Plaintiffs cite Tri-State CareFlight's deposition for evidence on the issue, so such an issue is not a real issue for trial. See Tr. at 50:23-51:9 (Lowry).

102. The Defendants explained that they believe that the only issue that will require time is the issue involving the clinical base mangers and the lead pilots. See Tr. at 51:9-15 (Lowry). The Court responded that it had the impression that this issue is relatively small, and will affect only a small number of employees and of claims. See Tr. at 51:16-21 (Court). The Court asked for an estimated percentage of the Plaintiffs that the issue implicates, and the Defendants estimated that more than ten percent of the Plaintiffs served as clinical base managers or lead pilots. See Tr. at 51:24-52:6 (Court, Lowry). The Defendants stated that the case involves the overtime issues, for which the facts are largely undisputed, and the resolution of which will not require much time. See Tr. at 52:11-18 (Lowry). The Court asked what deciding the clinical-base-manager-and-lead-pilot issue will take. See Tr. at 52:19-20 (Court). The Defendants explained that the Court should not rule on the issue now, because the parties have not briefed a summary judgment motion, but the Court replied that it must determine what issues are real. See Tr. at 52:21-53:4 (Lowry, Court). The Defendants agreed with the Court and noted that they disagree with the Plaintiffs' characterization of the issue. See Tr. at 53:5-7 (Lowry). According to the Defendants, some Plaintiffs state that they filled few supervisory or leadership positions, but that some individuals did performance evaluations and were considered supervisors. See Tr. at 53:7-16 (Lowry).

103.     The Court asked the Defendants what issue it will need to decide; it described: "[L]et's say every day you walked into the office and you've got . . . your people in the room and you say you're the [captain] for the day and that person was a foreperson, and they were exempt isn't that a common issue then across the group." Tr. at 54:11-15 (Court).  The Defendants replied that such an issue is not common, because, for instance, Perry states that he had no supervisory duties and did not perform performance evaluations but other people testified that they did perform such evaluations.  See Tr. at 54:16-22 (Lowry).  The Court asked whether the Defendants describe an issue or a fact.  See Tr. at 54:23-55:1 (Court).  The Defendants described that they believe that the analysis would reveal different facts for different individuals which would lead to different legal conclusions, and indicated that different bases used the clinical base mangers and the lead pilots differently.  See Tr. at 55:5-18 (Lowry).  The Court responded that the parties seem to be arguing about ten to fifteen percent of the case.  See Tr. at 55:19-24 (Court).  The Defendants replied that they believe that the issue would predominate.  See Tr. at 55:25-56:10 (Lowry).

104.     The Defendants indicated that they also have concerns about the unjust enrichment claim.  See Tr. at 56:10-12 (Lowry).  They repeated their arguments from the Response.  See Tr. at 56:12-57:5 (Lowry).  The Defendants indicated that the Plaintiffs assert in their Reply that several pilots believe that they had twelve-hour workdays, but that the written policy reflects a fourteen-hour day.  See Tr. at 57:5-17 (Lowry).

105.     The Court asked the Defendants how they envision trying this case.  See Tr. at 57:18-20 (Court).  The Defendants responded that they envision resolving much of the case in motions for summary judgment, and litigating the clinical-base-manager-and-lead-pilot issue and potentially litigating the unjust enrichment and the damages issues.  See Tr. at 57:23-58:1 (Lowry).

- 79 -

The Defendants also indicated their disagreement with the proposal for eight designated class representatives. See Tr. at 58:6-15 (Lowry). The Defendants explained that they did not refuse to go to depositions for these Plaintiffs, but that the Plaintiffs would not tell the Defendants how they selected the designated class representatives. See Tr. at 58:15-59:1 (Lowry). The Court asked the Defendants why they did not file motions for summary judgment earlier if they envision resolving the case on such motions. See Tr. at 59:2-8 (Court). The Defendants responded that they do not believe that such motions would be in their best interest. See Tr. at 59:9-20 (Lowry). The Court pressed how the Defendants imagine trying the case with ninety Plaintiffs. See Tr. at 59:21-22 (Court). The Defendants explain that they envision an individualized process of obtaining evidence on the clinical-base-manager-and-lead-pilot-issues, and expressed their opposition to class certification because of this expectation. See Tr. at 59:23-60:13 (Lowry). The Court stated that it was imagining having ninety plaintiffs in the courtroom if the parties do not file dispositive motions. See Tr. at 60:14-19 (Court). The Defendants replied that their counsel have tried multi-plaintiff cases and that they will discuss with the Plaintiffs a way to handle such a trial. See Tr. at 60:20-61:11 (Lowry). The Defendants next added that the clinical base managers and the lead pilots pose problems for typicality and adequacy, and repeated their arguments from the Response. See Tr. at 61:14-62:9 (Lowry).

106.    The Plaintiffs replied, regarding the Defendants' arguments on the superiority issues and that counsel always have to litigate attorneys' fees, so that issue does not affect the superiority analysis. See Tr. at 62:17-22 (Moody). The Plaintiffs opined that, when the question is whether ninety or 300 people get relief, the superiority factor points to a class action. See Tr. at 63:8-18 (Moody). The Court asked the Plaintiffs what they thought of the Defendants' explanation

that the Court would litigate a ninety-Plaintiffs trial where the issues are mostly undisputed, and some individualized issues predominate the trial.  See Tr. at 63:19-64:6 (Court).  The Plaintiffs stated that they believe that a number of issues are disputed, such as Stamper's liability.  See Tr. at 64:7-13 (Moody).  The Court asked whether that issue involves factual issues, and the Plaintiffs responded that it involves questions regarding the extent of control that Stamper exercised over Tri-State CareFlight's practices.  See Tr. at 64:14-22 (Court, Moody).  The Court asked what suggested that such an issue exists, and the Plaintiffs described that they have not taken Stamper's deposition, but that the Defendants have denied that Stamper was an employer within the NMMWA, so the Plaintiffs expect issues regarding Stamper, but do not know how complex the issues will be.  See Tr. at 64:23-66:5 (Court, Moody).  The Plaintiffs explained they have designed their depositions to address issues for class certification and not to address merits issues.  See Tr. at 66:22-67:10 (Moody).

107.    The Plaintiffs also repeated their arguments from the Reply that the clinical-base-manager-and-lead-pilot issue is a minor issue, and that these roles do not cause conflicts that pose problems for the adequacy element.  See Tr. at 68:17-70:4 (Moody).  The Plaintiffs also noted, regarding the unjust enrichment claim, that, in Menocal, the Tenth Circuit noted, regarding Colorado law, which has the same unjust enrichment elements as New Mexico law, that the Plaintiffs do not have to prove reliance and repeated their arguments that the issue is common classwide.  See Tr. at 70:5-71:2 (Moody).  The Court returned to how the litigation would proceed, and indicated that it suspected that individual issues exist whether the clinical base managers and the lead pilots are exempt from the NMMWA.  See Tr. at 73:3-7 (Court).  The Plaintiffs described that no dispute will exist who were clinical base managers or lead pilots, that a job description

exists for the roles, and that any slight variations in the individuals' duties are immaterial.  See Tr. at 73:8-21 (Moody).  The Court asked the Plaintiffs to elaborate, and the Plaintiffs explained that the primary issue is what was the clinical base managers' and the lead pilots' primary duties, and that those duties were additional to the individuals' primary duties as flight nurses, flight paramedics, or pilots, and that such a fact almost alone resolves the issue.  See Tr. at 73:22-74:19 (Court, Moody).

> The Court asked:
>
> Maybe [I'm] getting a wrong picture of what a base supervisor is, but my example a minute ago of you pick the [captain] . . . they got some responsibilities that day and then the next day somebody else does those responsibilities.  Is that farfetched or is that pretty close to what's going [on?]

Tr. at 74:20-75:3 (Court).  The Plaintiffs stated that the Court's description is "pretty close."  Tr. at 75:3 (Moody).  See id. at 75:3-8 (Moody).  The Plaintiffs added that, if motion practice does not resolve issues, they do not see the clinical-base-manager-and-lead-pilot issue dominating the trial, because multiple issues will be involved at trial.  See Tr. at 76:16-21 (Moody).  The Plaintiffs noted that defendants frequently state that they need to cross-examine all plaintiffs although such cross-examination does not occur, but the Court noted that the Defendants have a right to perform such an examination.  See Tr. at 77:4-17 (Moody, Court).  The Plaintiffs emphasized that a class action here is superior, because it provides redress to all the employee victims of Tri-State CareFlight's policies.  See Tr. at 78:12-79:4 (Moody).

108.     The Defendants replied that, "if the superiority element could be met merely because more people could get relief, then that [weeds] it out.  Because it would always be the case that certifying the class brings in the maximum number of plaintiffs.  So I think that's just the wrong analysis of that."  Tr. at 79:12-18 (Lowry).  The Court asked whether the Court does not

need to look at the class that the Plaintiffs propose to determine the best way to try all of those individuals' cases.  See Tr. at 79:21-80:5 (Court).  The Defendants indicated that the caselaw suggests considering other aggregation methods and that, here, a multiplicity litigation is fine and that the Plaintiffs argue simply that a class action brings in everyone.  See Tr. at 80:6-22 (Lowry). The Defendants also disagreed with the Plaintiffs that the analysis for the clinical base managers and the lead pilots is a primary duty test, and they argued that the NMMWA exemption includes foremen, whose primary duties are not supervisory, and that most of the Plaintiffs who were clinical base managers and lead pilots are exempt from the NMMWA.  See Tr. at 80:23-81:22 (Lowry).

109.    The Court indicated that it thought the case might be managed and tried more easily as a class action than as individual cases.  See Tr. at 82:16-32 (Court).  The Court indicated its inclination to grant the Motion.  See Tr. at 82:23-24 (Court).  The Court explained, however, that it has concerns about whether federal class action law permits a lawsuit here, so the Court will proceed through the rule 23 "checklist" to determine whether the law allows a class action here. Tr. at 83:1 (Court).  See id. at 82:24-25 (Court).

**5.    The Third Amended Complaint MOO.**

110.    In Third Amended Complaint MOO, the Court declined to set aside the Final Judgment and refused to permit the Basnet Intervenors to prosecute Payne without obtaining relief from the Final Judgment.  See Third Amended Complaint MOO at 58, 2019 WL 1242672, at *27. The Court concluded that the Basnet Intervenors had not satisfied rule 59's or rule 60's requirements to receive such relief.  See Third Amended Complaint MOO at 58, 2019 WL

1242672, at *27.  Accordingly, of the two NMMWA and unjust enrichment proceedings against Tri-State CareFlight, only the proceeding in <u>Bell</u> continues.

## <u>LAW REGARDING CLASS CERTIFICATION UNDER RULE 23</u>

111.    Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 23.  All classes must satisfy: (i) all rule 23(a) requirements; and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  <u>See</u> Fed. R. Civ. P. 23(a)-(b).  The plaintiff[14] bears the burden of showing that the requirements are met.  <u>See</u> <u>Rex v. Owens ex rel. Okla.</u>, 585 F.2d 432, 435 (10th Cir. 1978); <u>Pueblo of Zuni v. United States</u>, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.).  In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[15]  <u>See</u> <u>Rutstein v. Avis Rent-A-Car Sys., Inc.</u>, 211 F.3d 1228,

---

[14]Technically, the movant bears the burden of proof; defendants may also move for a denial of class certification and will bear the burden of proof for such a motion.  <u>See</u> William B. Rubenstein, <u>Newberg on Class Actions</u> § 7:20 (5th ed. 2017).  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

[15]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to a complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 912 F. Supp. 2d at 1097, 1120 (D.N.M. 2012)(Browning, J.)(citing <u>Shook v. El Paso Cty.</u>, 386 F.3d 963, 968 (10th Cir. 2004); <u>J.B. v. Valdez</u>, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. at 178).  Since the Court's statement in <u>In re Thornburg Mortgage, Inc. Securities Litigation</u>, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues.  <u>Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.</u>, 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage.  <u>See</u>, <u>e.g.</u>, <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.</u>, 546 F.3d 196, 202 (2d Cir. 2008); <u>In re Hydrogen Peroxide Litig.</u>, 552 F.3d 305,

1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996))).   "'In determining the legality of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" Anderson v. City of Albuquerque, 690 F.2d 796, 799(10th Cir. 1982)(quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  See Vallario v. Vandehey, 554 F.3d 1259, 1267(10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in General Telephone Co. of the Southwest v. Falcon [457 U.S. 147 (1982)] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

---

318-20 (3d Cir. 2008); Newberg § 7.21 (5th ed. 2017)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

Wal-Mart, 564 U.S. at 350-52.  In a subsequent admonition, the Supreme Court cautioned district

courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be
> "rigorous" and may "entail some overlap with the merits of the plaintiff's
> underlying claim," Rule 23 grants courts no license to engage in free-ranging merits
> inquiries at the certification stage.  Merits questions may be considered to the extent
> -- but only to the extent -- that they are relevant to determining whether the Rule 23
> prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013).  The Court will find

facts for the purposes of class certification by the preponderance of the evidence, but will allow

the parties to challenge these findings during the subsequent merits stage of this case.  See

Menocal, 882 F.3d at 926 n.17 (considering facts relevant to the merits only to the extent necessary

for class certification).  This approach is analogous to preliminary injunction practice, and many

circuits have endorsed it.  See Abbott v. Lockheed Martin Corp., 725 F.3d at 810; In re Hydrogen

Peroxide Antitrust Litig., 552 F.3d at 313; Gariety v. Grant Thornton, LLP, 368 F.3d at 366.  In

taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit

in a relaxed fashion.  See Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. at 378 n.39

("The Court concludes that the Federal Rules of Evidence apply [to a class certification

hearing.]. . . [R]ealistic[ally,] the judge [should] consider all but the most egregiously inadmissible

pieces of evidence as they are presented, and factor any evidentiary infirmity into the weight he or

she gives them.")

112.    All classes must satisfy the prerequisites of rule 23(a):

> **(1)**    the class is so numerous that joinder of all members is
> impracticable;
> **(2)**    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively. See Fed. R. Civ. P. 23(a). "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met." Reed v. Bowen, 849 F.2d at 1309. "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 161, and citing Reed v. Bowen, 849 F.2d at 1309).

### 1.    Numerosity.

113.    Rule 23(a)(1) provides for class certification where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). See Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). "[R]ule 23(a)(1) is concerned with manageability, i.e., the Court's ability to handle the case as a non-class action; this purpose is obvious from the rules text, which calls for 'joinder . . . [being] impracticable.'" Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436 (quoting Fed. R. Civ. P. 23(a)(1)), adhered to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.). "[T]he numerosity requirement . . . is [second] concerned with protecting absent plaintiffs from the dangers that inhere in class litigation's foregoing of meaningful, face-to-face attorney-client representation." Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 436. "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific

- 87 -

inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010) (Browning, J.)(quoting Rex v. Owens, 585 F.2d at 436).

114.     Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption." Trevizo v. Adams, 455 F.3d at 1162.  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *7 (quoting Rex v. Owens, 585 F.2d at 436).  Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(quoting Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639 (D. Colo. 1986)(Kane, J.)).  See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous" (citing Senter v. General Motors Corp., 532 F.2d 511, 523 n. 24 (6th Cir. 1976))0; Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."); 1 Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels, § 3.05, at 141-42 (2d ed. 1985).

115.    "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993).  See Robidoux v. Celani, 987 F.2d at 935 ("Impracticable does not mean impossible.").  The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement.  Lowery v. City of Albuquerque, 273 F.R.D. 668, 682-83 (D.N.M. 2011)(Browning, J.).  At the other end of the spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable.  See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.).  See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

### 2.    Commonality.

116.    Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact

that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing <u>In re Am. Med. Sys., Inc.</u>, 75 F.3d 1069, 1080 (6th Cir. 1996) and quoting <u>Adamson v. Bowen</u>, 855 F.2d at 676)).

117.   The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in <u>Wal-Mart</u>, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See <u>Wal-Mart</u>, 564 U.S. at 348-52.  In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  See 564 U.S. at 342.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 564 U.S. at 343-45.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  564 U.S. at 345.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2).  That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get? Reciting these questions is not sufficient to obtain class certification.  Commonality

requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 157]. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, Class Certification in the

Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)). In EQT Production Co. v. Adair, 764

F.3d 347 (4th Cir. 2011)(Diaz, J., joined by Keenan and Wilkinson, JJ.), the United States Court

of Appeals for the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties. These common practices are not irrelevant to Rule 23(b)'s predominance requirement. But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

> The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been

paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citing Adair v. EQT Prod. Co., No. 1:10-CV-00037, 2013 WL 5429882, at *38-39 (W.D. Va. Sept. 5, 2013)(Sargent, M.J.)).

118.   In Wal-Mart, the Honorable Antonin Scalia, then Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."  564 U.S. at 366.  Scalia concluded from this observation:

Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 564 U.S. at 367.  "Thus, the common question or questions cannot be 'incidental,' nor can the plaintiff submit a long list of 'incidental' questions or issues, and say that they predominate over the real issues."  Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. at 382.

### 3.   Typicality.

119.   Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  See Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d

48, 57 (3d Cir. 1994).  "Typicality measures whether a sufficient nexus exists between the claims

of the named representatives and those of the class at large."  Thompson v. Jiffy Lube Int'l, Inc.,

250 F.R.D. at 622 (citing Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1320 (11th Cir. 2008)).

120.     The Supreme Court has noted that "[t]he commonality and typicality requirements

of Rule 23(a) tend to merge."  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  "The

United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is

satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., No.

CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(Blackburn, J.)(citing

Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In determining whether the typicality

and commonality requirements have been fulfilled, either common questions of law or fact

presented by the class will be deemed sufficient.")); Adamson v. Bowen, 855 F.2d at 676).  "[L]ike

commonality, typicality exists where . . . all putative class members are at risk of being subjected

to the same harmful practices, regardless of any class member's individual circumstances."  DG

ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010).  Factual differences among

some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the

claims of the class representative and putative class members are based on the same legal or

remedial theory."  Adamson v. Bowen, 855 F.2d at 676.  See DG ex rel. Stricklin v. Devaughn,

594 F.3d at 1199 (citing Adamson v. Bowen, 855 F.2d at 676 ("Provided the claims of Named

Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact

situations of the putative class members do not defeat typicality.")); Penn v. San Juan Hosp., Inc.,

528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact

situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").

121.    Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  On the other hand, "it is well-established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become to become a major focus of the litigation.'"    In re Crocs, Inc. Sec. Litig., 306 F.R.D. 672, 687 (D. Colo. 2014)(Brimmer, J.)(quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 599 (3d Cir. 2012)). "[A] lead plaintiff's unique defense is detrimental to the class  . . . [because] the lead plaintiff 'might devote time and effort to the defense at the expense of issues that are common and controlling for the class.'"  In re Crocs, Inc. Sec. Litig., 306 F.R.D. at 687 (quoting Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006)); See Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. 825 F. Supp. 2d 1082, 1214 (D.N.M. 2011)(Browning, J.).

### 4.    Adequacy.

122.    Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "The requirement of typicality dovetails into the requirement of adequacy of representation." Edgington v. R.G. Dickinson & Co., 139 F.R.D. 183, 189 (D. Kan. 1991)(Crow, J.)(quoting Penn v. San Juan Hospital, Inc., 528 F.2d at 1189). See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1219 (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge'" (quoting Wal-Mart, 564 U.S. at 349 n.5)).  The adequacy requirement protects the interests of unnamed proposed class members -- who are bound by any judgment in the action.  See Lile v. Simmons,

143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings." (citing Albertson's, Inc. v. Amalgamated Sugar Co., 503 F.2d 459, 463-64 (10th Cir. 1974)).  "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)."  Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).  See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)(Gourley, J.)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").

123.     The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members."  E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Intra-class conflicts "may negate adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315-16 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts).  See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members

benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees, who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees, whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(Michael, J.)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- where some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).   On the other hand, "[t]hough a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit."   Lowery v. City of Albuquerque, 273 F.R.D. at 680 (quoting 1 A. Conte & H. Newberg, Newberg on Class Actions § 3:26, at 433-34 (4th ed. 2002)).   "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."   7A Wright, Miller & Kane, supra § 1768, at 389-93.

124.    Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, see Lopez v. City of Santa Fe, 206 F.R.D. at 289-90, this analysis has now been moved to rule 23(g).  The 2003 amendment to rule 23 created rule 23(g), entitled "class counsel."  Fed. R. Civ. P. 23(g).  This subsection contains its own adequacy-of-counsel analysis.  See Fed. R. Civ. P. 23(g)(1)-(2).  The advisory committee notes

advise that rule 23(g) should replace the analysis of class counsel under rule 23(a)(4); these notes

describe that rule 23(g)

> responds to the reality that the selection and activity of class counsel are often
> critically important to the successful handling of a class action.  Until now, courts
> have scrutinized proposed class counsel as well as the class representative under
> Rule 23(a)(4).   This experience has recognized the importance of judicial
> evaluation of the proposed lawyer for the class, and this new subdivision builds on
> that experience rather than introducing an entirely new element into the class
> certification process.   Rule 23(a)(4) will continue to call for scrutiny of the
> proposed class representative, while this subdivision will guide the court in
> assessing proposed class counsel as part of the certification decision.   This
> subdivision recognizes the importance of class counsel, states the obligation to
> represent the interests of the class, and provides a framework for selection of class
> counsel.  The procedure and standards for appointment vary depending on whether
> there are multiple applicants to be class counsel.  The new subdivision also provides
> a method by which the court may make directions from the outset about the
> potential fee award to class counsel in the event the action is successful.

Fed. R. Civ. P. 23(g) advisory committee notes to the 2003 amendment.  See Lyall v. City of

Denver, 319 F.R.D. 558, 565 (D. Colo. 2017)(Martinez, J.)(addressing the named plaintiffs'

adequacy under rule 23(a)(4) and the counsel's adequacy under rule 23(g)); Thompson v. Jiffy

Lube Int'l, Inc., 250 F.R.D. at 628 ("Rule 23(g) now sets forth a specific set of factors relevant to

the appointment of class counsel.").  Cf. Martin v. Blessing, 571 U.S. 1040, 1040 (2013)(stating,

while denying a writ of certiorari, that rule 23(g) orders a district court to consider the adequacy

of class counsel in determining whether to grant class certification).

## 5. **Rule 23(b).**

125.     Once the court concludes that the threshold requirements have been met, "it must

then examine whether the class falls within at least one of three categories of suits set forth in Rule

23(b)."  Adamson v. Bowen, 855 F.2d at 675.  See DG ex rel. Stricken v. Devaughn, 594 F.3d

1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must

also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").

Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> (b)    Types of Class Actions.  A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > (1)    prosecuting separate actions by or against individual putative class members would create a risk of:
> >
> > > (A)    inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > (B)    adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> >
> > (2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> >
> > (3)    the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
> >
> > > (A)    the putative class members' interests in individually controlling the prosecution or defense of separate actions;
> > >
> > > (B)    the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

126.    The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B), (c)(3)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B),

(c)(3)(A).  The Court will focus on the most important form of class action, the (b)(3) damages

class action.[16]

_____

[16]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but the situation does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing" in which, for example, one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.  Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally or logically -- incompatible judgments.  Fed. R. Civ. P. 23(b)(1)(B).  Rule 23(b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the res does not pay out the entire res to the first investors to file suit, but, instead, distributes the res fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the defendant's benefit -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it, or pursue his or her own individual claim.  Accordingly, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances.  See Fed. R. Civ. P. 23(c)(2)(A).  Class actions under (b)(2) provide for injunctive or declaratory

relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." . . .In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  See Newberg § 4:26.  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one?  . . .Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to Brown v. Board of Education, [349 U.S. 294 (1955),] once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial

127.     To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) "the class members' interest in individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any litigation concerning the controversy already begun by or against members of the class"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d at 1187 (stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

a.     Predominance.

128.     Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those questions that are individualized.  See Fed. R. Civ. P. 23(b)(3).  A question is common

---

incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  See Fed. R. Civ. P. 23(c)(2)(A).

when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member."  Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.")(quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997).  As the Tenth Circuit, addressing a Title VII claim, put it:

> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.
>
> . . . The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

129.    The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages.  In Comcast Corp. v. Behrend,

569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which

the plaintiffs' expert had developed as evidence that damages were susceptible of measurement

across an entire class -- as rule 23(b)(3) requires.  See 569 U.S. at 35-38.  The plaintiffs argued

four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust

impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders,"

companies that build competing cable networks in areas where an incumbent cable company

already operates.  569 U.S. at 31.  The district court found, among other things, that the damages

resulting "from overbuilder-deterrence impact could be calculated on a classwide basis."  569 U.S.

at 31-32.

> To establish such damages, [the plaintiffs relied] solely on the testimony of
> Dr. James McClave.  Dr. McClave designed a regression model comparing actual
> cable prices in the Philadelphia [Designated Market Area] with hypothetical prices
> that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive
> activities.  The model calculated damages of $875,576,662.00 for the entire class.
> As Dr. McClave acknowledged, however, the model did not isolate damages
> resulting from any one theory of antitrust impact.  The District Court nevertheless
> certified the class.

569 U.S. at 31-32 (citations omitted).

130.    The United States Court of Appeals for the Third Circuit affirmed the district court

decision.  The Third Circuit concluded that the plaintiffs "'provided a method to measure and

quantify damages on a classwide basis,' finding it unnecessary to decide 'whether the methodology

was a just and reasonable inference or speculation.'"  569 U.S. at 32 (quoting 655 F.3d 182, 206

(3d Cir. 2011)).  The Supreme Court granted certiorari on the question "[w]hether a district court

may certify a class action without resolving whether the plaintiff class had introduced admissible

evidence, including expert testimony, to show that the case is susceptible to awarding damages on

a class-wide basis."  Comcast Corp. v. Behrend, 567 U.S. 933, 933 (2012).  Justice Scalia criticized

the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination."  Comcast Corp. v. Behrend, 569 U.S. at 34.  Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.  Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34.  Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.  Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity."  569 U.S. at 35 (emphasis in original).

131.     It is clear that Comcast Corp. v. Behrend applies to classwide damages.  It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages.  There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.  First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.  Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages.  Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things which apply to classwide damages.  As to the first option, while much could be said for limiting Justice Scalia's opinion to classwide damages -- even from the opinion's language and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damage awards.  Some of

Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual. While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards. On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages. The dissent stated that "[r]ecognition that individual damage calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." 569 U.S. at 42 (Ginsburg, J., dissenting). Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law. See Menocal., 882 F.3d at 927 (stating that the determination of individualized damages does not defeat class certification). Accordingly, different amounts of damages for plaintiffs and class members, and separate calculations of damages do not defeat class certification.

132.    What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold. First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided. In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation. See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 ("[T]he district court should consider the extent to which material differences in damages determinations will require individualized inquiries."). A class can have individual damage calculations, but the Court has to look at the issues of individual damage calculations at the class certification stage. Second, the methodology for all class members needs

to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 (describing that individualized damages issues might destroy predominance).

133.     A defendant's desire to assert individual counterclaims[17] does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1259-60 (11th Cir. 2003).  A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual

---

[17]Generally speaking, counterclaims, even common ones, are not permitted against absent class members.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 810 (1985).

members."),[18] but this statement is less true after <u>Wal-Mart</u>.  Affirmative defenses may be

considered as one factor in the class certification calculus.  <u>See</u> <u>Donaca v. Dish Network, LLC.</u>,

303 F.R.D. 390, 400 (D. Colo. 2014)(Jackson, J.)(describing that affirmative defenses are relevant

considerations for class certification); <u>Miller v. Farmers Ins. Grp.</u>, No. CIV-10-466-F, 2012 WL

8017244, at *16 (W.D. Okla. March 22, 2012)(Friot, J.)(describing that affirmative defenses are

relevant to the class certification inquiry and stating that Wal-Mart clarifies that the question for

class certification "is whether it can fairly and lawfully be said that plaintiff's win, if he wins *his*

case, can fairly and lawfully be replicated for every member of the class")(emphasis in original);

---

[18]Limitations defenses are an especially common breed of affirmative defense.  Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.  Even if the question is individual -- for example, if a class is defined as encompassing only preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

<u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., <u>Moore's Federal Practice</u> ¶ 23.46[3] (3d ed. 1999)).  <u>See</u> <u>Newberg</u>, § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

Mulford v. Altria Grp., Inc., 242 F.R.D. 615, 629-30 (D.N.M. 2007)(Vazquez, J.)("While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification.").  Other recurring issues present serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[19]

---

[19]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes to the 1966 amendment (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg, supra, § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)(listing Courts of Appeals that "have held that oral misrepresentations are presumptively individualized"); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).  The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to

(ii) differences in the applicable law in a multi-state, state-law-based class action,[20] see Castano v.

Am. Tobacco Co., 84 F.3d at 741; and (iii) the need to determine individual personal injury

---

be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[20]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), the Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast Corp. v. Behrend, states:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015. Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable. Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis. About 20% of the Ford Explorers were shipped without Firestone tires. The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires. Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation. Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat. Other factors also affect heating;

the failure rate (and hence the discount) may have been higher in Arizona than in Alaska. Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold. Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000. Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled. The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . ..

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in In re Rhone-Poulenc Rorer, Inc., made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d [1293,] 1299][(1995)] will yield the information needed for accurate evaluation of mass tort claims.

. . ..

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

damages, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.  There is little uniform guidance

on how to assess when common issues predominate over individual ones, and the Court's

statements to this point have, obviously, done more to disavow various tempting but fallacious

rules than they have to set forth a usable standard.

134.    There is currently a split of authority between the United States Courts of Appeals

over the proper way to analyze predominance.  The Honorable Richard A. Posner, former United

States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down

to "a question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012),

vacated, 569 U.S. 1015 (2013).  Judge Posner poses the predominance question as: "Is it more

efficient, in terms both of economy of judicial resources and of the expense of litigation to the

parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears,

Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed

a district court's denial of certification of a class of washing-machine owners who alleged that

Sears' washing machines were prone to cultivate mold and affirmed the district court's

certification of the same class to pursue a claim that the machines' control units were defective.

See 702 F.3d at 360-61, 363-64.  The Seventh Circuit certified the class -- which spanned six states

-- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages
> in a case such as this, involving a defect that may have imposed costs on tens of
> thousands of consumers yet not a cost to any one of them large enough to justify
> the expense of an individual suit.  If necessary a determination of liability could be
> followed by individual hearings to determine the damages sustained by each class
> member (probably capped at the cost of replacing a defective washing machine --
> there doesn't seem to be a claim that the odors caused an illness that might support
> a claim for products liability as distinct from one for breach of warranty).  But

---

288 F.3d at 1018-20.

probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

. . . .

[T]he district court will want to consider whether to create different classes of the control unit class for the different states. That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362. Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend." Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013). On reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. [Wal-Mart, 564 U.S. at 338]. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). But predominance requires a qualitative assessment too; it is not bean counting. In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001)[(O'Malley)], we read that "common issues need only predominate, not outnumber individual issues." . . .

As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in

lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).  The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit.  Each defect is central to liability.  Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of classes.  See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364,] 365[ 7th Cir. 2012) (10 classes).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[21]

---

[21]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . .in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges.  Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages.  [569 U.S. at 37] (emphasis added).  "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)."  And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*."  (emphasis the [Supreme] Court's).  None of the parties had even challenged the district court's ruling that class certification

135.    The United States Court of Appeals for the Sixth Circuit handled essentially the

same case -- a class action against Sears for defective washing machines -- in In re Whirlpool

---

required "that the damages resulting from . . .[the antitrust violation] were
measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in Comcast, there is no possibility in this case that
damages could be attributed to acts of the defendants that are not challenged on a
class-wide basis; all members of the mold class attribute their damages to mold and
all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis
for class certification, and thus rejects our statement that "predominance" of issues
common to the entire class, a requirement of a damages class action under Rule
23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites
only the statement in the dissenting opinion in Comcast that "economies of time
and expense" favor class certification, -- a statement that the majority opinion does
not contradict. Sears is wrong to think that anything a dissenting opinion approves
of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of
the mold problem to the different antitrust liability theories in Comcast.  But it was
not the existence of multiple theories in that case that precluded class certification;
it was the plaintiffs' failure to base all the damages they sought on the antitrust
impact -- the injury -- of which the plaintiffs were complaining. In contrast, any
buyer of a Kenmore washing machine who experienced a mold problem was
harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike
Comcast, neither was asked to decide nor did decide whether to determine damages
on a class-wide basis.  As we explained in McReynolds v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited
to determining liability on a class-wide basis, with separate hearings to determine -
- if liability is established -- the damages of individual class members, or
homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often
be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co.
but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

- 115 -

Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also

elected to certify the mold-based claim.[22]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently.  This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.)(noting that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs).  Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation

omitted).  That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh

Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in

more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making.  See Amgen [Inc. v. Conn. Retirement Plans & Tr. Funds, 568 U.S. at 471 ].  Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action."  Id. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 107 (2009)).  That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class."  Id.  Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones.  Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."  Id. at 1196 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 . . . (1997)).

---

[22]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim."  Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013). The Sixth Circuit and Seventh Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied. See Butler v. Sears, Roebuck & Co., 727 F.3d at 802. This styling of the predominance inquiry is in keeping with the styling a leading class action treatise gave many years earlier:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

> The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(omission in original)(footnotes omitted)(quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 n.12 (11th Cir. 1997)).

136.   Although the Sixth Circuit and the Seventh Circuit may agree about the definition of predominance, the Third Circuit, the Tenth Circuit, and the United States Court of Appeals for the Eleventh Circuit stake out a different test.

> 'Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's

underlying cause of action.' *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000). Common issues of fact and law predominate if they '"ha[ve] a *direct impact* on every class member's effort to establish liability" *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member.' Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1270 (11th Cir. 2009)(emphasis added)(quoting Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004)). If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)." Klay v. Humana, Inc., 382 F.3d at 1255. In practical terms, while "[i]t is not necessary that all questions of fact or law be common," *id.* at 1254 (citation omitted), "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." *Id.* at 1255 (quoting Alabama v. Blue Bird Body Co., 573 F.2d 309, 322 (5th Cir. 1978)).

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170

(emphasis in original).[23] See Menocal, 882 F.3d at 915; CGC Holding Co. v. Broad & Cassel, 773

---

[23]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., and, in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc. See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170; Vega v. T-Mobile USA, Inc., 564 F.3d at 1270; Klay v. Humana, Inc., 382 F.3d at 1255. In each case, the Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals for the Fifth Circuit rule-of-thumb test:

An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co . . . In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. Id. ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present."). If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

F.3d at 1087-88; Marcus v. BMW of N. Am., LLC, 687 F.3d at 600.  The Eleventh Circuit,

however, imposes a different, more rigorous, second step: the district court's trial plan must spend

more time adjudicating the common questions than it does adjudicating the individual questions.

See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170.

The Eleventh Circuit's test may not be best -- the Court sees little reason why negative-value cases

that can be fairly and efficiently adjudicated via class action should not be certified[24] -- but it is

_____

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military
Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all
questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from
the class [should not] have a substantial effect on the substance or quantity of evidence
offered.'")(quoting Klay v. Humana, Inc., 382 F.3d at 1255); Vega v. T-Mobile USA, Inc., 564
F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

> The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied
so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote
-- without the Eleventh Circuit's alterations -- is:

> > We only point out that in a situation wherein one seeks to represent a nationwide
> > class in order to obtain redress for harm done from a nationwide conspiracy
> > consideration should be given to whether the addition or subtraction of any of the
> > plaintiffs to or from the class will have a substantial effect on the substance or
> > quantity of evidence offered.  If such addition or subtraction of plaintiffs does affect
> > the substance or quantity of evidence offered, then the necessary common question
> > might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

> [24]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and
superiority inquiries -- effectively reading out predominance -- in negative-value cases.  Thus, the
Eleventh Circuit's test is truer to rule 23's text than Judge Posner's.  "Predominate," the word that
rule 23 uses, means "[t]o be of greater quantity or importance; preponderate."  Predominate, The
American    Heritage    Dictionary    of    the    English    Language,    (5th    ed.    2019),
https://www.ahdictionary.com/word/search.html?q=predominate  (last  visited  September  12,
2019).  Rule 23's text thus arguably suggests a direct comparison of common and individual issues,
and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance
question on the basis of an economic analysis.  There are, however, two other rule 23 provisions
whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R.
Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with

respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even these classes had not been allowed, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. Certification Order, at 8 n.12, 18 n.22. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation, § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan. 1996)[(Theis, J.)]("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Broussard 155 F.3d at 340. Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." Broussard 155 F.3d at 344. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. Id. at 340. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class

_____

actions from abridging the substantive rights of any party.  Yet, from the record
before us, an abridgment of the defendant's rights seems the most likely result of
class treatment.  By glossing over the striking differences in the material terms of
the agreements, the district court created an "unnecessarily high risk," *Vega* [v. T-
Mobile USA, Inc.], 564 F.3d at 1279, of such unlawful results, and thereby abused
its discretion.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.
These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for
all contracts that did not fit into one of the five real categories -- the class would be certifiable.
Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc. 601 F.3d at 1176.
The only "abridgement of the defendant's rights" that the district court's plan would produce
would be the "'amalgamat[ion]'" of different contractual language into a single category -- the
sixth category.  Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.
601 F.3d at 1176.  That case, thus, leaves open the question whether subclassification and issue
certification can aid in satisfying predominance, or if these techniques are separate from the
predominance inquiry.

     The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano
v. American Tobacco Company case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not
> save the class action.  A district court cannot manufacture predominance through
> the nimble use of subdivision (c)(4).  The proper interpretation of the interaction
> between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must
> satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping
> rule that allows courts to sever the common issues for a class trial.  See *In re N.D.*
> *Cal. Dalkon Shield IUD Prods. Liability Litig.*, 693 F.2d 847, 856 (9th Cir.
> 1982)(balancing severed issues against the remaining individual issues) . . .; *see*
> *also Jenkins* [v. Raymark Indus. Inc.], 109 F.R.D. [269,] 278 [(E.D. Tex.
> 1985)(Parker, J.)](comparing state of the art defense to individual questions of
> exposure and degree of injury in a class action certified only on the common issue
> of the state of the art defense).  Reading rule 23(c)(4) as allowing a court to sever
> issues until the remaining common issue predominates over the remaining
> individual issues would eviscerate the predominance requirement of rule 23(b)(3);
> the result would be automatic certification in every case where there is a common
> issue, a result that could not have been intended.

Castano v. Am. Tobacco Co. 84 F.3d at 745 n.21.  This logic is hardly unassailable.  Namely, the
result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would not be
"automatic certification in every case where there is a common issue," because superiority must
still be satisfied.  Castano v. Am. Tobacco Co., 84 F.3d at 745 n.21.  If a proposed class action is
superior -- e.g., if it lacks the value to be brought on an individual basis -- and individual issues
can be pared away via rules 23(c)(4) and (c)(5), then it is not clear why certification "could not

- 121 -

have been intended" by the rule. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate the "likely difficulties in managing a class action." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings of [predominance and superiority] include: . . .likely difficulties in managing a class action," the Court, if it were writing on a clean slate, would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended," <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," <u>see</u> Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

> Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

>> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

> <u>Castano v. [Am.] Tobacco Co.</u>, 84 F.3d [at ]745 n.21 . . ..

<u>Gunnells v. Healthplan Servs., Inc.</u>, 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part). Despite Judge Niemeyer's concern with creating a circuit split, disagreement among Courts of Appeals exist. <u>See</u> <u>Robinson v. Metro-North Commuter R.R.</u>, 267

commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d at 1087 ("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see,

---

F.3d 147, 167-69 (2d Cir. 2001)(stating that the district court abused its discretion in not considering partial certification); Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001)(discussing subclasses); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999)(treating "[d]ivided certification" as "worth consideration").  The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case.  See Gunnells v. Healthplan Servs., Inc., 348 F.3d . . .446-47 . . .(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d [at] 745 n.21 . . .("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").  We did not directly address the legality of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d . . .898 . . ., with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3).  The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'" (quoting Roper U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 406 n.11 (1980)), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]")(quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

137.    The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases.  Accordingly, the issues disputed in this case are not unusual.  And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate.  Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not.  Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.
>
> In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims.  But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree.  So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88 (emphasis in original). See

Menocal, 882 F.3d at 915 (reiterating the test that the Tenth Circuit articulates in CGC Holding

Co., LLC v. Broad & Cassel); Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at

397 (distinguishing the Tenth Circuit test from other circuits' tests).

### b.   Superiority.

138.   The second requirement for certifying a (b)(3) class is superiority, which means

that a class action would be superior to -- not merely just as good as or more convenient than -- all

other available procedural mechanisms, including: (i) individual actions by class members;

(ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C.

§ 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether

cases. The superiority requirement thus sets a high bar, but there are two ways that a proposed

class can get an immediate leg up on certification, both of which involve rendering the

aforementioned procedural devices impractical for the task at hand.

139.   First, the suit can consist of so-called negative value claims -- claims in which the

cost of litigation exceeds the likely recovery, rendering them economically non-viable without

aggregation. These claims are the heart and soul of the class action, as the Supreme Court recently

reaffirmed:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem

by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).  The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

140.    Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.  While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

141.    In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.  See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria.").  The first factor, "the class members' interests in individually controlling the prosecution or defense of separate actions," closely tracks the individual cases' money value.  Fed. R. Civ. P. 23(b)(3)(A).  When individual actions are practical, they are preferred; the United States has a "'deep-rooted historic tradition that everyone should have his own day in court,'" and adjudicating individual disputes is our federal judicial system's core activity.  Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, et al., Federal Practice  Procedure, Jurisdiction & Related Matters

§ 4449, at 417 (1981)).  The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case. See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003)(Duggan, J.).  Courts should also consider the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.[25]   See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(Dimitrouleas, J.)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").

142.   Such questions arise particularly where the statute under which a plaintiff sues provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions or by granting statutory damages to individual plaintiffs while requiring class plaintiffs to prove actual damages.  See, e.g., Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000.00 and class action damages at $500,000.00); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping individual damages at $5,000.00 and class action damages at $500,000.00).  Although claims

---

[25]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation --- from an individual action than he would from his proportional share of the class recovery.  If the number of proposed class members likely to file individual claims ($n$), multiplied by the likely remuneration each would receive from an individual action ($i$), exceeds the entire class' recovery less attorneys' fees and expenses ($c$), then the Court will be hesitant to find superiority.  Thus, if $n \cdot i > c$, the Court will not generally certify a (b)(3) class.  The Court should bear in mind, however, that $n$ includes only those individuals who: (i) would, in the event of certification, become class members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action.  Thus, $n$ is likely to be a small number in most cases.

under these statutes may be more lucratively brought as individual actions, courts should assess

the real-world likelihood that class members would bring their own actions.  As the Honorable

Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential
> requires assuming that each putative class member is "aware of her rights, willing
> to subject herself to all the burdens of suing and able to find an attorney willing to
> take her case."  *Mace v. Van Ru Credit Corp.*, 109 F.3d [at] 344 . . . .  Those
> transaction costs are not insubstantial and have prompted other courts in this Circuit
> to conclude that litigating as a class is superior

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007)(Preska, C.J.).  See

Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11

(D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not

likely to know their rights and are therefore not likely to pursue these claims on their own.").

143.     The second enumerated (b)(3) factor, "the extent and nature of any litigation

concerning the controversy already begun by . . . class members," is closely linked to the first

factor.  Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to

consider the interests of individual members of the class in controlling their own litigations and

carrying them on as they see fit.  In this connection the court should inform itself of any litigation

actually pending by or against the individuals."  Fed. R. Civ. P. 23 advisory committee's notes

(citations omitted).  This passage suggests that the extent to which proposed class members -- or

individuals who would otherwise be proposed class members but for being specifically excluded

from the definition by virtue of their individual claims -- have already filed individual claims is

probative evidence of the extent to which they will continue to file individual claims in the event

of certification denial and indicates a higher "interest[] in individually controlling the prosecution."

Fed. R. Civ. P. 23(b)(3)(A).  It is also probative evidence whether the claims are truly negative

value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

144.     In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B).  The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, in most instances, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

145.     The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases

filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun." Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Pa. 2013)(Robreno, J.).  Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.[26]  See Newberg § 4:70

---

[26]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court should always strive to avoid having multiple overlapping or competing class actions certified in the federal court system.  It is less clear how to handle a proposed class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata impact on the Court's proposed class members.  Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis.  The Court can envision a scenario in which numerous heavily overlapping class actions languished across multiple state courts without making progress, and in which the Court is capable of expeditiously certifying and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, 28 U.S.C. § 2283, federal courts generally may not stay or enjoin state court cases on the ground that they would interfere with a proposed class action or even a certified class action.  See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").  There are possible exceptions, however, including that, pursuant to the All Writs Act, 28 U.S.C. § 1651, a district court may enjoin state court proceedings which would interfere with an imminent settlement agreement.  See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002).  In the seminal case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the Court of Appeals for the Third Circuit, noted that, although in personam cases may generally proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal case constituted the equivalent of a res, thus permitting the federal court to enjoin the state court from entertaining litigation which could destroy the settlement:

> [C]ourts have analogized complex litigation cases to actions in rem.  As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full

control."  In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins.
Litig.), 770 F.2d 328, 337 (2d Cir. 1985).  See also Wesch v. Folsom, 6 F.3d 1465,
1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th
Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and
mountains of paperwork, as similar to a res to be administered.").  The in rem
analogy may help to bring into focus what makes these cases stand apart.  In cases
in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the
jurisdiction of the federal court already attached."  Kline v. Burke Const. Co., 260
U.S. 226, 229 (1922).  Similarly, where complex cases are sufficiently developed,
mere exercise of parallel jurisdiction by the state court may present enough of a
threat to the jurisdiction of the federal court to justify issuance of an injunction.
See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.),
770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is
intolerable to have conflicting orders from different courts").  What is ultimately
important, in any event, is that in both kinds of cases state actions over the same
subject matter have the potential to "so interfer[e] with a federal court's
consideration or disposition of a case as to seriously impair the federal court's
flexibility and authority to decide the case."  Atl. Coast Line R.R. Co. v. Bhd. of
Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12.  See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th
Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel
state court action would make a nullity of the district court's [discovery] ruling, and render
ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v.
Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court
class action where the "the stated purpose of the [state] suit [was] to challenge the legality of the
federal class action").  Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th
Cir. 1981)(affirming an injunction against a South Carolina class action where the state court
enjoined the defendants -- who also were defendants in a federal multidistrict suit -- from
entering any settlement that contained any release of claims under South Carolina law, thereby
"clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader
action pending before it").  But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.
Liability Litig., 134 F.3d 133 (3d Cir. 1998)(refusing to enjoin a Louisiana state court from
approving a class settlement, even though a similar proposed class was pending certification in
federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the
absent class members, given that the federal class had not yet been certified nor notice served on
the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the
Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because
approval had already been finalized and final judgment entered; and (iii) the Anti-Injunction Act
would have barred the federal court from enjoining the state court even if the state court's
judgment were not finalized, as protecting the viability of a pre-certification class action is not
"necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate
its judgments").  See Dibble v. Wells Fargo Bank, Nat'l Ass'n, 226 F. Supp. 3d 1226, 1229

("[I]f a *class action* case is already pending, certification of another class suit might not be sensible or superior to the current litigation posture." (emphasis in original)).  Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[27]

146.     The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to

_____

(D.N.M. 2016)(Browning, J.)(explaining that the three situations in which state proceedings have ended under the Rooker-Feldman doctrine are: (i) the highest court in the state has affirmed judgment below and all matters are resolved, (ii) neither party seeks further action in the state action, and (iii) the state court proceedings have resolved all federal matters but left state law or factual questions unresolved)(citing <u>Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico</u>, 410 F.3d 17, 26 (1st Cir. 2005)); <u>Calvert v. Safranek</u>, Nos. 06–1051, 06–1123, 2006 WL 3735508 at *1 (10th Cir. Dec. 20, 2006) (affirming that the Rooker–Feldman doctrine removes the district court's jurisdiction to grant relief that would effectively negate a state court's judgement). In light of <u>General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation</u>, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

As a practical matter, many of the questions raised relating to competing state and federal class actions, CAFA's passage has obviated and has resulted in most truly nationwide class actions being immediately removable to federal court, <u>see</u> 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, <u>see</u> Emery G. Lee III & Thomas E. Willging, <u>The Impact of the Class Action Fairness Act of 2005 on the Federal Courts</u> 1-2 (Federal Judicial Center ed., 2008).

[27]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses.  The already certified class action's claims could be asserted in the proposed class action only by individuals excluded from the already certified class' definition.  The entirety of the proposed class, including those individuals who are also members of the already certified class, could assert claims not included in the already certified class action.

adjudicate the aggregated dispute.  Fed. R. Civ. P. 23(b)(3)(C).  The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.  See Newberg § 4:71.  The second prong is whether the particular court at issue is a desirable forum for the litigation.  Some issues that reliably influence the determination of this prong include: (i) the parties', witnesses', and class counsel' geographic convenience, see Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1191-92; (ii) the harm's locus, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001)(Bolton, J.); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000)(Arterton, J.); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).  "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.  For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d at 1271; if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009)(Britt, J.); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority, see Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 411.

147.    The fourth, final, and most important[28] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  The principal concern in a manageability inquiry is individualization. A proposed class's size, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues. See Carnegie v. Household Int'l, Inc., 376 F.3d at 660-61.  Accordingly, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> [T]he predominance analysis has a "tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims," Klay v. Humana, Inc., 382 F.3d at 1269, both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability, *see* Fed. R. Civ. P. 23(b)(3)(D).

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184.  See Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

---

[28]Newberg writes that the "manageability factor . . .is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

148.     When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism."  Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010).  Most techniques that are truly "procedural" are fair game: cases can be bifurcated,[29] trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question of how to distribute the damages among the class can be addressed with less formality.[30]

---

[29]"Vertical" polyfurction, which is what is typically meant when bifurcation is discussed, is so named because the separately tried elements build on top of each other, and a negative verdict in one trial obviates the need for the second trial.  For example, if the jury comes back for the defendant on a liability-only trial, then there is no need for a trial on damages.  Vertical polyfurcation also often requires that the separate trials be performed in a certain sequence.  "Horizontal" polyfurcation is so named because the trials do not build on one another, but rather sit analytically side-by-side.  "Severance" is similar to the criminal procedural maneuver in which a defendant whose case is joined to be tried with another defendant's or defendants' petitions the court for his or her own separate trial. Fed. R. Crim. P. 14(a), 12(b)(3)(D).

[30]Defendants have a due-process right to have any damages against them proven in court.  The question of how to distribute those damages among the class, however, does not implicate the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme.  The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial.  The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages.  The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect, especially when the alternative is denying certification.  One device of increasing popularity that the Court is loath to use, however, is cy pres relief.

The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that

---

───────────────────

will advance the interests of the class." Black's Law Dictionary 444 (9th ed. 2009). It derives from the French expression "*cy pres comme possible*," which means "as near as possible," and developed out of the law of trusts. M. Redish, P. Julian, & S. Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: a Normative and Empirical Analysis, 62 Fla. L. Rev. 617 (2010).

. . ..

 The Court has a basic disagreement with the application of this doctrine for several reasons: (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third[-]party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Lane v. Page, 862 F. Supp. 2d at 1230-31 (citations omitted).  See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. at 1105-12 (denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values).  The Tenth Circuit has never discussed cy pres relief in detail, see Tennille v. W. Union Co., 809 F.3d 555, 560 (10th Cir. 2015)(describing a fact pattern with a cy pres fund but not discussing the legal implications of the cy pres doctrine); United States v. New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103, 153-154 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C. § 2072, or both.  See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.).  The Court would be more likely to let unused or undisbursable funds escheat to the state or revert to the defendant --- although reversion undermines the deterrent value of the class action -- than it is to use cy pres relief.  If the fund is disbursed under a claim system, and the total of the claims does not exhaust the entire fund, the Court would likely first look to distributing the unclaimed funds to the claimants on a pro rata basis.

 Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings.  Even if the distribution is not completely fair -- if, for instance, a class member who sustained $100.00 in damage receives the

149.     Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.  Wal-Mart, 564 U.S. at 367.  A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.  See Wal-Mart, 564 U.S. at 367.  For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually.  Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[31]  The defendants might put on their own sample, attack

same distribution as another class member who sustained $800.00 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

[31]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.     See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm; Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval; Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").  A confidence level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of +/- 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.
       Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa.  See CI/CL Websites.  For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a

the representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample. The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[32]

150.     The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven. See Wal-Mart, 564 U.S. at 367.[33] When issues are truly common, multiple class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this common determination can be done forms the basis of the class action. Truly

---

[+/-] 8% margin of error and a 99% confidence level, or a [+/-] 1% margin of error and a 90% confidence level. The use of a 95% confidence level, however, is a scientific and industry standard.

[32]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00. The mathematics work out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.

The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees -- among the class. That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately.

[33]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the United States Constitution. See Wal-Mart, 564 U.S. at 367 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

individual issues, on the other hand, must be adjudicated individually and not by statistical inference.[34]

In formulating a workable trial plan, the Court must also ensure that it does not run afoul of the Seventh Amendment.  The Seventh Amendment contains two clauses:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

---

[34]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the plaintiffs' economic convenience, the Court is not convinced that it, as Wal-Mart seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parole evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses.  In the Court's opinion, the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply.  In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result.  Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources if the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens.  In short, the issues that should most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts.  The Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law.  The Court concludes that Comcast Corp. v. Behrend and Wal-Mart require the Court to count time spent adjudicating individual affirmative defenses against the predominance finding.

U.S. Const. amend. VII.

151.    These clauses are known as the trial-by-jury clause and the reexamination clause, respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation, because it lowers their odds of success by excluding damages evidence from the liability phase -- evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two trials instead of one.  They have, accordingly, argued that bifurcation -- a procedural innovation which post-dates the Founding -- violates the trial-by-jury clause.  Whatever the merits of this argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule.  It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance.  All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law.  Beyond this, the Seventh Amendment does not exact the retention of old forms of procedure.  It does not prohibit the introduction of new methods for ascertaining what facts are in issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931)(citing Herron v. S. Pac. Co., 283 U. S. 91 (1931); Walker v. N.M. & S. Pac. R., 165 U. S. 593, 596 (1897); In re Peterson, 253 U. S. 300, 309 (1920)).  The only restriction that the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal and equitable issues -- the former of which must be submitted to a jury and the latter of which a judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to preclude the jury from trying the legal issues.  See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959).

> The court should take care when deciding which issues may and should be severed for separate trial and the order in which to try them[, as] the right to trial by jury on legal claims may not (except under "the most imperative circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122 (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. at 510-511).

152.     The reexamination clause presents more formidable difficulties to polyfurcation. Relatively few appellate judges have invalidated lower-court judgments or class-management plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of action proposes to divide the trial of the issues that he has certified for class-action treatment from the other issues involved in the thousands of actual and potential claims of the representatives and members of the class.  Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts.  And a decision to employ the procedure is reviewed deferentially.  However, as we have been at pains to stress recently, the district judge must carve at the joint.  Of particular relevance here, the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries.  The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation.  But most of the separate "cases" that compose this class action will be tried, after the initial trial in the Northern District of Illinois, in different courts, scattered throughout the country.  The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact.  This would be obvious if the second finder of fact were a judge.  But it is equally true if it is another jury.  In this limited sense, a jury verdict can have collateral estoppel effect.
>
> The plan of the district judge in this case is inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or $n$th jury.  The first jury will not determine liability.  It will determine merely whether one or more of the defendants was negligent under one of the two theories.  The first jury may go on to decide the additional issues with regard to the named plaintiffs.  But it will not decide them with regard to the other class members.  Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the Wadleigh case, such issues as comparative negligence -- did any class members knowingly continue to use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence.  Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant.  Proximate

causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant. It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence. A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus. How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302-03 (citations omitted).

153.      By and large, other courts have not accepted Judge Posner's Seventh Amendment concerns with polyfurcation. The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation. The Court nonetheless concludes it can make three statements confidently on the issue. First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial. See In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1303 ("The problem is not inherent in bifurcation. It does not arise when the same jury is to try the successive phases of the litigation."); Manual for Complex Litigation § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated."). Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis to determine whether a prior jury definitively established an issue.[35] This requirement does not imply a need to "carve at the joint" -- whatever that means[36] -- but merely to

_____

[35]The Seventh Amendment defines collateral estoppel's contours. See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 F. App'x 151, 159 (10th Cir. 2011)(unpublished)).

[36]The Tenth Circuit has never used this term. It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements *A* through *E*, but the

do as the Seventh Amendment says, and prevent "reexamination."  Third, most minor reexamination issues -- i.e., issues submitted to different juries that overlap somewhat -- can be resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings.  See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill. July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues . . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705, 735-37 (2000); See also Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 686 (D.N.M. 2016)(Browning, J.).

## CONCLUSIONS OF LAW

The Court will now state its conclusions of law.  The Court will begin by setting out the law regarding the issues relevant to its analysis.  The Court will then present that analysis.

## LAW REGARDING THE NMMWA

1.       The NMMWA requires that employers pay an employee "one-half times the employee's regular hourly rate of pay" for all hours that the employee works over forty hours in a seven-day week.  N.M. Stat. Ann. § 50-4-22.  Such provisions advance two public policies:

> (1) to establish minimum wage and overtime compensation standards for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage and overtime compensation standards which are adequate to maintain the health, efficiency and general well-being of

---

"joint" is between $C$ and $D$, then the case cannot be bifurcated into a trial on $A$ and $B$ and a separate trial on $C$ through $E$.  Maybe the Court is reading too much into the metaphor.  In the Court's view, however, separate trials for $A$ and $B$ and $C$ through $E$ would be acceptable, so long as the $C$-through-$E$ jury respects the prior jury's findings on $A$ and $B$.

workers against the unfair competition of wage and hours standards which do not provide adequate standards of living.

N.M. Stat. Ann. § 50-4-19(D). To succeed on a NMMWA overtime compensation claim, a plaintiff must establish: "(a) they worked more than forty hours a week, (b) that management knew or should have known that they did so, and (c) that they were not compensated for the overtime." Self v. United Parcel Serv., Inc., 1998-NMSC-046, ¶ 15, 970 P.2d 582, 589.[37]

2.      For the NMMWA's purposes, the term "employer" "includes any individual, partnership, association, corporation, business trust, legal representative or any organized group of persons employing one or more employees at any one time, acting directly or indirectly in the interest of an employer in relation to an employee." N.M. Stat. Ann. § 50-4-21(B). "Employee" means "an individual employed by an employer," N.M. Stat. Ann. § 50-4-2(C), but excludes "forepersons, superintendents and supervisors," N.M. Stat. Ann. § 50-4-21(C)(1). When interpreting the NMMWA, the Supreme Court of New Mexico has considered law interpreting FLSA to be persuasive. See Valentine v. Bank of Albuquerque, 1985-NMSC-033, ¶ 4, 697 P.2d 489, 490 (conflating analyses of the NMMWA and the FLSA, and citing law on the FLSA); see also Corman v. JWS of New Mexico, Inc., 356 F. Supp. 3d 1148, 1160 (D.N.M. 2018).

### RELEVANT NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

3.      "To prevail in unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'" City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 260 P.3d 414, 428 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at

698).  Equitable claims are not available if there is an adequate remedy at law.  See Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715; Sims v. Sims, 1996-NMSC-078, ¶ 28, P.2d 153, 159 ("[E]quity will not act if there is a complete and adequate remedy at law." (quoting S.P.C.S., Inc. v. Lockheed Shipbuilding & Constr. Co., 631 P.2d 999, 1001 (Wash. App. 1981))).    Additionally,  the  "'hornbook  rule  [is]  that  quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'"  Elliott Industries Ltd. P'ship v. BP America Production Co., 407 F.3d 1091, 1117 (10th Cir. 2005)("Elliott Indus.")(quoting Member Servs. Life Ins. v. Am. Nat'l Bank & Tr. Co. of Sapulpa, 130 F.3d 950, 957 (10th Cir. 1997)).[38]

4.     In Elliott Indus., for example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations precluded the plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs' expense.  See 407 F.3d at 1117.

5.     The plaintiffs contended that the leases did not preclude their unjust-enrichment claim, because they did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee from the plaintiffs' royalty payments.  See 407

---

[38]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue."  Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003).  The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.) The Court reiterates that interpretation here, though not on the issue quoted above.  For the issue above, the Court predicts that the

F.3d at 1117.  The Tenth Circuit reasoned, however, that, although "the contracts may not delineate any specific deductions," the leases "control how royalties are to be paid."  407 F.3d at 1117.

6.        The Tenth Circuit concluded, therefore, that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust-enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationships."  407 F.3d at 1117. " See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. at 1033.

### ANALYSIS

7.        The Court will grant in part and deny in part the Motion.  The Plaintiffs propose two classes: (i) a NMMWA class; and (ii) an unjust enrichment class.  See Motion at 7.  The Plaintiffs cannot, however, satisfy rule 23(a)'s commonality, typicality, or adequacy requirements for the proposed NMMWA class.  Likewise, the Plaintiffs have not shown that they satisfy rule 23(b)(3)'s predominance or superiority requirements for the proposed NMMWA class.  On the other hand, the Plaintiffs have satisfied rule 23(a)'s and rule 23(b)(3)'s requirements for the proposed unjust enrichment class to the extent that the Plaintiffs argue that, given the pilots' twelve-hour shifts, the Defendants could not set the pilots' daily rate to account for hours worked over twelve hours a day.  The Plaintiffs' argument that the Defendants represented that the pilots had a twelve-hour day and did not contract with the Plaintiffs for a fourteen-hour day does not satisfy those requirements.  The Court will use the Plaintiffs' four designated class representatives for the unjust enrichment class that the Court certifies, and the other Plaintiffs in the unjust enrichment class will remain named Plaintiffs in this case for the NMMWA claim's purposes.  As the Defendants do not dispute Moody & Stanford, P.C.'s adequacy as class counsel, see Response at 36, the Court appoints the firm class counsel.  The Court will not order that a Notice in the form

of the Notice of Class Action Lawsuit, which provides notice of both proposed classes, be sent to all class members, but will order that the unjust enrichment class Plaintiffs prepare a notice of the certified class to be sent to all class members.

8.      Preliminarily, the Court notes that it considers in this Memorandum Opinion and Order whether to grant class certification for the period that the Plaintiffs propose in their Motion. See Motion at 7.  The Court determines whether to certify classes for the period that ends on January 19, 2016, which is a date pre-acquisition.  See Motion at 7; Reply at 4.  The Plaintiffs will not have the opportunity to prosecute through the proposed classes claims that stretch beyond the post-acquisition period.  This conclusion makes irrelevant the Defendants' concerns about the effects of post-acquisition facts on the class certification.  See, e.g., Response at 4; id. at 27; Tr. at 49:10-50:16 (Lowry).  Accordingly, the Court does not further address these arguments below.

**I.      THE PLAINTIFFS SATISFY RULE 23(A) FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.**

9.      To satisfy rule 23(a), the Plaintiffs must show that their proposed classes satisfy the rule's four requirements: numerosity, commonality, typicality, and adequacy.  See Fed. R. Civ. P. 23(a).  The Defendants do not dispute that the Plaintiffs satisfy the numerosity requirement.  See Response at 22.  The Court deems, therefore, this element satisfied for both proposed classes.  The Court concludes that the Plaintiffs have not satisfied the commonality, typicality, or adequacy requirements for the proposed NMMWA class or for the proposed alternative NMMWA classes. The Plaintiffs have satisfied commonality, typicality, and adequacy for the proposed unjust enrichment class to the extent that the Plaintiffs argue that the Defendants could not legally have

a fourteen-hour duty day, but not to the extent that the Plaintiffs argue that the Defendants had, in

fact, a twelve-hour duty day for the pilots.

A.   **THE PLAINTIFFS SATISFY COMMONALITY FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.**

10.       The Court concludes that commonality is not satisfied for the NMMWA class.  In

the Court's view, commonality is satisfied for the unjust enrichment class to the extent that the

Plaintiffs' claim depends on an argument that the Defendants could not legally have a fourteen-

hour duty day.  The Plaintiffs have not established commonality to the extent that they argue that

the pilots agreed, in fact, to a twelve-hour duty day.

1.   **The Plaintiffs Have Not Satisfied the Commonality Requirement for the Proposed NMMWA Class, Because, to Answer Which Plaintiffs Have Valid Claims, the Court Must Answer Which Plaintiffs Are Exempt from the NMMWA.**

11.       The Plaintiffs have not shown commonality across the NMMWA class, because, to

determine to which proposed class members the Defendants are liable, the Court must determine

which proposed class members are exempt from the NMMWA.  This analysis will require the

Court to proceed proposed class member by proposed class member.  Even were the Court to

ignore the clinical base managers and the lead pilots, the Court would deem commonality

unsatisfied, because no disputed common issues remain.

12.       The Plaintiffs' list of common issues may have survived the commonality analysis

pre-Wal-Mart, but the issues do not suffice under current Supreme Court precedent.  The Plaintiffs

propose a series of common issues related to the proposed NMMWA class:

1.       Whether Defendant Tri-State is an "employer" within the meaning of the NMMWA.  [Second Amended Complaint] ¶ 117[, at 14]; [Answer to Second

Amended Class Action Complaint ¶ 117, at 13, filed August 29, 2018 (Doc. 208)] (denying allegation);

2.      Whether Defendant Stamper is an "employer" within the meaning of the NMMWA.  [Second Amended Complaint] ¶ 117[, at 14]; Answer ¶ 117[, at 13] (denying allegation);

3.      Whether the class members were employees of Defendants during the relevant time period.  [Second Amended Complaint] ¶ 118[, at 14]; Answer ¶ 118[, at 13] (denying allegation);

4.      Whether class members were exempt or non-exempt from the overtime provisions of the NMMWA.  [Second Amended Complaint] ¶ 119[, at 14]; Answer ¶ 119[, at 13] (denying non-exempt status of class members either specifically or because of lack of sufficient knowledge/information);

5.      Whether Defendants' policy and practice of only paying flight nurses and flight paramedics premium overtime compensation for hours over ninety-six (96) in a two-week pay period violated the NMMWA's requirement in Section 50-4-22(D) that employees be paid overtime compensation for all hours worked over forty in a seven (7) day work week.  [Second Amended Complaint] ¶¶ 120, 128[, at 14, 16]; Answer ¶¶ 120, 128[, at 13, 14] (directly denying any and all claims of any NMMWA violations);

6.      Whether Defendants' policy and practice of paying Pilots premium overtime pay only for working shifts other than their regularly scheduled shifts (either seven on/seven off or fourteen on/fourteen off) violated the NMMWA's requirement that employees be paid overtime compensation for all hours over forty in a work week.  [Second Amended Complaint] ¶¶ 120, 128[, at 14, 16]; Answer ¶¶ 120, 128[, at 13, 14] (directly denying any and all claims of any NMMWA violations);

7.      Whether Defendants knew or should have known that Flight Nurses, Flight Paramedics and Pilots were working in excess of forty hours per week such that overtime compensation was due to them.  [Second Amended Complaint] ¶ 123[, at 15]; Answer ¶ 123[, at 14] (directly denying allegation);

8.      Whether Defendants exerted any pressure on Flight Nurses, Flight Paramedics and Pilots to work in excess of forty hours per week such that they were "required" to work overtime under Section 50-4-22; [Second Amended Complaint] ¶¶ 120, 128[, at 14, 16]; Answer ¶¶ 120, 128[, at 13, 14] (denying any and all liability);

9.      Whether Defendant Tri-State is exempt from application of the NMMWA under pre-emption principles; Answer ¶13[39] (claiming exemption); and

10.     Whether, and to what extent, the aggrieved employees are entitled to *American Pipe* tolling based on the filing of the underlying *Payne* and current *Bell* lawsuits.

Motion at 14-16.  The Supreme Court directs courts to ask whether an issue is capable of common resolution across the proposed class.  See Wal-Mart, 564 U.S. at 350.  The Supreme Court emphasizes: "[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims."  Wal-Mart, 564 U.S. at 367.  The Plaintiffs' suggested common issues here, rather than reflect issues that will produce common answers, resemble the common issue that the Supreme Court rebukes in Wal-Mart: "Is that an unlawful employment practice?"  Wal-Mart, 564 U.S. at 349.  The Plaintiffs ask generally: Do the Defendants owe uncompensated overtime?  The "crux of the inquiry" for the potentially exempt employees is, however, whether they are exempt from overtime laws.  Wal-Mart, 564 U.S. at 352.

13.     The Plaintiffs' proposed common issues are not, therefore, common.  As not all proposed class members are potentially exempt, the Plaintiffs' proposed issue number 4 depends on an analysis whether each class member filled a position that may be exempt from the NMMWA's overtime provisions, i.e., whether each individual was a clinical base manager or a lead pilot.  Cf. Callari v. Blackman Plumbing Supply, Inc., 307 F.R.D. 67, 78 (E.D.N.Y. 2015)(Spatt, J.)("As the Plaintiff has failed to establish the existence of a unified policy exempting inside sales representatives from overtime, the Court finds that the question of whether the Defendant misclassified class members as exempt from overtime is not common to all of the

---

[39]The Court assumes that the Plaintiffs intended to cite Answer ¶ 14, at 17, which asserts preemption as a defense.

proposed class members."). The substantive answers to the Plaintiffs' issues 1 through 3, and 5 and 6, however, turn on whether the proposed class members are employees for the NMMWA's purposes. The Court cannot answer the Plaintiffs' questions without inquiring whether each proposed class member is exempt from the NMMWA, similar to how the Supreme Court could not answer whether Wal-Mart engaged in an unlawful employment practice without inquiring why managers made individual employment decisions. See N.M. Stat. Ann. § 50-4-19(D); N.M. Stat. Ann. § 50-4-21(B)-(C). The Plaintiffs' proposed common issues 7 and 8, while elements of an NMMWA claim, are, likewise, not central to the validity of the potentially exempt class members' claims. Should the Court conclude that the clinical base managers and the lead pilots are exempt from the NMMWA, issues 7 and 8 are irrelevant.

14.     Even if the clinical base managers and the lead pilots among themselves performed common job functions, that similarity would not influence the Court's analysis. The Court must consider the entire class. Across the Plaintiffs' proposed class, the Court cannot answer any of the Plaintiffs' proposed common issues without asking about each proposed class member's job duties and, subsequently, whether that individual is exempt from the NMMWA's overtime requirements.

15.     The Plaintiffs' proposed common issues 9 and 10 play little role in the Court's analysis. As the Court would limit the proposed class to the timeframe that the Plaintiffs propose in their Motion, issue 9 is moot, as the Defendants' concede in their response. See Response at 41. The Court agrees with the Defendants that the American Pipe tolling issue is likely not common across the class. See Response at 19. Moreover, the Court does not think that such a statute-of-limitations issue is an issue central to the validity of a class' claim as the Supreme Court envisioned in Wal-Mart. See Wal-Mart, 564 U.S. at 350. Cf. Sibley v. Sprint Nextel Corp., 315

F.R.D. 642, 659 (D. Kan. 2016)(Vratil, J.)(noting that a statute-of-limitations issue does not prevent certification).

16.     The Court notes that, were the Court to proceed with this case, subdividing the NMMWA class into a class of flight nurses and flight paramedics and a class of pilots would best serve the class actions' purpose.  See Motion at 7.  The Plaintiffs propose that the Court could adopt such an approach should the Court deem such a sub-division necessary.  See Motion at 7. As discussed in the text, infra, Tri-State CareFlight applied slightly different pay policies to each of the proposed alternative NMMWA classes.  In the Court's view, each group brings, therefore, a slightly different contention before the Court.  As the Defendants make no comment on the Plaintiffs' proposal and on the differences between the proposed NMMWA class and the proposed alternative NMMWA classes, the Court presumes that little issue exists with the Plaintiffs' proposal, and the Court sees no reason not to divide the NMMWA class into the proposed classes.[40] Cf. Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso, 543 F.3d at 605-07 (explaining that a district court could have used subclasses to mitigate problems with the availability of uniform group remedies that defeated a proposed rule 23(b)(2) class).

17.     The Court additionally notes, however, that, although, without the clinical base managers and the lead pilots, a subclass of flight nurses and flight paramedics, and a subclass of pilot, see Motion at 7, share common contentions within the classes, no common issues remain

---

[40]That the Court would divide a class of non-clinical base managers and non-lead pilots into two classes further cautions against deeming commonality satisfied across the proposed NMMWA class.  The class contains at least four sub-groups: (i) flight nurses and flight paramedics; (ii) pilots; (iii) clinical base managers; and (iv) lead pilots.  Managing the class to ensure commonality would require either a division into those four groups, or a class on the NMMWA exemption issue and two classes for the remaining liability issues.

disputed to satisfy commonality.  "Commonality is usually satisfied in wage cases 'where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices.'" Chime v. Peak Sec. Plus, Inc., 137 F. Supp. 3d 183, 208 (E.D.N.Y. 2015)(Kuntz, J.)(quoting Lewis v. Alert Ambulette Serv. Corp., No. 11 Civ. 442, 2012 WL 170049, at *10 (E.D.N.Y. Jan. 19, 2012)(Weinstein, J.))).  See Ramirez v. Riverbay Corp., 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014)(Koeltl, J.)("[C]ourts addressing the commonality requirement after [Wal-Mart] have typically held that the requirement is satisfied where employees claim that they were denied minimum wage or overtime compensation as a result of a corporate employment policy."); In re Bank of Am. Wage & Hour Emp't Litig., 286 F.R.D. 572, 588 (D. Kan. 2012)(Lungstrum, J.)(stating that, where uniform policies affect all class members, commonality exists, but, deeming commonality unsatisfied in the case, where such uniformity did not exist). Cf. Velasquez v. Digital Page, Inc., 303 F.R.D. 435, 443 (E.D.N.Y. 2014)(Wexler, J.)(stating that, where "each Plaintiff will be subject to an individual determination of whether overtime was due, it is not fair to that [sic] the claims of the absent class members 'rise or fall' with the fate of the representative Plaintiffs")(quoting Indergit v. Rite Aid Corp., 293 F.R.D. 632, 652 (S.D.N.Y. 2013) (citations omitted in original))).

18.     For the group of flight nurses and flight paramedics, uniform Tri-State CareFlight pay and scheduling policies underlay the Plaintiffs' claims.  Tri-State CareFlight's flight nurses and flight paramedics uniformly worked twenty-four or forty-eight hour shifts; Tri-State CareFlight expected these employees to work ninety-six hours in a two week, fourteen day, pay period, and it paid the flight nurses and flight paramedics overtime only for work over ninety-six hours in a two-week pay period.  See, e.g., Tri-State Depo. at 11:6-11 (stating that flight nurses

and paramedics work twenty-four or forty-eight hour shifts); id. at 15:14-21 (stating that it expected flight nurses and paramedics to work ninety-six hours in a two week, fourteen day, period); id. at 37:20-38:6 (stating that, since 2009, at least, Tri-State CareFlight pays flight nurses and flight paramedics for overtime only if they exceed ninety-six hours per pay period); Defs. Answers to First Interrs., Interrogatory No. 3, at 3 (describing that flight nurses and flight paramedics who work more than ninety-six hours in a two-week pay period are paid overtime) Defs. Answers to Bell's First Interrs., Interrogatory No. 4, at 2 (stating that the pay period was for two weeks and that the workweek spanned from 12:00 a.m. on Saturday to 11:59 p.m. on Friday).

19.     Tri-State CareFlight also had a uniform pay policy for the pilots.  Tri-State CareFlight uniformly scheduled pilots for twelve-hour shifts.  See, e.g., Tri-State Depo. at 11:25-12:8 (stating that pilots are scheduled for twelve-hour shifts but that they might work fourteen hours under the FAA).  For every base except the base near Roswell, Tri-State CareFlight scheduled the pilots for "seven days-on-and-seven-days-off" shifts, and, for the Roswell bases, Tri-State CareFlight scheduled pilots for "fourteen-days-on-and-fourteen-days-off" shifts.  See, e.g., Tri-State Depo. at 24:2-21 (stating that pilots work twelve-hour shifts with seven days on and seven days off); id. at 45:1-23 (stating that pilots are paid overtime only for additional twelve-hour shifts and not for time worked over forty hours); Defs.' Answers to Second Interrs., Interrogatory No. 13 at 1-2 (describing that, except for pilots based at the Roswell base, pilots worked seven days on and seven days off, and that, at the Roswell base, pilots worked fourteen days on and fourteen days off, and that pilots who worked more than seven days during their shifts received overtime pay).  Tri-State CareFlight paid pilots only for additional shifts that they worked in addition to their scheduled "on" shifts.  E.g., Tri-State Depo. at 33:25-34:18 (stating that pilots are

paid a daily rate for from twelve to fourteen hours and scheduled to work seven days-on-and-seven-days-off shifts).  That Tri-State CareFlight had two different modes of scheduling pilots does not affect the common contention among the pilots that they should recover overtime for hours worked over forty hours per workweek during the seven days of twelve hours shifts.

20.     For each group of the groups of flight nurses and flight paramedics, and of pilots, the resolution of issues 1 through 8 would uniformly determine the validity of the proposed class members' claims.  See Motion at 3.  The NMMWA requires that employers pay an employee "one-half times the employee's regular hourly rate of pay" for all hours that the employee works over forty hours in a seven-day week.  N.M. Stat. Ann. § 50-4-22.  To succeed on a NMMWA overtime compensation claim, a plaintiff must establish: "(a) they worked more than forty hours a week, (b) that management knew or should have known that they did so, and (c) that they were not compensated for the overtime."  Self v. United Parcel Serv., Inc., 1998-NMSC-046, ¶ 15, 970 P.2d at 589.  Whether the Defendants are "employers," whether the Plaintiffs are "employees," whether the NMMWA exemption applies, whether the Defendants failed to pay overtime, whether the Defendants knew of the failure to pay overtime, and whether the Defendants expected the Plaintiffs to work overtime, determine the Plaintiffs' success in this case, and are central to this case's resolution.  Motion at 14-15.  As the Plaintiffs indicate, to the extent that the Court considers these Plaintiffs' groups, the case resembles Menocal and Daye; the proposed class members' claims rest on a uniform policy.  See Menocal, 882 F.3d at 916 (concluding that commonality is established where the claim was based on a common labor policy); Daye, 313 F.R.D. at 177-78 (concluding that issues regarding loan contracts and procedure were common where the lender used standard loan contracts and procedures).

21.     The Defendants characterize, however, the majority of the Plaintiffs' proposed common issues as undisputed, and these proposed classes fail the commonality requirement, because no disputed common issues central to the Plaintiffs' claims remain in dispute. <u>See</u> Tr. at 52:11-18 (Lowry); Response at 39-40.  The Court has previously noted that an undisputed issue is an incidental issue and not a central issue that establishes commonality as <u>Wal-Mart</u> requires.  <u>See</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 306 F.R.D. 312, 438 (D.N.M. 2015)(Browning, J.)(noting that an undisputed issue is incidental: "It is not merely 'capable of' a producing a common answer, <u>Wal-Mart</u>, 564 U.S. at 338, it has already been given one"), <u>adhered to on reconsideration</u>, 312 F.R.D. 620 (D.N.M. 2015)(Browning, J.).  The Defendants state that they do not dispute the overtime pay policies, <u>see</u> Tr. at 49:23-51:9 (Lowry), their knowledge of the overtime pay policies, their expectation that the Plaintiffs work overtime, or Stamper's liability, and that they deny the Complaints ¶¶ 120, 128, at 13, 14, for instance, because the Defendants did not violate the NMMWA in relation to all Plaintiffs, <u>see</u> Response at 28-29, 39-40.  The only issues remaining for the non-clinical base manager and the non-lead pilot Plaintiffs are incidental issues, including the issue of damages, which the Plaintiffs admit is an individualized issue.  <u>See</u> Motion at 32.  Although the Court is reluctant to deny class certification merely because in the Response to the Motion seeking class certification, the Defendants suddenly allege that they have no disputes with the Plaintiffs, the Court sees no common issues on which the non-clinical base managers and the non-lead pilots would proceed.

> **2.      The Plaintiffs Have Shown Commonality for the Proposed Unjust Enrichment Class to the Extent That They Claim That the Defendants' Daily Rate Could Not Properly Account for Over Twelve Hours of Work Each Work Day.**

22.     The Plaintiffs have shown commonality as to one theory on the unjust enrichment claim.  As with the NMMWA class, the Plaintiffs list several common issues for the unjust enrichment claim that:

> 1.     Whether Defendants' "daily rate" for Pilots can legally cover more than the twelve hours Pilots were regularly scheduled to work each work day.  [Second Amended Complaint] ¶¶ 130, 131[, at 16-17]; Answer ¶¶ 130, 131[, at 14] (denying claim);
>
> 2.     Whether Pilots were regularly expected to work more than twelve hours per shift.  [Second Amended Complaint] ¶¶ 135[, at 17-18]; Answer ¶¶ 135[, at 15] (denying claim);
>
> 3.     Whether Defendants knew or should have known that Pilots would on occasion be required to work more than twelve hours per shift.  [Second Amended Complaint] ¶¶ 135, 139[, at 17-19]; Answer ¶¶ 135, 139[, at 15](denying claim);
>
> 4.     Whether Defendants' policy and practice of expecting Pilots to work more than twelve hours per shift for no additional compensation caused Defendants to be unjustly reap the benefits of failing to pay Pilots for hours worked over twelve per shift.  [Second Amended Complaint] ¶ 135[, at 17-18]; Answer ¶ 135[, at 15](denying claim);
>
> 5.     Whether Defendants' failure to pay Pilots additional compensation for hours worked over twelve per shift was malicious, willful, reckless, wanton, fraudulent or in bad faith.  [Second Amended Complaint] ¶¶ 135, 142[, at 17, 18, 20]; Answer ¶¶ 135, 142[, at 15] (denying claim); and
>
> 6.     Whether, and to what extent, the aggrieved employees are entitled to *American Pipe* tolling based on the filing of the underlying *Payne* and current *Bell* lawsuit.

Motion at 21.  Commonality exists on the first issue to the extent that the Plaintiffs argue what their proposed common issue 1 states, which is that the Defendants could not "legally cover more than the twelve hours Pilots were regularly scheduled to work each work day."  Motion at 21.  See id. at 21-22.  The Plaintiffs have not established commonality to the extent that they argue that the

pilots and Tri-State CareFlight did not have a contract that the pilots work fourteen-hour duty days and that the duty day was, in fact, twelve hours.

23.     Preliminarily, a preponderance of the evidence reflects that the Defendants contemplated and contracted with the pilots for a daily rate for the pilots that accounted for fourteen-hour duty days, although the pilots generally worked twelve-hour shifts.[41]  See, e.g., Tri-State Depo. at 24:7-10; EMS Helicopter Pilot Position Description at 1, filed December 6, 2018 (Doc. 223-1("Helicopter Pilot Position Description"))(stating that the daily rate is for fourteen-hour duty days); Daniels Depo. 220-9 at 28:15-16 (describing that twelve hours was a scheduled shift); id. at 25:22-25 (stating that he has not seen a document from Tri-State CareFlight identifying the duty time as anything other than fourteen-hour days).  The Helicopter Pilot Position Description's last page contains an acknowledgement of receipt paragraph and a signature line, which suggests that the document is a contract between the pilots and the Defendants.  See Helicopter Pilot Position Description at 6.  The Plaintiffs' citations to the Tri-State Depo. to support their interpretation of the duty day indicate the twelve-hour shifts, but do not reveal that the daily rate reflects a twelve-hour duty day.  See Motion at 3-4.  See also Tri-State Depo. at 24:7-10 (stating that pilots worked twelve-hour shifts); id. at 33:25-34:18 (reflecting that pilots typically worked twelve-hour shifts, but they could work up to fourteen hours); id. at 46:24-27:24 (stating that pilots received overtime for extra shifts worked and that a shift is typically twelve hours); Defs.' Answers to Second Interrs., Interrogatory No. 16, at 3 (explaining that 135 pilots "worked at least one shift

---

[41]The Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case.  See Menocal, 882 F.3d at 926 n.17 (considering facts relevant to the merits only to the extent necessary for class certification).

longer than 12 hours in a single day").  Given that a typical worker likely associates a pay rate with the typical time worked and that pilots believed that the daily rate was for the typical twelve-hour shifts does not overcome the evidence reflecting that the pilots contracted for fourteen-hour duty days.  See Daniels Depo. 220-9 at 28:3-13 (explaining that twelve hours was a scheduled shift and that he deserved compensation for time worked over that time); Zulaski Depo. 220-11 at 20:1-22:3 (describing the shift length as twelve hours).  Likewise, given the likelihood of such a belief and that the Plaintiffs' counsel has conflated the twelve-hour shifts with the fourteen-hour duty day, that some pilots testified that the daily rate was for twelve hours is not sufficient to overcome the Defendants' argument.  See Mahaim Decl. ¶ 9, at 3 (stating that his daily rate was for twelve hours); Bundrandt Decl. ¶ 9, at 3 (stating that his daily rate was for twelve hours).

24.     Based on these facts, the Court concludes that the Plaintiffs satisfy commonality only insofar as they argue the legality of the Defendants' payment scheme whereby they assert a fourteen-hour duty day but had the pilots work twelve hours.  The Court reads this theory to align with the Plaintiffs' proposed common issue 1.  The Plaintiffs argue that the Defendants had the pilots regularly work twelve-hour shifts and that, accordingly, the daily rate should be read as a rate for a twelve-hour day.  See Motion at 36.  The Plaintiffs' citation to Echostar, NMCA-047, ¶¶ 7-9, 12, 16, 134 P.3d at 782-84, for the idea that a "'regular rate of pay' for calculating overtime compensation [is] not permitted to fluctuate depending on length of work week, but must instead be based on standard forty-hour work week," Motion at 21-22 (quoting Echostar, NMCA-047, ¶¶ 7-9, 134 P.3d at 782-83), reflects their attack on the legal basis for scheduling pilots twelve

hours a day and expecting them at times to work over those twelve hours.[42][43]  Additionally, the Plaintiffs suggest in the Reply that their argument might involve the application of Federal Aviation Administration regulations to Tri-State CareFlight's pay policy.  See Reply at 12. Although the "'hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue,'" Elliott Indus., 407 F.3d at 1117 (quoting Member Servs. Life Ins. v. Am. Nat'l Bank & Tr. Co. of Sapulpa, 130 F.3d at 957), under such theories, the Plaintiffs would be arguing unjust enrichment as a remedy for the Defendants' unlawful practices.

25.      To the extent that the Plaintiffs' claim rests on such theories, the Plaintiffs' proposed common issues 1, 4, and 5 all satisfy the commonality requirement.  Because each issue "depends on shared rather than individualized circumstances, the unjustness question is common to the class and does not defeat predominance." Menocal, 882 F.3d at 925.  As discussed, supra, the Defendants had a uniform pay and scheduling policy for the pilots.  The evidence supports by a preponderance of the evidence that the Defendants had a uniform policy regarding hours per shift and compensation per shift.  See e.g. Bundrant Decl. ¶¶ 3, 5-6, 8-9, at 1-3; Daniels Depo. 220-9 at 28:3-13; Zulaski Depo. 220-11 at 20:1-22:3 (describing the shift length as twelve hours); Mahaim Decl. ¶¶ 3, 5-6, 8-9, at 2-3.  The questions whether the Defendants could legally set the duty day

---

[42]The Court will not, in this Memorandum Opinion and Order deciding whether to certify a class, determine whether the Plaintiffs' argument has merit, contra Response at 31-32, as, "'[i]n determining the legality of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met,'" Anderson v. City of Albuquerque, 690 F.2d at 799 (quoting Eisen v. Carlisle & Jacquelin, 417 U.S. at 178).

43

for fourteen-hour days or require the pilots to work over twelve-hour days without additional compensation applies uniformly to the proposed class, which was subject to this pay and scheduling policy, and the case will generate a common answer on the issue of this scheme's legality, whether the Defendants were unjustly enriched, and whether the Defendants acted maliciously, willfully, recklessly, wantonly, fraudulently or in bad faith.  See Motion at 21.

26.     The Plaintiffs' proposed issues 2, 3, and 6, are incidental, and not central to the Plaintiffs' contentions.  The Defendants state that issue 2 is the NMMWA claim's issue 7, and they concede for issue 7 that they knew of the expectation to work additional hours.  See Response at 32.  The Court concludes, therefore, that the Defendants do not dispute issue 2.  The Defendants also note that they do not dispute issue 3.  See Response at 28, 33.  The Court agrees with the Defendants that the American Pipe tolling issues do not satisfy commonality because multiple named class representatives have claims "well within the statute of limitations,"  Response at 30, and therefore are not common across the class.  Furthermore, these tolling issues are  incidental.  Regardless of these incidental issues, however, the Plaintiffs have shown that common issues exist for this proposed class.

27.     The Plaintiffs have not established commonality to the extent that they argue that the pilots and the Defendants did not have a contract that the pilots work fourteen-hour duty days, and that the duty day was in fact twelve hours pursuant to the Defendants' representations and the pilots' beliefs.  The Court agrees with the Plaintiffs that reliance on reasonable expectations is not an element of an unjust enrichment claim, see Reply at 12-13; City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 260 P.3d at 428-29, but the Court also deems the Defendants correct that, if the Plaintiffs argue in this manner that the duty day was twelve hours, the Plaintiffs will

have to introduce individualized evidence, <u>see</u> Response at 16.  The only evidence that the Court has seen that an enforceable contract did not control the pilots' duty day is evidence that Tri-State CareFlight assigned the pilots twelve-hour shifts and that some pilots believed that their daily rate was connected to the twelve-hour shift.  <u>See</u> Daniels Depo. 220-9 at 28:3-13 (explaining that twelve hours was a scheduled shift and that he deserved compensation for that time); Zulaski Depo. 220-11 at 20:1-22:3 (describing the shift length as twelve hours); Mahaim Decl. ¶ 9, at 3 (stating that his daily rate was for twelve hours); Bundrandt Decl. ¶ 9, at 3 (stating that his daily rate was for twelve hours).  This evidence does not suffice to suggest that classwide evidence will produce a classwide answer to the question whether an express contract regulated the parties' conduct.  The evidence directs rather to the possibility that each pilot might have beliefs on the hours in the duty day.  Other pilots might have understood that they agreed to a fourteen-hour duty day, and Tri-State CareFlight might have made representations about the duty day to some pilots.  The Court concludes, therefore, by a preponderance of the evidence that it would have to resort to individualized inquiries that defeat the commonality analysis to resolve issues whether the pilots had, in fact, twelve-hour duty days.  No common issues exist based on such a theory, as the Court notes, <u>supra</u>, the Plaintiffs' proposed issues 2, 3, and 6, are incidental, and the Plaintiffs' proposed issues 1, 4, and 5, whether the Defendants could have such a twelve-hour day, whether the Defendants were unjustly enriched, and whether the Defendants acted maliciously, willfully, recklessly, wantonly, fraudulently or in bad faith in requiring such a day, will require individualized inquiries.  <u>See</u> Motion at 21.

**B.**    **THE PLAINTIFFS SATISFY TYPICALITY FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.**

28.    As the Supreme Court's statement that the commonality and typicality requirements tend to "merge" suggests, the Court's typicality analysis overlaps significantly with its comments on commonality.  Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  The Plaintiffs do not satisfy typicality for the proposed NMMWA class.  For the proposed unjust enrichment class, the Plaintiffs meet the typicality requirement to the extent that they argue that the Defendants could not legally have fourteen-hour duty days.

29.    As an initial matter, in the Court's view, the typicality analysis is not the place to determine whether the Plaintiffs' proposed procedure of using designated class representatives should defeat class certification.  Although the Defendants contend that the Supreme Court's "formulation" of typicality relates to the named Plaintiffs, of which this case has ninety, and note that they oppose the Plaintiffs' proposed approach of using designated class representatives, Response at 35, the Court does not see that having ninety named Plaintiffs or having eight designated class representatives changes the typicality analysis.  Typicality requires that the named representative's claims be typical of the class' claims.  See Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d at 57.  With either number of Plaintiffs, the Court's analysis

focuses on whether the Plaintiffs' or the designated class representatives' claims are typical of the proposed class members' claims.

### 1. The Plaintiffs Do Not Satisfy Typicality for the Proposed Commonality Class, Because of the NMMWA Exemption Issue.

30. The Plaintiffs do not satisfy typicality for the proposed NMMWA class. Regardless whether the proposed class involves eight or ninety representative class members, the Plaintiffs' proposed NMMWA class fails for the same reasons that it does not satisfy the commonality requirement. Cf. Gianzero v. Wal-Mart Stores Inc., 2010 WL 1258071, at *3 ("The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." (citing Milonas v. Williams, 691 F.2d at 938)). The clinical base managers and the lead pilots cannot represent the non-clinical base managers' and the non-lead pilots' interests. The NMMWA exemption issue occupies central space in the clinical base managers' and the lead pilots' cases. See Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 156 (S.D.N.Y. 2002)(Peck, J.)("'Typicality will not be present if the class representative's claim is subject to one or more unique defenses that likely will be central to the litigation.'" (quoting 5 Moore's Federal Practice § 23.24[6])). Conversely, the non-clinical base managers and the non-lead pilots, whose claims do not depend on the NMMWA exemption issue, do not typify the clinical base managers and the lead pilots. Cf. Carter v. Anderson Merchandisers, LP, No. EDCV 08-25-VAP, 2008 WL 4948489, at *6-7 (C.D. Cal. Nov. 18, 2008)(Phillips, J.)(noting, in discussing typicality, that the class representative was classified as exempt like the other class members).

31. As discussed, supra, the Court also favors treating the flight nurses and the flight paramedics separately from the pilots. Approaching the groups as one class, as the Plaintiffs'

primary proposed class involves, raises concerns for typicality as the flight nurses and the flight paramedics, and the lead pilots do not share pay policies.  Were the Court to consider the proposed alternative NMMWA classes, without the clinical base managers and the lead pilots, however, typicality is satisfied.  As discussed, <u>supra</u>, the Defendants had uniform pay and scheduling for the flight nurses and the flight paramedics, and the lead pilots, respectively.  Any of the non-clinical base managers and the non-lead pilots within the ninety Plaintiffs would bring the same contentions as the other class members on such uniform policies.  See <u>Carter v. Anderson Merchandisers, LP</u>, 2008 WL 4948489, at *6-7 (concluding that typicality is satisfied where the class representative was subject to the same policies as the other class representatives and shared the same exemption classification).   Moreover, the Plaintiffs' proposed designated class representatives represent those policies.  The relevant flight nurses and flight paramedics among the designated class representatives -- Johnson, Howell, and Stephens -- worked twenty-four and forty-eight hour shifts, and ninety-six hours a pay period, with overtime only for time worked over ninety-six hours in a two-week pay period.  See Howell Depo. 220-5, at 4:15-16 (stating that he was a flight paramedic); <u>id.</u> at 22:9-23:10 (describing that flight paramedics worked forty-eight-hour shifts during a two-week pay period and worked ninety-six hours in that pay period); <u>id.</u> at 24:9-5:8 (stating that flight paramedics received overtime pay for shifts that they "picked up" over ninety-six hours); <u>id.</u> at 30:4-11 (explaining that the pay period went from Saturday until the Friday two weeks later); Johnson Depo. 220-6, at 12:9-12 (describing that she was a flight nurse); <u>id.</u> at 24:1-7 (describing that flight nurses worked twenty-four and forty-eight hour shifts and that they built their own schedule); <u>id.</u> at 26:25-27:6 (describing that Tri-State CareFlight paid overtime for time worked in excess of ninety-six hours in two weeks); Stephens Decl. ¶¶ 5-9, at 2 (stating that

he is a designated class representatives and was a flight paramedic, who worked one forty-eight hour shift a week and received overtime when he worked over ninety-six hours in a two-week pay period).   The relevant pilots among the designated class representatives -- Daniels, Mahaim, and Zulaski[44] -- worked twelve-hour shifts with either seven or fourteen days on, and seven or fourteen days off, and received overtime compensation only for working additional shifts.   See Daniels at 22:14-19 (stating that he did not receive overtime and that he received the same pay for all 14 days that he worked); id. at 29:25-30:7 (stating that pilots received overtime for working extra shifts); Zulaski Depo. 220-11 at 15:15-19, 22:14-19 (stating that he worked twelve-hour shifts for two weeks on and two weeks off, and did not receive overtime); Mahaim Decl. ¶¶ 3, 5-7, at 2-3 (stating that he is a designated class member and was a pilot, that he worked twelve-hour shifts for seven days on and then had seven days off, and that he did not receive compensation for hours worked over forty hours a week).

---

[44]In the Reply, the Plaintiffs state: "Of the designated representatives who were deposed, Mr. Perry served a time as a clinical base manager, and Mr. Bundrant and Mr. Maplesden served a time as lead pilots."  Reply at 7.  The Court has only the Bundrant Decl. by which to judge Bundrant's experience at Tri-State CareFlight and, as the Bundrant Decl. does not mention Bundrant's role as a lead pilot, the Court cannot verify the Plaintiffs' statement.  The Court accepts, however, the representation.  In the Motion, the Plaintiffs identify Mahaim and not Maplesden as a designated class representative.  See Motion at 14.  As with Bundrant, the Court has only the Mahaim Decl. as evidence of Mahaim's employment and cannot determine whether Mahaim was a lead pilot.  The Court hesitates to assume that Mahaim was a lead pilot without further clarification of the Plaintiffs' statement.  Regardless whether Bundrant and/or Mahaim were lead pilots, the Court's analysis does not change.

2.     **The Plaintiffs Satisfy Typicality for the Proposed Unjust Enrichment Class to the Extent That Their Claim Rests on the Legality of the Fourteen-Hour Duty Day.**

32.     The unjust enrichment class satisfies typicality only to the extent that the Plaintiffs rely on arguments about the legality of the fourteen-hour duty day.  To the extent that the Plaintiffs argue the legality of the Defendants' fourteen-hour duty day and the theory that the twelve-hour shifts mandate an interpretation of the daily rate as accounting for twelve hours worked, typicality is satisfied.  As the Court discusses, supra, this claim is based on classwide claims and evidence, and will produce classwide answers.  Those Plaintiffs within the ninety Plaintiffs who are pilots will share the same contentions as the other pilots.  Moreover, Daniels, Bundrant, and Mahaim experienced Tri-State CareFlight's policy of twelve-hour shifts, and no additional compensation for time worked over twelve hours.  See Bundrant Decl. ¶¶ 3, 5-6, 8-9, at 1-3; See Daniels Depo. 220-9 at 9:33-10:1; See Zulaski Depo. 220-11 at 20:1-22:3; See id. at 22:14-19; See Mahaim Decl. ¶¶ 3, 5-6, 8-9, at 2-3.

33.     As the Court discussed, supra, to the extent that the Plaintiffs argue that the pilots had a twelve-hour duty day, based on the Defendants' statements and/or pilots' beliefs, typicality is not satisfied, because such an argument will necessitate individualized evidence and arguments from the parties aimed at individualized class members.  No single class representative can typify a claim that rests on each individual's experiences.  A representative with his or her own individualized facts cannot represent another class member with different facts in such a situation.

C.   **THE PLAINTIFFS SATISFY ADEQUACY FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.**

34.     As with the commonality and typicality requirements, the Plaintiffs' proposed NMMWA class and the unjust enrichment class, to the extent that the Plaintiffs argue that the pilots had a twelve-hour duty day, fail the adequacy requirement.  For the proposed NMMWA class, the Defendants focus their argument on the potential for a conflict of interest between the clinical base managers/lead pilots and the remaining proposed class members.  See Response at 36-38.  The Defendants do not discuss the adequacy of the proposed class representatives for the unjust enrichment class.  The Court concludes that, because the proposed NMMWA class and the proposed unjust enrichment class, to the extent that the Plaintiffs argue that the pilots had a twelve-hour duty day, require individualized analyses, the proposed class representatives cannot adequately represent the class members' interests.  To the extent that the unjust enrichment class depends on the argument that the Defendants' fourteen-hour duty day policy is illegal, the proposed class representatives will adequately represent the class members.

1.     **The Plaintiffs Do Not Satisfy Adequacy for the Proposed NMMWA Class, Because of the NMMWA Exemption Issue.**

35.     The Court concludes that, whether the Court looks at the Plaintiffs' eight designated representatives or at the ninety Plaintiffs, the representative class members will not adequately represent the proposed NMMWA class.  The Tenth Circuit has identified two questions relevant to the adequacy-of-representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.  The Defendants concede the second inquiry for adequacy, and

argue that a potential conflict exists between the clinical base managers and the lead pilots.  See Response at 36.  The Court disagrees with the Defendants' analysis and rests its decision instead on the inability of the representative class members to adequately represent the class in relation to the resolution of the NMMWA exemption.

36.      The Court disagrees with the Defendants that a potential conflict exists between the clinical base managers and the lead pilots, and the other Plaintiffs.  The clinical base managers and the lead pilots cannot be said to have employed the flight nurses, the flight paramedics, and/or the lead pilots.  Contra Response at 37.  The Supreme Court of New Mexico has looked to FLSA caselaw to flesh out NMMWA law.  See Valentine v. Bank of Albuquerque, 1985-NMSC-033, ¶ 4, 697 P.2d at 490.  The FLSA contains the same definition of employer as the NMMWA.  Compare 29 U.S.C. § 203(d), with N.M. Stat. Ann. § 50-4-21(B).  Under FLSA caselaw, "employees are those who as a matter of economic reality are dependent upon the business to which they render service."  Bartels v. Birmingham, 332 U.S. 126, 130 (1947).  To decide whether an entity is an employer for FLSA purposes, courts use an economic reality test and consider such factors as:

> (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker' investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business."  Baker v. Flint Eng'g & Constr. Co. 137 F.3d 1436, 1440 (10th Cir. 1998).  It also "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."  Id.  "None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach."  Id.

Barlow v. C.R. England, Inc., 703 F.3d 497, 506 (10th Cir. 2012).  See, e.g., Brown v. N.Y.C. Dep't of Educ., 755 F.3d 154, 167 (2d Cir. 2014)(listing such factors as "(1) the power to hire and fire employees, (2) the ability to supervise and control employee work schedules or terms of employment, (3) authority over the rate and method of employee payment, and (4) the maintenance of employment records"); Roberts v. Gwinnett Cty., 225 F. Supp. 3d 1400, 1411-13 (N.D. Ga. 2016)(Totenberg, J.)(describing that courts apply an economic realities test but noting that courts recognize that "there is no one-size-fits-all approach to analyzing employment status under the Act").

37.    The clinical base managers and the lead pilots had little control over the other Plaintiffs' employment conditions.  As the Defendants indicate, see Response at 37, the clinical base managers and the lead pilots had a role in overseeing payroll, see Bell Depo. 223-2, at 45:21-46:3; Aguilar Depo. 223-2, at 14:8-10; Perry Depo. 220-7, at 14:2-8; Bell Depo. 223-2 at 46:17-19, and scheduling, see Bell Depo. Doc. 220-14, at 47:19-48:6; id. at 64:17-65:23; Mori Depo. 223-2, at 17:11-20; Perry Depo. 220-7, at 15:7-14; Tri-State Tr. at 14:11-16:13; Maplesden Depo. 220-15, at 22:19-20; id. at 59:9-13.  The clinical base managers' and the lead pilots' roles in these areas were, however, limited.  For payroll, the clinical base managers and the lead pilots simply verified that employees reported their time and approved the time that they reported, and then the clinical base managers and the lead pilots transmitted the reports to Tri-State CareFlight's corporate office.  See Bell Depo. 223-2 at 45:21-46:3; Aguilar Depo. 223-2, at 14:8-10; Perry Depo. 220-13, at 14:2-8; Bell Depo. 223-2 at 46:17-19.  For scheduling, the clinical base managers and the lead pilots followed Tri-State CareFlight's existing scheduling requirements.  Tri-State CareFlight created the scheduling policies.  See Tri-State Depo. at 15:14-21 (describing the flight

nurses' and flight paramedics' schedule); Defs.' Answers to First Interrs., Interrogatory No. 3, at 2 (same); Tri-State Depo. at 24:3-21 (describing the pilots' schedule); Defs.' Answers to Second Interrs., Interrogatory No. 13, at 1-2 (same). The clinical base managers and the lead pilots applied these policies when they created the schedules. See Bell Depo. Doc. 220-14 at 47:19-48:6 (describing the flight nurses' and flight paramedics' schedule, and noting that everyone followed that rotation and, as a clinical base manager, she filled holes in the schedule); id. at 64:17-65:23 (stating that, as a clinical base manager, she would input employees' regular shifts into a spreadsheet, and that she would find someone to fill a shift if no one was available or fill the shift herself if needed); Maplesden Depo. Doc. 220-15 at 59:9-13 (stating that the employees had a regular schedule, and that he mainly completed holes left by vacations and sick people); Aguilar Depo. Doc. 220-13, at 18:3-7 (describing that flight nurses and flight paramedics signed up for their two days of shifts a week). The clinical base managers did not have the final say in the schedules' creation; the clinical services manager also reviewed the clinical base managers' proposed schedules, and then the medical program director approved all the schedules. See Tri-State Depo. at 4:16-17; id. at 13:24-14:21. Moreover, the Defendants concede that Tri-State CareFlight created the overtime pay policies, and that the clinical base managers and the lead pilots were subject to the same policies as the other Plaintiffs. See Response at 37-38. Additionally, the clinical base managers and the lead pilots had no authority to hire or fire employees. See Perry Depo. 220-7, at 50:1-2.

38.     That the clinical base managers and the lead pilots occupied supervisory positions in relation to the flight nurses, the flight paramedics, and the lead pilots does not alone persuade the Court to reach a different conclusion. Donaldson v. Microsoft Corp., which the Defendants

cite, is inapposite.  See Response at 37-38.  In Donaldson v. Microsoft Corp., the plaintiffs argued that Microsoft's evaluation system was subjective such that it permitted discrimination against female and African American employees.  See 205 F.R.D. at 562.  As the supervisors in the proposed class evaluated employees under Microsoft's rating system, the Honorable Marsha J. Pechman, United States District Judge of the United States District Court for the Western District of Washington, concluded that the supervisors "implemented" the rating system.  Donaldson v. Microsoft Corp., 205 F.R.D. at 568.  Here, although the clinical base managers and the lead pilots technically applied the scheduling policies, they did not participate in a system, like Microsoft's rating system, that gave them discretion such that they committed the complained-of practice, as the supervisors who evaluated employees within a system wherein the evaluations were allegedly discriminatory.

39.     Nevertheless, in the Court's view, the Court must ask in the second inquiry in the adequacy requirement whether the proposed class representatives will adequately prosecute the class' claims.  See, e.g., Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1219 (noting that "the commonality, typicality, and adequacy requirements of Rule 23(a) 'tend to merge'"  (quoting Wal-Mart, 564 U.S. at 349 n.5)); Edgington v. R.G. Dickinson & Co., 139 F.R.D. at 189 ("The requirement of typicality dovetails into the requirement of adequacy of representation.")(quoting Penn v. San Juan Hospital, Inc., 528 F.2d at 1189); Foster v. Merit Energy Co., 282 F.R.D. 541, 561 (W.D. Okla. 2012)(Friot, J.)("Although adequacy of representation by the proposed representative does not require complete factual congruence, where, as here, absent class members would be exposed to an adverse judgment on the basis of facts materially weaker than their own individual facts, the proposed representative is not an

adequate representative."); <u>Lane v. Page</u>, 272 F.R.D. at 577 (noting, regarding adequacy: "His claims are typical of those of the proposed class, and as such, he will directly benefit from a favorable resolution of the claims of the proposed class").  The Court cannot ignore rule 23(a)(4)'s directive that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

40.      Either among the Plaintiffs' eight designated class representatives or among the ninety Plaintiffs, the adequacy analysis fails.  A non-clinical base manager or non-lead pilot cannot adequately represent a clinical base manager or a lead pilot, whose claim will turn on the NMMWA exemption, because the non-clinical base manager or non-lead will not need to make any arguments about the defense.  Conversely, the NMMWA exemption will likely preoccupy a clinical base manager's case or a lead pilot's case, and will end his or her case prematurely from the view of the non-clinical base managers or non-lead pilots, the validity of whose claims do not depend on the NMWWA exemption issue.  Although this inadequacy does not affect Johnson's, Howell's, and Stephens' ability to adequately represent the flight nurses and the flight paramedics, with whom they share claims and factual circumstances with the flight nurses and the flight paramedics, or Daniels', Mahaim's, and Zulaski's abilities to adequately represent the pilots, with whom they likewise share contentions, none of these designated class representatives can adequately represent the clinical base managers and the lead pilots who need to argue the NMMWA exemption to further their interests.  Likewise, Perry and Bundrant, who presumably will devote time to arguing the NMMWA exemption, could not adequately represent the non-clinical base managers and the non-lead pilots.

### 2. The Plaintiffs Satisfy Adequacy for the Proposed Unjust Enrichment Class to the Extent That Their Claim Rests on the Legality of the Fourteen-Hour Duty Day.

41.     The Defendants do not contest the class representatives' adequacy for the proposed unjust enrichment class. The Court's conclusion on the adequacy of the class representatives for the proposed class follows, however, its commonality and typicality analyses. The Plaintiffs satisfy adequacy for the proposed unjust enrichment class to the extent that their claim rests on the legality of the fourteen-hour duty day and that the twelve-hour shifts mean that the daily rate was for twelve hours. As any argument that the pilots had a twelve-hour duty day pursuant to the Defendants' representations or the pilots' beliefs, rather than a fourteen-hour duty day, will require individualized analyses, neither the pilots of the ninety Plaintiffs, nor Daniels, Mahaim, Zulaski, and Bundrant, can adequately represent the class for such an argument. The pilots' individual experiences will more likely than not differ too greatly for the Court to base a decision on a subset of the pilots. On the other hand, as the issue of the fourteen-hour duty day's legality involves no individualized facts, any subset of pilots can adequately prosecute such a claim for the class.

## II.   THE PLAINTIFFS SATISFY RULE 23(B)(3) FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.

42.     The Plaintiffs satisfy rule 23(b)(3) for only the proposed unjust enrichment class to the same extent that they satisfy the rule 23(a) requirements. To satisfy rule 23(b)(3), the Plaintiffs must show that their proposed classes satisfy the rule's two requirements: (i) predominance; and (ii) superiority. See Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s requirements are stricter than rule 23(a)'s requirements. See Gandy v. RWLS, LLC, 2019 WL 1407214, at *9 (noting that because the plaintiffs could not establish rule 23(a)'s requirements, "the class cannot meet the

more demanding requirements of Rule 23(b)(3)"); <u>Callari v. Blackman Plumbing Supply, Inc.</u>, 307 F.R.D. at 82 ("As described above, the Court finds that the Plaintiff has failed to meet the Rule 23(a) requirement of commonality, typicality, and adequacy of representation. Therefore, it follows that the proposed class also fails to meet the more demanding requirements of Rule 23(b)(3)."). The Court's conclusions regarding the rule 23(b)(3) factors follow, therefore, its conclusions regarding the rule 23(a) requirements. The Plaintiffs have not satisfied the predominance or the superiority requirements for the proposed NMMWA class. The Plaintiffs have satisfied commonality, typicality, and adequacy for the unjust enrichment claim to the extent that the Plaintiffs argue that the Defendants could not legally have a fourteen-hour duty day for the pilots, but not to the extent that the Plaintiffs argue that the Defendants had a twelve-hour duty day for the pilots.

> **A.** **THE PLAINTIFFS SATISFY PREDOMINANCE FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.**

43. The Plaintiffs do not satisfy predominance for the NMMWA claim. They satisfy predominance for the proposed unjust enrichment class only to the extent that they argue that the Defendants could not properly have a fourteen-hour duty day. The Tenth Circuit has articulated two steps in the predominance inquiry; a court must identify: "(1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not." <u>CGC Holding Co., LLC v. Broad & Cassel</u>, 773 F.3d at 1087-88. Issues that either do not apply to the whole class or that require individualized analyses predominate over the proposed NMMWA class, and the proposed unjust enrichment class to the extent that the Plaintiffs argue that the pilots had a twelve-hour duty day.

1.      **The Plaintiffs Do Not Satisfy Predominance for the Proposed NMMWA Class, Because of the NMMWA Exemption Issue and Because No Disputed Common Issues Remain Among the Non-Clinical Base Manager and Non-Lead Pilot Plaintiffs.**

44.      Common issues do not predominate over the NMMWA claim or the proposed alternative NMMWA classes.  As discussed in the commonality analysis, no common issues exist between the clinical base managers and the lead pilots, and the other Plaintiffs.  The Plaintiffs' proposed issues 1 through 7 "are susceptible to generalized proof" only to the extent that the Court considers the issues for each of the groups of non-clinical base manager flight nurses and flight paramedics, and non-lead pilots.  See Motion at 3.  The Defendants concede, however, these issues 1 through 7 for this group of Plaintiffs.  See Response at 39-41; Tr. at 52:11-18 (Lowry).  The Defendants dispute only the NMMWA exemption as it applies to the clinical base managers and the lead pilots, and the American Pipe tolling issue, which they do not purport to dispute as to all Plaintiffs.  See Response at 41.  Only the NMMWA exemption, the American Pipe tolling issue and the damages issue, therefore, remain for litigation.  As the Defendants concede all other issues, the Court cannot say that any common issues predominate.

2.      **The Plaintiffs Satisfy Predominance for the Proposed Unjust Enrichment Class to the Extent That Their Claim Rests on the Legality of the Fourteen-Hour Duty Day.**

45.      The unjust enrichment class satisfies predominance to the extent that the Plaintiffs argue the fourteen-hour duty day's illegality.  As the Court discusses in the commonality analysis, the central, common issues for the unjust enrichment class are the Plaintiffs' proposed common issues 1, 4, and 5.  The questions whether the Defendants could have a duty day for fourteen-hour days given the twelve-hour shifts or require that the pilots work over twelve-hour days applies uniformly to the proposed class, which was subject to this pay and scheduling policy.  The case

will generate a common answer on the issue of this scheme's legality, whether the Defendants were unjustly enriched, and whether the Defendants acted maliciously, willfully, recklessly, wantonly, fraudulently, or in bad faith.  See Motion at 21.  The Defendants concede the proposed issues 2 and 3, whether the Defendants' knew of the pilots' working over twelve hours in a day and whether the Defendants expected the pilots to perform such work.  See Response at 28, 33. Issue 6 -- the American Pipe tolling issue -- is incidental and does not satisfy commonality.  The undisputed issues and the incidental individual issue will not occupy the bulk of the Court's attention for this class, as the Court's analysis will focus on the legality of the fourteen-hour duty days and the elements of the unjust enrichment claim.  Accordingly, such claims satisfy the predominance requirement.

46.      The Plaintiffs have not established predominance to the extent that they argue that the pilots and Tri-State CareFlight did not have a contract that the pilots work fourteen-hour duty days and that the duty day was twelve hours.  As the Court discusses in the commonality analysis, this issue requires individualized evidence, and the issues whether the Defendants unjustly benefited from the circumstances that these individualized analyses reveal, and whether the Defendants acted maliciously, willfully, recklessly, wantonly, fraudulently or in bad faith in these circumstances, will likewise require individualized evidence.  These uncommon issues will predominate over the undisputed and the incidental issues.

47.      Additionally, such individualized issues will more likely than not predominate should the Plaintiffs make the argument about an actual twelve-hour duty day in combination with the argument about the legality of the fourteen-hour duty day.  In such a situation, the Court will likely resolve the legality issue in a summary judgment motion, and the remaining trial will focus

on these uncommon issues.  Accordingly, the Plaintiffs do not satisfy predominance to the extent that they rely on this second theory.[45]

### B.   THE PLAINTIFFS SATISFY SUPERIORITY FOR ONLY THE PROPOSED UNJUST ENRICHMENT CLASS TO THE EXTENT THAT THEIR CLAIM RESTS ON THE LEGALITY OF THE FOURTEEN-HOUR DUTY DAY.

48.     In line with the Court's conclusions for rule 23(a)'s requirements and rule 23(b)(3)'s predominance factor, the Court concludes that the Plaintiffs have satisfied the superiority requirement only for the unjust enrichment claim and to the extent that the Plaintiffs argue that the Defendants could not have a fourteen-hour duty day.  "In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive."  Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 693 (citing Fed. R. Civ. P. 23 advisory committee's notes; Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16).  These factors are:

> (A)   the putative class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against putative class members;
>
> (C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)   the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  For each proposed class, the Court considers each factor in turn.

---

[45]The Defendants raise no objections regarding the effect of individualized damages on predominance.  See Motion at 42-43.

1.     **The Plaintiffs Do Not Satisfy Superiority for the Proposed NMMWA Class, Because Only Issues That Demand Individualized Attention Remain.**

49.     The proposed NMMWA class does not satisfy the superiority requirement.  First, the proposed class members have interests in individually controlling their lawsuits.  As discussed, supra, only uncommon and/or individual issues remain for the proposed NMMWA class.  No common representation will suffice for these issues, and each Plaintiff has, accordingly, an interest in prosecuting his or her individual damages, and defending himself or herself against NWWMA exemption or statute-of-limitations issues, as applicable.  Cf. Mendez v. U.S. Nonwovens Corp., 312 F.R.D. 81, 100-01 (E.D.N.Y. 2014)(Spatt, J.)(concluding that, where individual inquiries predominant, the class fails the superiority analysis); Ruggles v. WellPoint, Inc., 272 F.R.D. 320, 334-42 (N.D.N.Y. 2011)(Kahn, J.)("Because individualized proof is required to determine the correctness of Defendant's categorizing putative class members as exempt, a class action is not a superior mechanism for adjudicating their claims.").  No class interest even exists in pursuing the litigation where the parties dispute only such issues.

50.     Moreover, that so many Plaintiffs have indicated an interest in pursuing their cases lends this conclusion some additional credence.  As an initial matter, the Court states its recognition that, because over 200 potential class members have not found representing their own interests in this case worthwhile, see Tr. at 6:3-10 (Moody, Court), the presence of the ninety Plaintiffs does not control the Court's decision regarding superiority, contra Response at 46.  Moreover, the Court cannot say how many of these Plaintiffs would have joined had their counsel recruited them to individual lawsuits rather than to a class action wherein the Plaintiffs propose a designated class representative procedure.  Nevertheless, the large number of Plaintiffs indicates

considerable interest among proposed class members in pursuing suit against Tri-State CareFlight.

See Abby v. City of Detroit, 218 F.R.D. at 549 (noting that, where, over 100 victims of an allegedly unconstitutional policy brought suit, the proposed class members had "a strong interest in controlling and maintaining separate actions"); Zapata v. IBP, Inc., 167 F.R.D. at 163 (noting, in the superiority analysis, that individual suits had been brought pursuant to the statute at issue). This case does not present that negative value case where a class action is a necessary vehicle for recovery.  Cf. Zuniga v. Bernalillo Cty., 319 F.R.D. at 694 (discussing negative value of individual cases as weighing in favor of a class action); Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. 169, 278 (D.N.M. 2016)(Browning, J.)(same); Daye v. Cmty. Fin. Serv. Centers, LLC, 313 F.R.D. at 183 (same).  The Plaintiffs here may recover as much as tens of thousands in damages for the NMMWA claim and, under the NMMWA, recover attorneys' fees and costs for their efforts.  See Response at 46; Second Amended Complaint ¶¶ 27-34, at 4-5, filed January 28, 2016 (Doc. 100)(claiming damages under the NMMWA, and identifying Heard and Oldham as pilots bringing the unjust enrichment claim); Final Judgment at 1 (providing for damages of between $47,203.23 and $64,363.62 for Bastian, Welch, and Fernandez-Quezada under the NMMWA alone).[46]  Cf. Abby v. City of Detroit, 218 F.R.D. at 549 (treating settlement amounts from $1,000.00 to $550,000.00 as counseling against a class action's superiority); Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 222 (E.D. Pa. 2000)(Brody, J.)(concluding that, where each plaintiff asserted

---

[46]Although the Defendants discuss the value of the Plaintiffs' claims in relation to the second factor, the Court has traditionally considered this fact in relation to the first factor and does so here.  See, e.g., Daye v. Cmty. Fin. Serv. Centers, LLC, 313 F.R.D. at 183 ("The first factor, 'the class members interests in individually controlling the prosecution . . . of separate actions,' closely tracks the money value of the individual cases." (quoting Fed. R. Civ. P. 23(b)(3)(A)).

over $100,000.00 in damages, the potential damages counseled against a class action).  From a financial viewpoint, therefore, individuals likely have the ability to pursue this action.

51.     Second, although the nature of this litigation is such that the ninety Plaintiffs in Bell have some interest in individual control over the litigation, this factor does not counsel overall against a class action.  The Court has previously noted "rule 23(b)(3)(B)'s dictate to consider the 'nature of any litigation concerning the controversy already begun by . . . class members' requires the Court consider any other class actions that have already been certified."  Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 278 (quoting Fed. R. Civ. P. 23(b)(3)(B)).  "[T]he extent to which proposed class members . . . have already filed individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial." Zuniga v. Bernalillo Cty., 319 F.R.D. at 694.  Here, ninety Plaintiffs have already joined Bell. This joinder does not, however, indicate to the Court that individual plaintiffs will continue filing suits to pursue individual actions.  No other suits have been filed, see Motion at 39, and nothing indicates a likelihood of individual pursuits of these claims through other lawsuits.  The Plaintiffs joined this action after the Plaintiffs' counsel set out to prevent the Defendants from picking off the named Plaintiffs, and contacted all potential class members regarding Payne and Bell.  See Reply at 6-7; Tr. at 6:11-24 (Court, Moody).  According to the Plaintiffs, over two hundred potential class members remain outside the named Plaintiffs, see Tr. at 6:3-10 (Moody, Court), and the Court has little proof these individuals find pursuing their own claims worthwhile, cf. Lyon v. Caterpillar, Inc., 194 F.R.D. at 222 (noting that, where one individual filed a separate suit based on the class action claim, the separate  suit weighed against certification).  In these circumstances, the nature of pending litigation does not counsel against certification.

52.     Third, concentrating the litigation of the claims in the Court is desirable.   The Defendants do not dispute that the Court "is well-suited to adjudicating the claims at issue." Response at 47.  The litigation's claims involve events that occurred in New Mexico and apply New Mexico law.   See Second Amended Complaint ¶¶ 13-102, at 4-11; Second Amended Complaint ¶¶ 116-28, at 14-16; Second Amended Complaint ¶¶ 129-42, at 16-20.  Several deposed class members, at least, live in New Mexico.   See, e.g., Howell Depo. 220-5, at 4:8-10 (giving a current address in Santa Fe); Johnson Depo. 220-6, at 10:1-2 (stating that she currently resides in Santa Fe); Perry Depo. 220-7, at 4:7-9 (giving a current address in Rio Rancho); Daniels Depo. 220-9, at 4:8-10 (giving a current address in Santa Fe); Aguilar Depo. 220-13, at 4:10-12 (giving an address in Alto).  The parties have already sought to concentrate these claims in front of the Court by transferring Bell from Judge Gonzales.  See Transfer Motion at 1;Transfer Order at 1-2. The Court disagrees with the Defendants that a class action will not advance the effort to concentrate claims.  See Response at 47.  Ninety plaintiffs already have joined the potential class. Moreover, the Court can more efficiently navigate a class action procedure than the hypothetical joinder of over 200  additional plaintiffs, and the court system can more efficiently handle one class action than over 200  individual lawsuits.  Contra Response at 47 (asserting that "class certification is not necessary or superior to what has worked to date").

53.     Fourth, given that only uncommon or individualized inquiries remain, a class action will not be more manageable than another procedure.  Common issues do not remain such that a class action will add value by offering an efficient resolution of joint issues.  Whether the Court proceeds through a class action or the proposed class members proceed through individual lawsuits, the Court's and/or other courts' time and efforts will be devoted to sorting through the

class members to determine to whom the NMMWA applies, and working with the parties to address individual statute of limitations concerns and damages evaluations.[47]  Cf. Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184 (noting that the predominance analysis strongly influences the superiority analysis); Zimmerman v. Bell, 800 F.2d 386, 390 (4th Cir. 1986)("The possibility of such individualized determinations would impose an excessive managerial burden upon the district court.").[48]  In such circumstances, the Court sees

---

[47]As the Defendants raise no objection to the Plaintiffs' estimate that around 300 people are in the proposed class, the Court accepts the estimate as a rough estimation of the proposed class' size.  See Motion at 17.

[48]Once the Court determines what law governs the NMMWA exemption issue -- a primary duty test, or a new, foremen, superintendent, or supervisor test, see Motion at 32; Response at 15; Tr. at 80:23-81:22 (Lowry), the Court will have a better idea how individualized the inquiries for the NMMWA exemption will be.  Under a primary duty test, the Court must determine whether the clinical base managers and the lead pilots satisfy the following requirements:

(1)     their primary duty is to perform non-manual work related to management of the business;

(2)     they are to exercise discretion;

(3)     they regularly assist executives or perform specialized work or special assignments; and

(4)     they perform less than twenty percent manual work

N.M. Admin. Code 11.1.4.  The evidence here suggests that the clinical base managers and the lead pilots took on the clinical base manager and the lead pilot duties as additions to their flight nurse, flight paramedic, or pilot duties, and likely uniformly did not perform less than twenty percent manual work.  See Blake Decl. ¶ 9, at 2 (stating that clinical base managers had supervisory duties in addition to the duties of flight nurses and flight paramedics); Mori Depo. 223-2 at 17:11-13 (describing that lead pilots continued to perform pilot duties, like flying helicopters and carrying patients); Perry Depo. at 51:18-60:23 (stating that, as a clinical base manager, he participated along with other employees in safety and quality control processes, checking the equipment, checking supplies, tracking business development, such as which hospital had called Tri-State CareFlight, maintaining his education on events and news in Tri-State CareFlight's field, reporting any injuries that occurred within the workplace, and upholding the safety culture); Maplesden Depo. Doc. 220-

little advantage to certifying a class.  Class certification only will add individuals with regard to whom the Court will resolve independent issues.

**2.  The Plaintiffs Satisfy Predominance for the Unjust Enrichment Class to the Extent That Their Claim Rests on the Legality of the Fourteen-Hour Duty Day.**

54.     The unjust enrichment class satisfies predominance to the extent that the Plaintiffs argue the fourteen-hour duty days' illegality, but not to the extent that the Plaintiffs argue that the pilots' duty day was twelve hours based on the Defendants' representations and the pilots' beliefs. First, to the extent that the Plaintiffs aver that the Defendants contemplated a duty day of twelve hours, as discussed, <u>supra</u>, individualized issues arise, and each Plaintiff will have an interest in pursuing those issues independently such that the claims' resolutions reflect the Plaintiffs' individual circumstances.  <u>Cf.</u> <u>Mendez v. U.S. Nonwovens Corp.</u>, 312 F.R.D. at 100-01 (finding

---

15 at 58:18-59:8 (stating that he spent around ten to fifteen percent of his time on lead pilot duties while on shift and around four hours while off shift on such tasks).  A new, foremen, superintendent, or supervisor exemption would require more individualized inquiries, given the deviation in the clinical base managers' and the lead pilots' testimony about their leadership roles.  <u>See</u> Mori Depo. at 223-2 at 17:21-18:1 (stating that, as a lead pilot, he "made sure that all the pilots [were] happy," made sure shifts were filled, and ensured that the base was functional for continuous operations); <u>id.</u> at 18:3-7 (describing that, as a lead pilot, he handled complaints, explained procedures, and completed some necessary paperwork); Aguilar Depo. Doc. 220-13, at 16:2-12 (describing that, as a clinical base manager, he performed scheduling and clinical resources, such that he answered new clinical staff's questions, provided direction with policies and protocols for patient care or equipment issues, and helped ensure that the employees upkept their education requirements); Perry Depo. at 220-7, at 49:7-17 (stating that he did not create "policies, practices and procedures at Tri-State CareFlight," and that he only enforced those policies, practices and procedures against himself); <u>id.</u> at 49:18-50:3 (stating that, as a clinical base manager, he did not have the ability to discipline, to recommend for discipline an employee, or to hire or to fire an employee); Maplesden Depo. Doc. 220-15 at 57:23-58:1 (stating that scheduling was a lead pilots' primary task); <u>id.</u> at 22:20-23:5 (stating that, as a lead pilot, he addressed issues between pilots, and the flight nurses and the flight paramedics, and "performance issues or personality conflict").

that, where the court would have to "engage in individualized inquiries" relating to the "central question driving . . . [the] causes of action", the class fails the predominance analysis); Ruggles v. WellPoint, Inc., 272 F.R.D. at 334-42 (finding that the individualized inquiries necessary to classify class members predominates common questions regarding procedures)

55.     To the extent that the Plaintiffs argue that the Defendants could not have shifts of twelve hours and have a duty day of fourteen hours, no individual issues arise such that the proposed class members have an interest in individually litigating any issues.  The class shares an interest in that issue's litigation.  That twenty-eight of the 138 pilots have joined Bell does not persuade the Court against class certification.  Of the pilots, 118 did not conclude that joining the lawsuit in an individual stance was worthwhile, and, of the twenty-eight who joined the lawsuit, the Court cannot say whether they joined because they wanted to pursue individually their claims or whether they understood that they could take a backseat to litigation that involves designated class representatives.  Moreover, the Court cannot determine the value of the unjust enrichment claims.  For Heard and Olhdam, the Final Judgment does not differentiate between the offer assigned to the NMMWA claim and the offer assigned to the unjust enrichment claim.  Given that Bastian, Welch, and Fernandez-Quezada recovered tens of thousands on the NMMWA claim, the Court suspects that Oldham's $52,620.43 and Heard's $13,738.47 likewise include high NMMWA claim amounts.  Moreover, the attorney's fees and costs argument applies only to the NMMWA claim.  See Response at 46.  That the unjust enrichment claim may have a small value counsels class certification.  See Zuniga v. Bernalillo Cty., 319 F.R.D. at 694 (discussing individual cases' negative value as weighing in favor of a class action); Abraham v. WPX Prod. Prods., LLC, 317 F.R.D. at 278 (same); Daye v. Cmty. Fin. Serv. Centers, LLC, 313 F.R.D. at 183.

56.     The Court's analyses of the second and third superiority considerations largely overlap with the analyses in the preceding section.  As the Court discussed, supra, the nature of this litigation indicates that some pilots have an interest in an individual role in the litigation, but the factor does not counsel against class certification.  These lawsuits -- Payne and Bell -- appear as the driving motivator for the individual interest in the claims against Tri-State CareFlight.  The twenty-eight pilots here responded to the counsels' notices about the case.  See Reply at 6-7; Tr. at 6:11-24 (Court, Moody).  One hundred and eighteen pilots remain outside this case, and no individuals have filed lawsuits outside Payne and Bell.  In these circumstances, the litigation's nature does not counsel against certification.  The Court and the parties agree that the Court provides a desirable location to pursue this litigation.  See Motion at 39; Response at 47.  The Court views a class action as a desirable means of consolidating the remaining 118 pilots' claims with the twenty-eight pilots' claims before the Court.  The joinder of 118 additional pilots is less desirable than using a class action to concentrate the claims in the Court, and resolving all the pilots' claims in this litigation will prevent the use of other courts' resources on these issues. Contra Response at 47 (asserting that "class certification is not necessary or superior to what has worked to date").

57.     Fourth, whether the Court proceeds with twenty-eight Plaintiffs or with four designated class representatives, the proposed unjust enrichment class is manageable only to the extent that the Plaintiffs argue that the Defendants could not have shifts of twelve hours and have a duty day of fourteen hours.  To the extent that the Plaintiffs aver that the Defendants actually contemplated a duty day of twelve hours, individualized issues predominate.   Handling individualized analyses for a class action regardless of how the Court approaches the class

representatives will require separate inquiries for all 138 pilots.  Twenty-eight such inquiries in this lawsuit and the possibility of future individual lawsuits is more manageable and superior to 138 such analyses in one case.  Cf. Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184 (stating that the trial court's obligation to "evaluate significant quantities of individualized extrinsic evidence" partly rendered the class unmanageable); Zimmerman v. Bell, 800 F.2d at 390 ("[t]he possibility of such individualized determinations [regarding individualized reliance] would impose an excessive managerial burden upon the district court").  On the other hand, regardless whether the case involves twenty-eight or four class representatives, the Court can decide the question whether the fourteen-hour duty day is legal with the twelve-hour shift without encountering large manageability questions.  The evidence reflects and Tri-State CareFlight admits that the pilots generally had twelve-hour shifts, see, e.g., Tri-State Depo. at 24:2-21 (stating that pilots work twelve-hour shifts with seven days on and seven days off); id. at 45:1-23 (stating that pilots are paid overtime only for additional twelve-hour shifts and not for time worked over forty hours), so the question as the Plaintiffs' frame it in the Motion may even be resolved on a summary judgment motion, see Motion at 21.  To the extent that the Plaintiffs argue that the Defendants could not have shifts of twelve hours and have a duty day of fourteen hours, the proposed unjust enrichment class is, therefore, superior to procedures other than a class action.

## III.   THE COURT WILL PROCEED WITH FOUR DESIGNATED CLASS REPRESENTATIVES FOR THE UNJUST ENRICHMENT CLASS.

58.    The Court treats the Plaintiffs' proposal to use designated class representatives as a procedural question apart from the rule 23 analysis.  The Court will adopt the procedure.  The

Court concludes that, given that the Plaintiffs adopted the ninety-Plaintiff approach to avoid the Defendants' litigation tactics, permitting the designated class representatives procedure is proper.

59.     As an initial matter, the Court understands that the Defendants do not agree to the Plaintiffs' proposed designated class representative procedure.  Although the Defendants did not, as the Plaintiffs suggest, "disavow[] the proposed Rule 23 plan, file[] exceptions to the [Joint Status Report], voice[] their disapproval at the Rule 16 conference and/or file[] a motion objecting to the plan," Reply at 6, the Defendants object in the Joint Status Report to the procedure and state:

> On its face, a lawsuit with sixty-seven (or more) named plaintiffs is not properly a class action under the law . . . There is no legal basis to designate a subset of plaintiffs to represent other named plaintiffs already parties to the lawsuit, who can and must represent their own interests in litigation.

Joint Status Report at 3-4.

60.     The Court understands that the Plaintiffs chose to join ninety Plaintiffs in an attempt to stop the Defendants from picking off the named Plaintiffs.  See Reply at 5-6.  The Court recognizes the concerns with rule 68 offers and is sympathetic with the problems that the rule poses for class actions.  See, e.g., Smith v. NCO Fin. Sys., Inc., 257 F.R.D. 429, 434-35 (E.D. Pa. 2009)(Rufe, J.)("Rule 68 was not meant to test the strength of a plaintiff's motion for class certification. . . . [I]f Plaintiff were to consider Defendants' amended offer of judgment, the determinative factor will be whether she believes the Court will certify a class action, not . . . the merits of her claims."); Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, A. Benjamin Spencer, Adam N. Steinman, 12 Federal Practice and Procedure Civil § 3001.1 (3d ed. 2018)("[T]he potential coercive impact of the rule on the class representative could create a conflict of interest for [the named plaintiff] since possible personal responsibility for defendant's costs for a full class action may be far out of proportion to the class representative's stake in a

possible individual recovery." (footnotes omitted)); O. Randolph Bragg, Ohio Consumer Law § 5:31 (2018)(expressing concerns that rule 68 offers will force premature class certification motions). The Plaintiffs could not have intended to proceed in a class action with all ninety Plaintiffs or even with the twenty-eight Plaintiffs in the unjust enrichment class. Pursuing a class action with ninety or with twenty-eight Plaintiffs impedes class actions' manageability and efficiency benefits. Ninety plaintiffs could satisfy the numerosity requirement without any additional class members. The Third Circuit has, for instance, stated that forty is a general threshold for numerosity. See Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 486 (3d Cir. 2018). Even handling a trial with the twenty-eight pilots will likely inconvenience the Court and the parties.

61.     Like the Defendants, the Court has not located authority supporting the Plaintiffs' position, and the Court has some concerns about this procedure. Under rule 23, the class members who sue are the representative parties. See Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members"). The named plaintiffs are the instrument by which a court measures an action. Their standing determines the class' standing, see, e.g., Sosna v. Iowa, 419 U.S. 393, 402-03 (1975)(stating that a named plaintiff must meet the standing requirements and be a member of the class at the time of certification for standing); Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 364 (3d Cir. 2015)("Named plaintiffs are the individuals who seek to invoke the court's jurisdiction and they are held accountable for satisfying jurisdiction."); their claims determine the class' claims, see Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. at 156 (stating that rule 23 limits the class claims to those encompassed within the named plaintiffs' claims); they bring suit for the class, see Neale v. Volvo Cars of N. Am., LLC, 794 F.3d

at 366 (stating that rule 23 allows named plaintiffs to bring suit for the class); and they prosecute the action for the class and the merits of their claims result in the judgment, see Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88 (asking if the named Plaintiffs adequately represent the class); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)(same).  A party that joins a class action as a named plaintiff has an ability to participate in the class as a plaintiff, and these named Plaintiffs joined Bell in a named capacity that would traditionally give them this status and control over their litigation.

62.     These concerns do not, however, persuade the Court not to adopt the designated class representative procedure.  Such a procedure will make the case more manageable, and save the Court and the parties time and energy.  The Court certifies the unjust enrichment class as a rule 23(b)(3) class, so, unless the non-designated class representative Plaintiffs opt-out of the class, the designated class representatives will represent them and their claims will proceed.  See Amchem Prod., Inc. v. Windsor, 521 U.S. at 615 (describing rule 23(b)(3) class actions as opt-out class actions).  Moreover, the non-designated class representative Plaintiffs will remain named Plaintiffs in this case, because they have individual NMMWA claims for which the Court does not certify a class.  Accordingly, Daniels, Mahaim, Zulaski, and Bundrant will serve as designated class representatives for the unjust enrichment class.

## IV.   THE COURT CERTIFIES ONLY THE PROPOSED UNJUST ENRICHMENT CLAIMS TO THE EXTENT THAT THAT THE PLAINTIFFS ARGUE THAT THE DEFENDANTS COULD NOT HAVE LEGAL SHIFTS OF FOURTEEN-HOUR DUTY DAYS.

63.     In conclusion, the Court does not certify the proposed NMMWA class.  The Court certifies the proposed unjust enrichment class for the period from June 19, 2009, through January 19, 2016, to the extent that the Plaintiffs argue the legality of the fourteen-hour duty day.  Daniels,

Mahaim, Zulaski, and Bundrant will serve as designated class representatives for this class.  As the Defendants do not dispute Moody & Stanford, P.C.'s adequacy as class counsel, <u>see</u> Response at 36, and the Court agrees that the firm is adequate, and competent, and a very good leader of employment firms, the Court appoints the firm class counsel.  The unjust enrichment class Plaintiffs will prepare a notice that reflects the certified class to be sent to all class members.

**IT IS ORDERED** that: (i) the requests in the Plaintiffs' Motion for Class Certification & Supporting Memorandum, filed November 6, 2018 (Doc. 220), is granted in part and denied in part; (ii) the Court does not certify the proposed class for the New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-19 to 50-4-30, claim; (iii) the Court certifies a class for the unjust enrichment claim for the period of June 19, 2009, through January 19, 2016 to the extent that the Plaintiffs argue the legality of the fourteen-hour duty day, and with Moody & Stanford, P.C. as class counsel; and (iv) the unjust enrichment class Plaintiffs will prepare a notice that reflects the certified class to be sent to all the class members.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Christopher M. Moody
Repps D. Stanford
Alice Kilborn
Moody & Stanford, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs and Intervenors*

Charles J. Vigil
Melanie B. Stambaugh
Jeffrey L. Lowry
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

   *Attorneys for the Defendants*